IN THE
SOUTHERN DISTRICT OF INDIANA

UNITED STATES OF AMERICA

                                    Plaintiff

v.                                                          W-09-CV-009

                                                            W-01-CR-164
SHERMAN LAMONT FIELDS,

                                    Defendant

FILED
OCT 16 2014
U.S. CLERK'S OFFICE
INDIANAPOLIS, INDIANA

2:14-cv-0315 WTL-WGH

DEFENDANT-APPELLANT
SHERMAN LAMONT FIELDS' MOTION PURSUANT TO RULE 60(b)(3),
RULE 60(b)(6) & RULE 60 (d)(3). RULE 20 AND/OR 28 U.S.C
2241(c)(3)

THIS IS A CAPITAL CASE
(DEATH PENALTY)

SHERMAN LAMONT FIELDS
#15651-180
USP Terre Haute
P.O. Box 33
Terre Haute, Indiana
                    47808
                    (Pro Se)

## CERTIFICATE OF INTERESTED PERSONS

I, Sherman Lamont Fields, acting Pro Se certifies that the following listed persons and entities have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

1. APPELLEE: United States of America

2. APPELLEE'S ATTORNEY: Jennifer Sheffield Freel, United States Attorney, Western District of Texas, 816 Congress Avenue, Suite 1000, Austin, TX 78701

3. APPELLEE'S ATTORNEY: Joseph H. Gay, Jr., United States Attorney, Western District of Texas, 601 N.W. Loop 410, Suite 600, San Antonio, TX 78216

4. APPELLANT: Sherman Lamont Fields, #15651-180, United States Penitentiary, P.O. Box 33, Terre Haute, Indiana 47808

Sherman Lamont Fields
(Pro Se)

I

## QUESTION(S) PRESENTED

### ( CAPITAL CASE/ DEATH PENALTY )

1). Do the holding in Faretta v. California, 422 U.S. 806, 835, 45 L.Ed. 2d 562, 95 S.Ct. 2525 (1975) that states that a pro se defendant cannot complain about the adequacy of his representation, outweigh the Constitutional provisions in Furman v. Georgia, (1972) 408 US 238, 33 L.Ed 2d 346, 92 S.Ct. 2726, and the ban on Cruel and Unusual punishment when evidence that the defendant neglected to present, failed to present, and/or didn't know how to present proves that:

(a). The governments case is wholly fabricated;

(b). The government defrauded the Grand jury, the petit jury, the District Court and the appeals court(s)

(c). The government solicited the defendsant's murder via lethal injection by "seeking jailhouse testimony" and "hiring" inmates to lie and fabricate evidence;

(d). The government's witnesses engaged in a criminal conspiracy to fabricate false evidence;

(e). The government willfully and knowingly Aided and Abetted the conspiracy;

(f). The government totally ignored evidence that proves that it was more than likely the victim was killed by their Star witness;

(g). Forensics evidence proves that testimony presented to the jury is false;

(h). The government willfully and repeatedly, with malice aforethought procured law enforcement officer's to lie and manipulate and defraud the jury;

(i). Witnesses testimony isn't consistent with the forensics tests;

(j). The government withheld exculpatory and impeachment evidence in violation of Brady v. Maryland;

(k). The District Judge was bias;

(l). Racism and Fraud on the Court led to the appeals Court Unreasonable determination of fact;

(m). The introduction of "false facts" precluded the introduction of "true facts";

(n). The jury heard a corrupted body of evidence;

(o). Fields is Actually and Factually innocent.


2). Do RULE 20 provide an avenue through this Court that allows for access to Court when (a). The defendant wish to file (Pro Se) meritorious issues that counsel for defendant either neglected to file or forgot to file, when the defendant

QUESTIONS ( CONT'D )

have protected his right to file these issue(s) by notifying the Court(s) " every step of the way ", yet the District Court and the 5th Circuit court of appeals both deny defendant access to their Court? And (b). Because of the nature and complexity of the case adequate relief cannot be obtained in any other form or forum?

3). Can the Court(s) deny the defendant access to file a Pro Se Actual Innocence brief, and then deny the defendant C.O.A. on the merits and claim that the defendant didn't assert issues that he clearly asserted in the brief that they refused to entertain?

4). When a defendant have maintained his innocence throughout the judicial process and have never wavered and he can make a colorable showing of innocence at any stage of the process moving forward can the Court(s) deny access to Court?

5). When the prosecution align themselves with a criminal venture and commit multiple criminal act(s) in the process can the Court(s) deny a defendant access to Court(s) to provide proof?

6). When a Court of Appeals deny a defendant based on an unreasonable determination of the facts, can the Court deny deny further access to prove that justification for denial was unreasonable?

7). When the prosecution "clearly" used false evidence to obtain a conviction can the Court(s) deny access to prove that the evidence is indeed false?

8). When the Fraud On the Court "trickle up" to Higher court(s) and the defendant can prove that it is indeed "Fraud" does it mean that the Supreme Court's denial of cert. makes the Supreme Court a victim of the Fraud?

9). When the prosecution withhold evidence central to a defendant's innocence can the Court(s) deny access to prove that the withheld evidence is favorable and material to the defense?

10). When the prosecution procure witnesses to lie and they testify to material facts " outside of the statements " presented to the defense on discovery, things that the defense couldn't have known that they would say, then post trial when the defense get the evidence contradicting, impeaching and proving that the testimony is false can the Court(s) deny access to Court(s)?

11). Can the Court(s) refuse to accept a pro se Freestanding Actual Innocence brief when the defendant has meritorious issues and "strenuously objects" to the brief that appellate counsel file?

III

## TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  I

QUESTION(S) PRESENTED  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  II, III

TABLE OF CONTENTS  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  IV

TABLE OF AUTHORITIES  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  V, VI, VII, VIII

JURISDICTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  IX

CONSTITUTIONAL AND STATUTORY PROVISIONS INVOLVED  . . . . . . . . . . . . . . . . . . . . .  X

PRELIMINARY STATEMENT  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

BACKGROUND  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2, 3, 4

BRADY VIOLATION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  5-13

THE KNOWING USE OF FALSE TESTIMONY  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  13

FRAUD ON THE COURT  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  13-22

ACTUAL INNOCENCE  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  22-23

CONSPIRACY  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  23-24

SOLICITATION OF MURDER  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  24-26

UNREASONABLE DETERMINATION OF THE FACTS  . . . . . . . . . . . . . . . . . . . . . . . . . . .  27-32

ABUSE OF DISCRETION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  33-36

CIVIL RIGHTS VIOLATIONS  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  37-41

RULE 20  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  42-43

CONCLUSION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  44-47

TABLE OF AUTHORITIES CITED

| CASES | PAGE NUMBER |
|---|---|
| Abu-Ali Abdur'Rahman v. Ricky Bell, 154 LED 2d 501, 537 U.S. 88........ | 1 |
| Adams v. United States ex rel. McCann, 317 US 269, 87 L.Ed 268, 63 S.Ct. 236 (1942)....................... | 37 |
| Aetna Life Ins. Co. v. Lavoie, 475 U.S. 813, 825 (1986)................. | 33 |
| Alderman v. Zant, 22 F.3d 1541, 1553-1554 (11th Cir. 1994), cert. denied, __U.S.__, 130 S.Ct. 673, 130 L.Ed 2d 606 (1995)....... | 46 |
| Anders v. California, 386 US 738, 18 L.Ed 2d 493, 87 S.Ct. 1369 (1967).. | 37 |
| Andrade v. Chojnacki, 338 F.3d 448 (July 14, 2003)..................... | 33 |
| Bank of Nova Scotia v. U.S., 487 U.S. 250, 108 S.Ct. 2369,101 L.Ed. 2d 228 (1988)................................ | 47 |
| Barefoot v. Estelle, 463 U.S. 880, 893, 103 S.Ct. 3383, 3394, 77 L.Ed 2d 1090 (1983)........................................ | 22 |
| Beets, 767 S.W. 2d at 734. "180 F.3d 190:: Beets v. Johnson, June 28, 1999 (5th Cir.)......................................... | 25 |
| Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.ED 2d 215 (1963).... | 6, 46 |
| Bracy v. Gramley, 520 U.S. 899, 904-05 (1997)........................... | 33 |
| Cambell v. Blodgett, 940 F.2d 549 (CA9 1991)........................... | 38 |
| Chamberlain v. Ericksen, 744 F.2d 628, 630 (CA8 1984)................... | 38 |
| Chambers v. NASCO, Inc., 501 U.S. 32, 44, 115 L.Ed 2d 27, 111 S.Ct. 2123 (1991)............................................ | 47 |
| Chicago Tribune Co. v. Bridgestone Firestone Inc., 263 F.3d 1304, 1309 (11th Cir. 2001)..... | 34 |
| Commonwealth v. Rogers, 537 Pa 581, 583, 645 A2d 223, 224 (1994)........ | 38 |
| Curran v. Delaware, 259 F.2d 707, 712-713 (3d Cir. 1958)............... | 21 |
| Duest v. Singletary, 967 F.2d 472, 482 (11th Cir. 1992) vacated on other grounds, 507 U.S. 113 S.Ct. 1940, 123 L.ED 2d 647 (1993)............................................. | 23 |
| Eddings v. Oklahoma, 455 U.S. 104, 118 (1982)......................... | 23 |
| Fields at ( 483 F.3d 313 )............................................. | 27, 28 |
| Ford v. Wainwright, 477 U.S. 399, 411 (1986)........................... | 23 |
| Frederick v. Kirby Tankships Inc., 205 F.3d at 1287 (11th Cir. 2000).... | 22 |
| Furman v. Georgia, (1972) 408 US 238, 33 L.Ed 2d 346, 92 S.Ct. 2726..... | 43, 45 |
| Gardens v. Stephens, Sup. Ct. #13-546 (2013) cert. pending, (5th Cir. 2013) | 23 |
| Garrison v. Louisiana, 379 U.S. 64, 75, 85 S.Ct. 209, 13 L.Ed 2d 125(1964) | 44 |
| Garza v. Lappin, 253 F.3d 918, 921 (7th Cir. 2001)..................... | 42 |
| Giglio v. U.S., 405, 150, 92 S.Ct. 763, 766, 31 L.Ed 2d 104 (1972)....... | 13, 41 |
| Graham v. Florida, (2010; US) 176 L.Ed 2d 825, 130 S.Ct. 2011............ | 45 |
| Gregg v. Georgia, 428 U.S. 153, 187 (1976)............................. | 23, 43 |
| Hazel-Atlas Glass Co. v. Hartford-Empire Co., 322 U.S. 238, 88 L.Ed 1250, 64 S.Ct. 997 (1944)........ | 47 |
| Herrera v. Collins, 506 U.S. 390, 404, 113 S.Ct. 853, 122 L.ED 2d 203(1993) | 25 |

**CASES**                                                                                           **PAGE NUMBER**

In Re: Davis, No. CV 409-130 (8/24/10)..................................................

Kuhlman v. Wilson, 477 U.S. at 454 & n. 17, 106 S.Ct. at 2627 & n.17...... 22

Kyles v. Whitley, 514 U.S. 419, 435, 131 L.Ed 2d 490, 115 S.Ct. 1555(1995)   13, 21, 31

Langford v. Rite Aid of Ala., Inc., 231 F.3d 1308, 1312 (11th Cir. 2000).. 22, 39

Liljeberg v. Health Servs. Acq. Corp., 486 U.S. 847, 860 (1998)........... 35

Maxwell v. Roe, 9th Cir., 628 F.3d 486, 88 CrL 293........................

Martinez, 145 L.ED 2d 597 U.S. 152...................................... 38

McLamore v. South Carolina, (1972)-US-, 34 L.Ed 2d 189, 93 S.Ct. 240...... 45

McNabb v. U.S., 318 U.S. 332, 347, 87 L.Ed 819, 63 S.Ct. 608.............. 21

Murchison, 349 U.S. 133, 136 (1955)...................................... 33

Myers v. Collins, 8F.3d 249, 252 (CA5 1993)............................... 38

Napue v. Illinois, 360 U.S. 264, 269, 3L.Ed 2d 1217, 79 S.Ct. 1173 (1959).   13, 40

Neder v. U.S., 527 U.S.1, 25, 119 S.Ct. 1827, 1841, 144 L.Ed 2d 35 (1999))   22, 39

People v. Wende, 25 Cal 3d 436, 440, 600 P2d 1071 (1979)................. 37

Pfizer Inc. v. Int'L Rectifier Corp., 538 F.2d 180, 195 (8th Cir. 1976), cert
denied, 429 U.S. 1040, 97 S.Ct. 738, 50
L.Ed 2d 751 (1977)..................... 22

Price v. Johnson, 334 U.S. 266, 68 S.Ct. 1049, 92 L.Ed 1356 (1948)......... 38

Pyle v. Kansas, 317 U.S. 213, 87 L.Ed 214, 63 S.Ct. 177 (1942)............. 21

Rozier v. Ford Motor Co., 573 F.2d 1332, 1338 (5th Cir. 1978).............. 22

Sawyer v. Collins, 986 F.2d 1493, 1497 (5th Cir. 1993)..................... 22

Sawyer v. Whitley, 505 US 333, 120 L.Ed 2d 269, 112 S.Ct. 2514 (1992)....... 47

Schlup v. Delo, 513 U.S. 298, 314-16, 130 L.Ed 2d 808, 115 S.Ct. 851 (1995).  22

Scutieri v. Paige, 808 F. 2d at 794 (11th Cir. 1987)....................... 22

Smith v. Black, 904 F.2d 950, 967 (5th Cir. 1990), vacated, 503 U.S. 930, 112
S.Ct. 1463, 117 L.Ed 2d 609 (1992)............................. 12

Smith v. Kemp, 715 F.2d 1459, 1463 (11th Cir.), cert. denied, 464 U.S. 1003,
104 S.Ct. 510, 78 L.Ed 2d 699 (1985)............................ 31, 40

State v. Van Pelt, 305 Ark. 125, 127 810 SW 2d 27, 28 (1991)............... 38

Stringer v. Black, 503 U.S. 222, 112 S.Ct. 1130, 117 L.Ed 2d 367 (1992)...... 12

U.S. v. Agurs, 472 U.S. 97, 103, 49 L.Ed 2d 342, 96 S.Ct. 2392 (1976)........ 45

U.S. v. Auten, 632 F.2d 478, 481 (5th Cir. 1980))......................... 6

U.S. v. Bagley, 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed 2d 481 (1985).......... 6

U.S. v. Bell, 577 F.2d 1313, 1315 n.2 (5th Cir. 1978), cert. denied, 440 U.S.
946, 99 S.Ct. 1422, 59 L.Ed 2d 634 (1979)....................... 24

U.S. v. Blackthorne, 378 F.3d 449, 454 (5th Cir. 2004)..................... 25

U.S. v. Cardwell, 433 F.3d 378, 390, 91 (4th Cir. 2005).................... 24

U.S. v. Chiavola, 744 F.2d 1271, 1274 (7th Cir. 1984)...................... 21

U.S. v. Como, 53 F.3d 87, 90 (5th Cir. 1995)............................. 6

U.S. v. Couch, 896 F.2d 78, 82 (5th Cir. 1990)............................ 33

CASES                                                                   PAGE NUMBER

U.S. v. Dunnigan, 507 U.S. 87, 94, 113 S.Ct. 1111, 1116, 122 L.Ed 2d 445
                (1993)...................................................    21, 24

U.S. v. Fields, 483 F.3d 313 (2007), cert. denied, 552 U.S. 1144........    3

U.S. v. Harlow, 444 F.3d 1255 (10th Cir. 2006)..........................    34

U.S. v. Hasson, 333 F.3d at 1270-71.....................................    22, 39

U.S. v. Jordan, 49 F.3d 152, 155 (5th Cir. 1995)........................    35

U.S. v. Lanford, 838 F.2d 1351, 1355 (5th Cir. 1988)....................    6

U.S. v. Meros, 866 F.2d 1304, 1308 (11th Cir.) (Per (63 F.3d 1015) curiam),
                cert. denied, 493 U.S. 932, 110 S.Ct. 322, 107 L.Ed 2d 312
                (1989)..................................................    47

U.S. v. Moore, 525 F.3d 1033 (11th Cir. 2008)...........................    23

U.S. v. Percel, 553 F.3d 903 ( Dec. 23, 2008 )..........................    23

U.S. v. Razo-Leora, 961 F.2d 1140, 1148 n.6 (5th Cir. 1992).............    24

U.S. v. Roger LaPage, 23, F.3d 488 (2000)...............................    45

U.S. v. Spagnoulo, 960 F.2d 990, 994 (11th Cir. 1992)...................    47

U.S. v. Sutherland, 463 F.2d 641, 645 (5th Cir.), cert. denied, *1569409
                U.S. 1078, 93 S.Ct. 698, 34 L.Ed 2d 668 (1972).......    24

U.S. v. Walters, 351 F. 3d 159, 169 (5th Cir. 2003).....................    6

Walberg v. Israel, 766 F.2d 1071, 1078 (7th Cir.) (Posner J.), cert. denied,
                474 U.S. 1031 (1985)...................................    47

Webb v. State, 533 SW 2d 780, 784 (Tex. Crim. App. 1976)................    38

Webb v. State, 274 Ind. 540, 542, 412 NE 2d 790 (1980).................    38

Wedra v. Thomas, 671 F.2d 713, 717 n.1 (2d 1982).......................    21

Wiggins, 539 U.S. at 520-21............................................    32

Williams v. Griswald, 743 F.2d 1533, 1541 (11th Cir. 1984)..............    13, 41

Williams v. Taylor, 529 U.S. 362, 409, 120 S.Ct. 1495, 146 L.Ed 2d 389 (2000)    32

Woodson v. North Carolina, 428 U.S. 280, 305 (1976)....................    23

Faretta v. California, 422 U.S. 806, 835, 45 L.Ed. 2d 562, 95 S.Ct. 2525(1975)    42

Ring v. Arizona, 536 U.S. 584, 614, 122 S.Ct. 2428, 153 L.Ed. 2d 556 (2002)    43

VII

## STATUTES AND RULES

18 U.S.C.S. 4 ............................................... 36

18 U.S.C.S. 371 ........................................... 5, 24

18 U.S.C.S. 373(a) ...................................... 5, 24, 25

18 U.S.C.S. 1621 (3 Cl.1) ................................. 24

18 U.S.C.S. 1622 .......................................... 24

18 U.S.C.S. 1623(a) ....................................... 14

28 U.S.C.S. 455 ......................................... 33, 35

28 U.S.C.S. 1651(a) ......................................... X

28 U.S.C.S. 2241(c)(3) .................................... IX

RULE 60 (b)(3), (b)(6) & (d)(3) ...................... X, 1, 4

RULE 20 ......................................... IX, X, 42, 43

## OTHER

Amendment V ................................................ X

Amendment VIII ............................................ X

Amendment XIV ............................................. X

U.S. Const. Art. III § 1 .................................. 47

## JURISDICTION

( CAPITAL CASE / DEATH PENALTY )

The jurisdiction of this Court is invoked under 28 U.S.C. 2241(c)(3) and Garza v. Lappin, 253 F.3d 918, 921 (7th Cir. 2001) ( finding that, even when 2241 is being used to challenge the sentence, the action must be brought in the district of the prison ); And RULE 20 ( showing by clear and convincing evidence that this petition will be in aid of the Court's appellate jurisdiction, that exceptional circumstances warrant the exercise of the Court's discretionary powers, and that adequate relief cannot be obtained in any other form or from any other Court.)

IX

## CONSTITUTIONAL PROVISIONS

### AMENDMENT V

The pertinent part of the Fifth Amendment pertaining to this case states, in part, that " No person shall be deprived of Life, Liberty, or property without due process of law."

### AMENDMENT VIII

The pertinent part of the Eighth Amendment pertaining to this case states that " Excessive bail shall not be required, nor excessive fines imposed, nor Cruel and Unusual punishment inflicted."

### AMENDMENT XIV

The pertinent part of the Fourteenth Amendment pertaining to this case states, in part, that " No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; Nor shall any State deprive any person of Life, Liberty, or property without due process of law; Nor deny to any person within its jurisdiction the equal protection of the law.

## RULES

### RULE 20

Issuance by the Court of an extraordinary writ authorized by 28 U.S.C. 1651(a) is not a matter of right, but of discretion sparingly exercised. To justify the granting of any such writ, the petition must show that the writ will be in aid of the Court's appellate jurisdiction, that exceptional circumstances warrant the exercise of the Court's discretionary powers, and that adequate relief cannot be obtained in any other for or from any other court.

### RULE 60

(b)(3): On Motion and just terms, the Court may relieve a party of its legal representative from a final judgment, order, or proceeding for the following reasons: FRAUD ( whether previously called intrinsic or extrinsic ), misrepresentation or misconduct by an opposing party;

(b)(6): Any other reason that justifies relief;

(d)(3): This Rule does not limit a Court's power to: set aside a judgment for Fraud On The Court.

X

Defendant-Appellant SHERMAN LAMONT FIELDS, by and through this Pro Se Motion hereby moves to petition the Court to set-aside his judgement pursuant to Rule 60 (b)(3) Fraud On the Court, the Fifth Amendment to the U.S. Constitution, the Eighth Amendment to the United States Constitution, and the Fourteenth Amendment to the United States Constitution.

## PRELIMINARY STATEMENT

Defendant-Appellant Sherman Lamont Fields ("Fields") brings this Motion to set-aside his judgement based on facts set forth in this Rule 60 Motion; the facts herein are supported by the accompanying Appendix. The allegations in this Complaint/Motion, if true, would be a miscarriage of justice if this Court turned a "Blind Eye" to such abuse of the judicial process;See  Abu-Ali Abdur'Rahman v. Ricky Bell, 154 LED 2d 501, 537  U.S. 88.

In this Motion Fields allege that the prosecution and the District Judge engaged in a criminal conspiracy, solicited his murder via lethal injection; Aided and Abetted a criminal conspiracy, fabricated evidence, withheld evidence, and they did it all while Committing Fraud On the Court(s). The evidence herein this Motion/Complaint shows that it was an unconscionable scheme and/or plan that was designed to improperly influence the Court(s) in their decision and it led to the indictment of an innocent man, the conviction of an innocent man, and the impending demise of an innocent man.

The Complaint's allegations, substantiated by tangible documents and forensics shows that there was indeed a deliberate, knowing, intentional and willful (effort), calculated to Commit Fraud On the Court(s).

1

BACKGROUND

In 1989 when Sherman Lamont Fields was fifteen years old he met and started dating April Corelle Vasquez. Ms. Vasquez, whom was eighteen at the time had a boyfriend named Derrick Bradshaw whom was also eighteen, Mr. Bradshaw couldn't accept the fact that he lost his girlfriend to this "boy" and one night as Fields and Ms. Vasquez walked home from the store Mr. Bradshaw pulled up in his car, stood up in the sunroof, and started shooting at Fields. Bradshaw missed Fields, but a bullet struck Ms. Vasquez in the leg. At the time she was pregnant with her first child by Fields.

Fields didn't react to Bradshaw's aggression towards him and elected to let the police "handle it", but Bradshaw was out for blood. Bradshaw ran up on Fields again at a later date and pulled a gun on Fields. Fields was able to drive away, but this time Fields obtained a gun himself, went by Bradshaw's house and shot back. Unfortunately a bullet (or maybe some flying glass) struck Bradshaw's stepfather. Fields pled guilty and went to State prison for eight years.

Fields got out of prison in July 2000. In late August or early September 2000 Fields got into a brief altercation with a drug dealer. The drug dealer hired a Hit Man by the name of LaDon King to murder Fields. The Hit Man almost killed Fields the first time that he caught up with him, but his efforts were thwarted by some security guards on the scene that saw what was happening. But the very next day the Hit Man came back to "finish the job", and Fields ended up shooting the Hit Man. This led to the government charging Fields with being a felon in possession of a firearm.

Fields' attorney went to the prosecution with a Necessity defense. The prosecution said that they wouldn't accept a Necessity defense because Fields should have " just called the police."

The prosecutor's "logic" was totally "illogical". When LaDon King was hired to murder Fields, King was already wanted by both State and Federal officials for a host of violent offenses, including an incident where he kicked a guys door in and shot the guy eight times with a .40 caliber. If the police would have done their job and apprehended him then Fields wouldn't have needed a gun to defend himself from this mad man. But in addition to that, after King was shot he escaped from the hospital and when the police caught up with him he pulled a gun on the police and got away again. The police couldn't even handle him. Fields was in a no-win situation: Protect himself and go to jail, or die.

In any event Fields made the worst mistake of his life: He offered a guard at the jail $5,000 for a key to the fire escape door and he used that key to walk away from the jail. That same night Fields' girlfriend, Suncerey "Shining Star" Coleman was murdered. The government charged Fields with her murder, sought the death penalty and

sentenced Fields to die. He was also found guilty on six additional charges; Conspiracy, Escape, Carjacking, Using and Carrying a firearm during the commission of a crime of violence, Felon in possession of a firearm, and Using and carrying a firearm during the commission of a crime of violence. Appellate counsel filed a direct appeal and the 5th Circuit affirmed the conviction and sentence(s) in the United States v. Fields, 483 F. 3d 313 (2007), cert. denied, 552 U.S. 1144.

Attorney(s) Jeffrey Ellis, of Alsept & Ellis, 621 SW Morrison St., Ste. 1025, Portland Oregon 97205 (206) 218-7076 and Peter J. Isajiw of Cadwalader, Wickersham & Taft, LLP, One world Financial Center, New York, NY 10281 (212) 504-6000 was appointed to assist on Habeas. Mr. Isajiw and the Cadwalader team took the case Pro Bono because of Fields' Actual Innocence.

The attorney's filed several motions seeking to vacate, set aside, or correct Fields' conviction(s) pursuant to 28 U.S.C. 2255, alleging 49 points of error ( ROA 349, 455, 984 ), Fields' attorney's also asked the District Judge to compel discovery.

However, upon accepting Mr. Ellis and Mr. Isajiw as habeas counsel Fields told them that he wanted them to file the criminal elements because this case warrants it; (i.e.) Conspiracy, Fraud On the Court, Solicitation of murder, etcetera, but Mr. Ellis and Mr. Isajiw failed to do so, choosing to file the "traditional appeal". Fields immediately notified the Court that his Habeas petition was incomplete. ( See App. 1      ).

When the District Court denied the habeas petition Fields informed the Court that from that point forward he would be proceeding pro se; The Court denied Fields' request to proceed pro se. ( See App. 2      ).

Fields then notified the 5th Circuit that he would be proceeding pro se. ( See App. 3   ).

The 5th Circuit sent a copy of the Motion to Fields attorney, Jeff Ellis and a copy to the prosecution, then returned the original to Fields for his signature. ( See App. 4   ).

The request for the signature misled Fields to believe that the Motion was accepted and Fields immediately filed a Freestanding Actual Innocence Brief with 3-volumes of Appendix showing that not only could he prove that he is actually and factually innocent, but he could prove that his conviction and sentence(s) were the direct result of a Fraud On the Court with a criminal conspiracy being its foundation and the admission of false facts precluded the development of true facts. ( See App. 5      ). Fields also filed a Motion " to bar " the prosecution and their coconspirators from having any contact with each other due to their ability to continue their criminal endeavors. ( See App. 6    ). A Motion to seal the brief. ( See App. 7    ). And a Motion for discovery. ( See App. 8     ).

Fields' attorney, Jeff Ellis responded to the Court stating that Fields' pro se Motion isn't actually a "Pro Se" Motion and Fields only ask to be able to file his brief and Motion(s) along with additional pleadings filed by counsel. ( See App. 9      ).

On 10/23/13 the 5th Circuit denied Fields' Motion to proceed pro se. ( See App. 10     ).

3

On 10/30/13 the 5th Circuit notified Fields that they won't consider his brief and Motions. ( See App. 11        ).

Fields responded to the notice and asked the Court to allow his brief and Motions to either work in conjunction with whatever counsel file, or allow his "filings" to stand alone.

On 11/18/13 the 5th Circuit again refused. ( See App. 12        ).

Fields responded to the notice once again stating that he don't want to rely on the "unseen" brief that Counsel intended to file and asked the Court to reconsider.

On 12/05/13 the 5th Circuit responded stating that only Fields attorney's can file on his behalf. ( See App. 13        ).

On 12/12/13 Fields received a copy of the brief that Counsel filed on his behalf, Fields immediately filed a Motion for Reconsideration of his Pro se filings, stating that he " strenuously object " to the brief that his counsel filed. ( See App. 14        ).

On 12/24/13 Fields filed another Motion to " Reurge Filings ". ( See App. 15        ).

On January 14, 2014 the 5th Circuit entered an Order to not accept " anything " that Fields file. ( See App. 16        ).

Fields filed two Motions to the Supreme Court appealing the Order. ( See App. 17        ). Then Fields filed a Motion pursuant to Rule 60 with the Supreme Court postmarked Feb. 17, 2014. ( See App.  18        ).

On 5/6/14 Fields received the Rule 60 Motion back from the Supreme Court with a 60 day deadline from May 1st, 2014 to restructure the Motion with a timeline of events, and serve a copy on opposing counsel. Fields met those criteria and refiled by June 9, 2014. ( See App.  19        ).

In late June 2014 Fields received the petition back from the Supreme Court with a note that said that Fields had to wait until the 5th Circuit ruled on his COA before he could file in the Supreme Court. ( See App.  20        ).

Fields immediately responded. ( See App. 21        ).

On 8/15/2014 the Supreme Court informed Fields that he would have to file in the " lower courts ".

Now Fields files this Motion pursuant to Rule 60 (b)(3) for Fraud On The Court.

4

FIELDS WAS DENIED DUE PROCESS OF LAW AND CRUEL AND UNUSUAL PUNISHMENT WAS INFLICTED UNDER THE FIFTH, EIGHTH AND FOURTEENTH AMENDMENTS WHEN THE PROSECUTION WITHHELD EXCULPATORY EVIDENCE; KNOWINGLY USED FALSE AND FABRICATED EVIDENCE; THE PROSECUTION ENGAGED IN A CRIMINAL CONSPIRACY IN VIOLATION OF 18 U.S.C. 371; THE PROSECUTION SOLICITED FIELDS MURDER VIA LETHAL INJECTION IN VIOLATION OF 18 U.S.C. 373(a); FIELDS WAS DENIED DUE PROCESS OF LAW AND CRUEL AND UNUSUAL PUNISHMENT WAS INFLICTED WHEN THE DISTRICT JUDGE ABUSED HIS DISCRETION; FIELDS WAS DENIED DUE PROCESS OF LAW AND CRUEL AND UNUSUAL PUNISHMENT WAS INFLICTED BECAUSE HE IS ACTUALLY INNOCENT; FIELDS WAS DENIED DUE PROCESS OF LAW AND CRUEL AND UNUSUAL PUNISHMENT WAS INFLICTED WHEN THE PROSECUTION COMMITTED FRAUD ON THE COURT IN ORDER TO OBTAIN FIELDS' CONVICTION(S) AND DEATH SENTENCE; AND THE 5th CIRCUIT'S UNREASONABLE DETERMINATION OF FACTS DENIED FIELDS DUE PROCESS OF LAW.

The facts surrounding the issues herein isn't that complex; Given the materiality of the evidence at issue there is a clear violation of Fields Constitutional rights.

(1). (a). The government's Star witness, Shalaykea "Lakie" Scroggins claimed that Fields confessed to her that he murdered Suncerey Coleman. Scroggins claimed that Fields told her that " there was a lot of blood "; that he " got blood in the car that he was driving "; And when she and Fields were dropped off at the New Road Inn motel later that night in the car she witnessed " blood on Fields clothes and shoes."

(b). In addition to all of the blood that Scroggins testified to, a detective Roy Davis testified that huge thorns were all over the crime scene; Thus whomever drug Coleman's body to where it was found they would have been injured by the thorns and their blood would have also been transferred to the vehicle that they were in.

(c). Forensics testing was done on the Grand Am that Fields was driving and the search for blood yielded negative results. ( See App. 22     ).

(d). The prosecution procured a Detective Morris "Bubba" Colyer to lie and willfully mislead and defraud the Court by claiming that when he took possession of the Grand Am the car was "clean" and "looked like it had been detailed". ( See App. 23     ).

(e). Detective Colyer took possession of the Grand Am on November 14th, 2001, eight days after Coleman's murder at a construction site. ( See App. 24     ). The man that own the Grand Am, a Mr. Roger Thomison also rented his car out daily for crack cocaine There is no way possible the Grand Am could have been "detailed" on the 6th and survived the elements of Mr. Thomison's dirty job and the many individuals that rented the car daily and was still "clean" eight days later on the 14th. In addition to that a "detailed" car wouldn't detract from finding blood. ( See App. 25     ). Also the forensics report shows that the car wasn't "clean". ( See App. 26     ). The forensics report also acknowledges that there are photographs that will undoubtedly show the vehicle pr  and post forensics testing.

FOOTNOTE: The car wasn't "detailed", nor was the car "clean".

## THE BRADY VIOLATION

Under Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed. 2d 215 (1963), the government must disclose material, exculpatory (397 Fed. Appx. 971) evidence to a criminal defendant. United States v. Walters, 351 F. 3d 159, 169 (5th Cir. 2003) (citing Brady, 373 U.S. at 87). " A valid Brady complaint contains three elements; (1) the prosecution must suppress or withhold evidence; (2) which is favorable, and (3) material to the defense." United States v. Lanford, 838 F. 2d 1351, 1355 (5th Cir. 1988 )( quoting United States v. Auten, 632 F. 2d 478, 481 (5th Cir. 1980)). Impeachment as well as exculpatory evidence fall within Brady's purview. United States v. Bagley, 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed. 2d 481 (1985); Fields meets all three prongs of Brady. Prior to trial Counsel for Fields filed a Motion for discovery pursuant to Rule 16 and was supposedly given " open file discovery ". The Motion specifically requests the timely disclosure of Photographs, documents, tangible objects, results or reports of scientific tests or experiments, and disclosure of written summaries of testimony of expert witnesses. ( See Motion; App. 27 ). The prosecution never turned over the pre and post forensics photographs, effectively suppressing and/or withholding the evidence; the first prong of Brady have been satisfied.

The second prong of Brady is just as clear. The photographs is favorable to the defense because the evidence is exculpatory and it's impeaching; The photographs prove unequivocally that Detective Morris "Bubba" Colyer lied and defrauded the Court via the prosecution when he said that the Grand Am was "clean" and had been "detailed". But most importantly the jury, during deliberations at the guilt/innocence phase only had one question: They wanted the " testimony (or evidence, if it's available) of the results of DNA testing on the car..." ( See Jury note; App. 28 ).

The district Judge, Walter Smith, Jr. denied the jurors request. ( See Judges response; App. 29 ). If the jury would have remembered and/or knew the testimony in regards to the forensics testing and the state or condition the vehicle was in they wouldn't have been requesting the information; thus the jury had nothing to rely on. If the prosecution would have honored their duty to disclose then Fields would have impeached Detective Colyer's willfully false testimony with the photographs and the photographs would have been in evidence for the jury to use in their deliberations; There is no doubt that the photographs are favorable. The third prong has been met as well. " Testimony is material if it was designed to substantially affect the outcome of the case. United States v. Como, 53 F. 3d 87, 90 (5th Cir. 1995). " Detective Colyer's false testimony about the car being "clean" and "detailed" was definitely designed to substantially affect the outcome of the case. The prosecution procured Detective Colyer to testify falsely with malicious intent in order to defraud the Court into believing that Fields killed Coleman and then "detailed" the car so there was no blood where blood should have been. Since the jury's only question

6

in regards to the entire guilt/innocence phase was in regards to that car, the photographs proving that the car wasn't "clean" and/or "detailed is definitely material, especially in light of the other evidence:

EVIDENCE THAT SHALAYKEA "LAKIE" SCROGGINS AND EDWARD LEE "TREYBOY" OUTLEY MURDERED SUNCEREY COLEMAN:

Shalaykea "Lakie" Scroggins and the victim, Suncerey " Shining Star " Coleman were both Sherman Fields girlfriends.

(2).(a) Four months prior to Coleman's murder Scroggins wrote two letters that bears on her state of mind; Scroggins expounded upon her obsession for Fields and said how she'd lost Fields to " that girl." Scroggins emphatically stated that she'd lost Fields once and " I'm not going to let it happen again." And if she were to lose Fields again she would be " Killing bitches." ( See App. 30    )

(b) At or about a week prior to Coleman's murder Scroggins and Coleman engaged in a very heated verbal altercation over Fields. ( See Trial Transcripts, pgs. 3-5; App. 31 ) Coleman's friend Deshondra Bridgewater was with her that day when Scroggins approached her. Scroggins backed off, ran and retrieved her three sisters and approached Ms. Coleman again At this time Fields' mother pulled up in her car and when she realized what was happening she said, " Why are y'all out here fussing and fighting over Sherman? Sherman is in jail, y'all are grown women, y'all are too old for this."

According to Fields, Scroggins later told him that she ran " and got her sister's and a " big butcher knife " just in case that hoe "Skeeter" wanted to jump in." And " If my mother-in-law wouldn't have came I was going to drag that bitch!"

(c) Shortly thereafter Scroggins obsession for Fields led her to illegally get a phone cut on in Fields name. Scroggins immediately started calling Coleman threatening her.

The day before the murder Fields and Coleman sought out a way to stop Scroggins harassment and threatening calls, Fields and Coleman called the phone company together and explained that Scroggins had illegally obtained the phone and she was calling Coleman threatening her. ( See App. 32    ). That phone call to the phone company resulted in Scroggins illegal phone getting turned off. ( See App. 33    ).

(d) The next night Fields obtained a key from a jailor and used that key to exit a fire escape door and walk away from the jail.

Edward Lee "Treyboy" Outley's cousin, a guy named "Fred" drove Fields and Outley out to a motel on Interstate 35 where Outley used crack cocaine to rent a red two door pontiac Grand Am from a drug addict named Roger Thomison; Mr. Thomison apparently had

7

taken up residence in a corner room " on the end near the highway."

(e) Outley, with Fields in the passenger seat, drove to Morrow Street in Waco Texas where he let Fields out in an alley that was heavily overgrown with grass, located between 9th and 10th street. Fields stood just inside the alley while Outley drove to a service station down the street to put gas in the vehicle.

After Outley put the gas in the car he picked Fields up and drove home, back to " the Villages " apartment complex where he had a Gold Jaguar waiting. Outley gave Fields the Grand Am and some money and told Fields to call him in an hour.

(f) Fields drove to Hillcrest hospital where Suncerey Coleman and her cousin, Tanesha Hilliard met Fields downstairs up under the canopy at the front door. Fields and Coleman conversed amiably and they were "hugging and kissing" ( See exam. of Tanesha Hilliard, pg. 1361; App. 34 ) Fields told Coleman that Outley was getting a motel room for him and then he would come back and get her.

(g) Fields drove to a payphone and called Shalaykea Scroggins' sister, "Sheki". Fields asked Sheki to run across the parking lot and get Scroggins since their apartments were right across from each other. Sheki replied, " Ain't, you better call her."

Fields told Sheki that the phone company cut Scroggins phone off the day before. Sheki said, " My sister called the phone company right back and told them that Shining Star was just a little girl playing on the phone and the phone company cut her phone back on with a different number."

Sheki then called Scroggins via threeway and someone hung the phone up as soon as they answered. Sheki attempted to call Scroggins again, but Scroggins was in turn calling her; the two sisters spoke briefly and then Sheki called Scroggins again via threeway with Fields on the phone.

Fields informed Scroggins that he was out and asked her to " walk up Colcord to 10th street just in case the police is watching " her house. Scroggins replied, " Boy you're out of your damn mind, I'm not walking down that dark ass street by myself."

Fields ultimately drove to Scroggins house and she got in the Grand Am and left with him.

Fields and Scroggins drove to a road near Gurley Elementary School where they sat and talked for an indeterminate amount of time. Then they drove to Alpha Omega, a service station a block away.

Scroggins got out and called Outley from a pay phone at the store. Outley told her that he'd rented a room at the ' New Road Inn ' and told her to tell Fields to meet him there. Fields and Scroggins drove to the motel.

When Fields and Scroggins arrived at the New Road Inn Scroggins said that it was " that time of the month " and that she was going to walk to the service station next to the motel to " change her pad ". Fields asked her to call Outley while she was over there

to " see where he's at."

Scroggins stayed at the store less than ten minutes, she informed Fields that Outley said that he stopped at McDonalds because he " thought Fields might be hungry."

Not long after that a police car came up under the Interstate 35/New Road underpass with its lights flashing; Fields asked Scroggins to " see where that police went."

Scroggins walked back to the store. When she returned to the car she told Fields that the police had stopped a car on the street next to the store. She also said that she called Outley again and he said that he was on his way.

Shortly thereafter Outley arrived with Scroggins sister, Alberta "Nay-Nay" Hampton in the Gold Jaguar. Outley had the motel room key, he opened the door and they all went inside.

Outley and Hampton sat at the table and started eating the food Outley bought, Fields and Scroggins sat on the bed. Scroggins ate some of the food, Fields didn't eat because he'd just had dinner before he left the jail.

Fields was wearing jail pants that were cut-off to make shorts ( the letters J-A-I was still on one leg of the shorts). He wore an old tattered T-shirt and holey basket ball shoes that he'd spent the past nine months playing basket ball in.

Scroggins called her sister Sheki. ( Sheki was married to Fields brother at the time, but he was in State jail ). Scroggins asked her sister to give Fields a pair of pants, a shirt, and some shoes. Sheki told them that she would get the clothes ready.

Outley said that he and Hampton would follow Fields and Scroggins to Sheki's house and then afterwards he would drop Fields and Scroggins back off at the motel for the night.

With the plan laid out Outley and Hampton got back in the jaguar and Fields and Scroggins got back in the Grand Am.

Fields and Scroggins made it to their destination first. Fields dropped Scroggins off and told her that he would " drive around the block " and then pick her back up.

But Fields didn't drive around the block. Instead he drove back up to the hospital.

H). Fields tried to call Suncerey Coleman's room to no avail until finally he just threw caution to the wind and took the elevator up to the floor that she was on. He entered the room where Coleman sat at the head of the bed feeding her baby; Tanesha Hilliard was sitting at the foot of the bed; And the child's father, Nathan "Cream" LLoyd was lying across the far side of the bed asleep.

Coleman said to Fields, " Baby, did you try to call?"

Fields said, " Yeah, I called twice, the line was busy."

At the time Tanesha Hilliard was a jailor at the jail that Fields walked away from; Hilliard said, " I called the jail to talk to my little friend, you know, just casual like. He said " motherfuckers is burning up the jail, and niggas is escaping and shit."

A cell phone was sitting on the baby cart, Fields picked the phone up and asked who

it belong to. Coleman nodded towards Mr. LLoyd just as Fields saw his name on the screen. Fields sat the phone down.

LLoyd looked up. When he saw Fields he nodded his head. Fields acknowledged him and LLoyd laid his head back down.

Coleman gave the baby to Tanesha Hilliard then took Fields' hand, they walked out of the room together. Coleman said she needed to tell the nurse that was over her baby that she would be back in a couple of hours and that LLoyd and Hilliard was in the room with the baby.

No one was at the nurses station, Fields stood at the desk while Coleman went through a door behind the desk to convey the message. When she emerged she and Fields headed for the exit.

As they neared the sally port Tanesha Hilliard called their name's. Fields and Coleman stopped and Coleman kissed him, and kept kissing him until Hilliard caught up with them. Hilliard told Coleman to give her her (Hilliard's) money, " just in case she get hungry before Coleman came back." Coleman gave Hilliard the money then she and Fields went out to the Grand Am.

Coleman asked Fields did Outley get the motel room? Fields told her no. " I know if I would have took her to the motel she would know where I was staying," Fields said. " And once I took her back to the hospital I was going back to get Scroggins and I didn't want her calling the room with Scroggins there."

Coleman suggested that they " go home ", but Fields reminded her that because she was a constant visitor at the jail they were going to check her house first. Coleman then said that they could go to Tanesha Hilliard's house because " her door was unlocked." She asked Fields did he have some money on him, and when he affirmed that he did Coleman told him to go to the convenience store on the corner of 18th and Lyle street so she could get a soda.

The Lyle street store was only three blocks from Fields' mother's house and any police on their way to that location would see them so Fields told her that he would take her to a store on Waco, Drive.

Coleman and Fields started down 18th street talking about "future plans" or, for lack of a better description, " what they were going to do now that he was essentially on the run."

At the Corner of 18th and Colcord they passed Outley, Scroggins and Hampton in the Jaguar heading towards the hospital. Unbeknown to Fields, while he was with Scroggins, Coleman had called Fields' mother while Ms. Fields was on the phone with Sheki. Coleman told Fields' mother that Fields had been to the hospital and he was coming back to get her; When Fields failed to pick Scroggins back up after she retrieved the clothes Sheki told Scroggins about the phone call. ( See Statement; App. 35 ) At that point Scroggins decided that she wanted to confront Fields and Coleman. Outley had the transportation. (The GOLD Jaguar);

10

Scroggins sister Alberta Rene "Nay-Nay" Hampton had a gun. ( See. App. 36    ). The GOLD Jaguar, the gun and Scroggins hatred for Coleman gave them "Means", "Motive" and the "opportunity" to murder Coleman.

Unfortunately for everyone involved Fields and Coleman's route leaving the hospital put them on a collision course with this hatred. Outley tried to get Fields attention by either flashing the headlights off and on, or either flashing the bright lights off and on.

" Baby who is that?" Coleman asked Fields.

" I don't know," Fields lied. " Probably a drug addict that think I'm Treyboy."

Fields showed little, if any reaction to the Jaguar at the corner, he kept driving, picking up speed, hoping that he could either outrun them or they would just give up. But the Jaguar turned on 18th Street behind them. The confrontation was inevitable.

On 11/13/01, a week after Coleman's murder Outley was arrested for being a felon in possession of a firearm. Two days later, on 11/15/01 Scroggins was arrested for Harboring a Federal fugitive and Aiding and Abetting.

(I). Outley and Scroggins immediately started framing Fields for Coleman's murder. They both claimed that they were nowhere near the crime scene and they only knew of Coleman's murder because Fields told them.

Scroggins gave several different versions of how, when and where Fields supposedly confessed to her. On 11/26/01 Scroggins wrote a statement alleging that she met Fields in a car, she asked him about Coleman and he said, " I fucked up. She's gone." ( See App. 37    ) Then the day that she was arrested Fields called her and went into very graphic details about the murder. (NOTE: Phone records show that the call never took place).

Three months later Scroggins told the Grand Jury that Fields confessed to her in her apartment two days after the murder. ( See App. 38    ). Scroggins said she asked Fields about Coleman and that's when he said, " She's gone. I fucked up." And it was then that he went into very graphic details about the murder.

Scroggins also gave several different alibi's for the time of the murder. On 11/26/01 she said that she was at the store " buying something to drink and a box of black and mild cigars." ( See App. 39    ). But when she found out that the store was closed at that time she said, " No, I went to my sister Sheki's house and went to sleep. ( See App. 40    ).

Outley also had different alibi's. On 11/26/01 Scroggins said that Outley " went looking for Fields. On 2/26/02 she changed her story and said, " No, he went home with her sister, Alberta "Nay-Nay" Hampton. ( See App. 39    and App. 40    ). At trial Outley said that he was " Out selling crack cocaine." ( See App. 41    ).

Outley told several versions of how he learned of Coleman's murder as well. He said that Fields cousin, Bird told him, then Fields called him and confessed. ( See App. 42    ) Then Outley said that Scroggins and Hampton told him, then fields approached him and confessed. ( See App. 43    ). Then when Outley went to prison, a William "Skeeter" Young came forward claiming that Outley told him that he witnessed Coleman's murder. ( See App. 44    ).

11

In addition to the multiple alibi's and conflicting stories, (1) There is no doubt that Outley possessed the alleged murder weapon; (2) Scroggins claimed that she knew Coleman was missing the day after the murder "because she read it on the newsstand". ( See App. 45 ). Yet it wasn't on the newsstand on November the 7th thus the only way she could have known that Coleman was missing on the 7th was if she was the one that did something to her. (3) Scroggins and Outley appears to have went around recruiting other inmates to lie for them and was telling crooks crucial information about Coleman's murder. (i.e) Outley told Christian Chae Walker to lie and say that he gave him the murder weapon; ( See App. 46 ); Outley told William "Skeeter" Young that Coleman was shot in the head twice. ( See App. 47 ). Scroggins told all of her cell mates crucial information about Coleman's murder; ( See App. 48 ). And every inmate that the government eventually used to lie on Fields had previously been in Outley or Scroggins presence prior to "coming forward. (4) And most importantly, after the murder Scroggins and Outley both conspired to hide the car that they were in that night. Outley lied and said that the Jaguar was BLUE.(See App. 49 ). Scroggins lied and said that the Jaguar was BLUE. ( See App. 50 ). Scroggins and Outley both knew that had the Jaguar been tested in the forensics lab they wouldn't have been able to explain how their blood, where the thorns from the crime scene undoubtedly cut them, got intertwined with the blood from Coleman's wounds in that GOLD Jaguar. ( See Freestanding Actual Innocence Brief, App. 5 & Writ of cert. App. 19 )

<u>BRADY ARGUMENT CONTINUED</u>

(3).(a) " The materiality of Brady material depends almost entirely on the value of the evidence relative to the other evidence mustered by the State." <u>Smith v. Black</u>, 904 F.2d 950, 967 (5th Cir. 1990), vacated, <u>503 U.S. 930</u>, 112 S.Ct. 1463, <u>117 L.Ed. 2d 609</u> (1992), abrogated on other grounds, <u>Stringer v. Black</u>, <u>503 U.S. 222</u>, 112 S.Ct. 1130, <u>117 L.Ed. 2d 367</u>(1992). The government's entire case against Fields is "jailhouse testimony", inmates whose stories are so incredulous it defies description. And not only do Outley and Scroggins ties to these inmates appear to be of great influence upon their testimony, but very strong evidence proves that the inmates were likely solicited by the prosecution. ( See App. 51 ). Thus the withheld photographs proving that the car that Fields was in on the night of Coleman's murder was not "clean" and/or "detailed" like the prosecution procured Detective Morris "Bubba" Colyer to lie and defraud the Court into believing is definitely material to Fields innocence. And since the jurors one and only question in regards to guilt/innocence was in relation to the car that the photographs are in relation to it shows unequivocally without any doubt that the photo's are material.

In addition to that Detective Colyer lied and defrauded the Court about the car being

"clean" and/or "detailed" to hinder, impede and willfully thwart by illegal means the fact that the people whom Fields said committed the murder, both Edward Lee "Treyboy" Outley and Shalaykea "Lakie" Scroggins were conspiring to hide the Jaguar that they were in on the night of Coleman's murder, and had the prosecution honored their duty not only to disclose, but their duty of honesty to the Court as well the jury would have undoubtedly moved towards a verdict of " Not Guilty." And the Court have held that " If the prosecution withholds evidence that satisfies the above definition of materiality, then harmless error analysis is inapposite and relief is warranted. See Kyles v. Whitley, 514 U.S. 419, 435, 131 L.Ed. 2d 490, 115 S.Ct. 1555 (1995).

THE GOVERNMENT KNOWINGLY<br>USED FALSE TESTIMONY

(4).(a) Because the prosecution have those photographs in their possession; And they also have the forensics reports in their possession that shows that the car wasn't "clean" and/or "detailed"; And they also know that even if a vehicle is "detailed" they still would find blood, there is no doubt that the prosecution knew that Detective Colyer's testimony was false. And clearly established Federal Law states that the government has a duty not to use false testimony; Giglio v. United States, 405, 150, 92 S.Ct. 763, 766, 31 L.Ed. 2d 104 (1972); Williams v. Griswald, 743 F.2d 1533, 1541 (11th Cir. 1984). There is no statement from Detective Colyer, no report; Nothing in relation to the car being "clean" and/or "detailed", the government made a sudden and conscious decision to put this detective up on the stand at the spur of the moment so he can defraud the Court and mislead the jury. In Napue v. Illinois, 360 U.S. 264, 269, 3L.Ed. 2d 1217, 79 S.Ct. 1173 (1959), Chief Justice Warren wrote for the Court: " First, it is established that a conviction obtained through the use of false evidence, known to be such by representatives of the State, must fail under the Fourteenth Amendment; The same result obtains when the State, although not soliciting false evidence, allows it to go uncorrected." In Fields case the prosecution did solicit false evidence. ( See Freestanding Actual Innocence Brief, App. 5 & Writ of cert., App. 19 )

FRAUD ON THE COURT, PURSUANT TO<br>RULE 60

(5).(a) The Grand Jury knew that Shalaykea "Lakie" Scroggins was lying and they voiced their skeptism about her testimony. ( See App. 52 ).

The prosecution wanted to " make an example " out of Fields for walking away from that jail, and having the Grand Jury thinking that their Star witness was lying could only prove to be disastrous for their case. The prosecution procured Sheriff Detective Johnny Spillman to lie and say that " Fields became "irate" when he came into contact with Coleman

at the hospital. ( See Johnny Spillman's Grand Jury testimony, page 5; App. 53 ). And to bolster Detective Spillman's perjury the prosecution procured U.S. Marshal Christian Casson to lie and say that " Tanesha Hilliard " said that " Fields became "angry" when he came into contact with Coleman at the hospital. ( See Chris Casson's Grand Jury testimony, pg. 6; App. 54 ). However, the prosecutor's, Detective Spillman and U.S. Marshal Casson all knew that Fields was never angry and/or irate like they all misled the Grand Jury to believe. On November 10, 2001, just four days after Coleman's murder, Tanesha Hilliard told the Waco Tribune Herald that Fields " did not appear angry." ( See Newspaper article; App. 55 ). Then during trial two years later Tanesha Hilliard reiterated the fact that Fields was never angry and/or irate. ( See Cross exam. of Tanesha Hilliard, pg. 1350; App. 56 ). These officer's of the law and the prosecutor's believe that they are above the law, perjury before a Grand Jury, like perjury at trial, is a serious criminal offense. See, e.g., 18 U.S.C. § 1623(a). Hilliard even states that she has never known Fields to act violent towards Coleman.

(b) The Gold Jaguar that Outley drove on the night of Coleman's murder was never subjected to forensics testing because Outley, Scroggins and the prosecution intentionally, deliberately, willfully and knowingly conspired to suppress, hide and/or conceal the car. Scroggins lied and said that the Jaguar was BLUE. ( See Shalaykea Scroggins Grand Jury testimony, pg. 17; App. 50 ). Outley also lied and said that the Jaguar was BLUE. ( See Report of Interview; App. 49 ). Fields called a Mr. Lutrill Payne to the witness stand, the owner of the Jaguar. Mr. Payne verified that his Jaguar, the car that he rented to Outley on the night of the murder, was indeed GOLD like Fields said it was. Yet the prosecutor's willfully attempted to defraud the jury, claiming that Outley and Scroggins was indeed in a BLUE Jaguar; a Jaguar that the prosecution knew all along didn't even exist. ( See Exam. of Lutrill Payne, pgs. 1936-1938; App. 57 ). The prosecution aligned themselves with Outley and Scroggins conspiracy to hide the Jaguar and they deliberately, intentionally, knowingly and willfully defrauded the Court because the prosecutor's knew all along that Outley and Scroggins was hiding the Jaguar and the car was really GOLD because three months prior to trial Mr. Payne had given the prosecution a statement telling them that his car was GOLD. ( See Report of Investigation; App. 58 ).

(c) The evidence strongly suggests that the prosecution knew that Fields didn't kill Coleman, but because Fields walked out of that jail; refused to talk to them; tried to protect Outley and Scroggins, and was said to be very disrespectful towards law enforcement and prosecutors the government adopted an " I'll show you " attitude towards Fields, and when the evidence against Fields wasn't " adding up ", the prosecution went " seeking jailhouse testimony." See ( App. 51 ).

On their quest to continue the fabrication of evidence against Fields the government tried to convince Outley and/or Scroggins to lie and say that they were " with Fields ". ( See App. 59 ). Given the fact that the government was saying that Fields killed

Coleman, " with Fields " can only mean that they were trying to procure false "eyewitnesses".

Also a Chance Alexander was recruited by the prosecution to lie and say that Fields confessed to him, but somewhere along the way there was a breakdown between Alexander and the government and Alexander admitted that he lied, and as a matter of fact don't even know Fields. ( See App. 60         ).

This is three different incidents, by three independent sources that don't even know each other, all stating that, in some form, the government is trying to fabricate evidence against Fields. Then two years after Fields was put on Notice that the prosecution is " seeking jailhouse testimony " the government close their case with nothing but " jailhouse testimony," inmates whose stories are blatantly and demonstrably false.

(d) The government had a "theme"; every time they " hit a wall ", or their case was challenged by substantial credible evidence, they would procure and use a law enforcement officer to willfully lie and mislead the Court by and through fabricated and fraudulent evidence.

(1) It started in the Grand Jury when the prosecution procured Sheriff Detective Johnny Spillman and US Marshall Chris Casson to lie and say that Fields became "angry" and/or "irate" when he came into contact with Coleman at the hospital.

(2) Detective Morris "Bubba" Colyer lying saying that the Grand Am was "clean" and "detailed".

(3) Edward Lee "Treyboy" Outley wrote a Christian "Chae" Walker a letter telling Walker to lie and say that he gave Outley the alleged murder weapon..." But whatever they got you charged with tell them to drop that bullshit," Outley told Walker. ( See App. 46    ).

Outley wanted Walker to say that he gave Outley the gun to give to Fields. ( See App. 61 ). Walker said he gave the gun to Outley for "protection". ( See App. 62         ).

But there was one problem: Walker didn't know what kind of gun it was. Walker, who has a below average IQ admitted that he didn't know what kind of gun it was " until Detective "Bubba" Colyer told him; (Coached him). ( See App. 63       ).

(4) Detective Morris "Bubba" Colyer was the prosecution's " go to " guy when it came to defrauding the Court(s). After Fields put forth concrete evidence proving that the Jaguar that Scroggins and Outley were in on the night of the murder was GOLD the prosecution procured Detective Morris "Bubba" Colyer to lie again; Colyer claimed that Outley told him the name of the person that he got the Jaguar from. ( See App. 64      ). When in reality all Outley told Colyer, according to Colyer's only report in regards to Outley is that the Jaguar was BLUE. ( See App. 49     ). Amrad Patel, the guy whom owns the New Road Inn testified that police arrived at the motel on November 7, 2001, the next day after the room was rented and did a thorough search of the room " and took everything that was in the room." It was then that law enforcement discovered the name " Payne " on the

15

daily logs, or sign-in-sheets. ( See App.  65         ). Investigators didn't talk to Outley until November 13th, the day that he was arrested. It was then that they confronted him with the name " Payne " based on the fact that it was said that Outley rented the motel room for Fields, and Outley lied, telling investigators that " Payne " was the owner of a BLUE Jaguar, in an attempt to hide the car.

(5) Nine days after Coleman's murder a Tammy Edwards claimed that her car was jacked by " an unknown black male." ( See App.  66   ). Fields was ultimately charged with the "carjacking".

Two years later, during a deposition Edwards changed her story to say that she knew it was Fields all along "because his picture was on fliers all over the hospital". ( See App.  67  ). During this same deposition she took it a step further and said, " Oh, he shot at me too." ( See App.  68      ).

The evidence strongly suggests that Edwards used Fields unfortunate situation so she could defraud and sue Civigenics, the company that ran the jail that Fields walked out of. ( See App.  69    ).

The prosecution procured U.S. Marshal Chris Casson to lie and defraud the Grand Jury once again. Casson lied and said that Fields had friends and other relatives near the hospital and he could have been "staking the hospital out" and "he could have ran to their house should the carjacking go wrong. ( See App.  70     ).

Fields mother lived on 21st and Lyle street, the hospital is on 31st and Herring Avenue, definitely not close enough to "stake out" or "run to", and it's a proven fact that that Fields was never at her house, there was 24-hour surveillance teams watching her house.

As for there being "friends" and "other relatives" in the area, that's a blatant lie, the people that live around the hospital are upper and middle class white families. At trial Marshal Casson kept the lie afloat, he told the jury that the hospital is " a block and a half " from Fields mother's house. ( See App.  71    ). This time Fields was present and challenged the perjury. He got Casson to admit that his mother live on 21st and Lyle, and Casson hesitantly admitted that the hospital is on 31st and herring, but Casson remained defiant and arrogant in his perjured state. ( See App.  72        ).

(6) The alleged carjacking vehicle was subjected to forensics testing, but after and when the results yielded no ties to Fields the prosecution procured a Detective Steve January to lie and say that there were no fingerprints or nothing in the car, the car was clean. ( See App.  73    ). That was a blatant lie. ( See App.  74     ). The prints were checked against Fields and there was no match. ( See App.  75      ).

(7) Detective Steve January had nothing whatsoever to do with the case. He claim that he came on to "assist the U.S. Marshals in the city limits", but the Marshals were already being assisted by the McLennan County Sheriff's office:

The following timeline of events is very telling:

16

November 7, 2001:  Fields' cellmates separated at 1:00 A.M. and interviewed by Waco Sheriff's Detectives; Dominique Tubbs, nor Christopher Quigley could provide no useable information.

November 7, 2001:  Two U.S. Marshals flew into Waco Texas from Austin Texas and at or about 6:00 P.M. the U.S. Marshal's, Sheely and Shaddix reinterviewed Tubbs and Quigley; They still couldn't provide no useable information.

November 13, 2001:  Detective Steve January talks to Edward Lee "Treyboy" Outley.

November 15, 2001:  For reasons that no one have been able to explain, this detective January, whom have nothing whatsoever to do with the case decides that he should go out to the jail and "reinterview" Tubbs and Quigley, and this time he did what Sheriff Detectives and U.S. Marshals failed to do; Detective January leaves the jail with statements from Tubbs and Quigley that he himself wrote and Tubbs and Quigley signed claiming that they heard Fields threaten Coleman over the phone.

January 29, 2004:  During trial Tubbs claimed that he didn't know that Coleman was deceased until weeks after her body was found when " he read it in the newspaper." ( See App. 76 ). But his friend Chris Quigley inadvertently admits that he and Tubbs both knew that Coleman was deceased before her body was found because a "police officer" told them both during the time that Fields was "still free". The only "police officer" they talked to was Detective "Steve January". ( App. 77 )

It's obvious what happened here. Detective January, a homicide Detective, was told by Edward Lee "Treyboy" Outley that Fields "Killed Coleman". In anticipation of a murder trial January went out to the jail and coerced and coached Tubbs and Quigley to completion. The governments argument was: " How did Tubbs and Quigley know that Coleman would end up dead if they didn't hear Fields threaten her? They said he threatened her even before her body was found." ( See App. 78 ). Yet the government knew that Outley and January "talked" just two days before January wrote the statements for Tubbs and Quigley, and the government knew that January told Tubbs and Quigley that Coleman was deceased. The government also knew that January tried to cover his tracks by trying to distance himself from Outley.

(a). Detective January first wrote a report alleging that he wasn't there when Outley was arrested on November 13, 2001, stating that the next day, November 14, 2001 at 1:30 he received a call from U.S. Marshal Parnell McNamara who told him that they had arrested Outley. ( See App. 79 ).

(b). But at trial two years later January forgot what he said in his original report and admitted that he was indeed there. ( See Cross exam. of January, pg. 1333; App. 80 ).

(c). Fields asked January was he the first one on the scene, and again January lied, attempting to keep that barrier between him and Outley. January claimed that the Marshals was there first and they called him over there. ( See Cross exam. of January, pg. 1334 App. 81 ).

(d). But a report filed by U.S. Marshal Chris Casson states that the Waco PD called the Marshals, and when they arrived they " encountered detective Steve January  talking to Outley. ( See report; App. 82 ).

(e). Also during Outley's felon in possession trial Outley testified that January held him up until the Marshals arrived. ( See Direct exam. of Outley  Pg. 134  App. 83 ).


There is no doubt that Detective January committed perjury in order to hide the fact that he talked to Outley just two days prior to going out to the jail and writing the statements for these crooks. And the government knew that January was willfully concealing that fact.


(8). Which brings us to U.S. Marshal Parnell Mcnamara,  the guy that Detective January first claimed called him and told him that they arrested Outley.


The night that Fields was rearrested following his departure from the jail Law Enforcement surrounded the apartment of a convicted sex offender named Hubert Steadman after Steadman, his then girlfriend, and another government witness, Christian "Chae" Walker lured Fields to Steadman's apartment in anticipation of collecting some reward money for Fields' arrest.

Walker had informed Fields that "two brothers" and several other guys were looking for Fields with firearms. Walker offered Fields a gun to protect himself. Walker gave Fields the alleged gun of unknown caliber but told Fields that he would have to go get the gun from Walker's childhood friend, Hubert Steadman...

Fields went to Steadman's house where Steadman claimed that he'd let "a friend" borrow the gun. Steadman told Fields to " sit tight " while he went to get the gun. Steadman left the house and called the police. The police surrounded the house and Fields surrendered without incident.

U.S. Marshal Parnell McNamara claimed that he asked Fields did he have a gun and Fields said yes and told McNamara where to find the gun. ( See Direct exam. of Parnell McNamara, pgs. 1556 -1557; App. 84 )

18

However, Hubert Steadman admits that it was he whom claimed that Fields had a gun, Steadman said that the Marshals went into the apartment looking for the gun but couldn't find it, so he, Steadman went in and "found" the gun for them. ( See App. 85        ).

(9). The government procured inmate Homero DeLeon to falsely implicate Fields in Coleman's murder. DeLeon claimed that he and Fields were cell mates, Fields adamantly denied it and stated that he didn't even know DeLeon and had never even seen him before until he got up on the witness stand and lied on him. ( The government knew DeLeon was lying jail records show that Fields and DeLeon have NEVER been cellmates.)

In any event DeLeon claimed that he was in Fort Worth Federal Prison when Fields arrived there in Segregation in December 2002. DeLeon alleged that Fields hollared across the hallway at him and said: " Since you're not on the government's witness list to testify against me I'm going to confess to you."

First of all there was no "witness list" in December 2002, the government's witness list didn't come out until January 2004. Fred Waggoner admits that fields only talked to the inmate next door to him ( Francisco "Pancho" Rios ), an elderly gentleman, and they never talked about fields case. There were up to 80 other inmates in the surrounding cells and at least three officer's present at all times. Fields also had an observation sheet on his door where the officer's had to write down everything that he did and said every 15-minutes. Officer Waggoner confirms that if Fields would have confessed to anyone across the hall where DeLeon claim that he was Fields would have been heard by everyone. ( See App. 86    ).

In 2004 when Fields went to trial DeLeon alleged that Fields told him the names of the people that went to the Grand Jury on him. ( See App.   87      ). DeLeon named five people that didn't even go to the Grand Jury on Fields; Five people that DeLeon admits that he know personally. ( See App.  88      ). DeLeon named a girl, Andrea Sais, this young woman wasn't in jail, she doesn't know Fields, nor do Fields know her, Sais' only involvment was that she was giving money to a jailor, whom in turn was taking contraband to her brother in jail. ( Whether that was knowingly on her part or unknowingly is unclear.) In any event her actions have nothing to do with Fields; No one DeLeon named was a witness against Fields, nor could they have been a witness against Fields.

In order to bolster DeLeon's testimony the prosecution put ATF agent Douglas Kunze on the stand to defraud the Court by adding false substance to DeLeon's fabricated testimony. Kunze alleged that the prosecution gave Fields' defense team the "Grand Jury Transcripts" "early on in the investigation." ( See App. 89        ). Then the prosecutor willfully manipulated the jury by arguing that Fields had to tell DeLeon that those people went to the Grand Jury on him since Kunze said that they'd given the defense  the Grand Jury transcripts " early on in the investigation." ( See App.  90      ). Yet the government knew that it was all a lie and they hadn't given up the Grand Jury transcripts in December 2002 when DeLeon claimed this happened. On July 30, 2003 Fields' attorney's was still asking

19

the government for " the Grand Jury transcripts "; ( See App.   91   ). The testimony was knowingly, willfully, intentionally and deliberately false.

(10). Agent Kunze's deception didn't stop there. William "Skeeter" Young, an inmate that Edward Lee "Treyboy" Outley was in Beaumont Federal Penitentiary with, and whom Outley once sold drugs for in the late 1980's/early 1990's said that Outley told him that Coleman was "shot in the head twice". ( See App.   47   ). The government scrambled to find a "witness" to counter Young's testimony. Young had came forward in anticipation of using what Outley told him to make a deal to testify against Fields, but because Fields had never been to Beaumont Federal prison and had never been in Young's presence the government couldn't use Young to lie like they'd used the other crooks to lie. But Young's testimony could be used to impeach Outley. Outley had consistently said that Fields admitted to killing Coleman, but before Fields could go into details Outley had stopped Fields and said that he don't want to know. ( See App.   92   ). If Outley was telling the truth then he wasn't supposed to know that Coleman was "shot in the head twice".

The prosecution immediately procured ATF Agent Douglas Kunze to lie and say that he talked to William Young the day before and Young said that he don't even know Outley. ( See App.   93   ). That was a blatant lie and a willful and deliberate means of defrauding the Court. Outley admitted that he do know William "Skeeter" Young. ( See App.   94   ). And William "Skeeter" Young admits that he's known Edward Lee "Treyboy" Outley since he was a child. ( See App.   95   ).

But there's an even bigger problem here. Agent Kunze claimed that he talked to William Young the day prior. Fields supoenaed William Young AD TESTIFICUNDUM. ( See App.   96   ). Fields also had the Motion sealed so the government wouldn't know who he was supoenaing. ( See App.  97   ). William Young could provide no evidentiary value to the governments case and thus was not supoenaed by the government, the government wasn't even supposed to know that Young was in Waco. That means that either Judge Smith or someone around the Judge was leaking confidential information to the prosecution.

There is no doubt whatsoever that the prosecution intentionally, deliberately, willfully and knowingly used law enforcement officer's to mislead the jury and defraud the Court. Every time Fields impeached one of their witnesses and/or challenged their case with substantial and credible evidence the prosecution procured law enforcement to lie, using them to defraud the Court into overlooking the real evidence that exonerates Fields and implicates Edward Lee "Treyboy" Outley and Shalaykea "Lakie" Scroggins in Coleman's murder.

The Court's have held that " the supervisory powers of the Courts is

20

reserved to protect the integrity of the federal courts. United States v. Chiavola, 744 F. 2d 1271 , 1274 (7th Cir. 1984). The policy is concerned with the extent to which fraud on the courts converts the courts into an instrument of the party's deception. cf. McNabb v. United States, 318 U.S. 332, 347 87 L. Ed. 819, 63 S.Ct. 608 ( Court is not concerned with law enforcement " except in so far as the courts themselves become instruments of law enforcement.) Chiavola, 744 F. 2d at 1274 ( fraud on the court common factor in cases in which Courts have exercised their supervisory power.) Recognizing a Court's inherent authority to correct injustice perpetrated through it by a party's lying in Court is not novel , and does not augment a Court's power regarding probation beyond what congress allowed. Fields have shown by clear and convincing evidence that the government pollinated, primed and pumped witnesses to testify to a parade of perjury. The Supreme Court has defined perjury in the context of an obstruction of justice sentencing enhancement as " false testimony concerning a material matter with the willful intent to provide false testimony." United States v. Dunnigan, 507 U.S. 87, 94, 113 S.Ct. 1111, 1116, 122 L. Ed. 2d 445 (1993). There is no doubt that the perjury was willful and deliberate and it was intended to defraud the Court in regards to everything material. The Dunnigan example leaves no doubt that the violation is indeed criminal, and the prosecution cannot, up under any circumstances commit criminal act(s) in the pursuit of "justice". ( Bearing in mind that this isn't justice sought, but a deliberate and willful malicious prosecution.) The Supreme Court have held that knowingly false or misleading testimony by a law enforcement officer is imputed to the prosecution; Wedra v. Thomas, 671 F. 2d 713, 717 n.1 (2d 1982); Curran v. Delaware, 259 F. 2d 707, 712-713 (3d Cir. 1958) (citing Pyle v. Kansas, 317 U.S. 213, 87 L. Ed 214, 63 S.Ct. 177 (1942); The knowing use of perjured testimony constitutes a due process violation as defined in Kyles v. Whitley.The government knew that Detective Spillman and Marshal Casson was lying when they said that Fields became "angry" and/or "irate" when he came into contact with Coleman at the hospital; The government knew that Detective Morris "Bubba" Colyer was lying when he misled the jury and said that Outley told him the name of the man who owns the Jaguar; or when Detective Colyer lied and said that the Grand Am was "clean" and "detailed"; The government knew that Detective Steve January was lying when he said that there was no fingerprints in the alleged carjacking vehicle; The government also knew that those prints had been checked against Fields' prints and it didn't match. Just as the government knew that had the Grand Am been "detailed" they still would have found blood and there was no blood; The government also knew that Fields had no other "friends" and "relatives" close to the hospital where he could have ran to should "a carjacking go wrong" like Marshal Chris Casson misled the Grand and petit jury's to believe; The government also knew that Fields didn't tell Parnell McNamara that he had a gun and where to find it when he was arrested. The aforementioned leaves no doubt that the prosecution used an "unconscionable

21

plan and/or scheme " to improperly influence the Court's decision by fabricating evidence, using law enforcement officer's to improperly and illegally staunch every material fact in Fields' favor, and to hide, suppress, conceal and/or withhold exculpatory and impeachment evidence. Rozier v. Ford Motor Co., 573 F. 2d 1332, 1338 (5th Cir. 1978); United States v. Hasson, 333 F. 3d at 1270-71; ( A scheme to defraud requires proof of material misrepresentations, or the omission or concealment of material facts...reasonably calculated to deceive...") (citing Neder v. United States, 527 U.S.1, 25, 119 S.Ct. 1827, 1841, 144 L. Ed. 2d 35 (1999)); Langford v. Rite Aid of Ala., Inc., 231 F. 3d 1308, 1312 (11th Cir. 2000) ( " Intent to defraud need not be shown through active misrepresentation-material omissions can be fraudulent if they are intended to create a false impression.") The innuendo, half truths, rhetorical hyperbole and outright willful lies herein, calculated by the prosecution to defraud prevented Fields from fully and fairly presenting his case and/or defense; Frederick v. Kirby Tankships, Inc., 205 F. 3d at 1287 (11th Cir. 2000); Scutieri v. Paige, 808 F. 2d at 794 ( 11th Cir. 1987 ); Rozier v. Ford Motor Co., 573 F. 2d 1332, 1339 (5th Cir. 1978). The prosecutors violated their duty of honesty to the Courts. Sawyer v. Collins, 986 F. 2d 1493, 1497 (5th Cir. 1993); citing Barefoot v. Estelle, 463 U.S. 880, 893, 103 S.Ct. 3383, 3394, 77 L. Ed. 2d 1090 (1983). The species of fraud that they perpetrated subverted the integrity of the Court(s) itself so that the judicial machinery could not perform in the usual manner and the impartial functions of the Court have been directly corrupted. See Pfizer inc., v. Int'L Rectifier Corp., 538 F. 2d 180, 195 (8th Cir. 1976), cert. denied, 429 U.S. 1040, 97 S.Ct. 738, 50 L.Ed. 2d 751 (1977); The government withholding the photographs is an extension of their fraud on the Court. ( See Freestanding Actual Innocence Brief, App. 5 & Writ of cert., App. 19  )

## ACTUALLY INNOCENT

6). (a). Fields is actually and factually innocent of the crime(s) of conviction. The governments decision to align themselves with a criminal venture and aid and abet Outley and Scroggins conspiracy to suppress, hide, and/or conceal the color of the Jaguar along with the prosecutions willful, intentional, deliberate and knowing decision to withhold the photographs effectively robbed Fields of his Constitutional right to prove that Outley and Scroggins did in fact murder Coleman and their blood in that Jaguar where the thorns undoubtedly cut them intertwined with the blood from Coleman's wounds would have exonerated Fields. There is no doubt that Fields have established a "colorable showing of innocence"; Kuhlman v. Wilson, 477 U.S. at 454 & n.17, 106 S.Ct. at 2627 & n.17; Schlup v. Delo, 513 U.S. 298, 314-16, 130 L.Ed. 2d 808, 115 S.Ct. 851 (1995). The Due Process clause have been severely and egregiously offended. Due Process of law prohibits the conviction of either

22

a legally and/or factually innocent person. Gardens v. Stephens, Sup. Ct. # 13-546 (2013) cert. pending, (5th Cir. 8/2/13). The evidence that the jury was permitted to hear was impermissible, materially inaccurate and demonstrably false. Duest v. Singletary, 967 F.2d 472, 482 (11th Cir. 1992), vacated on other grounds, 507 U.S., 113 S.Ct. 1940, 123 L. Ed. 2d 647 (1993). " When a defendant's life is at stake, Court's must be "particularly sensitive to insure that every safeguard is observed " Gregg v. Georgia, 428 U.S. 153, 187 (1976); See also Woodson v. North Carolina, 428 U.S. 280, 305 (1976) (" Because of that qualitative difference [between death and any other punishment], there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case"); Eddings v. Oklahoma, 455 U.S. 104, 118 (1982) ( O'Connor, J. concurring ) ( Noting that, because of the exceptional and irrevocable nature of the death penalty, " extraordinary measures " are required by the eighth and Fourteenth Amendments to ensure the reliability in Capital proceedings ); Ford v. Wainwright, 477 U.S. 399, 411 (1986) ( The heightened standard of reliability in Capital cases is " a natural consequence of the knowledge that execution is the most irremediable and unfathomable of penalties; that death is different"). The police and prosecutors in Fields' case acted as if they were above the law and have shown no regards for Mr. Fields' innocence, his life, and/or his Constitutional rights to be free of Cruel and Unusual Punishment. ( See Free-Standing Actual Innocence Brief, App. 5 & Writ of cert. App. 19 )

## CONSPIRACY

Clearly established Federal Law defines the elements of Conspiracy as (1). An agreement between two or more persons; (2). The object of which is to do an unlawful act or a lawful act by unlawful means. ( A formal agreement need not be demonstrated, as an agreement may be demonstrated by circumstantial evidence of a meeting of the minds to commit an unlawful act.); United States v. Moore, 525 F. 3d 1033 (11th Cir. 2008); United States v. Percel , 553 F. 3d 903 ( Dec. 23, 2008 ). There is no doubt that the government and their witnesses joined in a seditious conspiracy to provide false testimony to a grand and petit jury in this capital case so they could manipulate a verdict of guilty, which would ultimately lead to the murder of Sherman Lamont Fields via lethal injection. The evidence presented herein in substantial, concrete and undeniable; The perjury in the Grand jury claiming that Fields was "angry" and/or "irate" to the willful concealment of the true color of the jaguar. It's not like Scroggins said that the Jaguar was BLUE, Outley said that the Jaguar was BLACK, and the prosecution said that the Jaguar was GREEN, they all said that the car was BLUE while knowing all along that the car was GOLD and in order for them to come to that consensus they all had to AGREE /CONSPIRE to lie and say that the car was BLUE; They all had to AGREE on that color.

Just as the prosecutor's and the law enforcement officer's had to AGREE , whether it was

23

formally or by and through " a meeting of the minds " there is no doubt that the conspiracy is complete. Conspiracy only requires that after the conspiracy is born at least one of the people commits an overt act in furtherance of the agreement. 18 U.S.C. § 371 (1982); United States v. Bell, 577 F. 2d 1313, 1315 n.2 (5th Cir. 1978), cert. denied, 440 U.S. 946, 99 S.Ct. 1422, 59 L. Ed. 2d 634 (1979); United States v. Sutherland, 463 F. 2d 641, 645 (5th Cir.), cert. denied, *1569409 U.S. 1078, 93 S.Ct. 698, 34 L. Ed. 2d 668 (1972). A person suborns perjury when he procures another to commit any perjury. 18 U.S.C.A. § 1622; See also Dunnigan, 507 U.S. at 94, 113 S.Ct. at 1116 ( applying definition of perjury from 18 U.S.C. § 1621, the criminal perjury statute to § 3C1.1 ). The prosecution " seeking jailhouse testimony " and trying to procure false "eyewitnesses" and willfully hire inmates to lie is unfathomable in a Country that relies on the integrity of the Justice system. But here in Fields that's exactly what happened, the evidence don't lie. There was a reoccuring theme amongst the governments "jailhouse witnesses", they all claimed that Fields was known for " robbing and shooting drug dealers " and all of the "jailhouse witnesses" that the government procured to defraud the Court were "drug dealers". All the prosecution did was provide these crooks with a foundation to use Fields' unfortunate situation to murder Fields, and the prosecution knowingly and willfully aligned themselves with this criminal venture. ( See Freestanding Actual Innocence Brief, App. 5 & Writ of cert., App. 19 )

## 18 U.S.C.S. § 373(a)
## SOLICITATION OF MURDER

The Court(s) have yet to recognize that police, prosecutors and "witnesses" whom intentionally, deliberately, knowingly and willfully fabricate evidence and Defraud the Court(s) in Capital Death Penalty cases can be prosecuted under the solicitation of murder, Conspiracy to commit murder and Murder Statutes under the State and Federal Constitution although a reoccuring theme in all wrongful convictions and malicious prosecutions is that the offending police, prosecutors and their "witnesses" are never held accountable for their criminal conduct/actions. And as long as they know there are no serious consequences for their illegal, unethical and criminal actions they will do it again and again. This is an opportunity for the Courts to show "the people" that the integrity of our Justice system is of the utmost importance and these criminal act(s) will not be tolerated by anyone!

To find someone guilty of Solicitation of murder for hire the jury must find, (1). That the offender intended for another person to commit murder for hire; and (2). That the offender induced or tried to persuade that other person to commit murder for hire. 18 U.S.C.S. § 373(a). United States v. Razo-Leora, 961 F.2d 1140, 1148 n.6 (5th Cir. 1992); See also United States v. Cardwell, 433 F.3d 378, 390, 91 (4th Cir. 2005). The plain language of the Statute indicates that actual movement in interstate commerce is not required for a solicitation of

24

murder conviction under 18 U.S.C.S. § 373(a) c.f., United States v. Blackthorne, 378 F. 3d 449, 454 (5th Cir. 2004) ( Even where a conviction for the substantive offense of federal murder for hire fails for want of interstate travel, an offender can be convicted of conspiring to commit the offense".)

It is Clearly Established Federal Law that a Section 373(a) offense is complete when one corruptly "endeavors" to, and employs another to commit Murder-for-remuneration; One need not prove that a murder actually occured. And as the Court of criminal appeals noted "remunerate" encompasses a broad range of situations, including compensation for loss or suffering, and the idea of a "reward" given or received because of some act." The Court's interpretation far from offering a surprising or far-fetched construction, stated the everyday meaning of the words used by Legislature. Beets, 767 S.W. 2d at 734." 180 F.3d 190:: Beets v. Johnson: June 28, 1999 (5th Cir.)

The first prong of the Murder-for-hire Statute have been met; In Herrera v. Collins, 506 U.S. 390, 404, 113 S.Ct. 853, 122 L.Ed. 2d 203 (1993), Justice Blackmun said that "the execution of a person who can show that he is innocent comes perilously close to simple murder". But even then, Justice Blackmun wasn't factoring in a case like Fields where the prosecution intentionally, deliberately, knowingly and willfully, with malice aforethought recruited a bunch of "paid occurence witnesses" whom engaged in a criminal conspiracy to use the Justice system as a murder weapon and Defrauded the Court(s) into taking away Fields' liberty with intentions of taking his life. Fields' impending demise exceeds Justice Blackmun's "logic" tenfold and crosses into the territory of impending murder with premeditation.

With the death penalty on the table there is no question and/or doubt what the police, prosecutor(s) and their "witnesses" goal and/or intent were; the end result would be death and they all knew that, so when the prosecution went "seeking jailhouse testimony", and hired those crooks to lie and procured a number of Law Enforcement officers to add false substance to the perjury by boasting their lies and Defrauded the Court the prosecutor's intended for those crooks to "wield that sword" and commit Murder-for-hire; Thus satisfying the first prong.

The second prong have been met as well. According to a letter that Shalaykea "Lakie" Scroggins wrote her accomplice, Edward Lee "Treyboy" Outley the prosecution wanted one of them to lie and say that they saw Fields murder Coleman, thus inducing or trying to persuade Outley and/or Scroggins to commit murder. Also Chance Alexander, another inmate that Fields don't know said that law enforcement working for the prosecution tried to recruit him with the promise of "remuneration" (a reward for the act), to lie in this Capital case and say that Fields confessed to him although he don't even know Fields and have never had a conversation with him; thus inducing or trying to persuade Alexander to commit Murder-for-hire; the second prong of Section 373(a) have been met.

There are generally speaking two types of evidence from which the Court may properly find the truth as to the facts of a case. One is direct evidence such as testimony of

25

an eyewitness, the other is indirect or circumstantial evidence, the proof of a chain of circumstances pointing to the existence of certain facts; The notice that the prosecution is "seeking jailhouse testimony" is instrumental and offers a glimpse into the prosecutor(s) state of mind; This notice was before they had any witnesses, and then two years later the prosecution closed their case with nothing but "jailhouse testimony", inmates whose stories are demonstrably false. Next we have Scroggins telling her accomplice that the prosecution want one of them to say that they were "with Fields" , and being that they were saying that Fields killed Coleman "with Fields" could only mean that they wanted to procure a false eyewitness. And then there is Chance Alexander, the guy that the prosecution tried to "hire" to lie on Fields; Three separate and individual incidents about the prosecution seeking false and fabricated evidence from three different places and/or people that don't know each other; And when you add the fact that every time Fields proved that this false evidence was indeed false the prosecutor's procured a law enforcement officer to lie and defraud the Court; (i.e) When fields said that the Jaguar was GOLD, the prosecutor said, " No it was BLUE; Trust me."; " When Fields said that he didn't kill Coleman,and the forensics from the Grand Am proves it, the prosecutor's said, " He killed her " and then they procured Detective Morris "Bubba" Colyer to lie and say that the car had been detailed, and then they withheld the photographs that proves the car wasn't detailed, while knowing that even if a vehicle is detailed forensics still would have found blood; When Fields said that he don't even know inmate Homero DeLeon and had never been his cell mate, the prosecutors said, " Yeah he know him, they were cell mates," while knowing all along that Fields and DeLeon was never cell mates; When Fields said that he didn't carjack Tammy Edwards, the government said " Yes he did.". Fields said that the fingerprints exonerate him and the prosecutor's procured Detective Steve January to lie and say that there were no fingerprints, while knowing all along that there were fingerprints and they didn't match Fields And there's multiple other incidents. There is no doubt that the prosecution solicited and/or conspired to murder Fields via lethal injection and defrauded the Court(s) to meet their end result.

A guiding principle here in Fields is that the Court(s) should be mindful that evidence like this that's outside the record is critical to determining the truth because it bears on the prosecutions state of mind. The prosecution created a "kill zone" when they went "seeking" and/or "hired" these crooks to Defraud the Court and engaged in conduct that caused a situation manifesting an extreme indifference to the value of Mr. Fields life. This egregious abuse of governmental power severely violates Fields interest and/or right in not being the subject of arbitrary authority. This kind of official conduct involves the willfully illegal exercise of discretion and it implicates substantive due process because it affects Fields' right to be free of the abuse of power. There is absolutely no doubt that the major component in the malicious prosecution of Fields is the prosecutions solicitation of murder which contributed to the Fraud On the Court. ( See Freestanding Actual Innocence Brief, App. 5 & Writ of cert., App. 19 )

26

## UNREASONABLE DETERMINATION OF THE FACTS

On Direct Appeal to the 5th Circuit Counsel for Fields argued that photographs of the victim were inflammatory. The Court admits that " many of the photo's are shocking," but states that " The photo's showing the victim's body decomposing were highly probative. One of Fields's key themes at trial was that the government had little physical evidence linking him to the crime. In his opening statement, for example, Fields argued that it was "not possible" to commit murder in the time and manner in which the government witnesses allege and not leave any physical evidence..." The 5th Circuit held that the photo's were necessary to rebut Fields' argument. The photo's " helped explain why little physical evidence was found; because it had been carried away by animals or worn away by the elements. ( 483 F. 3d 313 ).

In another 5th Circuit case out of Jefferson County Louisiana ( Damon Thibodeaux), the prosecution used the exact same argument claiming that animals carried the DNA away and an expert successfully defeated that argument, stating that " animals don't carry away DNA." Mr. Thibodeaux was found to be innocent and freed from Death Row. The finding of "false facts" against Sherman Lamont Fields, an innocent man is extremely prejudicial and places an impossible burden on an innocent man; There was no physical evidence because Fields didn't kill Coleman, and the physical evidence that was found exonerates Fields. We are here today because the prosecution chose to turn criminal and defraud the Court(s). The disturbing fact that Shalaykea "Lakie" Scroggins and Edward Lee "Treyboy" Outley conspired to hide that Jaguar is what's significant here; That's where the missing DNA is, in that GOLD Jaguar, and instead of the prosecution conceding that they chose to knowingly and willfully align themselves with a criminal venture and aid and abett Scroggins and Outley, thus the 5th Circuit's decision to Aid the prosecution's deception is clearly erroneous, especially in light of the fact that the prosecution set out to willfully defraud the Court(s).

In addition to that, and what the Courts have failed to acknowledge in light of the prosecutions deception and criminal act(s) is that on/or around May 2003 the prosecution approached the defense claiming that they went back, searched the victim's clothes and found a hair. The trial was scheduled for the end of 2003, but an extension delayed the trial while the hair was tested. The prosecution then retrieved two envelopes of head and pubic hair from Fields.

After testing the prosecution told the defense that "they got a match, the hair belong to Fields." Counsel for Fields didn't see it as a big deal " because everyone knows that Fields was with Coleman," but Fields insisted that, in Fields' words, " The prosecution is trying to do something slick." Counsel asked the Court for funds to hire an independent DNA specialist and testing confirmed that the prosecution was indeed " trying to do some-

27

thing slick." The hair was African American but it wasn't Fields'. The prosecution then said that they weren't going to use the hair anyway; That's when they informed the defense that they had several inmates that were going to say that Fields confessed to them; Enter Homero DeLeon, Kevin Burton, Jerry Reed, John Mercer, and later Christian "Chae" Walker.

Fields had every right to expound upon the fact that these inmates were lying and the DNA didn't match because that's the truth, and the real evidence supports that. The erroneous judgement that the 5th Circuit made in favor of the government on Direct Appeal is a testament to the fact that the prosecution did and continue to Defraud the Court(s), which is not only a violation of Fields' Civil and Constitutional rights, but it lends credence to the fact that the prosecution's actions are criminal indeed. The Fraud On The Court led the 5th Circuit to an unreasonable determination of the facts.

Also on Direct Appeal the 5th Circuit focused on the testimony of inmate Kevin Lamar Burton, a man that Fields don't know and had never seen before until he got up on the witness stand and lied. At trial the prosecution led Burton into perjury by asking questions that suggest the desired answer; (i.e) Have he ever tried to rob you? (App. 98 ). Nowhere in Burton's statements do Burton ever say that Fields tried to rob him. In any event Burton followed the prosecutor's lead and claimed that a William Hayes told him that Fields was going to rob him, Hayes told Fields not to do it, then Fields just came out and confessed to Burton that he'd killed Coleman.

On appeal the 5th Circuit said that because Fields challenged Burton's false testimony and said that it was fabricated any prosecutorial misconduct and 404(b) violations in regards to Burton was appropriate. ( 483 F.3d 313 ). Again, this erroneous ruling places an impossible burden on an innocent man and places  the 5th Circuit in the awkward position of Aiding and Abetting these criminals. There is no doubt that Burton is lying; Shalaykea "Lakie" Scroggins started corresponding with Christian "Chae" Walker in October 2002 and shortly thereafter Walker was sent to Three Rivers Federal Prison with Burton. It was then that Burton "came forward". Burton claimed that on November 16, 2001 Fields was in a four door red Grand Am and Outley was "in a Jaguar". Burton said that they were all on Proctor Street in Waco, Texas.

There are several things that an honest prosecutor would have noticed in Burton's story besides the fact that it's incredulous; The Grand Am was a two door, not a four door, and it's a proven fact that it was no longer in Fields possession after the night of the murder, which was ten days prior. And the Grand Am went to the forensics lab on the 14th so there is absolutely no way Burton could have encountered Fields in the Grand Am on the 16th like he claim. In addition to that the Jaguar was no longer in Outley's possession after the night of the murder, and Outley went to jail on the 13th, so there is absolutely no way possible Burton saw Outley in the Jaguar on the 16th. Burton's testimony was indeed false  and the prosecution knew that, yet they intentionally

28

and willfully defrauded the Court(s).

On Habeas the Fraud On the Court led to the 5th Circuit further making an unreasonable determination of the facts.

(1). On July 30, 2014 the 5th Circuit Court of Appeals denied C.O.A. holding that, (a) Actual Innocence is not a cognizable issue in their circuit; (b) Shalaykea Scroggins said that she never threatened Suncerey Coleman; And (3) The Grand Am didn't reveal any blood because a detective said that the car " looked detailed " or " wiped down."

THE 5TH CIRCUIT'S CLAIM THAT
SCROGGINS NEVER THREATENED
COLEMAN

Scroggins wrote two letters bearing on her state of mind. Four months prior to Coleman's death Scroggins wrote the letters expounding upon her obsession for Fields. She talked about how she'd lost Fields  to Coleman once, and said, " I will not let it happen again." And if she were to lose Fields, she would be " killing bitches." ( See App. 30      ).

A week before the murder Scroggins approached Coleman and they got into a very heated argument. ( See App. 31   ). The only reason the altercation didn't turn physical that day is because Fields' mother arrived and broke it up.

Also Scroggins went and got a phone turned on in Fields name. She immediately started calling Coleman threatening her. The day before the murder Fields and Coleman called the phone company together, and Coleman told them that Scroggins illegally got the phone turned on in Fields name and she was calling her house threatening her. ( See App. 32        ).

Because of the prosecution's Fraud On the Court it led the 5th Circuit to give an opinion that's clearly inapposite the facts, logic, and the law.

THE 5TH CIRCUIT'S ERRONEOUS RULING
IN REGARDS TO THE FORENSICS

After Fields brought up the fact that the Grand Am that he was driving that night was cleared by forensics and Outley and Scroggins conspired to hide that Jaguar the prosecution procured Detective Morris "Bubba" Colyer to lie and say that the Grand Am " looked detailed " and/or " wiped down ". The 5th Circuit referred to this false testimony in their denial of Fields C.O.A. as a way to explain the lack of blood in the Grand Am. They also said that Fields could have cut his legs on the thorns at the crimescene and his legs could have healed by the time he went back to jail two weeks later. And the Court referred to the testimony of the government's forensic expert where he said that he found a "stain" that he thought could possibly be blood.

(2). The owner of the Grand Am, Mr. Roger Thomison, he worked construction, which is a very dirty job; He also rented his car out daily to various individuals for crack cocaine. ( See App. 24    ). There is no way  possible that car was "detailed" or "wiped down" on November the 6th when the murder occured and it was still "clean" on November the 14th when Detective Colyer took possession of the car. (NOTE: Fields maintains that the car wasn't "detailed" or "wiped down".

(3). Also the forensics reports show that the car wasn't "detailed" or "wiped down". ( See App.  26    ).

29

(4). There are photographs of the car pre and post forensics testing that will undoubtedly show that the car wasn't "detailed" or "wiped down". ( See App. 26      ).

(5). And what the 5th Circuit failed to acknowledge is that the same forensics expert that they referenced also said that he tested the "stain" with TMB solution and it wasn't blood. ( See App. 26     ). But he took the carpet anyway and sent it to the lab. And the lab results were also negative. ( See App. 22      ).

(6). But most importantly the forensics expert also said, and the 5th Circuit failed to acknowledge is that " even if a car is detailed they got technology that will still find blood." ( See App.  25      ).

Thus there is no way Fields could have killed Coleman because, even assuming the Court is correct and any wounds sustained from the thorn bushes could have healed, Fields' blood where the thorns would have cut him, along with the blood from Coleman's wounds would have still been found in that Grand Am.

In addition to that the Court fails to acknowledge that the victim's blood, along with Scroggins and Outley's blood must have been in that Jaguar. What other reason would they have for conspiring to hide the car?

There is no doubt that the prosecution's Fraud On the Court led to the 5th Circuit handing down an opinion that's inapposite the facts, it's inapposite the law, it's inapposite logic, and it's inapposite science. It's clear that Outley and Scroggins committed this murder, the prosecution fabricated the evidence to convict Fields, and the Fraud On the Court(s) have led to the Court's clearly ignoring factual evidence. The Court's are saying that the government's "word of mouth" case is more credible than forensics when in fact that have never held true in any case. ( Especially in light of all of the evidence proving that the inmates that the government procured to lie are indeen lying.)

## THE 5TH CIRCUIT'S CLAIM THAT THE PROSECUTION'S OBJECTION'S WERE NOT BASELESS

(1). Shalaykea "Lakie" Scroggins gave several different alibi's for the time of Coleman's murder. In one alibi Scroggins claimed that she was at the store " buying a box of black and mild cigars and something to drink." However the store was closed at the time that she claim that she was there. When Fields tried to impeach her alibi the prosecution objected and Judge Smith sustained the objection, ruling that it wasn't relevant. ( See App.  99    ). When in fact Scroggins " alibi " absolutely was relevant.

(2). Then in closing the prosecutor bragged to the jury how he'd made all of these baseless objections. ( See App. 100      ).

(3). The prosecution's misconduct got so bad Fields' stand-by counsel took it upon themselves to bring it to the attention of the Court. ( See App. 101       ).

The prosecution's Fraud On the Court led to the 5th Circuit finding that " the prosecution's objection's were not baseless, and nearly all were sustained." It's clear here that the Judge was sustaining objections that were truly legal and valid. ( This is only one such incident of many ). And the objections were "baseless", even the prosecution admits that while bragging to the jury. Also stanby counsel for Fields objected to the prosecution's illegal and unethical actions.

30

EDWARD LEE "TREYBOY" OUTLEY'S
LIE THAT THE GOVERNMENT HAD
MADE HIM NO PROMISES

(1). At trial Fields asked Outley had the prosecution made him any promises? ( See App.     ). Outley lied and said no; The prosecution didn't even attempt to correct him. In Smith v. Kemp, 715 F.2d 1459, 1463 (11th Cir.) cert. denied 464 U.S. 1003, 104 S.Ct. 510, 78 L.Ed. 2d 699 (1983), the Court held that " If false testimony surfaces during a trial and the government has knowledge of it, the government has a duty to step in and disclose." ( The government must affirmatively correct testimony of witness who fraudulently testifies that he has not received a promise of leniency in exchange for his testimony.)

The government referred to the District Court's erroneous ruling where the Court said that it was unclear whether Outley  understood the general question posed to him. Id. ( Brief in opposition of C.O.A. pgs. 63-64.)

The letter that Outley wrote Fields' attorney ( App. 59     ) is what spurred the question. In the letter Outley said, " I could have got 5K1." When Outley lied and said that the government hadn't made him any promises, the Court erroneously ruled that Fields didn't follow-up with questions. But Fields did indeed follow-up, asking Outley about the 5K1 program. ( See App.  102    ). The letter where Outley say that he could have got 5K1 and Fields questions about 5K1 show that Outley did indeed understand that Fields was asking him if he'd received a deal for his testimony.

Thus it's no surprise that the prosecution would then essentially say: " So what if we suppressed the nature of Outley's immunity deal?" stating: " Even if Fields could show that the United States suppressed the nature of Outley's immunity " he cannot show that it would undermine confidence in the verdict. ( Brief in opposition of C.O.A. pg. 62 ).

In denying Fields C.O.A. the 5th Circuit agreed with the prosecution and the District Court. (ROA pg. 46 of 62 ) The prosecution's Fraud On the Court led to the 5th Circuit's unreasonable opinion in regards to Outley's lie.

(a) If the government had not given Outley broader immunity Outley would have testified that he didn't give Fields a gun, as evidenced by the many times that Outley denied giving Fields a gun, and in that case the only person the alleged murder weapon could be traced back to is Outley himself, because it was Outley himself whom admits to at some point having the gun.

(b). Fields have called into question the governments entire case, the only solid evidence pertaining to Outley is that he gave multiple alibi's for the time of the murder; he conspired with Scroggins to hide the car that they were in on the night of the murder so it wouldn't be subjected to forensics testing ; He told William Young that Coleman was "shot in the head two times" when he wasn't supposed to know that; He procured "Shae" Walker to lie and say that he gave him the alleged murder weapon. Also Outley is known to lie and say that guns belong to other people. ( See App. 103    ). And he lied about not receiving a deal; Thus the 5th Circuit's decision is inapposite clearly established federal law and relief is warranted. See Kyles v. Whitley, 514 U.S. 419, 435, 131 L.Ed. 2d 490, 115 S.Ct. 1555 (1995).

In other cases where Outley falsely implicated others, as in the aforementioned ( App. 103 ) where Outley tried to put the gun off on his cousin, Calvin Rollins and/or his girlfriend's brother, Willie Hampton, the government successfully exposed Outley, stating that Outley was a liar and was "trying to get himself "out of a pickle". ( See App. 104 ). But when it came to Fields and the alleged murder weapon the prosecution didn't even attempt to check and see if Outley was lying even when Outley kept going from, " No I didn't give Fields a gun " to " Yeah I gave Fields a gun ". The government even knew that Outley told Walker to lie and say that he gave him the gun for Fields. But simply put, the government didn't care if Outley was lying in this instance because the government "wanted Fields". Instead the government aligned themselves with Outley's criminal venture, allowed Detective Morris "Bubba" Colyer's coaching of "Shae" Walker to go unacknowledged and then "paid" Walker via a time reduction, and "paid" Outley via full immunity for their lies and deception, while all the time committing Fraud On the

31

Court. And the prosecution's Fraud On the Court led to the 5th Circuit handing down an opinion that's inapposite the facts and the law.

" Under the unreasonable application " clause, the Court's application of federal law must be "objectively unreasonable". See Wiggins, 539 U.S. at 520-21 (citing Williams v. Taylor, 529 U.S. 362, 409, 120 S.Ct. 1495, 146 L.Ed. 2d 389 (2000) (internal quotation marks omitted). There is no doubt that the Fraud On the Court led to the 5th Circuit violating the "unreasonable application" clause.

## NEWLY DISCOVERED EVIDENCE

(1). At trial the prosecution led inmate Kevin Lamar Burton into saying that Fields was going to "rob" him, but a William Hayes told Fields not to do it. The search for the elusive Mr. Hayes have been of the utmost importance, but the 5th Circuit's unreasonable determination of the facts in regards to that situation made the search that much more urgent. In February 2014 Fields finally found Mr. William Hayes whom was genuinely shocked and flabbergasted that Burton had used him to deceive the Court and frame Fields for Coleman's murder. Hayes is adamant that the incident the prosecution used Burton to defraud the Court with never happened. In light of this newly discovered evidence in conjunction with the false facts in Burton's testimony there is no doubt that Burton's story is fabricated, and because of the fabricated "evidence" there was an intent to knowingly and willfully deceive and defraud the Court(s).

(2). Every one of the governments "witnesses" testified to things that were outside of their statements, things that "Discovery" didn't cover, and Fields couldn't have found impeachment evidence "on a dime", if you will; Thus any evidence found after the fact is "New Evidence".

For instance: Inmate Christian "Chae" Walker had always maintained that Fields never confessed to him.

December 5, 2001 Walker wrote a statement saying that Fields never confessed to him. ( See App. 105  ). December 6, 2001 Walker wrote another statement saying that Fields never confessed to him. ( See App. 106  ). February 26, 2002 Walker told the Grand Jury that Fields never confessed to him. ( See App. 107  ). But Walker insinuated that Fields may have done something to Coleman.

Based on that the prosecution gave Walker a time reduction stating that his statements are "truthful", "reliable" and "complete". ( See App. 108   ).

Walker was already in contact with Edward Lee "Treyboy" Outley, but in October 2002 after Fields told Scroggins to stop writing him, Scroggins got mad and responded in a self-serving letter stating that she was writing "Shae". ( See App. 109   ).

In January 2004, just two days before Walker was set to testify about the gun that Outley recruited him to lie about the prosecution approached the defense and told them that Walker was changing his story and was now going to testify that Fields confessed to

32

Fields tried to show the jury that Walker got his testimony from Outley and/or Scroggins. Fields asked Walker do he talk to Outley? Walker said, " Yeah, but not about the case." ( See App. 110   ). That was a blatant lie and the prosecution knew it was a lie. In the Grand Jury after Walker claimed to have given Outley the alleged murder weapon, Walker was asked did he know what happened to that gun and Walker said that he did, " Because I talked to Outley when I was down in the holding tank with him for a few-- about an hour ago, and he told me that he let Fields get it." ( See App. 111     ). Now new evidence have come to light exposing Walker's testimony as false as well.

## ABUSE OF DISCRETION
### (TRIAL JUDGE)

The evidence strongly suggests that District Judge Walter Smith Jr. had knowledge of the Fraud On the Court and he himself played a major role in this catastrophe. Judge Smith have repeatedly made comments and did things that prejudiced Fields greatly, and in Fields' humble opinion it was done willfully with malice aforethought.

In a case that came along prior to Fields, in Andrade v. Chojnacki, 338 F.3d 448 ( July 14, 2003 ) prosecuting attorney William [Bill] Johnston was one of the original defendant's in a lawsuit stemming from the botched raid at the Branch Davidian Compound in Waco, Texas; Johnston is Judge Smith's friend.

While the Andrade case was before Judge Smith a special counsel from within the Justice Department investigated Johnston for allegedly withholding evidence from the then defendant Branch Davidians during their criminal trial. According to Newspaper report (338 F.3d 458) Judge Smith was upset by the investigators treatment of his friend. ( The article used the term "witch hunt" to describe Judge Smith's view.) In response Smith told several investigators that he would no longer cooperate with the inquiry. When Fields went to trial in 2004 Judge Smith's friend, William [Bill] Johnston was in private practice and he took on the victim's family in Fields' case as his client.

One would think that Judge Smith would have disqualified himself under 28 U.S.C 455 being that his impartiality had been questioned at least once before where Mr. Johnston was involved, however Smith stayed on the case and it brought us to where we are today.

A criminal defendant's right to an impartial judiciary is embedded in the Due Process Clause of the Fifth Amendment to the U.S. Constitution, which mandates a " fair trial in a fair tribunal " for every defendant. In re Murchison, 349 U.S. 133, 136 (1955). A Judge violates a defendant's due process rights if he is biased against the defendant. Bracy v. Gramley, 520 U.S. 899, 904-05 (1997). And even if a Judge has no actual bias, but a bias may be apparent, a judge must recuse to avoid offending due process. Aetna Life Ins. Co. V. Lavoie, 475 U.S. 813, 825 (1986); United States v. Couch, 896 F.2d 78, 82 (5th Cir. 1990)

( Due Process "requires a judge to step aside when a reasonable judge would find it necessary to do so".)

In the United States v. Harlow, 444 F. 3d 1255 (10th Cir. 2006) the Court held that the Judge should not say or do anything that will give the jury the impression that he's improperly vouching for the prosecution; Judge Smith improperly vouched for the prosecution on several different occasions and his actions undoubtedly coerced Fields' conviction.

(a). During voir dire, Donna Williams, a woman that ended up on the jury on Fields case was told by Judge Smith that " if the prosecutor's in Fields case thought that someone's rights are not being protected they will go so far as to dismiss the case rather than pursue it. ( See App. 112 ). This is extremely prejudicial given the fact that the prosecution suborned perjury, fabricated evidence, withheld evidence, aligned themselves with a criminal venture and defrauded the Court.

(b). In the Andrade case Judge Smith declared that he had not read the evidence prior to denying its admissibility, which in fact alignes with what he did here in Fields. When the government's Star Witness gave several different alibi's and Fields attempted to impeach one of the alibi's where she claimed that she was at a store that was indeed closed at the time in question the prosecution objected, claiming that it was irrelevant, and Judge Smith sustained the objection, effectively hindering Fields from impeaching Scroggins "alibi". ( See App. 99 ).

" A district Judge abuses its discretion if it applies an incorrect legal standard, follows improper procedures in making the determination, or make findings of fact that are clearly erroneous. Chicago Tribune Co. v. Bridgestone Firestone Inc., 263 F.3d 1304, 1309 (11th Cir. 2001). When Fields asked Judge Smith isn't all relevant facts proving who committed the murder admissible, Judge Smith said no. ( See App. 113 ). But Scroggins "alibi" and Fields' right to impeach her should have been admissible. Judge Smith then threatened to cut Fields' cross examination of this very important witness short. A moment later Smith did indeed cut Fields' cross examination short and allowed the government to take over and solicit some very damaging and demonstrably false testimony from Scroggins. ( See App. 114 ). Judge Smith's actions gave the jury the impression that Fields was lying and the prosecution and their witnesses were the one's being "honest", and it amounted to improper vouching; especially in light of the fact that the Grand Jury had already voiced their skeptism about Fields threatening Scroggins. ( See App. 52 ).

(c). Judge Smith prejudiced Fields severely and "fatally" when he forced Fields to proceed to trial pro se. Fields filed a motion for New Attorney's after having significant problems with his trial attorney(s). ( See App. 115 ). And then later found out that one of the attorney's had prosecuted him before. Judge Smith refused the Motion for New Attorney's. ( See App. 116 ).

Fields knew he couldn't represent himself so right before trial he begged Judge Smith not to make him proceed pro se against his will. ( See App. 117 ).

The evidence strongly suggests that Judge Smith made these erroneous decisions that

were calculated to give the prosecution the advantage on one end of the spectrum, and on the other end he wanted to satisfy his friend, William [Bill] Johnston. On several occasions Smith admonished Fields in open Court in front of the jury, but when Fields' standby counsel got tired of the prosecutor's taking advantage of Fields inexperience and the prosecution leading their witnesses and asking inappropriate and illegal questions they brought it to the attention of Judge Smith who pretended like he didn't know what the attorney's were talking about. Then instead of admonishing the prosecutor's in open court like he'd continuously did to Fields, Judge Smith "admonished" the prosecutor's in a bench conference. ( See App. 101     ). Judge Smith's words and actions were the equivalent of testimony for the prosecution and put the prestige of the U.S. government behind every last one of the prosecution's witnesses.

   (d). Also at trial several jurors, in their jury questionnaire said " Black males commit most violent crimes "; " A group of blacks jumped on my daughter and son in law "; " My preachers father was murdered and the man that killed him didn't do not one day in jail "; " Police officer's must be obeyed at all times "; etcetera, etcetera, etcetera. Fields immediately filed a Batson Challenge . ( See App. 118     ). Judge Smith denied the Batson Challenge and as a direct result this jury with racial ideologies found an innocent man guilty based on blatantly false testimony and sentenced him to die. The jury contends that they sentenced Fields to die because he didn't show any emotions; which is a blatant lie. Fields was crying so much at trial the prosecution even commented on it during closing arguments. Judge Smith's refusal to grant Batson was clearly erroneous especially in light of the fact that a number of the jurors held high regards for police officer's, and undoubtedly police officer's led the charge in defrauding the Court with undeniably complex perjury.  Judge Smith's bias is undeniable. A Judge must recuse himself "in any proceeding in which [the judge's] impartiality might be reasonably questioned", 28 U.S.C. 455(a), or if the judge "has a personal bias or prejudice concerning a party..." 28 U.S.C. 455(b)(1). Section 455(a) is interpreted under an objective standard, and a judge must recuse himself if "a reasonable and objective person, knowing all the facts would harbor doubts concerning the judge's partiality." United States v. Jordan, 49 F. 3d 152, 155 (5th Cir. 1995); See Liljeberg v. Health Servs. Acq. Corp., 486 U.S. 847, 860 (1998) (""The goal of section 455(a) is to avoid even the appearance of partiality"") (citation omitted).  Judge Smith should have recused himself from overseeing Fields' trial.


                    POST CONVICTION PROSECUTOR'S
                    VIOLATED 18 USCS § 4
                    MISPRISION OF FELONY


   At or about February 17, 2014 Fields filed a Motion with the United States Supreme Court pursuant to Rule 60 for Fraud On the Court; The Supreme Court returned the Motion

35

with instructions for Fields to restructure and label " writ of cert.", and to serve a copy on opposing counsel; Fields met those criteria and refiled by June 9, 2014. Fields served prosecution attorney, Jennifer S. Freel, Western District of Texas, 816 Congress Ave., Ste. 1000, Austin, Texas 78701. ( See writ. App. 19   ).

In the writ Fields put forth clear and convincing evidence that trial prosecutor's suborned perjury, engaged in a criminal conspiracy, solicited Fields' murder via lethal injection, Aided and Abetted a criminal conspiracy; committed perjury in the Grand Jury and committed Fraud on the Court.

The plain language up under 18 U.S.C.S. 4 states that, " Whoever, having knowledge of the actual commission of a felony cognizable by a court of the United States, conceals and does not as soon as possible make known the same to some Judge or other person in civil or military authority under the United States, shall be fined under this title or imprisoned not more than three years, or both."

Ms. Freel, now having knowledge of the criminal act(s) committed by trial prosecutors have had ample time to follow the letter of the law and "make known" the facts as alleged to a Judge. One can't deny that U.S. Marshal Chris Casson and Sheriff Detective Johnny Spillman, after being procured by Prosecutor Greg Gloff, committed perjury in the Grand Jury when they lied and said that Tanesha Hilliard said that Fieldsbecame "angry" when he came into contact with Coleman at the hospital on the night of the murder; Perjury in the Grand Jury is a felony in all fifty states.

Instead of Ms. Freel informing the Court (Judge) that the Court have been the victim of Fraud and multiple criminal act(s) have been committed, Ms. Freel sits idly by and let the 5th Circuit deny C.O.A based on what she know to be false facts and keeps Fields on track to be murdered in the pretense of justice. Immunity is inapposite when an officer of the Court knows of an impending murder yet does nothing to try to stop it. In Ms. Freel's case she has elected to Aid and Abet Fields' murder.

36

Upon filing a [the] petition for C.O.A. to the 5th Circuit Court of Appeals Fields moved to recuse Circuit Judge Edith Jones due to her potential bias against minorities, the innocent and the mentally ill, as well as her inability to separate her personal religious views from her job. ( See App. 119   ). The petition was denied, and on July 30, 2014 Judge Edith Jones played an integral part in denying Fields C.O.A. and her reason(s) for denial isn't rooted in fact, it's not rooted in logic, it's not rooted in science, nor is it rooted in the law. Fields contends that Judge Jones personal bias and religios views inserted themselves into the case and the decision making process, and it's because of her racial ideologies and bias, and her personal religious views that she denied Fields's C.O.A., violating his Civil and Constitutional Rights, and Aided and Abetted the prosecution(s) criminal act(s) and Fraud On the Court.

In denying Fields's C.O.A. the 5th Circuit held that:

(1). Fields does not acknowledge that at trial, there was testimony that the Grand Am "looked like it had been detailed [and] wiped down." ( Order denying C.O.A. pg. 54 ).


(a). Prior to the C.O.A. petition that Fields attorney's filed Fields filed his own pro se freestanding Actual innocence brief. ( See App. 5 ). In that brief Fields did in fact acknowledge the aforementioned ( App. 5, pg 18 ). But Fields also showed that the car couldn't have been "detailed" and/or "wiped down" like the prosecution defrauded the Court(s) to believe, but the 5th Circuit refused to allow Fields to proceed with the freestanding actual innocence brief, even after Fields objected to the brief that counsel filed on his behalf. ( See App. 14 ). Fields even offered to allow counsel's brief to stand " if he could file his own brief along with it." The 5th Circuit rejected this notion as well, stating that as long as Fields is represented by counsel then only counsel can file on his behalf. ( See App's 13 and 16 ). Fields elected to relieve counsel of their duties and asked the court to allow his brief to "stand alone", and again the Court rejected Fields and placed an order to not accept anything that Fields file. Now the Court denied Fields on the merits, claiming that he didn't assert such issues that he did indeed attempt to file.

The 5th Circuit should have entertained Fields's pro se filings; See  People v. Wende, 25 Cal 3d  436, 440, 600 P2d 1071 (1979); See also Anders v. California, 386 US 738, 18 L. Ed 2d 493, 87 S.Ct. 1396 (1967); " The rules governing appeals seem to protect the ability of indigent litigants to make pro se filings." As Justice Frankfurter eloquently put it for the Court in Adams v. US ex rel. McCann, 317 US 269, 87 L. Ed 268 , 63 S.Ct. 236 (1942); " to require the acceptance of counsel " is to imprison a man in his privileges and call it the Constitution." Id. at 280, 87 L. Ed 268, 63 S.Ct. 236. " Our system of laws generally presumes that the criminal defendant, after being fully

37

informed, knows his own best interests and does not need them dictated by the State." The Court in Martinez, 145 L. Ed 2d 597 U.S. 152 held that " asserting the right to self-representation may often, or even usually work to the defendant's disadvantage is no more remarkable-and no more a basis for withdrawing the right-than is the fact that proceeding without counsel in custodial interrogation, usually works to the defendant's disadvantage."

It wasn't Fields' intent to proceed without counsel, Fields only wanted to be able to file his own brief and motions. Fields even made this known to the courts, but after the Court said that "as long as Fields are represented by counsel then only counsel can file on his behalf, Fields elected to relieve counsel of their duties so it would enable him to file his freestanding actual innocence brief," but again the Court denied Fields again. At the very least the Court should have allowed Fields to make the pro se filings. See Myers v. Collins, 8 F. 3d 249, 252 (CA5 1993) (finding right of self-representation extends to appeals); Cambell v. Blodgett, 940 F. 2d 549 (CA9 1991) (same); Chamberlain v. Ericksen, 744 F. 2d 628, 630 (CA8 1984) (same); Commonwealth v. Rogers, 537 Pa 581, 583, 645 A2d 223, 224 (1994) (same); State v. Van Pelt, 305 Ark. 125, 127, 810 SW 2d 27, 28 (1991) (same); Webb v. State, 274 Ind. 540, 542, 412 NE 2d 790 (1980) (same); Webb v. State, 533 SW 2d 780, 784 (Tex Crim. App. 1976) (same). The 5th Circuit should have allowed Fields to make pro se filings, or in the alternative allow him to proceed without counsel. Instead the 5th Circuit refused to allow Fields to file pro se along with counsel, refused to let Fields "relieve his attorney's of their duties", refused to consider the freestanding actual innocence brief, and then denied Fields on the merits, claiming that he didn't assert issues that he did indeed try to assert, but they rejected.  In Chamberlain v. Ericksen, 744 F. 2d 628, 630 (8th Cir. 1984), cert. denied, 470 U.S. 1008, 84 L. Ed 2d 387, 105 S.Ct. 1368 (1985), the Chamberlain Court found that the below-quoted language from Price v. Johnson, 334 U.S. 266, 68 S.Ct. 1049, 92 L. Ed. 1356 (1948) (" a prisoner has no absolute right to argue his own appeal or even to be present at the proceedings in an appellate Court ") foreclosed any right of a defendant to act pro se. But, this did not foreclose a right of a defendant to present a pro se brief. In light of this, the Court argued that, whether at trial or on appeal a defendant should not be required to have counsel forced upon him or her. Id. Thus, the Chamberlain Court found that a criminal defendant does have a right under the Constitution to present pro se briefs or motions on appeal. Id.

(2). The 5th Circuit referenced the government's expert (James Blair) whom said that the car had "suspicious stains that could possibly be blood". ( Order denying C.O.A. pg. 54 ).

(b). However, the Court conveniently left out the fact that the stain was tested with

TMB solution and determined not to be blood. ( App. 26 ). The same report shows that the car wasn't "detailed" and/or "wiped down", and the government withheld the photo's that will show that the car wasn't "detailed" and/or "wiped down". Also even though the initial test proved that the suspicious stains wasn't blood, the carpet was taken and sent to the lab for further testing, which also determined that the "suspicious stain" wasn't blood. The omission of this material fact by the prosecutor was willful, deliberate and intentional while on their quest to defraud the Court(s). United States v. Hasson, 333 F. 3d at 1270-71 (" A scheme to defraud requires proof of material misrepresentations, or the omission or concealment of material facts...reasonably calculated to deceive..." (citing Neder v. United States, 527 U.S.1, 25, 119 S.Ct. 1827, 1841, 144 L. Ed 2d 35 (1999)); Langford v. Rite Aid of Ala., Inc., 231 F. 3d 1308, 1312 (11th Cir. 2000) ("Intent to defraud need not be shown through active misrepresentation- material omissions can be fraudulent if they are intended to create a false impression".) The omission of the fact that the "suspicious stain" had been initially tested, and was sent to the lab for aditional testing, and all tests was negative for blood was undoubtedly meant to deceive and defraud the Court(s). The omission is obviously material because the Court referenced testimony that this material facts impeaches. But what's most important here is that Judge Edith Jones and the 5th Circuit Judges "conveniently" and "willfully" neglected to acknowledge that the very same expert that they referenced also said that " even if the car was "detailed" and/or "wiped down" ( and Fields maintains that he didn't "detail" or "wipe down" the car), forensics have technology that still would have found blood. ( See App. 25 ).


(3). Judge Edith Jones and the 5th Circuit Judges held that " Fields offers no explination for the logical response that he could have cut his legs on thorns during the November 6th murder of Coleman, and that those cuts could have healed by his November 24th Capture, more than two weeks later. ( Order denying C.O.A. pg. 55 ).

(c). Again, if that was even a logical "fact", forensics still would have found Fields' blood in the Grand Am. It's "mind boggling" that Judges with the experience that the 5th Circuit panel has would reach such unreasonable determination of "fact". This Court placed an "impossible burden" on Fields, who's an innocent man. Logic and fact would undoubtedly reason that the blood where the thorns would have cut the perpetrator, and the victims blood is off in the GOLD Jaguar that Outley and Scroggins conspired to hide; the GOLD Jaguar that the prosecution Aided and Abetted Outley and Scroggins in hiding.


(4). Judge Edith Jones and the 5th Circuit Judges held that " Fields provides no corroborating evidence to support his allegations that various government witnesses gave false evidence at trial. ( Order denying C.O.A. pg. 57 ).

39

(d). Again, this is not true. In Fields' freestanding Actual Innocence brief, (App 5), Fields did indeed show that every last one of the governments witnesses gave false evidence, that the witnesses were "coaching" each other, telling each other critical information about Coleman's murder, telling each other to lie and make deals with the prosecution for their false testimony, engaged in a criminal conspiracy, etcetera, and the 5th Circuit denied Fields' brief and then denied C.O.A. claiming that he didn't assert clearly asserted issues.

(5). Judge Edith Jones and the 5th Circuit Judges held that Actual Innocence is not a cognizable issue in the 5th Circuit. ( Order denying C.O.A., pg. 51 ).

(e) The 5th Circuit's ruling, in essence, states that the prosecution can commit criminal act(s) against the innocent, violate the Constitutional Rights of the innocent, A district Judge can force the innocent to proceed pro se when he's in fact no match for his conspirators, and Actual Innocence, which is cognizable in other Circuits is completely out of reach for the innocent, so the innocent " just have to die."

(6). Judge Edith Jones and the 5th Circuit Judges held that after Outley lied at trial and said that the government hadn't made him any promises, " reasonable jurists would not be able to debate the District Court's holding because Outley's testimony is not material." ( Order denying C.O.A. pg. 49 ).

(f). Outley's testimony is indeed material, because had the Government not given Outley full immunity Outley would have testified that he didn't give Fields a gun, and then the only person the alleged murder weapon could have been tied to is Outley himself.

(g). Also, the 5th Circuit's opinion is inapposite Smith v. Kemp, 715 F. 2d 1459, 1463 (11th Cir.), cert. denied, 464 U.S. 1003, 104 S.Ct. 510, 78 L. Ed. 2d 699 (1985), where the Court held that " If false testimony surfaces during a trial and the government has knowledge of it, the government has a duty to step in and disclose." ( The government must affirmatively correct testimony of witness who fraudulently testifies that he has not received a promise of leniency in exchange for his testimony.)

(h). The 5th Circuit's opinion is inapposite Napue v. Illinois, 360 U.S. 264, 269, 3L Ed. 2d 1217, 79 S.Ct. 1173 (1959), where Chief Justice Warren wrote for the Court, " First, it is established that a conviction obtained through the use of false evidence, known to be such by representatives of the State, must fail under the Fourteenth Amendment; The same result obtains when the State, although not soliciting false evidence, allows it to go uncorrected."

(i). The 5th Circuit's opinion is inapposite Giglio v. United States, 405, 150, 92 S.Ct. 763, 766, 31 L. Ed 2d 104 (1972); Williams v. Griswald, 743 F. 2d 1533, 1541 (11th Cir. 1984) because " The government has a duty not to use false testimony."

(7). Judge Edith Jones and the 5th Circuit Judges held that when at trial Judge Smith forced Fields to reveal his defense by doing a "dry run" of his questions with Scroggins, the woman that Fields said committed the murder, in the presence of the prosecution, it was not a violation because, (1) " We note that the dry run only became necessary because of Fields decision to represent himself." ( Order denying C.O.A. pg. 42 ). and (2) Fields " does not contend that witness coaching took place. Furthermore, there is no indication of coaching such as through baseless objections or the use of non-verbal cues. In fact, the prosecution's objections were not baseless, and nearly all were sustained. ( Order denying C.O.A. pg. 42 ).

(j). Fields didn't make a decision to represent himself, Fields was forced to represent himself. ( See App. 117 ). It's interesting that the Court would omit this interesting fact.

(k). Fields did indeed contend that there was witness coaching in his freestanding Actual Innocence brief; ( App. 5 ). And the prosecutor repeatedly led their witnesses with questions that suggests the desired answer, and admitted in closing arguments that their objections was indeed baseless. ( App. 100 ).

(8). Fields contends that the 5th Circuit's unreasonable determination of the fact(s) and willful desire to ignore the law is due in part to Judge Edith Jones's racial bias and religious views, which is a direct, willful, intentional, deliberate and knowing violation of Fields's Civil and Constitutional Rights.

(1). Fields also contends that the prosecution's Fraud On the Court led to the 5th Circuit Judge's unreasonable determination of the facts, and willful desire to ignore the law, which is a direct violation, willfully, deliberate, intentional and knowing of Fields's Constitutional Rights.

41

RULE 20 allows for the Court to use its Supervisory powers to grant the appropriate relief where that relief can't be obtained in any other form or any other forum. This Court should grant relief pursuant to RULE 20 because (1). Fields contends that, and have always maintained that he's innocent. And if that is true, Fields's execution will in fact be criminal homicide (murder); (2). Failure to entertain the claims herein will be a fundamental miscarriage of justice; (3). Relief should be granted pursuant to RULE 20 in order to protect the integrity of the Justice system; (4) To deter any further illegal conduct in this case and any other case; (5). Relief should be granted pursuant to RULE 20 because it will be in aid of this Court's jurisdiction under Garza v. Lappin, 253 F.3d 918, 921 (7th Cir. 2001); Relief should be granted because the District Court (Trial Court) and the 5th Circuit Court of appeals refused Fields access to their Court's as a pro se defendant; (6). Relief should be granted because the jury never heard the evidence herein because (a) Fields didn't know what he was doing; And (b). Fields wrongfully thought that the "discovery file" was "the evidence" and it was automatically a part of the record; (7). The evidence that wasn't presented to the jury proves (a). That the government's case is wholly fabricated; (b). The government defrauded the Grand jury, the petit jury, the District Court and the Court of appeals; (c) The government solicited Fields' murder via lethal injection by "seeking jailhouse testimony", and "hiring" inmates to lie and fabricate evidence; (d). The government's inmate witnesses engaged in a criminal conspiracy to fabricate false evidence; (e). The government willfully and knowingly Aided and Abetted this conspiracy; (f). Circumstantial evidence proves that Fields' other girlfriend committed the murder; (g). That girlfriend and her accomplice took the necessary steps to hide and conceal any and all physical evidence linking them to the murder; (h). The government willfully and knowingly helped them hide the physical evidence; (i). The forensic evidence proves that Fields didn't commit the murder; (j). Contrary to what the prosecution made the appeals court believe the alleged "stain" was proven not to be blood; (k). The government repeatedly procured law enforcement officer's to lie and manipulate and defraud the jury; (l). Contrary to what the prosecution manipulated and defrauded the jury and the Court's to believe there were fingerprints found in the alleged carjacking vehicle, those prints were compared to Fields and there was no match; (m). The District Judge was bias; (n). Racism and Fraud on the Court led to the Appeals Court unreasonable determination of fact; (o). the government knowingly and willfully withheld exculpatory and impeachment evidence; And (p). Fields is Actually and Factually innocent.

The holding in Faretta v. California, <u>422 U.S. 806</u>, 835, <u>45 L.Ed. 2d 562</u>, 95 S.Ct. 2525 (1975) that state that a pro se defendant can't complain about the adequacy of

his representation must not be allowed to outweigh the Constitutional provisions in Furman v. Georgia, 408 U.S. 238, 286-291, 92 S.Ct. 2726, 33 L.Ed. 2d 346 (1972) and the ban on cruel and unusual punishment when the evidence that the defendant neglected to present, failed to present, and/or didn't know how to present is material, not only to the defendant's innocence, but is also material in proving that the prosecution's actions were sinister and/or criminal in nature.

Because Fields have no other forum to litigate the claims herein, and because the Supreme Court have required States to apply special procedural safeguards to "minimize the risk of wholly arbitrary and capricious action" in imposing the death penalty; see Gregg v. Georgia, 428 U.S. at 189, 195, 96 S.Ct. 2909, 49 L.Ed. 2d 859 (1976) (joint opinion by Stewart, Powell and Stevens, JJ.); See also Ring v. Arizona, 536 U.S. 584, 614, 122 S.Ct. 2428, 153 L.Ed. 2d 556 (2002) (Breyer, J., concurring in judgment) (explaining that without adequate procedural safeguards, " the constitutional prohibition against ' cruel and unusual punishments ' would forbid [the] use " of the death penalty ), Fields believes that the plain language in RULE 20 applies to this case.

43

## FRAUD ON THE COURT ( CONT'D )

The United States Constitutional ban on Cruel and Unusual punishment provides that any conduct that "shocks the conscience" violates the Eighth Amendment. Reasonable jurist and/or citizens of this country would undoubtedly find that a prosecutor that intentionally, deliberately, knowingly and willfully make deals with crooks and procure law enforcement officer's to lie on an innocent man just so they can murder him via lethal injection, in the name of the people "shocks the conscience".

Due to the Fraud On the Court(s) the Court's have repeatedly classified bold and blatant lies as " a little inconsistency." When inmate John Mercer said that Fields confessed directly to him "because there are no TV's and newspapers in segregation, so they talk", but at trial changed his story to say "No Fields didn't confess to me, I heard him confessing to a Little D" these stories can't be classified as " a little inconsistency ", the stories are so vastly different at least one of them have to be a blatant lie. When and after Inmate Christian "Shae" Walker had written two statements and testified in the Grand Jury that Fields never confessed to him, and the prosecutor had given him a deal, stating that his information was "truthful", "reliable" and "complete", and then Walker started corresponding with the woman that Fields said committed the murder, he changed his story to say that Fields did confess to him, that's not " a little inconsistency ", those stories are so vastly  different at least one of them have to be a blatant lie. " There is no constitutional value in false statements of fact ", See Garrison v. Louisiana, 379 U.S. 64,  75, 85 S.Ct. 209, 13 L.Ed. 2d 125 (1964) ( "[T]he knowingly false statement and the false statement made with reckless disregard of the truth, do not enjoy constitutional protection.) The prosecution knew that Fields was never angry when they procured Sheriff Detective Spillman and U.S. Marshal Chris Casson to lie and say that Tanesha Hilliard said that Fields became "angry" when he came into Contact with Suncerey Coleman on the night of the murder; The prosecution knew that the Jaguar Scroggins and Outley hid so it could avoid forensics testing was GOLD and not BLUE like they defrauded the jury to believe; The prosecution knew that Fields and inmate Homero Deleon have NEVER been cellmates; The prosecution knew that Fields didn't have the Grand Jury transcripts "early on in the investigation" like they procured ATF Agent Douglas Kunze to mislead the jury to believe; The prosecution knew that William Young did in fact know Edward Lee "Treyboy" Outley when they procured ATF Agent Douglas Kunze to lie; The prosecution knew that the Grand Am was not "wiped down" or "locked detailed" like they procured Detective Morris "Bubba" Colyer to defraud the jury and the Court(s) to believe; The prosecution also knew that even if a vehicle had been "wiped down" and/or "detailed" forensics still would have found blood. We could go on and on reciting the numerous acts of Fraud, but even with just the aforementioned any reasonable juror could find that it's so overwhelming it "shocks the conscience" and the Constitutional and

44

Criminal violations are immense. In re Davis, No. CV 409-130 (8/24/10) the Courts held that the lowest degree of confidence in a jury verdict would presumably occur when the jury has heard a corrupted body of evidence. Because the procedural protections in place to protect the innocent from conviction have been breached, confidence in the result of the trial is generally undermined. The [Supreme Court] has repeatedly held that a conviction obtained by and through the knowing use of perjured testimony is fundamentally unfair and must be set aside if there is any reasonable likelihood that the testimony could have affected the judgment of the jury. United States v. Agurs, 472, U.S. 97, 103, 49 L.Ed. 2d 342, 96 S.Ct. 2392 (1976). Here in Fields case the perjury and Fraud started in the investigative stage, corrupted the Grand Jury, the petit jury, the trial, Direct Appeal, cert., and Habeas. The lies that the prosecution witnesses told are so blatant and obvious that no person of ordinary prudence would have put them on the stand. In the United States v. Roger LaPage, 231 F. 3d 488 (2000), the Court held that " All perjury pollutes a trial, making it hard for jurors to see the truth." Thus it's very reasonable to conclude that undoubtedly the perjured testimony and Fraud On the Court affected the Judgment of the jury here in Fields; Agurs; Supra. Fields case is the perfect storm. (1). The prosecution sided with Edward Lee "Treyboy" Outley and Shalaykea "Lakie" Scroggins, the two people that Fields said committed the crime, and never even considered them a suspect even though they told multiple lies, gave several different alibi's, conspired to hide the car that they were in on the night of the murder so it wouldn't be subjected to forensics testing, gave several different versions of how, when and where Fields allegedly "confessed" to them, and the evidence shows that they were actively recruiting inmates to lie on Fields. (2). The prosecution defrauded the Grand Jury into returning an indictment. went "seeking jailhouse testimony", procured law enforcement to lie, and ultimately "hired" several inmates that they should have known were lying. (3). The prosecution picked a racist and bias pro prosecution jury. (4) Fields was then forced to proceed pro se. (5) Then after soliciting Fields' murder via lethal injection the prosecution engaged in a criminal conspiracy and Defrauded the Court(s). Indeed the prosecution have experienced an illegal windfall, while Fields have been deprived-contrary to congressional intent-of his Constitutional rights. In Furman v. Georgia, (1972) 408 US 238, 33 L.Ed. 2d 346, 92 S.Ct. 2726, In a concurring opinion by Justice Douglas, it was stated that " a penalty should be considered unusually imposed if it is administered arbitrarily or discriminatorily." No one can honestly deny the fact that the Death Penalty here in Fields case was administered arbitrarily."Standard of extreme cruelty is not merely descriptive, but necessarily embodies moral judgment", Graham v. Florida, (2010;US) 176 L.Ed. 2d 825, 130 S.Ct. 2011; McLamore v. South Carolina, (1972)-US-, 34 L.Ed. 2d 189, 93 S.Ct. 240 " wherein, it was stated that the concept of Cruel and Unusual Punishment was not rigid, but progressive." Any time a prosecutor procure "crooks" and law enforcement officer's to lie and commit fraud so they can convict, and in Fields case, "murder" an innocent

45

man it undoubtedly "shocks the conscience"[5] and violates the Eighth Amendment's ban on Cruel and Unusual punishment.

The prosecution's deliberate and willful disregard of the instruction of Brady ; the withholding of exculpatory and/or impeachment evidence that could have, and still could be used to challenge Detective Morris "Bubba" Colyer's false and fabricated testimony and impeach his credibility should not be ignored. Because the 5th Circuit referred to this false and fabricated testimony in denying Fields C.O.A. no one can deny that it's material and substantial. The lack of blood in the Grand Am proves that Fields didn't commit this murder; The fact that Scroggins and Outley conspired to hide the car that they were in on the night of the murder to avoid forensics testing would have undoubtedly been the determining factor here if the prosecution had not defrauded the Court by alleging that Scroggins and Outley was indeed in a BLUE Jaguar that they all knew didn't even exist, and procuring Detective Morris "Bubba" Colyer to lie and say that the car looked "wiped down" and/or "detailed" while withholding the photographs that prove that Colyer is lying. Because the evidence shows that the prosecution continuously used Detective Colyer as a "vehicle" to defraud the Court Fields being able to use the photographs to impeach Colyer's credibility could have very well been the "tumbling block" that would have brought the prosecution's house of deceit crumbling down. A prosecutor has a duty to provide a defendant with all material evidence in their possession favorable to the accused. Brady, 393 U.S. at 87, 83 S.Ct. at 1196-97. The government knew they were going to use Detective Colyer to lie, and they knew that the only tangible admissible evidence disputing the lie was the photographs, so they willfully withheld them. And to make sure Fields couldn't get the photographs the prosecution said, "Here, we'll give you open file discovery ", and then implored the Judge to deny Fields' pre trial Motion for discovery so they could withhold the photographs. ( See App. 120  ). And then they opposed every post trial Motion for discovery in order to continue defrauding the Court's.

" When a  defendant's guilt or innocence may turn on the reliability of a witness, the prosecutions mondisclosure and/or willful withholding of the  evidence affecting the credibility of this witness falls within this general rule." Alderman v. Zant, 22 F. 3d 1541, 1553-1554 (11th Cir. 1994), cert. denied, __U.S.__, 130 S.Ct. 673, 130 L.Ed. 2d 606 (1995). Fields have met every prong of Brady; He has shown that the government possessed evidence that's favorable to him (including impeachment evidence); He has shown that the only way he could get the evidence is by and through the prosecution and he tried with reasonable diligence to get the evidence by filing for discovery (at every stage) to no avail; Fields have shown that the prosecution suppressed and/or withheld favorable evidence;  And because the jury's sole question in regards to guilt/innocence was in regards to the forensics results to the vehicle that the withheld photographs depicts had the government honored their duty to turn over the photographs to the defense a

reasonable probability exists that the outcome of the proceedings would have been different." United States v. Spagnoulo, 960 F.2d 990, 994 (11th Cir. 1992) (quoting United States v. Meros, 866 F.2d 1304, 1308 (11th Cir.) ( Per (63 F.3d 1015) curiam ), cert. denied, 493 U.S. 932, 110 S.Ct. 322, 107 L.Ed. 2d 312 (1989)). But most importantly, the 5th Circuit quoting Detective Colyer's false and fabricated testimony in denying C.O.A. and accrediting it instead of the forensics results, while knowing that even if a vehicle is "wiped down" and/or "detailed" forensics would still find blood, only proves that the Court is indeed a victim of the prosecution's Fraud. Also the 5th Circuit referencing the testimony of the government's forensic expert when he said that he found a stain "that could possibly be blood", but ignoring the fact that the same forensics expert said that he tested the stain and it wasn't blood, but he took the carpet and sent it to the lab anyway, also proves that the 5th Circuit is the victim of the prosecution's Fraud, especially in light of the fact that the lab also concluded that the stain wasn't blood. We ask the Court to be mindful that the "withheld photographs" is only an element of the overall picture, the Fraud started in the investigative phase, and corrupted the Grand Jury, the petit jury, the Court, the 5th Circuit on Direct and enbanc, the Supreme Court on Cert., the District Court on Habeas, the 5th Circuit on C.O.A. and enbanc, continuous. " The Supreme Court has repeatedly held that Federal Courts possess the inherent power " to vacate [their] own judgments upon proof that a fraud has been perpetrated upon the Court." Chambers v. NASCO, Inc., 501 U.S. 32, 44, 115 L.Ed. 2d 27, 111 S.Ct. 2123 (1991) (citing Hazel-Atlas Glass Co. v. Hartford-Empire Co., 322 U.S. 238, 88 L.Ed. 1250, 64 S.Ct. 997 (1944)). ( "Some elements of the inherent authority are so essential to 'the judicial power', U.S. Const., art. III, § 1, that they are indefeasible...") Fields is innocent and he has been fatally harmed by the prosecution's criminal actions. If this Court refuse to entertain the claims herein it would result in a fundamental miscarriage of justice. Sawyer v. Whitley, 505 US 333, 120 L.Ed. 2d 269, 112 S.Ct. 2514 (1992). " By the protection of the law, human rights are secured; withdraw that protection and we are at the mercy of wicked rulers, or the clamors of an excited people; Walberg v. Israel, 766 F.2d 1071, 1078 (7th Cir.) (Posner J.), cert. denied, 474 U.S. 1031 (1985). Fields asks this Court to use its supervisory powers to correct this miscarriage of justice and to deter any further illegal conduct. Bank of Nova Scotia v. United States, 487 U.S. 250, 108 S.Ct. 2369, 101 L.Ed. 2d 228 (1988).


For the reasons stated herein, Fields asks that this Court grant this Motion.


Signed this____*9th*____ day of ____*October*_____ 2014



                                                    _____
47                                                          Signature