No_____

_____

IN THE

SUPREME COURT OF THE UNITED STATES

_____

SHERMAN LAMONT FIELDS-PETITIONER (PRO SE)

vs

UNITED STATES        -RESPONDENT(S)

ON PETITION FOR A WRIT OF CERTIORARI TO

THE FIFTH CIRCUIT COURT OF APPEALS

THIS IS A CAPITAL CASE ( DEATH PENALTY )

SHERMAN LAMONT FIELDS
#15651-180
USP Terre Haute
P.O. BOX 33
Terre Haute, IN 47808
(Inmate) (Pro Se)

QUESTION(S) PRESENTED

( CAPITAL CASE / DEATH PENALTY )

(1). Is "Actual Innocence" a cognizable issue? Especially in a situation like Fields where the conviction and Death Sentence is the direct result of Fraud On The Court(s), with a criminal conspiracy being the foundation?

(2) Can the 5th Circuit deny relief because "Actual Innocence" isn't cognizable in the Circuit when Fields is Actually Innocent and " Actual Innocence " is cognizable in other Circuits?

(3). Can an Appeals Court be so invested in the prosecution that they won't even allow an innocent man to prove that he's innocent and that the Court itself have been the victim of fraud?

(4). When the prosecution's case is strictly "word of mouth" evidence willfully and maliciously procured by and through "crooks", are the Courts allowed to just ignore the facts when the evidence proves that the prosecutions evidence is fabricated, and the conviction was obtained by and through Fraud On the Court?

(5). If the Supreme Court refuse to entertain this writ, does it mean that once again, as was the case on Direct Appeal, the Supreme Court is allowing the Fraud that "trickled up" from the lower Courts to use the Supreme Court as an extension of these crooks deception?

(6). Is there an Avenue for relief when the evidence clearly shows that the prosecutor's and their "witnesses" engaged in a criminal conspiracy to murder the defendant, yet the lower Court(s) deny relief?

(7). Do Rule 35 (b), conveying false information that harms human life apply to substantial perjury and subornation of perjury in capital Death Penalty cases?

(8). Can Rule 35 (b) apply to substantial perjury and subornation of perjury in Capital Death Penalty cases?

(9). Can Rule 35 (b) be applied here in Fields?

(10). Do you kill an innocent man and put the prestige of the Court(s) behind crooks and murderers just because the police and prosecutors have an ax to grind?

(11). Why are there not any safety measures in place to protect defendants from the false and malicious testimony of crooks? And will this case be used to set precedent on the issue once and for all?

(12). When there is clearly established Federal Law that proves the prosecution willfully committed criminal act(s) to obtain a conviction and death sentence do the conviction stand? And can the State or Government murder the defendant?

(13) Can the prosecution use the false and malicious testimony of a guilty man to condemn, convict, and murder someone that is supposed to be presumed innocent at the start of trial?

(14). Can the prosecution use past conviction(s) and/or cases that never made it to trial as aggravating factors to mislead the jury with lies, half truths, omissions and false facts?

I

(15) When the 5th and 14th Amendments Due process Clause is violated due to the unethical and/or illegal conduct of the prosecution and the proper relief can't be obtained in any other forum can the Supreme Court's extraordinary writ be invoked?

(16) When the 8th Amendments ban on Cruel and Unusual Punishment is violated due to the unethical and/or illegal conduct of the prosecution and the proper relief can't be obtained in any other forum can the Supreme Court's extraordinary writ be invoked?

(17) When the prosecutor's willfully illegal exercise of discretion create an extreme indifference to the value of human life is automatic reversal required?

(18) When the procedural protections in place to protect the innocent from conviction have been breached like it was breached here in Fields  and the lower Courts refuse to acknowledge it can, and/or will the Supreme Court use their Supervisory powers to intervene?

(19) When the prosecution enter into a "scheme" to deprive a defendant of Life and/or Liberty do it violate the 5th and 14th Amendments due process clause, as well as the 8th Amendments ban on Cruel and Unusual punishment?

(20) When the Circuit Court refuse to allow a defendant to proceed pro se "because he have attorney's", yet the defendant's issues that he wish to proceed with are meritorious and exposes unethical and/or criminal violations do it violate the 5th and 14th Amendments due process clause, as well as the 8th Amendments ban on Cruel and Unusual punishment?

(21) When the lower court(s) refuse to allow a defendant to proceed pro se "because he have attorney's", yet the attorney's have filed issues that won't do their client justice do it violate the 5th and 14th Amendments due process clause, as well as the 8th Amendments ban on Cruel and Unusual punishment?

(22) When an innocent man is forced to proceed pro se to trial do he forfeit his life just because he was no match for the criminals that conspired to use the death penalty as an illegal murder weapon to take his life?

(23) Do the United States Constitution bar the execution/murder of a defendant that was forced to proceed pro se and then was thwarted by the Court's rulings?

(24) When a lower Court's determination of the facts are totally unreasonable do it violate the 5th, 8th and 14th Amendment(s) to the Constitution?

(25) Can the police, prosecutor(s) and their "witnesses" be prosecuted for the criminal violations committed while pursuing a malicious prosecution? Especially in a Capital case where an innocent man's life is at stake?

## TABLE OF CONTENTS

QUESTION(S) PRESENTED................................................... I, II

TABLE OF CONTENTS...................................................... III

INDEX OF APPENDIXES.................................................... III, IV

TABLE OF AUTHORITIES.................................................. V, VI, VII

OPINIONS BELOW........................................................ 1

JURISDICTION.......................................................... 2, 3

CONSTITUTIONAL AND STATUTORY PROVISIONS INVOLVED...................... 4-7

STATEMENT OF THE CASE................................................. 8-11

REASON(S) FOR GRANTING THE WRIT....................................... 12-33

FRAUD ON THE COURT ( CONSPIRACY; SOLICITATION OF MURDER; AIDING &

                       ABETTING )....................................... 12-30

UNREASONABLE DETERMINATION OF FACTS................................... 25-26

ABUSE OF DISCRETION................................................... 27

INEFFECTIVE ASSISTANCE OF COUNSEL..................................... 31

IMPORTANCE TO THE PUBLIC OF THE ISSUES................................ 32

CONCLUSION............................................................ 33

## INDEX TO APPENDIXES

APPENDIX: A1- District Court's "final Order" denying post conviction relief

APPENDIX: A2- Motion to Proceed Pro Se

APPENDIX: A3- Notice from 5th Circuit telling Petitioner to sign Motion

APPENDIX: A4- Motion to Bar the named and unnamed conspirators and/or coconspirators from having any contact with each other due to their ability to continue their criminal endeavor(s).

APPENDIX: A5- Defendant's Motion to Seal Free Standing Actual Innocence Brief.

APPENDIX: A6- Petitioner's Attorney's Response to Pro Se Motion

APPENDIX: A7- Order denying Pro Se Motion.

APPENDIX: A8- Notice from 5th Circuit ( Won't consider brief & Motions )

APPENDIX: A9- Notice refusing to allow brief and Motions to proceed.

APPENDIX: A10- Notice

APPENDIX: A11- Petitioner's Motion for reconsideration.

APPENDIX: A12- Petitioner's Motion to "Reurge Filings".

APPENDIX: A13- Order from 5th Circuit not to accept "anything" Petitioner file

APPENDIX: A14- Motion(s) to Supreme Court appealing Order from 5th Circuit.

APPENDIX: A15- Supplement Report ( Forensics testing on Grand Am )

APPENDIX: A16- Pre trial Motion for Discovery.

III

APPENDIX: A17- Supplement Report

APPENDIX: A18- Follow up Report (Roger Thomison)

APPENDIX: A19- Shalaykea Scroggins Grand Jury (GJ) testimony, pg. 17 (Blue Jaguar).

APPENDIX: A20- Report of Interview of Edward Outley (Blue Jaguar)

APPENDIX: A21- Trial Transcripts (Prosecution), pgs. 1936-1938 (Blue Jaguar).

APPENDIX: A22- Interview of Lutrill Payne (Gold Jaguar)

APPENDIX: A23- Detective Johnny Spillman (GJ) testimony, pg. 5 (Fields Irate)

APPENDIX: A24- Marshal Christian Casson (GJ) testimony, pg. 6 (Fields Angry)

APPENDIX: A25- Newspaper article, (Nov. 10, 2001) (Not angry)

APPENDIX: A26- Hilliard testimony, pg. 1350 (Fields never angry)

APPENDIX: A27- Prosecution "seeking jailhouse testimony" (Letter from SP to Fields)

APPENDIX: A28- Letter ( Want Scroggins or Outley to say that they were "with Fields".

APPENDIX: A29- Chance Alexander testimony, pgs. 1930-1931 ( Want Alexander to lie on Fields).

APPENDIX: A30- Letter from Edward Outley to Christian "Chae" Walker

APPENDIX: A31- Walker's written statement (Detective Morris "Bubba" Colyer coaching).

APPENDIX: A32- Report of Investigation ( Officer Fred Waggoner )

APPENDIX: A33- Letter from Attorney Scott Peterson to Prosecutor(s) asking for Grand Jury (GJ) transcripts.

APPENDIX: A34- Letter from Prosecutor Greg Gloff to Inmate Chance Alexander

APPENDIX: A35- Tammy Edwards deposition, pgs. 56-57

APPENDIX: A36- Report ( Forensic testing "Tammy Edwards car" )

APPENDIX: A37- Edward Outley's letter(s) to prosecutors ( Want a deal for him AND Shalaykea Scroggins )

APPENDIX: A38- Question from juror ( Note asking to see "DNA" results of car )

APPENDIX: A39- Calvin Washington ( Another victim "prior to Fields"). Information from Northwestern School of Law.

IV

## TABLE OF AUTHORITIES CITED

CASES                                          PAGE NUMBER

Andrade v. Chojnacki, 338 F. 3d 448 ( July 14, 2003 ) ..................... 27

Bank of Nova Scotia v. U.S., 487 U.S. 250, 108 S.Ct. 2369, 101 L. Ed 2d 228
(1988)........................................................................... 14

Beets, 767 S.W. 2d at 734." 180 F.3d 190:: Beets v. Johnson: June 28, 1999
(5th Cir.)...................................................................... 15

Chicago Tribune Co. v. Bridgestone Firestone Inc., 263 F. 3d 1304, 1309
(11th Cir. 2001)............................................................... 27

Creel v. Johnson, 162 F. 3d 385, 391 (5th Cir. 1998)...................... 30

Dawson v. Del., 503 U.S. 159, 163 (1992)................................... 3

Dunnigan, 507 U.S. at 94, 113 S.Ct. at 1116............................... 19

Durley v. Mayo, 351 U.S. 277, 290-91, 76 S.Ct. 806, 100 L.Ed. 1178 (1956).. 30

Freels v. Hill, 843 F. 2d 958 (6th Cir. 1988)............................. 31

Giglio v. U.S., 405, 150, 92 S.Ct. 763, 766, 31 L.Ed. 2d 104 (1972)........ 23

Herrera v. Collins, 506 U.S. 390 (1993).................................. 2, 15, 28, 2
404, 113 S.Ct. 853, 122 L.Ed. 2d 203

Hill v. Johnson, 210 F. 3d 481, 484 (5th Cir. 2000)....................... 3

Hoffa v. U.S., 385 U.S. 293, 311, 87 S.Ct. 405, 418, 17 L.Ed. 2d 374, 387(1966) 21

Holloway v. Horn, 355 F. 3d 707, 729 (3d Cir. 2004) 31

House v. Bell, 547 U.S. 518, 554-55 (2006)................................ 28

In re Davis, 130 S.Ct.1 (2009)........................................... 2

In re Davis, 2010 WL 8961437, at *2 ( S.D. Ga. Oct. 8, 2010)............. 2

In re Davis, No. CV 409-130 (8/24/10).................................... 24

Johnson v. Mississippi, 486 U.S. 578, 108 S.Ct. 1981, 100 L.Ed 2d 575 (1988). 22
Id. at 585, 108 S.Ct. at (1986)..........................................

Langford v. Rite Aid of Ala., Inc., 231 F. 3d 1308, 1312 (11th Cir. 2000)..... 30

Maxwell v. Roe, 9th Cir. 628 F. 3d 486, 88 CrL 293........................ 26

Mcnabb v. U.S., 318 U.S. 332, 347, 87 L. Ed 819, 63 S.Ct. 608............. 12

Mooney v. Holohan, 294 U.S. 103, 79 L. Ed 791, 55 S.Ct. 340 (1935)........ 24, 29

Mulero v. Thompson, 751 F. Supp. 2d 1009, 1027 (N.D. Ill. 2010)........... 2
Aff'd 668 F. 3d 529 (7th Cir. 2012)

Murphy v. Mo. Dept. of Corr., 506 F. 3d 1111, 1117 (8th Cir. 2007)........ 29

Murray v. Carrier, 477 U.S. 478, 91 L.Ed 2d 397, 106 S.Ct. 2639 (1986)......... 2

Napue v. Illinois, 360 U.S. 264, 269, 3L. Ed 2d 1217, 79 S.Ct. 1173 (1959)..... 23, 24

Neder v. U.S., 527 U.S.1, 25, 119 S.Ct. 1827, 1842, 144 L. Ed 2d 35, (1999) 30

Payne v. Tenn., 501 U.S. 808, 825 (1991)................................. 3

Pfizer Inc., v. Int'l Rectifier Corp. 538 F. 2d 180, 195 (8th Cir. 1976), cert.
denied, 429 U.S. 1040, 97 S.Ct. 738, 50 L. Ed 2d 751 (1977.............. 28

Pinkerton v. U.S., 328 U.S. 640, 66 S.Ct. 1180, 90 L. Ed 1489 ............ 20

CASES                                                                    PAGE NUMBER

Rivas v. Fischer, 687 F. 3d 514, 540 n. 34 (2d Cir. 2012) .................. 2

Roberts v. South Carolina, 361 S.C.1; 602 S.E. 2d 768; 2004 S.C. LEXIS 218. 22

Sawyer v. Collins, 986 F. 2d 1493, 1497 (5th Cir. 1993); citing Barefoot v. Estelle, 463 U.S. 880, 893, 103 S.Ct. 3383, 3394, 77 L. Ed 2d 1090 (1983).. 28

Smith v. Kemp, 715 F. 2d 1459, 1463 (11th Cir.) cert. denied 464 U.S. 1003, 104 S.Ct. 510, 78 L. Ed 2d 699 (1983) ........................................ 23

U.S. v. Agurs, 472, U.S. 97, 103, 49 L. Ed 2d 342, 96 S.Ct. 2392 (1976)... 24

U.S. v. Beil, 577 F. 2d 1313, 1315 n.2 (5th Cir. 1978), cert. denied, 440 U.S. 946, 99 S.Ct. 1422, 59 L.Ed 2d 634 (1979) ............................... 19

U.S. v. Blackthorne, 378 F. 3d 449, 454 (5th Cir. 2004) .................... 14

U.S. v. Broadwell, 870 F.2d 594, 602-04 (11th Cir.) cert. denied, 493 U.S. 840, 110 S.Ct. 125, 107 L.Ed 2d 85 (1989) ................................. 20

U.S. v. Cardwell, 433 F.3d 378, 390, 91 (4th Cir. 2005) .................... 14

U.S. v. Cathey, 591 F.2d 268, 271-72 (1979) ................................ 14

U.S. v. Chiavola, 744 F.2d 1271, 1274 (7th Cir. 1984) ...................... 12

U.S. v. Elwood, 993 F.2d 1146, 1151 (5th Cir. 1993) ........................ 20

U.S. v. Fields, 483 F.3d 313 (2007); cert. denied, 552 U.S. 1144 .......... 10, 25, 26

U.S. v. Greer, 137 F.3d 247, 251 (5th Cir. 1998) ........................... 14

U.S. v. Harlow, 444 F.3d 1255 (10th Cir. 2006) ............................. 27

U.S. v. Hasson, 333 F.3d at 1270-71 ........................................ 30

U.S. v. Hull, 456 F.3d 133, 141 (3d Cir. 2006) (internal marks omitted), cert. denied, 127 S.Ct. 2877, 167 L.Ed 2d 1155 (2007) ..................... 29

U.S. v. Hyder, 732 F.2d 841, 845 (11th Cir. 1984) .......................... 14

U.S. v. Jaramillo, 42 F.3d 920, 923 (5th Cir.), cert. denied, U.S. 115 S.Ct. 2014, 131 L.Ed 2d 1013 (1995) ....................................... 20

U.S. v. Mechanik, 475 U.S. 66, 74, 106 S.Ct. 938, 943, 89 L.Ed 2d 50(1986) 14

U.S. v. Metro St. Louis Sewer Dist. 440 F. 3d 930 , 935 (8th Cir. 2006)... 29

U.S. v. Moore, 525 F.3d 1033 (11th Cir. 2008) .............................. 19

U.S. v. Nobles, 422 U.S. 225, 230 (1975) ................................... 28, 29

U.S. v. Peoples, 250 F.3d 630, 639 (8th Cir. 2001) ......................... 21

U.S. v. Percel, 553 F.3d 903 (Dec. 23, 2008) ............................... 19

U.S. v. Polk, 56 F.3d 613, 620 (5th Cir. 1995) ............................. 20

U.S. v. Razo-Leora, 961 F.2d 1140, 1148 n.6 (5th Cir. 1992) ............... 14

U.S. v. Roger LaPage, 231 F.3d 488 (2000) .................................. 24

U.S. v. Roper, 874 F.2d 782, 787-88 (11th Cir.) cert. denied, 493 U.S. 867 110 S.Ct. 189, 107 L.Ed 2d 144 and cert. denied, 493 U.S. 955, 110 S.Ct. 369, 107 L.Ed 2d 355 (1989) ............................................... 20

U.S. v. Snitz, 342 F. 3d 1154 (10th Cir. 2003) ............................. 31

PAGE NUMBER

CASES

U.S. v. Sonya Evette Singleton, 144 F. 3d 1343 (1998)....................... 25

U.S. v. Sonya Evette Singleton, 165 F. 3d 1297 (1999)....................... 25

U.S. v. Strouse, 286 F.3d 767 (5th Cir. 2002)............................... 13

U.S. v. Sullivan, 578 F. 2d 121, 124 (5th Cir. 1978)....................... 14

U.S. v. Sutherland, 463 F.2d 641, 645 (5th Cir.), cert. denied, *1569409 U.S. 1078, 93 S.Ct. 698, 34 L.Ed 2d 668 (1972)............................. 19

U.S. v. Williams, 504 U.S. 36, 112 S.Ct. 1735, 118 L.Ed 2d 352 (1992)........ 13

Walberg v. Israel, 766 F.2d 1071, 1078 (7th Cir.) (Posner J.), cert. denied, 474 U.S. 1031 (1985)....................................................... 3

Wiemotko, v. Maryland, 340 U.S. 268, 271, 71 S.Ct. 325, 327, 95 L.Ed 267 (1951)  3

Williams v. Griswald, 743 F.2d 1533, 1541 (11th Cir. (1984).................. 23

Zurich, 426 F.3d at 1291................................................... 29

## STATUTES AND RULES

Rule 11....................................................................... 2, 6

Rule 20....................................................................... 2, 6

Rule 60 (b) (2) & (3) & (d) (3)............................................... 7, 28, 29

18 U.S.C. § 2................................................................. 6, 20

18 U.S.C. § 201 (c) (2)....................................................... 6, 25

18 U.S.C. § 371............................................................... 5, 13, 19

18 U.S.C. § 373............................................................... 5, 14, 15

18 U.S.C. § 1621.............................................................. 5, 19

18 U.S.C. § 1622.............................................................. 6, 13, 19

18 U.S.C. § 1623.............................................................. 6, 13

28 U.S.C. § 455............................................................... 4, 27

28 U.S.C. § 1254(1)........................................................... 2, 4

28 U.S.C. § 1651(a)........................................................... 2, 4

## OTHER

Amendment V................................................................... 4

Amendment VIII................................................................ 4

Amendment XIV................................................................. 4

Case No. W-01-CR-114; No. 02-50690 (Anders Brief)............................. 9

Case No. W-01-CR-168......................................................... 23

Case No. W-01-CR-114......................................................... 30

VII

OPINIONS BELOW

The opinion of the United States court of appeals appears at Appendix A-13 to the petition and is UNPUBLISHED.

The opinion of the United States district Court appears at Appendix A-1 to the petition and is UNPUBLISHED.

Petitioner respectfully prays that a writ of certiorari issue to review the judgment(s).

1

JURISDICTION

( CAPITAL CASE; DEATH PENALTY )

This is a Death Penalty case; A case that involves severely egregious, unethical, illegal and criminal conduct perpetrated against the petitioner by government and State officials. Petitioner believes that Rule 11 and Rule 20 governs this writ.

The District Court isn't the proper forum to adjudicate the merits of this writ because; (1). The Court refuses to accept "anything" Petitioner files; And (2). Petitioner have reason to believe that the District Judge, Walter Smith Jr. willfully took part in the unethical, illegal and criminal conduct that inspires this writ.

The United States Court of Appeals for the 5th Circuit isn't the proper forum to adjudicate the merits of this writ because; (1). On January 14, 2014 after Petitioner attempted to file a Pro Se Actual Innocence Brief, freestanding or as a supplement Petitioner was informed that the Court will not accept anything Petitioner file " because he have attorney's." (2). Opposing Counsel's claim that "Actual Innocence" (freestanding) are not cognizable. ( COA page 72-73 ). Reasonable jurist could differ on the cognizability of Fields' claim of Actual Innocence. The Government contends that Herrera v. Collins, 506 U.S. 390 (1993), together with Fifth Circuit cases interpreting that decision, categorically disallow any "freestanding claim of actual innocence". ( Government's opposition to Fields' COA, 76-77 ). But the Fifth Circuit's interpretation of Herrera must be reviewed in light of this Court's recent decision in In re Davis, 130 S.Ct. 1 (2009), and other cases interpreting that decision. See id. at 1; Mulero v. Thompson, 751 F. Supp. 2d 1009, 1027 (N.D. ILL. 2010) ( finding that Davis indicates that a claim of actual innocence may be cognizable), aff'd 668 F. 3d 529 (7th Cir. 2012); Rivas v. Fischer, 687 F. 3d 514, 540 n.34 (2d Cir. 2012) (citing Davis as contrary to the position that the Court has "never explicitly recognized the existence of a freestanding actual innocence claim"); See also In re Davis, 2010 WL 8961437, at *2 (S.D. Ga. Oct. 8, 2010). The Government does not even address Davis, relying instead on pre-davis caselaw. See Opp. 77. In any event because Actual Innocence isn't a cognizable issue in the 5th Circuit, even if Petitioner were to prevail on any other issue that Counsel filed on his behalf it will only serve to put Petitioner back in the very same position; Back on trial (sic) retrial with the same false and fabricated evidence with the Fraud on the Court and Criminal Conspiracy as the foundation. Granted Petitioner understands that Issuance by the Court of an Extraordinary writ authorized by 28 U.S.C. § 1651 (a) is not a matter of right, but of discretion, but if any case deserves such discretion it's this one. There is no doubt that the Writ will aid the Court, if granted in other cases of this nature. When Government officials use the Judicial system as an arm of their deceit and/or deception it warrants the exercise of the Court's discretionary powers, and as stated above relief cannot be obtained in any other form or from any other Court; And (3). The brief that Counsel for Petitioner filed, Petitioner objects to it and it's that brief that the 5th Circuit choose to rely on; And (4) Because of the nature of this writ and the unimaginable consequences that failure to adjudicate the merits will inspire the Supreme Court is Petitioners last and only alternative.

The Supreme Court has recognized that the "Cause and Prejudice" requirement has an " Actual Innocence " exception, sometimes known by other names such as the " fundamental miscarriage of justice " exception. In Murray v. Carrier, 477 U.S. 478, 91 L. Ed. 2d 397, 106 S.Ct. 2639 (1986), the Supreme Court held that in order to invoke this exception a federal Habeas Corpus petitioner is required to show that a constitutional violation has "probably" resulted in the conviction of one who is Actually innocent. Because of the 5th Circuit's "logic" in regards to Actual Innocence, their refusal to accept anything from Petitioner, and the facts that inspires this writ  the lower Court(s) are inadequate and/or insufficient to test

2

the legality of Petitioners detention. This leaves the Supreme Court as Fields only "gateway" to review.

In cases like this one in which there is a denial of rights under the Federal Constitution a Court of Appeals is not bound by the conclusions of lower court's, but will re-examine the evidentiary basis on which those conclusions are founded; Wiemotko v. Maryland, 340 U.S. 268, 271, 71 S.Ct. 325, 327, 95 L. Ed 267 (1951). To demonstrate a substantial showing of the denial of a Constitutional right, a prisoner must show that the "issues are debatable amongst jurist of reason". Hill v. Johnson, 210 F. 3d 481, 484 (5th Cir. 2000). " The Supreme Court has explained that " the reaches of the Federal Court to investigate whether a judgment was obtained by fraud is beyond question". This writ only outlines a "fraction" of the egregious and illegal criminal conduct that contributed to this malicious prosecution and even that is overwhelming. A death sentence may be reversed if the sentencing jury was influenced or misled by improper evidence, arguments, or instructions; Dawson v. Del., 503 U.S. 159, 163 (1992). In Dawson, the Court found it is clear that "when a State Court admits evidence that is " so unduly prejudicial that it renders a trial fundamentally unfair, the Due Process Clause of the Fourteenth Amendment provides a mechanism for relief; Id. at 179 ( quoting Payne v. Tenn., 501 U.S. 808, 825 (1991). Fields can't get that relief unless the Supreme Court entertain this writ. It's clear that discretionary powers is required here because the prosecution's misconduct, both egregious and illegal, seriously affected fairness, integrity and/or reputation of trial/judicial proceedings. There is no doubt that had the prosecution not defrauded the Court we wouldn't be here today. " By the protection of the law, human rights are secured; withdraw that protection and we are at the mercy of wicked rulers, or the clamors of an excited people; Walberg v. Israel, 766 F. 2d 1071, 1078 (7th Cir.) (Posner J.), cert. denied, 474 U.S. 1031 (1985). For the reasons stated above the Supreme Court has jurisdiction.

The jurisdiction of this Court is invoked under 28 U.S.C. § 1254(1)

CONSTITUTIONAL PROVISIONS

Amendment V

No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury, except in cases arising in the land or naval forces, or in the Militia, when in actual service in time of war or public danger; Nor shall any person be subject for the same offence to be twice put in jeopardy of Life or limb; Nor shall be compelled in any criminal case to be a witness against himself, nor be deprived of Life, Liberty, or property without due process of law; Nor shall private property be taken for public use, without just compensation.

Amendment VIII

Excessive bail shall not be required, nor excessive fines imposed, nor Cruel and Unusual Punishment inflicted.

Amendment XIV

The first section of the Fourteenth Amendment to the United States Constitution provides as follows:

All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of Citizens of the United States; Nor shall any State deprive any person of Life, Liberty, or property without due process of law; Nor deny to any person within its jurisdiction the equal protection of the laws.

STATUTES

28 U.S.C. § 1651

(a) The Supreme Court and all courts established by Act of Congress may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law.

(b) An alternative writ or rule may be issued by a justice or judge of a court which has jurisdiction.

28 U.S.C. § 1254

Cases in the Court of appeals may be reviewed by the Supreme Court by the following methods:

(1) By writ of certiorari granted upon the petition of any party to any civil or criminal case, before or after rendition of judgement or decree:

28 U.S.C. § 455

(a) Any justice, Judge, or magistrate judge of the United States shall disqualify

4

himself in any proceeding in which his impartiality might reasonably be questioned.


## 18 U.S.C. § 1001

(a) Whoever, in any matter within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United States, knowingly and willfully-
    (1) falsifies, conceals, or covers up by any trick, scheme, or device a material fact;
    (2) makes any materially false, fictitious, or fraudulent statement or representation; or
    (3) makes or uses any false writing or document knowing the same to contain any materially false, fictitious, or fraudulent statement or entry;

shall be fined under this title or imprisoned not more than 5 years, or both.


## 18 U.S.C. § 371

If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined under this title or imprisoned not more than five years, or both.


## 18 U.S.C. § 373

(a) Whoever, with intent that another person engage in conduct constituting a felony that has an element the use, attempted use, or threatened use of physical force against property or against the person of another in violation of the laws of the United States, and under circumstances strongly corroborative of that intent, solicits, commands, induces, or otherwise endeavors to persuade such other person to engage in such conduct, shall be imprisoned not more than one half the maximum term of imprisonment or (notwithstanding section 3571) fined not more than one half the maximum fine prescribed for the punishment of the crime solicited, or both; or if the crime solicited is punishable by Life imprisonment or death, shall be imprisoned for not more than twenty years.

(c) It is not a defense to a prosecution under this section that the person solicited could not be convicted of the crime because he lacked the state of mind required for its commission, because he was incompetent or irresponsible, or because he is immune from prosecution or is not subject to prosecution.

## 18 U.S.C. § 1621

Whoever-

(1) having taken an oath before a competent tribunal, officer, or person, in any case in which a law of the United States authorizes an oath to be administered, that he will testify, declare, depose, or certify truly, or that any written testimony, declaration, deposition, or certificate by him subscribed, is true, willfully and contrary to such oath states or subscribes any material matter which he does not believe to be true; or

(2) in any declaration, certificate, verification, or statement under penalty of perjury as permitted under section 1746 of title 28, United States Code, willfully subscribes as true any material matter which he does not believe to be true;

is guilty of perjury and shall, except as otherwise expressly provided by law, be fined under this title or imprisoned not more than five years, or both. This section is applicable whether the statement or subscription is made within or without the United States.

5

## 18 U.S.C. § 1622

Whoever procures another to commit any perjury is guilty of subornation of perjury, and shall be fined under this title or imprisoned not more than five years, or both.

## 18 U.S.C. § 1623

(a) Whoever under oath (or in any declaration, certificate, verification, or statement under penalty of perjury as permitted under section 1746 of Title 28 United States Code) in any proceeding before or ancillary to any Court or grand jury of the United States knowingly makes any false material declaration or makes or uses any other information, including any book, paper, document, record, recording, or other material, knowing the same to contain any false material declaration, shall be fined under this title or imprisoned not more than five years, or both.

## 18 U.S.C. § 2

(a) Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principle.

(b) Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal

## 18 U.S.C. § 201 (c) (2)

Whoever-

(2) directly or indirectly, gives, offers, or promises anything of value to any person, for or because of the testimony under oath or affirmation given or to be given by such person as a witness upon a trial, hearing, or other proceeding, before any court, any committee of either House or both Houses of congress, or any agency, commission, or officer authorized by the laws of the United States to hear evidence or take testimony, or for or because of such person's absence therefrom;

shall be fined under this title or imprisoned for not more than two years, or both.

## Rule 11

A petition for a writ of certiorari to review a case pending in a United States Court of appeals, before judgment is entered in that Court, will be granted only upon a showing that the case is of such imperative public importance as to justify deviation from normal appellate practice and to require immediate determination in this Court. See 28 U.S.C § 2101(e)

## Rule 20

Issuance by the Court of an extraordinary writ authorized by 28 U.S.C. § 1651(a) is not a matter of right, but of discretion sparingly exercised. To justify the granting of any such writ, the petition must show that the writ will be in aid of the Court's appellate jurisdiction, that exceptional circumstances warrant the exercise of the Court's discretionary powers, and that adequate relief cannot be obtained in any other form or from any other court.

6

Rule 60

(b) (2). On Motion and just terms, the court may relieve a party of its legal representative from a final judgment, order, or proceeding for the following reasons:

newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial under Rule 59(b)

(b) (3). Fraud ( whether previously called intrinsic or extrinsic ), misrepresentation, or misconduct by any opposing party;

(d) (3). This Rule does not limit a Court's power to:

set aside a judgment for Fraud On The Court.

## STATEMENT OF THE CASE

This is a case that involves multiple criminal offenses committed by State and government officials; Thus in order to grasp the necessity of this writ a little "Background" is required

At or about mid 1990 15 year old Sherman Lamont Fields met and started dating 18 year old April Vasquez. Ms. Vasquez had a boyfriend whom was her age named Derrick Bradshaw that she left for Fields, and one night as Fields and Vasquez walked home from the store Mr. Bradshaw pulled up in a white 1979 Oldsmobile Cutlass, Bradshaw stood up in the sunroof of the car and started shooting at an unarmed Fields; He missed fields but a bullet struck Ms. Vasquez in the leg. ( At the time she was pregnant with her and Fields' first child.)

Fields didn't react to Bradshaw's aggression, Fields let the police "handle it". But months later Bradshaw, his brother Mark, and their two cousins pulled guns on an unarmed Fields once again. Fields was able to drive away, but this time he obtained a gun himself, went by Bradshaw's house and shot at Bradshaw in an attempt to scare Bradshaw into leaving him alone. Unfortunately Bradshaw's step father was either scraped by a bullet or cut with some flying glass, he was treated at the scene without hospitalization. Fields pled guilty to a charge of Aggravated Assault and was sentenced to eight years in prison.

Fields was released from prison in July 2000, In late August 2000 Fields got into a brief altercation with a drug dealer after Fields asked the dealer to stop disrespecting a young lady that have a child with Fields' cousin. As a result of the altercation the drug dealer hired a LaDon King to kill Fields. King almost murdered an unarmed Fields when they first crossed paths but was thwarted by security guards on the scene. King came back the next day to " finish the job ", but was thwarted again when Fields obtained a gun from another guy at the scene and the Hit Man, LaDon King was shot.

In late October 2000 the police got a tip that Fields was at a private residence. Armed with an arrest warrant for the LaDon King shooting the police surrounded the house, ordered the homeowner outside, stormed the house and arrested Fields. After Fields was cuffed and restrained the police searched him and found (28) 9-Millimeter bullets in the front pocket of the jeans he was wearing, one of the officers yelled: "There's a gun somewhere!" The police immediately started searching the house and found a 9-Millimeter handgun under the mattress on a bed  Fields was booked into the McLennan County jail in Waco Teaxs for the LaDon King shooting and he made bail.

In November 2000 a guy named Royce Riley got into an altercation with (Riley's) brother in law, a guy named "Ike". ( Either Riley was "Ike's" sister's boyfriend, or "Ike" was Riley's sister's boyfriend; petitioner don't know.) But it appears that Riley went to buy crack cocaine from "Ike", but the drugs was "short on weight", and when Riley refused to pay for the drugs "Ike" and the other drug dealer with "Ike" became upset. A guy that was with Riley asked "Ike" to let him "see the drugs", and when "Ike" handed him the cocaine he jumped out of the car and ran away with the drugs. "Ike" and the other drug dealer then attempted to kidnap Riley who pulled out a gun and fired a shot into the console. Riley was then able to flee on foot.

Ike and his accomplice drove to a woman's house that Riley have a child with. ( It's unknown if this woman is "Ike's" sister.) In any event "Ike" told her what happened, but they didn't know who the "other guy" that was with Riley was; The girl said " It had to be Sherman Fields ", so "Ike" called the police and said that " Royce Riley and Sherman Fields "robbed" him for jewelry and money."

Fields was arrested once again in January 2001, but 9 months later State prosecutors realizing that the LaDon King shooting wasn't an "attempted murder" and the "robbery" wasn't a "robbery", per se refused to let Fields go. Instead the State pushed the government to charge Fields with the bullets and 9-Millimeter that was found 11-months earlier when Fields was arrested for the shooting of the Hit Man.

Federal prosecutors said that Fields should have "just called the police" on the Hit man, LaDon King, and because Fields was a felon he had no right to possess a firearm up under any circumstances. However the prosecutor's was being totally unreasonable and illogical. The Hit Man was already wanted for kicking another guys door in and shooting him multiple times with a .40 Caliber along with a host of other violent offenses when he was hired to murder Fields and the police had failed to apprehend him. Then after LaDon King was shot he escaped from the hospital and went after Fields again, and when the police caught up with

8

him King pulled a gun on the police and got away. So the prosecutions decision to charge Fields with Felon in Possession because Fields should have "just called the police" on the Hit Man defies reason when it's obvious that the police couldn't handle LaDon King.

In any event Fields made the worst mistake of his life, he obtained a key to the fire escape door from a jailor and on November 6, 2001 Fields used that key to open the door and he walked away from the jail. That same night Fields' girlfriend, Suncerey "Shining Star" Coleman was murdered, shot twice in the head.

Fields said that his other girlfriend, Shalaykea "Lakie" Scroggins killed Coleman, and Scroggins had an accomplice, Edward Lee "Treyboy" Outley.
Four months prior to the murder Scroggins wrote two letters expounding upon her obsession for Fields, stating that she'd lost him once to "that girl", referring to Coleman as "That Girl", and adamantly stated that she "won't let it happen again!" And if Coleman or any other woman try to take Fields from her she would be "Killing bitches!"

Scroggins started/resorted to stalking Coleman, it got so bad that Scroggins got a phone cut on in Fields name and started calling Coleman threatening her. The day before the murder Coleman and Fields called the phone company together and informed the phone company that Scroggins had illegally obtained the phone and was calling Coleman threatening her. The phone company cut the phone off.

Shortly after Coleman's murder Scroggins was arrested for aiding and abetting a Federal fugitive, her accomplice Edward Lee Outley was arrested for being a felon in possession of a firearm, they both immediately started framing Fields for Coleman's murder, telling every-one that Fields killed her and sharing details of the murder with everyone they told. Outley and scroggins started hiding evidence that implicates them, fabricating evidence and recruiting inmates to lie for them. Scroggins and Outley both gave several different "alibi's" for the time of Coleman's murder, they both gave several different versions of how, when and where Fields supposedly confessed to them, and they both conspired to hide the car that they were in when Coleman was murdered so the Jaguar wouldn't be subjected to forensics testing.

On the other hand both State and Federal law enforcement and prosecutors were angry that Fields walked out of that jail and they adopted an "I'll show you" attitude towards Fields and set out to "make an example" out of him. When the evidence against fields wasn't "adding up" police and prosecutors started lying, fabricating evidence and it culminated into a criminal conspiracy to Use the Death Penalty as a murder weapon to take Fields life, which led to the prosecution committing <u>Fraud On The Court</u> in order to reach their end result.

In the interim Fields' tenure at the McLennan County jail in waco Texas was mentally and emotionally taxing, law enforcement did everything within their power to make it a living hell for Fields, and at times he was even subjected to physical abuse by the jailors. They taunted Fields calling him "The Green Mile", and often wrote him bogus disciplinary cases to use against him in the event of a guilty verdict. On One occasion a Judge saw Fields in the holding tank at the jail where they held Fields up under observation 24/7 and remarked: "Y'all ought to take his ass out back, put a bullet in his head and save the government some money."

Fields always kept his attorney's abreast of the abuse that he was suffering at the jail, Fields' attorney suggested that Fields plead guilty to the original gun charges stemming from the LaDon King shooting and said that if Fields plead guilty he'll be able to get transferred away from the abuse at the jail because he'll get some time and he can be sent off to prison. Also since it was all one indictment the "max was 10 years", and the other charges against Fields might just go away. Fields pled guilty and Judge Walter Smith went over the ten year mark and gave Fields 12½ years.

Fields wanted to appeal, his attorney filed an Anders Brief stating that the appeal had no merit, ( Case No. W-01-CR-114; No. 02-50690; Anders Brief ) and the relationship between Fields and his attorney started to breakdown and soon became irreparable. Then a week before trial the attorney told Fields that he was once a prosecutor and while he held that position he had prosecuted Fields himself. Fields, whom suffers from paranoia went into flight mode, he asked the Judge to appoint him new counsel but Judge Smith refused and "suggested" that Fields could represent himself. Fields didn't want to do that, he said: Your Honor, I can't do this. I'm not learned in the law and i have a severe case of stage fright." Judge Smith didn't care, he refused to appoint Fields new counsel and Fields proceeded to trial Pro se with a bias pro prosecution jury that the prosecution

9

picked, aided by Judge Smith. And with the criminal conspiracy being the foundation for the prosecution to Defraud the Court Fields' trial quickly turned into the disaster that the prosecution was hoping for. Fields was found guilty on seven counts; Conspiracy; Escape; Capital Murder; Carjacking; Using and Carrying a firearm during the commission of a crime of violence; Felon in possession; and, Using and Carring a firearm during the commission of a crime of violence. He was sentenced to Death and over 700 months in prison.

Fields filed a Direct appeal and the 5th Circuit affirmed the conviction and sentence in United States v. Fields, 483 F. 3d 313 (2007), cert. denied, 552 U.S. 1144.

Subsequently Fields filed several motions via his appeals attorney's, Jeffrey Ellis, of Alsept & Ellis 621 SW Morrison St., Ste. 1025, Portland, OR 97205 (206) 218-7076 and Peter J. Isajiw of Cadwalader, Wickersham & Taft, LLP, One World Financial Center, New York, NY 10281 (212) 504-6000, seeking to vacate, set aside, or correct his conviction and sentence pursuant to 28 U.S.C. § 2255, alleging 49 points of error ( ROA 349, 455, 984 ), Fields attorney(s) also asked the District Court to compel Discovery.

In a 137 page order, the District Judge, Walter Smith denied the requested relief and, sua sponte, ruled that a COA should not issue; The Court also denied Fields' various motions for reconsideration. ( ROA 2195 ).

Upon accepting Mr. Ellis and Mr. Isajiw as 2255 Habeas attorney's Fields told them that he wanted them to file the criminal elements; (i.e) Conspiracy, Fraud On The Court, Solicitation of murder, etcetera, but attorney's failed to do so, choosing to file the "traditional appeal", so when the District Court denied Fields 2255, Fields notified the District Court that he would be proceeding to the 5th Circuit Pro Se. Judge Smith denied Fields his right to do so without even an inquiry.

Fields notified the 5th Circuit Court that he would be proceeding to their Court Pro Se. ( See Motion; App. A2        ). The 5th Circuit sent a copy of the Pro Se Motion to Fields attorney, Jeff Ellis and a Copy to the prosecution, then returned the original Motion to Fields to sign; ( See Notice from the Court; App. A3     ).

The request for the signature misled Fields to believe that the Motion was accepted and he immediately filed a Freestanding Actual Innocence Brief with 3-Volumes of Appendix showing that not only could he prove that he is Actually and Factually innocent, but he could prove that his conviction and sentence(s) were the direct result of a Fraud On The Court with a criminal conspiracy being its foundation, and the findings of guilt was unauthorized and the admission of false facts precluded the development of true facts. Fields also filed a " Motion to Bar the prosecution and their coconspirators from having any contact with each other due to their ability to continue their criminal endeavors;( See Motion;   App. A4 ) A Motion to Seal the Brief; ( See Motion; App. A5   ); And A Motion for Discovery; ( Not included.)

Fields' attorney, Jeff Ellis responded to the Court stating that Fields' Pro Se Motion isn't actually a "Pro Se" Motion and Fields only ask to be able to file his brief and Motion(s) along with additional pleadings filed by Counsel; ( See Response to Pro Se Motion; App. A6    ).

On 10/23/13 the 5th Circuit denied Fields Motion to Proceed Pro Se; ( See Order; App. A7

On 10/30/13 the 5th Circuit notified Fields that they won't consider his Brief and Motions; ( See Notice; App.  A8     ).

Fields responded to the notice and asked the Court to allow his brief and Motions to either work in conjunction with whatever counsel file, or allow Fields' filings to stand alone.

On 11/18/13 the 5th Circuit again refused; ( See Notice; App.  A9     ).

Fields responded to the Notice once again stating that he don't want to rely on the "unseen" brief that Counsel intended to file and asked the Court to reconsider.

On 12/05/13 the 5th Circuit responded stating that only Fields attorney's can file on his behalf; ( See Notice; App. A10    ).

On 12/12/13 Fields received a copy of the brief that counsel filed on his behalf, Fields immediately filed a Motion for Reconsideration of his Pro Se filings, stating that he "strenuously object" to the brief that his counsel filed; ( See Motion; App. A11     ).

On 12/24/13 Fields filed another Motion to " Reurge Filings"; ( See Motion; App. A12    ).

On January 14, 2004 the 5th Circuit entered an Order to not accept "Anything" that Fields file; ( See Order; App. A13 ).

Fields filed two Motions to the Supreme Court appealing Order; ( See Motions; App. A14). Then Fields filed a Motion Pursuant to Rule 60 with this Court postmarked Feb. 17, 2014.

On 5/6/14 Fields received the Rule 60 Motion back from the Supreme Court with a 60 day deadline from May 1st, 2014 to restructure the Motion with a timeline of events, stay within a 40-page page limit, and serve a copy on opposing Counsel; This writ meets those guidelines.

11

REASONS FOR GRANTING THE PETITION

FRAUD ON THE COURT (CONSPIRACY; SOLICITATION OF MURDER; AIDING & ABETTING )

" The supervisory power is reserved to protect the integrity of the federal courts. United States v. Chiavola, 744 F. 2d 1271, 1274 (7th Cir. 1984). The policy is concerned with the extent to which fraud on the courts converts the courts into an instrument of the party's deception. cf. McNabb v. United States, 318 U.S. 332, 347, 87 L. Ed. 819, 63 S.Ct. 608 ( Court is not concerned with law enforcement "except in so far as the Courts themselves become instruments of law enforcement"). Chiavola, 744 F. 2d at 1274 ( fraud on the Court common factor in cases in which Courts have exercised their supervisory power.) Recognizing a Court's inherent authority to correct injustice perpetrated through it by a party's lying in Court is not novel, and does not augment a Court's power regarding probation beyond what congress allowed. Which brings us to the Fraud Upon the Court's that inspires this writ:

(1). The Night that Suncerey "Shining Star" Coleman was murdered, November 6, 2001 Fields was driving a red two door Pontiac Grand Am owned by a Roger Thomison, Edward Lee "Treyboy" Outley was driving a "GOLD" Jaguar owned by a Mr. Lutrill Payne. Later that night Shalaykea "Lakie" Scroggins, assisted by Outley murdered Coleman where they arrived at, and left the crime scene in that Gold Jaguar; The evidence in that regard is overwhelming.

Scroggins claimed that Fields killed Coleman and he got blood in the car that he was in; ( Grand Jury transcripts, pgs. 41-43). A Detective Roy Davis testified that there were thorn bushes that would have cut whoever drug the body to where it was found; ( Trial Transcripts, pgs. 1282-1283 and 1269-1270). Fields was wearing green jail pants cut off and made into shorts so the thorns would have undoubtedly cut his legs if he would have killed Coleman.

The Grand Am that Fields was driving that night was processed in the forensics lab; ( Trial Transcripts, pg. 1320) and ( See Waco PD Supplement Report; App. A15 ). Forensics cleared the car, there was no blood; ( Trial Transcripts, pg. 1332.)

The prosecutor's went through several deceptive hypotheticals why the Grand Am came back with negative results during forensics testing, neither of their reasons having any merit; They said that Fields could have just put his feet on the floor mats and then threw the mats away; ( Trial Transcripts, pg. 1928). But their forensic expert admitted that the mats were in the car when he processed it; ( Trial Transcripts, pg. 1929 ).

The prosecutor's tried another manipulative and deceptive tactic, they called Sheriff Detective Morris " Bubba " Colyer to the stand to lie and defraud the Court; Colyer lied and said that the car had been detailed; ( Trial Transcripts, pg. 1924-1925). The lab report reflects that the car wasn't clean; ( See Waco PD Supplemental Report; App. A15 ). The Supplement Report also states that there are photo's of the car pre and post forensics testing, these photo's will undoubtedly show that the car wasn't "detailed" like Colyer and the prosecutor misled the jury and defrauded the Court into believing. This " false fact " was intentionally willful and meant to defraud the Court. The defense was never given the photo's although a Discovery Motion was filed to obtain the photo's; ( See Motion; App. A16 ). If the car was detailed there wouldn't have been latent prints found in the vehicle; ( See Waco PD Supplement Report; App. A17 ). There was also dirt in the fender wells; ( See Waco PD Supplement Report; App. A17 ). Also the owner of the Grand Am had a dirty job, he worked construction; ( See follow up report; App. A18 ). He also rented his car out for drugs. There is no way the car was detailed on the 6th and it was still "clean" on the 14th like Detective Colyer defrauded the Court to believe. But most importantly the prosecution's own expert admitted that had the car been detailed they still would have found blood; ( Trial Transcripts, pg. 1927).

The prosecution went through every deceptive excuse that they could conjure up about why they didn't find blood in the Grand AM except for the right excuse; Fields didn't kill Coleman, Scroggins and Outley killed her and the blood was in that GOLD Jaguar that they were in on the night of the murder. No one have ever been able to explain why Outley and Scroggins, two "innocent" people conspired to hide the Jaguar.

12

Scroggins lied and said that the Jaguar was "Blue"; ( See Scroggins Grand Jury Testimony, pg. 17; App.  A19  ); Outley also lied and said that the Jaguar was "Blue"; ( See Report of Interview; App.  A20  ). The prosecutor also lied and said that the Jaguar was "Blue"; ( See Trial Transcripts, pgs. 1936-1938; App.  A21  ). It is clearly established Federal law that whoever knowingly and willfully (1) falsifies, conceals, or cover up by any trick, scheme, or devise a material fact; (2) Makes any materially false, fictitious, or fraudulent statement or representation is guilty of Fraud. There is no doubt that the prosecutor's committed the criminal act of fraud on the court, the prosecutor's knew all along that Scroggins and Outley were lying and conspiring to hide and/or conceal the Jaguar because three months prior to trial the prosecutor's talked to the owner of the Jaguar, Mr. Lutrill Payne, and he told them at that time that he'd rented Outley his "Gold" Jaguar on the night of the murder. ( See Interview of Lutrill Payne; App.  A22  ). Thus the prosecutor's knew all along that they would attempt to defraud the Court and Aid and Abet Scroggins and Outley's conspiracy to hide the Jaguar and frame Fields for Coleman's murder. And pursuant to 18 U.S.C. § 371 it is clearly established federal law that this is indeed the criminal act of conspiracy perpetrated by Outley and Scroggins. It's not like one of them said that the Jaguar was "Blue" and the other one said that it was "Green" or "Black" or "Brown", they both lied and said that the car was "Blue", and in order for them both to come to that consensus they had to get together and "agree" to defraud the Court by conspiring to say that the Jaguar was the same color so they can hide the car and keep it out of the forensics lab because had the Jaguar been tested Scroggins and Outley wouldn't have been able to explain how their blood, where the thorns undoubtedly cut them, mixed with the blood from Coleman's wounds got in the Jaguar; Their only alternative was to hide the Jaguar and put the murder off on Fields. So when the prosecutor's decided to Aid and Abet this conspiracy and Defraud the Court themselves the prosecution's criminal actions converted the Court(s) into an instrument of Outley and Scroggins deception.

However the criminal acts in relation to the Jaguar is just the tip of the conspiratorial "iceberg", the prosecution made a deliberate, conscious, knowing and willful decision to turn criminal in their pursuit of murdering Sherman Fields via lethal injection.

(2) In February 2002 Shalaykea "Lakie" Scroggins told the Grand Jury that Fields threatened to use a bullet on her. ( Scroggins Grand Jury testimony, pg. 18 ). But the Grand Jury knew she was lying. ( ATF Agent Douglas Kunze Grand Jury testimony, pg. 60-61 ). Prosecutor Greg Gloff procured Sheriff Detective Johnny Spillman to lie and say that when fields came into contact with Coleman on the night of the murder he became "Irate". ( Johnny Spillman's Grand Jury testimony, pg. 5; App.  A23  ). And in order to bolster Spillman's perjury/fraud, Gloff procured U.S. Marshal Chris Casson to lie and defraud the Grand Jury as well; Casson lied and told the Grand Jury that Coleman's cousin Tanesha Hilliard said that Fields became "angry" when he came into contact with Coleman at the hospital. ( Chris Casson's Grand Jury testimony, pg. 6; App.  A24  ).

Prosecutor Gloff, Detective Spillman and Marshal Casson knew the testimony was blatantly and demonstrably false, and they intentionally and willfully set out to defraud the Grand Jury into Indicting Fields. On November 10, 2001, four days after Coleman's murder Tanesha Hilliard told the Waco Tribune Herald that Fields " did not appear angry at the time." ( See Newspaper article; App.  A25  ). Then during trial in January 2004 Tanesha Hilliard reiterated the fact that Fields was never upset. ( See Trial Transcripts, pg. 1350; App. A26  ). Tanesha Hilliard, whom was with Coleman that night and was a hostile government witness towards Fields even states that she's never known Fields to act violent towards Coleman and on the night of the murder, at the hospital Fields and Coleman were "hugging and kissing". ( Trial Transcripts, pg. 1361.) Rule 18 U.S.C. § 1623 prohibits perjury before the Grand Jury, and 18 U.S.C. § 1622 criminalizes the subornation of perjury. See United States v. Strouse, 286 F. 3d 767 ( 5th Cir. 2002); United States v. Williams, 504 U.S. 36, 112 S.Ct. 1735, 118 L.Ed. 2d 352 (1992). Prosecutor Gloff, Sheriff Detective Spillman and U.S. Marshal Casson willfully violated clearly established federal criminal law. The Williams decision establishes that the prohibition of perjury is among "the few clear rules" that a Court may enforce using its supervisory powers. And by listing "standards of behavior for prosecutors (and others)" the Court intimated that

13

misconduct independent of the government, if precluded by an established standard of behavior, could provide a basis for overturning an indictment. Id. (emphasis added). In the Bank of Nova Scotia v. United States, 487 U.S. 250, 108 S.Ct. 2369, 101 L.Ed. 2d 228 (1988), the Court held that " the supervisory power can be used to dismiss an indictment because of misconduct before the Grand Jury, at least where the misconduct amounts to a violation of one of those ' few clear rules ' which were carefully drafted and approved by the court and by congress to ensure the integrity of the Grand Jury's functions." Id. ( citing United States v. Mechanik, 475 U.S. 66, 74, 106 S.Ct. 938, 943, 89 L.Ed 2d 50 (1986). citing <u>Williams</u>, the court has indicated that the "statutory prohibition against making a false declaration before a Grand Jury exemplifies one of the "few clear rules" intended to protect the integrity of the Grand Jury's functions. ( United States v. Greer, 137 F. 3d 247, 251 (5th Cir. 1998). See also United States v. Sullivan, 578 F. 2d 121, 124 (5th Cir. 1978); United States v. Cathey, 591 F.2d 268, 271-72 (1979) ( suggesting that witness perjury could provide a basis for dismissing indictments returned by the Grand Jury in reliance on the perjured testimony. See e.g., United States v. Hyder, 732 F. 2d 841, 845 (11th Cir. 1984 ). In light of the doubts that the Grand Jury had about Scroggins testimony Prosecutor Gloff's criminal decision to procure Spillman and Casson to lie and defraud the Grand Jury was undoubtedly meant to prove fatal for Fields and there is no doubt that their criminal act(s) compromised the integrity of the Grand Jury and its functions.

(3) Fields was tried and convicted with nothing but "jailhouse testimony", and it's this false jailhouse testimony that the prosecution claim is "overwhelming evidence" of Fields' guilt. The evidence proves that the prosecution intentionally, deliberately, knowingly and willfully solicited, sought out, and acquired this false and malicious testimony by and through criminal means in order to fabricate evidence that they could use to defraud the Court(s) and Murder Fields in the Pretense of Justice:

(a) Three months after Coleman's murder when the evidence against Fields wasn't "adding up" the prosecution should have realized that they were pursuing the wrong person, but instead of taking a step back and refocusing the investigation the prosecution decided to go "seeking jailhouse testimony"; ( See Letter; App. A27   ).

(b) Shortly thereafter, continuing on their quest to fabricate evidence against Fields the prosecution wanted, and attempted to procure a false "eyewitness"; Shalaykea " Lakie" Scroggins wrote her accomplice, Edward Lee "Treyboy" Outley a letter stating that the prosecution want to recruit one of them to lie  and say that they were " with Fields ". ( See Letter; App. A28 ).

(c) Officer(s) for the prosecution recruited an inmate, Chance Alexander to lie and say that Fields confessed to him, but at the last minute inmate Alexander backed out of the deal and admitted that he don't even know Fields and he'd lied because he was promised that he would be let out of jail; ( Trial Transcripts, pgs. 1930-1931; App. A29).

The Court(s) have yet to recognize that police, prosecutors and "witnesses" whom intentionally and willfully fabricate evidence and Defraud the Court(s) in Capital Death Penalty cases can be prosecuted under the solicitation of murder, Conspiracy to commit murder and Murder statutes under the State and Federal Constitution although a reoccuring theme in all wrongful convictions and malicious prosecutions is that the offending police, prosecutor(s) and their "witnesses" are never held accountable for their criminal conduct/actions. And as long as they know there are no consequences for their unethical, illegal and criminal  actions they will do it again and again. This is an opportunity for the Court's to show "the people" that the integrity of our Justice system is of the utmost importance and these criminal act(s) will not be tolerated by anyone!

To find someone guilty of Solicitation of Murder for hire the jury must find, (1) That the defendant intended for another person to commit murder for hire; and (2) That the defendant induced or tried to persuade that other person to commit murder for hire.

18 U.S.C.S § 373 (a). United States v. Razo-Leora, 961 F.2d 1140, 1148 n.6 (5th Cir.1992); See also United States v. Cardwell, <u>433 F.3d 378</u>, 390, 91 (4th Cir. 2005). The plain language of the statute indicates that actual movement in interstate commerce is not required for a solicitation conviction under 18 U.S.C.S. § 373 (a) c.f., United States v. Blackthorne, 378 F. 3d 449, 454 (5th Cir. 2004) ( Even where a conviction for the

14

substantive offense of federal Murder-for-hire fails for want of interstate travel, a defendant can be convicted of conspiring to commit the offense".)

It is clearly established Federal Law that a section 373(a) offense is complete when one corruptly "endeavors" to, and employs another to commit Murder-for-remuneration; One need not prove that a murder actually occured. And as the Court of criminal appeals noted " remunerate" encompasses a broad range of situations, including compensation for loss or suffering, and the idea of a "reward" given or received because of some act." The Courts interpretation far from offering a surprising or far-fetched  construction, stated the everyday meaning of the words used by Legislature. Beets, 767 S.W. 2d at 734." 180 F.3d 190:: Beets v. Johnson: June 28, 1999 (5th Cir.)

The first prong of the Murder-for-hire statute have been met; In Herrera v. Collins, 506 U.S. 390, 404, 113 S.Ct. 853, 122 L.Ed. 2d 203 (1993), Justice Blackmun said that the execution of a person who can show that he is innocent comes perilously close to simple murder. Even then, Justice Blackmun wasn't factoring in a case like Fields where the prosecution intentionally, knowingly, willfully, with malice aforethought recruited a bunch of "paid occurence witnesses" whom engaged in a criminal conspiracy to use the Death Penalty as a murder weapon and Defrauded the Court(s) into taking away Fields' liberty with intentions of taking his life. Fields' impending demise exceeds that tenfold and crosses into the territory of impending murder with premeditation.

With the Death Penalty on the table there is no question and/or doubt what the police, prosecutors and their "witnesses" goal and/or intent were; the end result would be death and they all knew that, so when the prosecution "hired" these crooks to Defraud the Court the prosecutor's intended for those crooks to "wield that sword" and commit Murder-for-hire; Thus satisfying the first prong.

The second prong have been met as well. According to a letter that the real murderer, Shalaykea "Lakie" Scroggins wrote her accomplice, Edward Lee "Treyboy" Outley the prosecution wanted one of them to lie and say that they saw Fields murder Coleman, thus inducing or trying to persuade Outley and/or Scroggins to commit murder. Also Chance Alexander, another inmate that Fields don't even know said that a law enforcement officer working for the prosecution tried to recruit him with the promise of "remuneration" (a reward for the act), to lie in this Capital Case and say that Fields confessed to him although he doesn't even know Fields and have never had a conversation with him, thus inducing or trying to persuade Alexander to commit murder-for-hire; the second prong of section 373(a) have been met.

There are generally speaking two types of evidence from which the Court may properly find the truth as to the facts of a case. One is direct evidence such as testimony of an eyewitness, the other is indirect or circumstantial evidence, the proof of a chain of circumstances pointing to the existence of certain facts; The notice that the prosecution is "seeking jailhouse testimony" is instrumental and offers a glimpse into the prosecutor(s) state of mind; This notice was before they had any witnesses, and then two years later the prosecution closed their case with nothing but "jailhouse testimony", inmates whose stories are demonstrably false. Next we have Scroggins telling her accomplice that the prosecution want one of them to say that they were " with Fields ", and being that they were saying that Fields killed Coleman "with Fields" could only mean that they wanted to procure a false eyewitness. And then there is Chance Alexander, the guy that the prosecution tried to "hire" to lie on Fields; Three separate and individual incidents about the prosecution seeking false and fabricated evidence from three different places and/or people that don't know each other; There is no doubt that the prosecution solicited and/or conspired to Murder Fields via lethal injection and Defrauded the Court(s) to meet their end result.

A guiding principle here in Fields is the fact that the Court(s) should be mindful that evidence like this that's outside the record is critical to their determination because it bears on the prosecutor's state of mind. The prosecution created a "kill zone" when they went "seeking" and/or "hired" these crooks to Defraud the Court and engaged in conduct that caused a situation manifesting an extreme indifference to the value of Mr. Fields life; this egregious abuse of governmental power severely violates Fields' interest and/or right in not being the subject of arbitrary authority. This kind of official conduct involves the willfully illegal exercise of discretion and it implicates

15

substantive due process because it affects Fields' right to be free of the abuse of power. There is absolutely no doubt that the major component in the Malicious prosecution of Fields is the prosecutions solicitation of murder which contributed to the Fraud On The Court.

4. The evidence also proves that Shalaykea "Lakie" Scroggins and  Edward Lee "Treyboy" Outley were also recruiting inmates to lie for them so they could frame Fields for Coleman's murder; And Scroggins and Outley also Aided police and prosecutors in recruiting inmates to frame Fields.

(a). Dominique Tubbs and Chris Quigley was in a four man cell with Fields when Fields walked away from the jail and admits that they didn't get along with Fields and had several verbal "altercation" with him.

Tubbs and Quigley were interviewed by local and  State officials on November 6, 2001 as soon as Fields was discovered absent from the jail, but neither of them could provide no useable information.

The next morning, November 7, 2001 two U.S. Marshals flew into Waco from Austin, Texas and reinterviewed Tubbs and Quigley, but neither of them could provide no useable information.

On November 13, 2001, a Detective Steve January, whom has a long history of arresting Fields, but wasn't a part of the Coleman investigation decided to insert himself into the case: Detective January went to Edward Lee "Treyboy" Outley's house to "interview" Outley.

On November 15, 2001 Detective January went to the jail to "reinterview" Tubbs and Quigley, and this time he did what other local, state and government law enforcement officer's failed to do, January walked away with statements that he wrote himself, and Tubbs and Quigley signed alleging that they heard Fields threaten Coleman on the phone; which would be impossible because they claim that they heard a one-sided conversation. Tubbs and Quigley claimed that Fields got upset when Shalaykea "Lakie" Scroggins told him that Coleman was "on Crenshaw "bopping".

Tubbs and Quigley's statements are factually impossible because even if they were listening to Fields side of the conversation ( and I assure you they were not because there was never any threats ), they still couldn't have known who Fields was talking to, nor could they have heard Scroggins say that Coleman was "on Crenshaw "bopping".

It's obvious what happened here: Outley told Detective January that "Fields" killed Coleman and January, in anticipation of a murder case went out to  the jail and coached and coerced Tubbs and Quigley's false statements.

On November 14, 2001 Detective January wrote a statement saying that he wasn't there on the 13th when Outley was arrested, a U.S. Marshal called him at home on the 14th and told him that they had arrested Outley. But at trial in January 2004 Detective January was asked was he there when Outley was arrested and he said that he was but he claim that the Marshals called him over there to assist them after they encountered Outley. However the Marshals statement say that the Waco Police department called them and told them that the Waco PD had Outley at an apartment complex and when they arrived they encountered Detective January "talking to Outley". Also at Outley's felon in possession trial Outley told the Court that Detective January held him up until the U.S. Marshals arrived; So the question is: Why is Detective January trying to hide the fact that he talked to Outley, the guy that put the murder off on Fields, just two days before he went out to the jail and wrote the statements for Tubbs and Quigley?

(b) John Allen Mercer was a 50 year old white supremacist (skinhead). He was in jail for sexual assault on a child and while in jail he wrote the Judge a letter threatening to murder the Judge and his family and he threatened to blow up multiple Federal buildings.

Mercer wrote the prosecution alleging that Fields confessed to him because "there are no TV's or newspapers in segregation so he and Fields talk."

When Fields went to trial Mercer changed his story, he said that Fields didn't confess to him he heard Fields confess to a Little D that was alleged to be in a cell down the hall; And of course there was no Little D to confirm or deny the story, and contrary to what Mercer said there are TV's and newspapers in segregation and everything that Mercer said came out of the newspaper.

In addition to that Fields was in a one man cell all alone about ten feet from the officer's desk (the officer's desk is right out in the middle of the hallway), and

no officer or none of the other inmates heard this alleged confession. Also Fields had an observation sheet on his door where the officer's had to look in on him, write down whatever he did or said, and then the officer had to sign the observation sheet four times per hour, every 15-minutes. There was never any kind of communication between Fields and Mercer, nor did Fields ever confess to a little D, like Mercer changed his story to reflect. But, in addition to John Mercer's story coming from newspaper articles about Fields, Shalaykea "Lakie" Scroggins was also in segregation with John Mercer prior to Fields' arrival at the jail.

It defies reason that John Mercer, a man that have been to prison (4) times with one previous Life sentence and was in jail again for raping a child and threatening to murder a Federal Judge and his family and blow up various Federal buildings in an act of terrorism ended up with only 25 years in State prison. And the prosecution allowed this clearly dangerous man to change his story from " Fields confessed to me because there are no TV's and newspapers in segregation ", to " No Fields didn't confess to me I heard him confess to a Little D." This is what the prosecution claim is "overwhelming" evidence of an innocent man's guilt and it only serves to highlight the prosecutions conspiracy to murder Fields and their Fraud Upon the Court.

(c) Christian "Chae" Walker is a close friend of the victim's family whom refered to the victim as " My Little Sister." Walker and Edward Lee "Treyboy" Outley are best friends; Fields and Walker were associates.

December 5, 2001 Walker wrote a statement saying that Fields never confessed to him.

December 6, 2001 Walker wrote another statement saying that Fields never confessed to him.

February 26, 2002 Walker told the Grand Jury that Fields never confessed to him but said that he "thought" Fields had done something to her. ( The victim )

Based on that the prosecution gave Walker a time reduction stating that his statements were "truthful", "complete", and "reliable".

In October 2002 Walker started corresponding with Shalaykea "Lakie" Scroggins.

In January 2004, just two days before Walker was set to testify about other things besides Coleman's murder the prosecution approached the defense and told them that Walker was changing his story he was now going to testify that Fields confessed to him; Two days later Walker testified, telling a story similar to Scroggins.

Fields asked Walker do he talk to Outley? Walker said: " Yeah, but not about the case. ( Trial Transcripts, pg. 1777 ). That was a blatant lie. In the Grand Jury Walker claimed that he gave Outley a .32 pistol ( which is alleged to be the murder weapon ). When Walker was asked did he know what happened to that gun Walker said that he did, " Because I talked to Outley when I was down in the holding tank with him for a few-- about an hour ago, and he told me that he let Fields get it." ( Walker's Grand Jury Transcripts, pg. 20 ). Also Outley wrote Walker a letter telling Walker to lie and say that he gave Outley a gun, but he told Walker to make a deal with the government first to drop his charges. ( See Letter, App. A30  ). Walker, who has a very low IQ and obviously very impressionable did what Outley told him to do, but Walker didn't even know what kind of gun it was until Detective Morris "Bubba" Colyer coached him and told him what kind of gun it was. ( See Walker's statement; App. A31  ). There is no doubt that Walker's testimony came from Scroggins, Outley and Detective Morris " Bubba " Colyer.

(D). Inmate Jerry Reed was cell mates with Christian "Chae" Walker in October 2002 when Walker and Shalaykea "Lakie" Scroggins started corresponding. ( Trial Transcripts, pg. 1371).

In January 2003 Reed claim that he was sent to Fort Worth Federal Prison and put in segregation where Fields was being housed pending trial, and Reed claim that he was put in a cell across the hall from Fields. Reed said that Fields hollared across the hallway and said: " Do you know me? I'm Sherman Fields, I'm the one that killed my girlfriend." Reed told the Jury that Fields said that he killed Coleman but he was going to say that Outley and Scroggins did it.

It's obvious that Scroggins told Walker that Fields was saying that she murdered Coleman along with Outley, and Walker passed along this "information" to his cell mate Jerry Reed. In segregation where Fields was housed in Fort Worth the officer's desk is also in the middle of the hallway between Fields cell and the cell where Reed said that he was in, with at least three Officer's present at all times and they had to

17

sign the observation sheet on Fields door four times per hour, every 15 minutes. Also there were anywhere from 40 to 80 other inmates in the surrounding cells and no one else heard this alleged confession; Impossible! Reed was arrested once before for providing false information in a criminal case.

(E). Inmate Homero DeLeon claim that in December 2002 "he" was in a cell across From Fields in Fort Worth Federal Prison and Fields told him that " since he's not on the government's witness list to testify against Fields then he would confess to DeLeon." Not only is this ludicrous and incredulous, it's impossible! An officer in segregation admits that Fields only talked to the inmate next door to him; ( Francisco "Pancho" Rios ), an elderly gentleman, and they never talked about Fields' case. The officer confirms what Fields have always maintained, if he would have confessed to anyone in the cell across the hall Fields would have been heard by everyone; ( See Report of Investigation; App. A32  ). Also the government didn't even have a "witness list" in December 2002, the government's witness list is dated January 7, 2004 5:16 PM US ATTY WDTX PROGRAMSOFFICE No. 904 P. 2/27 " ( Government's witness list.)

The prosecution knew that DeLeon was lying. DeLeon claim that prior to the alleged confession he was in protective custody and Fields was his cell mate; Fields have never been in protective custody, DeLeon was never Fields cell mate, and as a matter of fact Fields had never even seen DeLeon before until he got up on the witness stand and lied.

Post trial DeLeon was reinterviewed and although Fields and DeLeon have never communicated this time DeLeon put himself in the position of a government agent, claiming that the prosecution knew what he  was doing and that he was sending the prosecution regular updates by and through notes that he was taking. Fields immediately Filed a Motion to obtain the "notes", but given the fact that the prosecution willfully "hired" all of these crooks to Defraud the Court in their pursuit of Murdering Fields, it's no surprise that the prosecution would deny that DeLeon was a government agent. ( Brief in opposition of C.O.A.; pgs. 66-67).

While Shalaykea "Lakie" Scroggins was in jail in 2002 she was corresponding with her ex-boyfriend, Eric Snell and on at least one occasion Scroggins and Snell rode to Court together in the same van; When DeLeon "came forward" he was in Fort Worth with Eric Snell, and Lo and Behold Eric Snell became a part of DeLeon's story.

At trial DeLeon claimed that in December 2002 Fields told him that Eric Snell, Jarrell Patterson, Steven Sais, Colin Alvis Smith and Andrea Sais went to the Grand Jury on him. However neither one of the people that DeLeon named went to the Grand Jury on Fields, they all went to provide information on the Guard that was bringing them in contraband into the jail. The girl Andrea Sais, her only involvement was that she was paying the guard for her brother, Andrea Sais wasn't even in jail and she don't know Fields nor do Fields know her. Fields don't know any of the people that DeLeon named, he'd only "heard" of Eric Snell by and through Scroggins.

Prosecutor Gloff procured ATF Agent Douglas Kunze to lie, defraud the Court and provide false substance to DeLeon's  perjury, Kunze claimed that they'd given the defense the Grand Jury transcripts " early on in the investigation " implying that Fields had to tell DeLeon that in December 2002 since he had the Grand Jury transcripts ( Trial Transcripts, pgs. 1876-1889. But Prosecutor Gloff knew that was demonstrably false and they were defrauding the Court. In July 2003 Fields' attorney sent the prosecution a letter asking for the Grand Jury transcripts. ( See Letter; App. A33  ) There is no doubt that DeLeon was indeed a Government agent that was "hired" then coached to defraud the Court.

(F) And rounding out the prosecution's conspiracy of " paid occurence witnesses" is Kevin Lamar Burton, another inmate that Fields don't know and had never seen before until he got up on the witness stand and lied.

Burton "came forward" right before trial in November 2003, exactly two years after Coleman's murder when he was in Three Rivers Federal Prison with Christian "Chae" Walker after Walker started corresponding with Shalaykea "Lakie" Scroggins".

Burton claimed that on November 16th, 2001 Fields was in a four door red Grand Am and Outley was "in a Jaguar". Burton said that they were on Proctor Street in Waco, Texas and Fields was going to rob him until a William Hayes told Fields not to

18

rob him. It was then that Burton claim that Fields confessed to him that he murdered Coleman.

There are several things that an honest prosecutor would have noticed in Burton's story besides the fact that it's incredulous; The Grand Am was a two door not a four door, and it's a proven fact that it was no longer in Fields possession after the night of the murder, which was ten days prior. And the Grand Am went to the forensics lab on the 14th so there is absolutely no way Burton could have encountered Fields in the Grand Am on the 16th like he claim. In addition to that the Jaguar was no longer in Outley's possession after the night of the murder, and Outley went to jail on the 13th, so there is absolutely no way possible that Burton saw Outley in "a Jaguar" on the 16th.

The murder was on the 6th of November, Burton claim that Fields confessed to him on the 16th, but there is absolutely no confusion about the dates; November the 6th was a Tuesday, Burton said that Fields confessed to him on a Friday, which was November 16th. Burton said that he remember the date so well, precisely, because he went to jail within a week later; ( Trial Transcripts, pg. 1381). Records show that Burton did indeed go to jail on the 23rd.

What happened here is that whomever "recruited", "solicited" and/or "hired" Burton to lie told Burton that the murder was on the 6th and Burton thought he said the 16th, or the person that " recruited", "solicited", and/or "hired" Burton told him the wrong date and Burton constructed his story around that date. In any event there is no doubt that Burton's testimony is false and he willfully defrauded the Court at the prosecutions discretion.

There are so many contributing factors to Fields wrongful conviction, but the foundation was the conspiracy that was first orchestrated by Edward Lee " Treyboy" Outley and Shalaykea " Lakie " Scroggins, then joined by the police and prosecutor's whom adopted and continued the criminal action(s) to its completion.

Clearly Established Federal Law defines the elements of conspiracy as (1); An agreement between two or more persons; (2); The object of which is to do an unlawful act or a lawful act by unlawful means. ( A formal agreement need not be demonstrated, as an agreement may be demonstrated by circumstantial evidence of a meeting of the minds to commit an unlawful act.); United States v. Moore, 525 F. 3d 1033 (11th Cir. 2008); United States v. Percel, 553 F. 3d 903 ( Dec. 23, 2008). There is no doubt that the government and their witnesses joined in a seditious conspiracy to provide false testimony to a grand and petit jury in this capital case so they could manipulate a verdict of guilty, which would ultimately lead to the murder of Sherman Lamont Fields via lethal injection. The evidence presented herein this writ is undeniable, starting with the deliberate and willful defrauding of the Grand Jury when Prosecutor Gloff procured U.S. Marshal Chris Casson and Sheriff Detective Johnny Spillman to lie and say that Fields became "angry" and/or "Irate" when he came into contact with Coleman on the night of the murder, while knowing all along that the testimony was and/or would be demonstrably false. Their actions left the Grand Jury, whom had serious doubts about Scroggins false testimony, only one option; The option to indict Fields, whom was being held as the sole suspect in Coleman's murder. Whether there was a "formal agreement" or just " a meeting of the minds" to do this illegal and/or criminal act there is no doubt that the conspiracy is complete; Conspiracy only requires that after the "agreement" at least one of the people commits an overt act in furtherance of the agreement. 18 U.S.C. § 371 (1982); United States v. Beil, 577 F. 2d 1313, 1315 n.2 (5th Cir. 1978), cert. denied, 440 U.S. 946, 99 S.Ct. 1422, 59 L. Ed. 2d 634 (1979); United States v. Sutherland, 463 F. 2d 641, 645 (5th Cir.), cert. denied, * 1569409 U.S. 1078, 93 S.Ct. 698, 34 L. Ed. 2d 668 (1972). A person suborns perjury when he procures another to commit any perjury. 18 U.S.C.A. § 1622; See also Dunnigan, 507 U.S. at 94, 113 S.Ct. at 1116 ( applying definition of perjury from 18 U.S.C. § 1621, the criminal perjury statute to § 3C1.1). When Gloff procured Spillman and Casson to commit perjury and they fulfilled the obligation the conspiracy was complete.

It's obvious here that the prosecutions practice of vetting false "jailhouse testimony" turned a routine practice into a monumental conspiracy. Until Outley went to jail on November 13th, 2001, and Scroggins went to jail on November 15th, 2001 no one in jail was saying that Fields threatened Coleman, or that Fields confessed to them in any capacity; Tubbs and Quigley "came forward" after Outley talked to Detective Steve

19

January, and January decided to "re-interview" Tubbs and Quigley even though he had no jurisdiction to do so. Chris Walker changed his story only after Outley told him to "make a deal" with the prosecution and say that he gave Outley a gun to give to Fields; Then Walker started corresponding with Scroggins and every inmate that came into contact with Walker thereafter alleged that Fields confessed to them. Jerry Reed was Walker's cell mate when Walker and Scroggins were corresponding. Burton was in Three Rivers Federal prison with Walker when he "came forward"; DeLeon was in Fort Worth with Scroggins' ex-boyfriend, Eric Snell; John Mercer's story is straight from the newspaper but he was also in segregation with Scroggins, and there are significant lies in each of the inmates story that would have been a cause for pause had the prosecution not intentionally "hired" them to willfully defraud the Court. In that essence the evidence herein demonstrates that both a "formal agreement" exist and a "meeting of the minds" to use perjury to obtain deal(s) from the government, and murder Fields via lethal injection. The PINKERTON DOCTRINE, which finds its roots in Pinkerton v. United States, 328 U.S. 640, 66 S.Ct. 1180, 90 L. Ed. 1489 provides that " [a] party to a continuing conspiracy, even if that party does not participate in the substantive offense or have any knowledge of it, may be responsible for a substantive offense committed by a coconspirator pursuant to and in furtherance of the conspiracy. United States v. Elwood, 993 F. 2d 1146, 1151 (5th Cir. 1993) (quotations omitted) (describing the Pinkerton doctrine). Even if the parties herein decided to go after the prosecutions "jailhouse testimony seeking deal" on their own they are still a part of the conspiracy as a principle because each committed an overt act in furtherance of the conspiracy, and once it is established that a person is a member of a conspiracy, any act by a coconspirator in furtherance of the conspiracy is attributable to him; See Pinkerton, Supra. When DeLeon Lied and said that Fields told him the people who went to the Grand Jury on him and then named five people that didn't even go to the Grand Jury on Fields, this overt act in furtherance of the conspiracy is attributed to each and every one of them; When Prosecutor Gloff put ATF Agent Douglas Kunze on the witness stand to bolster DeLeon's false testimony by falsely alleging that they'd given the defense the Grand Jury transcripts "early on in the investigation", when in fact Fields' attorney's were still asking for the Grand Jury transcripts in July 2003, this overt act in furtherance of the conspiracy is attributed to every one of them. Every individual act of perjury and/or subornation of perjury is an overt act in furtherance of the conspiracy and it's attributed to each and every one of them; The theory of vicarious liability provides that a person may be found criminally liable even if he did not personally commit a substantive offense. United States v. Broadwell, 870 F. 2d 594, 602-04 (11th Cir.) cert. denied, 493 U.S. 840, 110 S.Ct. 125, 107 L.Ed. 2d 85 (1989) However, everyone herein did commit a substantive offense; See also United States v. Roper, 874 F. 2d 782, 787-88 (11th Cir.) cert. denied, 493 U.S. 867, 110 S.Ct. 189, 107 L.Ed. 2d 144 and cert. denied, 493 U.S. 955, 110 S.Ct. 369, 107 L.Ed. 2d 355 (1989). When Edward Lee "Treyboy" Outley and Shalaykea "Lakie" Scroggins conspired to put Coleman's murder off on Fields, whether the government knew that Outley and Scroggins were the real culprits of the crime or not, they effectuated the purpose of the conspiracy by "seeking jailhouse testimony" and "recruiting and/or "hiring the coconspirators and formalizing and completing deals with them. In the very least the prosecution Aided and Abetted the conspiracy under clearly established Federal Law, 18 U.S.C. § 2 because they associated with a criminal venture, purposefully participated in the criminal activity by suborning perjury, and sought by their actions to make the venture successful. United States v. Polk, 56 F. 3d 613, 620 (5th Cir. 1995) (citations omitted). A person associates with the criminal venture if he shares in the criminal intent of the principal; United States v. Jaramillo, 42 F. 3d 920, 923 (5th Cir.) cert. denied, U.S. 115 S.Ct. 2014, 131 L. Ed. 2d 1013 (1995). It was Outley and Scroggins intentions to put Coleman's murder off on Fields and see that Fields was convicted and ultimately murdered via lethal injection; It was the prosecutions intentions to see that Fields was convicted by and through the use of false evidence and ultimately murdered via lethal injection; It was the prosecutions "witnesses" intentions to see that Fields was convicted by and through the use of false evidence and ultimately murdered via lethal injection, and the manner in which they all acted was affirmatively designed to aid the venture, therefore when Outley and Scroggins

20

conspired to hide the GOLD Jaguar alleging that the car was BLUE so it wouldn't be subjected to forensics testing that overt act in furtherance of the conspiracy is attributed to each and every coconspirator; And when the prosecution stood before the jury at trial and willfully and maliciously tried to mislead the jury by claiming that Outley and Scroggins was indeed in a BLUE Jaguar that he knew hadn't existed for three years prior to Coleman's murder that overt act in furtherance of the conspiracy is attributed to each and every one of the coconspirators; When and after Christian "Chae" Walker had been given a time reduction for his "honest", reliable" and " complete" statements that were ultimately false the prosecution allowed Walker to "change his story" and mislead the jury claiming that he "didn't want to tell the truth at first because he didn't want to put his family in jeopardy", when Walker had already told them everything that he could think of that would qualify him for the time reduction that the prosecution was giving away for false "jailhouse testimony"; (i.e)  Fields wanted to rob one of Walker's long time friends; Fields Wanted to rob a bank; Fields wanted to kill some guy named Reggie Hammond ( Which turned out to be Eddie Murphy's character in the movie 48-Hours ); Walker told them that he'd given Fields a .22 pistol; He told them that Fields "rob people"; And as previously stated he had told them that he "thought" Fields had done something to Coleman. That's not a man that "didn't want to tell the truth at first" because he didn't want to "put his  family in jeopardy", that's a man that lied to gain access to a free time reduction in the beginning, and then changed his story after he started corresponding with the real murderer, Shalaykea "Lakie" Scroggins, and the prosecution knew that, and their decision to put this lying, manipulative, and deceptive crook on the witness stand in a Capital case where an innocent man's life is at stake was deliberate, willful and this overt act in furtherance of the conspiracy is attributed to each and every one of the coconspirators; Also after inmate Chance Alexander backed out of his deal with the prosecution prosecutor Gloff willfully mislead the jury and defrauded the Court by insinuating that the government had nothing to do with the deals being made, saying: " This is a federal case. No one from the government agreed to get you out of jail." When in fact Gloff knew that in the beginning when, and before the State turned the case over to the government it was investigated by State officials that stayed on the case assisting the government all the way to its conclusion at trial; (i.e) Detective Steve January, Detective Morris "Bubba" Colyer, Detective Johnny Spillman, Detective Roy Davis, Detective Jimmy Stone, are all State and County officials. Chance Alexander said that the officer that offered him the deal was named "Robertson", and coincidentally there is a "Robertson that work for the Sheriff department. And someone from the government did in fact contact Chance Alexander, it was Prosecutor Gloff himself; ( See Letter from Gloff to Chance Alexander; App.   A34   ). Then Gloff attacked Alexander for lying about his name when he was arrested once before. But Gloff already knew that Alexander had lied about his name when they were recruiting him to lie on Fields. And in addition to that Christian "Chae" Walker lied about his name, Kevin Burton lied about his name in two different cases, and Jerry Reed lied on someone else in another criminal case, thus prosecutor Gloff's actions were definitely meant to deceive and/or defraud and that overt act in furtherance of the conspiracy is attributed to each and every coconspirator

The prosecution's intentional, deliberate and willful " seeking of jailhous testimony " that spawned the likes of Jerry Reed, Homero DeLeon, Kevin Burton, John Mercer, Chris Quigley, Dominique Tubbs and Christian Chae Walker was and/or is the quintessential " fuel on the fire," if you will. Every since Courts have started using DNA to right the wrongs of the Justice system it's been unequivocally proven that jurors are unable to guage the level of deception in "jailhouse testimony" cases, and although we recognize that one of the oldest established rules of Anglo American Jurisprudence has been that the jury is the arbiters of credibility of witnesses; Hoffa v. United States, 385 U.S. 293, 311, 87 S.Ct. 405, 418, 17 L.Ed. 2d 374, 387 (1966); And questions of the reliability and consistency of witness testimony are within the province of the jury; United States v. Peoples, 250 F. 3d 630, 639 (8th Cir. 2001), DNA testing have shown that an extraordinary number of people have been innocent after a jury convicted them based on false "jailhouse testimony" and have proven both Hoffa's and People's optimism wrong. And although the aforementioned have been elaborated upon to outline the conspiracy and the Fraud On the Court Fields isn't asking the Court to weigh the testimony because there is nothing to

21

weigh, the testimony that the prosecution put before the jury is undoubtedly false! Inmate Homero DeLeon and the prosecution claim that DeLeon was Fields cell mate, Jail records show that Fields and DeLeon have NEVER been cell mates; Scroggins and Outley and the prosecution claimed that Outley and Scroggins were in Lutrill Payne's "BLUE" Jaguar, Lutrill Payne doesn't even have a "BLUE" Jaguar and states that he rented Outley his "GOLD" Jaguar; Detective Spillman, U.S Marshal Casson and Prosecutor Gloff claim that " Tanesha Hilliard" said that Fields became " angry" and/or "Irate" when he came into contact with Coleman at the hospital, " Tanesha Hilliard" said that Fields was NEVER "angry" and/or "Irate" and as a matter of fact, Fields and Coleman were "hugging and kissing". Also in Roberts v. South Carolina, 361 S.C.1; 602 S.E. 2d 768; 2004 S.C. LEXIS 218 the Court held that it was impossible for someone to confess in the manner in which DeLeon, Reed, and Mercer claim; And Fields situation was much more stringent than Roberts. In Roberts there was no observation sheet that the officer's had to sign every 15-minutes, nor was the officer's desk right there on the range with the cells like it was in Fields case; There is no doubt that this was indeed a conspiracy to use the Death Penalty to Murder Fields and the prosecution defrauded the Courts to meet its end result. In Johnson v. Mississippi, 486 U.S. 578, 108 S.Ct. 1981, 100 L.Ed. 2d 575 (1988), the Supreme Court vacated the death sentence because the jury had been allowed to consider evidence that was false. Id. at 585, 108 S.Ct. at (1986) (emphasis added). Not only was the jury allowed to consider false and fabricated evidence here in Fields, but the conveyance of this false and fabricated evidence was delivered in bad faith with the intent of Defrauding the Court and harming human life.

In November 2001, a Tammy Edwards took advantage of Fields' unfortunate situation. First she claimed that her car was "jacked" by an unknown black male, but two years later in December 2003 she changed her story and claimed that it was Fields, alleging that she knew it was Fields all along " because his picture was posted up all over the hospital."

Edwards story continued to change, evolving each time she told it; First she told investigators that the unknown black male was wearing a cap, but at trial when she was asked how did the subject wear his hair, Edwards said that it was shorter than " Fields' hair at trial", and then lied and said that she never said that the alleged perpetrator wore a cap.

The investigating officer said that Edwards cut her hand during "the struggle" and her fingers were bandaged, Tammy Edwards said her fingers were never bandaged; The police said the alleged perpetrator had a "black" gun, Tammy Edwards said that the gun was "green"; Edwards said that the alleged carjacking left her essentially mentally and emotionally decapitated, but her supervisors said that she flourished during that time frame; Also after the initial complaint, two years later, Tammy Edwards said, " Oh, he shot at me too. Now this is supposedly happenin at shift change at a major hospital, with people coming and going, amid a struggle with loud "yelling and screaming" and a "gunshot", yet no one else saw or heard anything; That's impossible!

The evidence suggests that Tammy Edwards conspired with one or more of the prosecutions witnesses to fabricate evidence and defraud the Court so she can give the prosecutions case false substance, and she could scam and sue Civigenics, the company that ran the jail that Fields walked away from.

Mrs. Edwards is no stranger to the Capital Murder process, her husband, a black man named Darryl Edwards ( Whom could possibly be one of Mr. Fields' enemies ), Mr. Edwards robbed an elderly couple and murdered the woman, he pled guilty to avoid the Death Penalty and received a Life sentence. But it's reason to believe that Christian "Chae" Walker is Mrs. Edwards accomplice. She admits to dating a "Chris", but claim that she don't know his last name; ( See Deposition, pgs. 56-57; App. A35 ). At trial Fields asked Edwards were she ever shown a picture of Chris Walker and she claimed that she didn't know who that was. ( Trial Transcripts, pgs. 1741-1742.) But it is alleged that her car keys were found in a convicted sex offender's house named Hubert Steadman, whom is Chris Walker's best friend, and the car was allegedly "found" near where Walker was living.

The prosecution lied to the jury and defrauded the Court claiming that there were no fingerprints or nothing in Edwards car; " This thing was clean," they claim. ( Trial Transcripts, pg. 1326.) But the car wasn't "clean", ( See Reports; App. A36 ). The prints found in the car were checked against Fields prints and there was no match.

22

The lies, deception and perjury in this case is immense; The Fraud On the Court is unconscionable. Prosecutors down in Waco, Texas have become accustomed to "stepping outside the law" without significant challenges to their illegal, unethical and criminal conduct. Defrauding the Court(s) have become par for the course for them; For example:

(5) In January 2004, during trial, Fields asked Edward Lee "Treyboy" Outley had the prosecution made him any promises and Outley lied and said no; The prosecutor's didn't even attempt to correct his false testimony. ( Trial Transcripts, pg. 1847.) In Smith v. Kemp, 715 F. 2d 1459, 1463 (11th Cir.), cert. denied 464 U.S. 1003, 104 S.Ct. 510, 78 L.Ed 2d 699 (1983), the Court held that " If false testimony surfaces during a trial and the government has knowledge of it, the government has a duty to step in and disclose."; ( The government must affirmatively correct testimony of witness who fraudulently testifies that he has not received a promise of leniency in exchange for his testimony.)

The government refers to the district Court's erroneous ruling where the Court said that it was unclear whether Outley understood the general question posed to him. (Id.) ( Brief in opposition of C.O.A., pgs. 63-64).

The trial transcripts support the fact that Outley did indeed understand that Fields was asking him if he'd received a plea deal for his testimony. ( Trial Transcripts, pg. 1847). The Court erroneously ruled that Fields didn't follow up with questions about the letter that spurred the questioning; ( Brief in opposition of C.O.A., pg. 64). In the letter Outley said that he could have got 5k1, which is the program in which the government use to make deals with crooks for testimony. After the initial questions about "promises", Fields continued trying to get Outley to "honestly" answer questions for four more pages amid the prosecutions objections, Fields repeatedly asked Outley about the 5k1 program. ( Trial Transcripts, pgs. 1847-1850). Thus it's no surprise that the prosecution would now essentially say: " So what if we suppressed the nature of Outley's immunity deal?"; stating: " Even if Fields could show that the United States suppressed the nature of Outley's immunity " he cannot show that it would undermine confidence in the verdict; ( Brief in opposition of C.O.A., pg. 62). However, the fact that evidence supports Fields' story that Outley assisted Scroggins in Coleman's murder and framed Fields for it and the prosecution knew this but still gave Outley complete immunity and then suppressed the full extent of the immunity so they could use Outley to Defraud the Court and murder Fields can't be ignored. The prosecution want the Court's to believe that Outley's immunity was completely conditional upon Outley's truthful, candid cooperation, when the prosecution already knew that Outley was completely incapable of being truthful. In Outley's felon in possession trial the prosecution told Outley's jury: " So once again I ask you, what does the defendant (Outley) say about this? It depends on which time, because you heard the fourth version today in trial. That's the fourth version of the story. He said everybody's lying in this case except him. I want you to ask yourself, does your common sense tell you that that's what's going on, or is it simply that the defendant is trying to get himself out of a pickle? He's told three different stories before, today's the fourth, and he's trying to keep it all straight; ( The United States v. Edward Lee "Treyboy" Outley, W- 1-CR-168, at pg, 175; Trial Transcripts.) Then the same prosecutor presented Outley to Fields' jury as if Outley was the most honest man alive and just stood by as he lied, defrauding the Court. Now the prosecutor is telling the Court to just ignore what's obvious here. Clearly establishe Federal Law states that the government has a duty not to use false testimony; ( In any capacity); Giglio v. United States, 405, 150, 92 S.Ct. 763, 766, 31 L.Ed. 2d 104 (1972); Williams v. Griswald, 743 F. 2d 1533, 1541 (11th Cir. 1984). In Fields' case the government did use false testimony. The culmination of the many lies denied Fields due process of law as recognized by the Fifth Amendment. In Napue v. Illinois, 360 U.S. 264, 269, 3L. Ed. 2d 1217 79 S.Ct. 1173 (1959), Chief Justice Warren wrote for the Court, " First, it is established that a conviction obtained through the use of false evidence, known to

23

be such by representatives of the state, must fail under the Fourteenth Amendment; The same result obtains when the State, although not soliciting false evidence, allows it to go uncorrected." In Fields case there is no doubt that his conviction was obtained through the use of false evidence, undoubtedly known to be such by the prosecution because their own evidence proves that their witnesses were lying; The conspiracy to hide the Jaguar is only one such incident.

In Napue v. Illinois, Supra; the Court held that when public officers connive at or knowingly acquiesce in the use of perjured evidence their misconduct denies a defendant due process of law; Mooney v. Holohan, 294 U.S. 103, 79 L. Ed. 791, 55 S.Ct. 340 (1935); The multiple acts of perjury, subornation of perjury, fraud and other violations herein by public officers make Napue valid.

The deal that Outley made with the government was extremely significant because prior to making the deal Outley had maintained and/or stated on occasion that he did not give Fields a gun. BUT, if the government made a deal for Outley AND Scroggins, then Outley would testify against Fields and "anybody else" the government wanted Outley to testify against. ( See Letters from Outley to Prosecution; App.   A37  ) And ( Letter to Scott Peterson; App.  A28  ). What's telling here is that Outley wanted to make a deal for him AND Scroggins, especially in light of the fact that Fields said that Outley AND Scroggins killed Coleman; Outley AND Scroggins gave several different alibi's for the time of the murder; Outley AND Scroggins told several different stories about how, when and where Fields supposedly confessed to them; Outley AND Scroggins went around "recruiting" inmates for the prosecution; AND, Outley AND Scroggins conspired to hide the GOLD Jaguar so it wouldn't be  processed in the forensics lab...

But had the government not given Outley full Immunity Outley would have testified that he didn't give Fields a gun, thus the only person the evidence proves possessed the murder weapon is Outley, and given the fact that the multiple alibi's, the multiple stories, the hiding of the Jaguar points to guilt, the gun seals the deal proving that Outley and Scroggins did in fact murder Coleman and framed Fields for it; So the governments contention that " Even if Fields could show that the prosecution suppressed the nature of Outley's "immunity" he cannot show that it would undermine confidence in the verdict is completely false.

But again, this isn't about Fields " undermining confidence in the verdict ", per se, this is about the prosecution engaging in a criminal conspiracy and committing Fraud On the Court. In Re: Davis, No. CV 409-130 (8/24/10) the Courts held that the lowest degree of confidence in a jury verdict would presumably occur when the jury hears a corrupted body  of evidence. Because the procedural protections in place to protect the innocent from conviction have been breached, confidence in the result of the trial is generally undermined. The [ Supreme Court ] has repeatedly held that a conviction obtained by and through the knowing use of perjured testimony is fundamentally unfair and must be set aside if there is any reasonable likelihood that the testimony could have affected the judgement of the jury; United States v. Agurs, 472, U.S. 97, 103, 49 L. Ed. 2d 342, 96 S.Ct. 2392 (1976). Here in Fields case the governments entire case was lies, deception, fraud and/or perjured testimony. The lies that the government witnesses told are so obvious that no person of ordinary prudence would have put them on the stand. It's patently obvious that the government knew that every one of their witnesses would and/or

did commit perjury, yet they connived at or knowingly acquiesced in the use of this false, fabricated and/or perjured evidence. In the United States v. Roger LaPage, 231 F. 3d 488 (2000) the Court held that " All perjury pollutes a trial, making it hard for jurors to see the truth. No lawyer, prosecutor, or defense counsel, civil or criminal, may knowingly present lies to a jury and then sit idly by while opposing counsel struggle to contain this pollution of the trial. The jury understands defense counsels duty of advocacy and frequently listens to defense counsel with skepticism. A prosecutor has a special duty commensurate with a prosecutor's unique power, to assure that defendants  receive fair trials. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate method to bring about one."; The prosecutor's here in Fields polluted the trial with numerous acts of fraud (perjury), calculated to bring about Fields' wrongful conviction and Death sentence. And while the Courts recognize that jurors view defense counsel with skeptism, one can only imagine how they viewed Fields standing alone trying to conquer the pollution of fraud and perjury,

24

while the prosecutors sat idly by watching this innocent man flounder; And just like at trial, throughout the Appeals process the prosecutors sit idly by behind their fraud and other illegal and criminal activity while Fields "flounders" trying to contain this immense pollution of the Courts. There is no doubt that the prosecution knew their "witnesses" were lying because they had the proof even before the defense did, yet they chose to ignore it, hide it, suppress it and defraud the Courts into believing that these crooks were being truthful. The prosecution violated Section 201 (c) (2) of Title 18 of the United States Code that prohibits giving, offering, or promising anything of value to a witness because of his/her testimony. Every one of the government witnesses were promised a "reward" in the form of either a time reduction and/or leniency. In the United States v. Sonya Evette Singleton, 144 F. 3d 1343 (1998) Singleton argued that the government violated Section 201 (c) (2) of Title 18 by promising leniency to a witness in return for his testimony against her. The 10th Circuit reversed the conviction and remanded for new trial, but on rehearing en banc  United States v. Sonya Evette Singleton, 165 F. 3d 1297 (1999), Circuit Judge Porfilio held that within the Statute penalizing whoever gives, offers or promises anything of value for, or because of his testimony, the word "whoever" does not include the United States acting as alter ego  of the United States and offering an accomplice leniency in exchange for truthful testimony.

In Fields' case the key word isn't "whoever" like Singleton argued, but the operative word in Fields is "Truthful". There is no doubt that perjury was the dominant factor in Fields case, the governments promises and/or suggestions of leniency and time reductions in exchange for testimony that's undoubtedly false turned their witnesses into paid "occurenc witnesses", thus employed by a fraudulent and deceptively criminal sovereign and testimony from those of such ilk is contrary to the fundamental precepts of American Justice. The " Blueprint " on how to use the Justice system to commit murder undetected thrives in Waco, Texas. In cases like Fields where there is no evidence to sustain a conviction the prosecution can just go out and make a deal with a bunch of criminals to lie; This within itself brings about a different set of problems; (1) It essentially decimates the burden of proof, the lies, deception and fraudulent and criminal conduct obtains the conviction and shifts the burden of proof onto the defendant which creates an almost impossible hurdle to overcome, because Appeals Courts don't look at evidence the same way that a jury do; A jury, unable to guage the level of deception will use a lie to convict. On the other hand the Court of Appeals will recognize the lie, but let it stand. So that lie will ultimately send an innocent man to his death. And (2). It undermines the presumption of innocence when you take the testimony of a guilty man ( crook, jailhouse snitch, informant, etcetera,) and use that testimony to convict ( and in Fields' case ), murder, not only a man that was supposed to be presumed innocent, but whom is Actually and factually innocent.

## UNREASONABLE DETERMINATION OF FACTS

(6)    On Appeal to the 5th Circuit (Direct Appeal), Counsel for Fields argued that photographs of the victim were inflammatory; the Court admits that " many of the photo's are shocking," but states that " The photo's showing the victim's body decomposing were highly probative. One of Fields's key themes at trial was that the government had little physical evidence linking him to the crime. In his opening statement, for example, Fields argued that it was " not possible " to " commit a murder in the time and manner in which the government witnesses allege and not leave any physical evidence..." The 5th Circuit held that the photo's were necessary to rebut Fields' argument. The photo's "helped explain why little physical evidence was found: because it had been carried away by animals or worn away by the elements. ( 483 F. 3d 313 ). In another 5th Circuit case out of Jefferson County Louisiana (Damon Thibodeaux), the prosecution used the exact same argument claiming that animals carried the DNA away and an expert successfully defeated that argument, stating that " animals don't carry away DNA." Mr. Thibodeaux was found to be innocent and freed from Death Row. The finding of "false facts" against Sherman Lamont Fields, an innocent man is extremely prejudicial and places an impossible burden on an innocent man, there was no physical evidence because Fields didn't kill Coleman, and

25

the physical evidence that was found exonerates Fields. We are here today because the prosecution chose to turn criminal and defraud the Court(s). The disturbing fact that Shalaykea "Lakie" Scroggins and Edward Lee "Treyboy" Outley conspired to hide that Jaguar is what's significant here; That's where the missing DNA is, in that Jaguar that the prosecution helped these crooks hide. The 5th Circuit's decision to Aid the prosecution's deception is clearly erroneous, especially in light of the fact that the prosecution set out to willfully defraud the Court(s).

In addition to that, and what the Courts have failed to acknowledge in light of the prosecutions deception and criminal act(s) is that in or around May 2003 the prosecution approached the defense claiming that they went back, searched the victim's clothes and found a hair. The trial was set for the end of 2003, but the prosecution filed for a delay while they test the hair; The prosecution then retrieved two envelopes of head and pubic hair from Fields.

After testing the prosecution told the defense that " they got a match, the hair belong to Fields." Counsel for Fields said that it didn't matter because everyone knows that Fields was with Coleman, but Fields insisted that, in Fields words, " The prosecution is trying to do something slick." Counsel for Fields asked the Court for funds to hire an independent DNA specialist and independent DNA testing confirmed that the prosecution was indeed " trying to do something slick." The hair was african american but it wasn't Fields. The prosecution then said that they weren't going to use the hair anyway, that's when they informed the defense that they had several inmates that were going to say that Fields confeseed to them; Enter Homero DeLeon, Kevin Burton, Jerry Reed, John Mercer, and later Christian Chae Walker.

Fields had every right to expound upon the fact that these inmates were lying and the DNA didn't match, because the real evidence supports that, and the erroneous judgement that the 5th Circuit made in favor of the government on direct appeal is a testament to the fact that the prosecution did and continue to defraud the Court, which is not only a violation of Fields' civil rights, the prosecutions actions are criminal; The Fraud On the Court led the 5th Circuit to an unreasonable determination of facts.

(7) Also on Direct Appeal the 5th Circuit focused on the testimony of Kevin Lamar Burton, a man that Fields don't know and had never even seen before until he walked into the Courtroom at trial, got up on the witness stand and lied; ( See Burton herein, pg. 18-19   )

At trial the prosecution led Burton into perjury by asking questions that suggests the desired answer; (i.e) Have he ever tried to rob you? ( Trial Transcripts.) Nowhere in any of Burton's statements do he ever say that Fields tried to "rob him". In any event Burton followed the prosecutor's lead and claimed that a William Hayes told him that Fields was going to rob him, Hayes told Fields not to do it, then Fields just came out and confessed to Burton that he'd killed Coleman. ( This testimony from Burton is ludicrous, incredulous; It's perjury.) The 5th Circuit said that because Fields challenged Burton's false testimony and said that it was fabricated any prosecutor misconduct and 404(b) violations in regards to Burton was appropriate. ( 483 F.3d 313 ). Now newly discovered evidence proves that Burton's testimony is indeed false and that Burton and the prosecutor's defraude the Court(s), which resulted in an erroneous ruling that substantially affects Fields' Fifth and Fourteenth Amendment rights; The Fraud on the Court led to the 5th Circuits unreasonable determination of facts; Maxwell v. Roe, 9th Cir, 628 F. 3d 436, 88 CrL 293.

## NEWLY DISCOVERED EVIDENCE

(8) After Kevin Lamar Burton claimed at trial that a William Hayes told Fields not to "rob" him, the search for the elusive Mr. William Hayes have been ongoing, and became of the utmost importance after the 5th Circuit's decision. In February 2014 Fields finally found Mr. William Hayes whom was genuinely shocked and flabbergasted that Kevin Burton had used him to deceive the Court and frame Mr. Fields for Coleman's murder. Mr. Hayes is adamant that the incident the prosecution used Burton to defraud the Court with never happened. In light of this newly discovered evidence in conjunction with the false facts in Burton's testimony there is no doubt that Burton's story is fabricated and because of the fabricated "evidence" there was an intent to knowingly deceive and defraud the Court(s).

26

## ABUSE OF DISCRETION

(9)  The evidence strongly suggests that District Judge Walter Smith had knowledge of the Fraud On The Court and he himself played a major role in this catastrophe. Judge Smith have repeatedly made comments and did things that prejudiced Fields greatly, and in Fields humble opinion it was done willfully with malice aforethought.

In a case that came along prior to Fields, in Andrade v. Chojnacki, 338 F. 3d 448 ( July 14, 2003 ) prosecuting attorney William [Bill] Johnston was one of the original defendant's in a lawsuit stemming from the botched raid at the Branch Davidian Compound in Waco, Texas; Johnston is Judge Smith's friend.

While the Andrade case was before Judge Smith a special counsel from within the Justice Department investigated Johnston for allegedly withholding evidence from the then defendant Branch Davidians during their criminal trial. According to Newspaper report (338 F. 3d 458) Judge Smith was upset by the investigators treatment of his friend. ( the article used the term " witch hunt " to describe Judge Smith's view.) In response Smith told several investigator that he would no longer cooperate with the inquiry. When Fields went to trial in 2004 Judge Smith's friend, William [Bill] Johnston was in private practice and he took on the victim, Suncerey Coleman's family as his client.

One would think that Judge Smith would have disqualified himself under 28 U.S.C. § 455 being that his impartiality had been questioned at least once before where his friend William [Bill] Johnston was involved, however Judge Smith stayed on the case and it brought us to where we are today. In the United States v. Harlow, 444 F. 3d 1255 (10th Cir. 2006) the Court held that the Judge should not say or do anything that will give the jury the impression that he's improperly vouching for the prosecution; Judge Smith vouched for the prosecution on several occasions and his actions undoubtedly coerced Fields' conviction.

(a)  During Voir Dire, Donna Williams, a woman that ended up a juror on Fields case was told by Judge Smith that if the prosecutors in Fields case thought that someone's rights are not being protected they will go so far as to dismiss the case rather than pursue it; ( Trial Transcripts, pg. 397.) This is extremely prejudicial given the fact that the prosecution suborned perjury, fabricated evidence, defrauded the Court and aligned themselves with a criminal venture.

(b)  In Andrade v. Chojnacki; Supra, Judge Smith declared that he had not read the evidence prior to denying its admissibility, which in fact alignes with what he did here in Fields; The government's star witness, Shalaykea "Lakie" Scroggins gave several different Alibi's for her whereabouts at the time of Coleman's murder. In one Alibi Scroggins claimed that she was at the store around the corner from her house; ( Scroggins written statement dated 11/26/01.) However she couldn't have possibly been at that store buying "something to drink and a box of Black & Mild cigars like she claim, the store was closed. When Fields attempted to impeach Scroggins "Alibi" the prosecutor objected, claiming that it was irrelevant, and Judge Smith sustained the objection, effectively stopping Fields from impeaching Scroggins "Alibi"; ( Trial Transcripts, pg. 1621.); A district Judge abuses its discretion if it applies an incorrect legal standard, follows improper procedures in making the determination, or make findings of fact that are clearly erroneous; Chicago Tribune Co. v. Bridgestone Firestone Inc., 263 F. 3d 1304, 1309 (11th Cir. 2001). When Fields asked Judge Smith isn't all relevant facts proving who committed the murder admissible, Judge Smith said "No". ( Trial Transcripts, pg. 1652.) And then smith threatened to cut Fields' cross examination short. A moment later Smith did cut Fields' cross examination short and allowed the prosecution to take over and elicit some very damaging and demonstrably false testimony from Scroggins. ( Trial Transcripts, pgs. 1665-1668.) Judge Smith's  actions gave the jury the impression that Fields was lying and the prosecution and their witnesses were the one's being "honest", and it amounted to improper vouching; Especially in light of the fact that the Grand Jury had voiced their skepticism about Fields threatening Scroggins; ( ATF Agent Douglas Kunze Grand Jury testimony, pgs. 60-61.)

(c)  Judge Smith prejudiced Fields severely and "fatally" when he forced Fields to proceed to trial Pro Se. Fields filed a Motion for new attorney's after having significant problems with his trial attorney's and then later learned that one of them had prosecuted him before; Judge Smith refused the Motion for New Attorney's; ( Trial Transcripts, pgs. 6-32.) When Smith denied Fields new counsel he "offered" Fields the option to proceed Pro. Se., stating

27

" So your request to have new lawyers is not going to be granted.

If you want to represent yourself--" ( Trial Transcripts, pg. 14 ).

Fields knew he couldn't represent himself, so right before trial he tried to avoid proceeding Pro Se again, stating: " And I just want to tell you that I'm not sure I can do this, you know. I have no knowledge of the law and I believe I'll be hindered by a severe case of stage fright. I want to ask you one last time to appoint me new counsel. As I stated Friday my attorney's and I have a major conflict of interest and if you refuse me new counsel you'll be forcing me to proceed Pro Se against my will. ( Trial Transcripts, pgs. 64-65.)

The evidence strongly suggests that Judge Smith made these erroneous decisions that were calculated to give the prosecution the advantage on one end of the spectrum, and on the other end he wanted to satisfy his friend, William [Bill] Johnston. On several occasions Judge Smith admonished Fields in open Court in front of the jury, but when Fields standby counsel got tired of the prosecution taking advantage of Fields' inexperience and the prosecution leading their witnesses and asking inappropriate and illegal questions they brought it to the attention of Judge Smith and instead of admonishing the prosecution in open Court like he'd repeatedly done Fields, Judge Smith "admonished" the prosecutor's in a bench conference. ( Trial Transcripts, pgs. 1855-1856.) Judge Smith's words and actions were the equivalent of testimony for the prosecution and put the prestige of the United States Government behind every last one of the prosecutions witnesses.

(d) Also at trial several Jurors, in their jury questionnaires said " Black males commit most violent crimes;"  " A group of "blacks" jumped on my daughter and son in law;" " My preachers father was murdered and the man that killed him didn't do not one day in jail;" " Police officers must be obeyed at all times;", etcetera, etcetera, etcetera... Fields immediately filed a Batson Challenge; ( Trial Transcripts, pgs. 1153-1162.) Judge Smith denied the Batson Challenge and as a direct result this jury with racial ideologies found an innocent man guilty based on blatantly false testimony and sentenced him to die. The jury contends that they sentenced Fields to die because he didn't show "any emotions", which is a blatant lie, Fields was crying so much at trial the prosecution even commented on it during his closing argument; ( Trial Transcripts.) Judge Smith's refusal to grant Batson was clearly erroneous, proven by the jurors false assertion that Fields didn't show any emotion; The only reason the jury would lie about this is if they are trying to hide the fact that racism was a factor and/or bias.

(10) Fed R. Civ. P. 60 (b) (2) provides for relief based upon newly discovered evidence which by due dilegence could not have been discovered in time to move for a new trial; And Fed R. Civ. P. 60 (b) (3) provides for relief based upon Fraud, misrepresentation, or other misconduct of an adverse party. Fields have satisfied the prongs in both, Rule 60 (b) (2) & (3), showing by clear and convincing evidence that the prosecution obtained the verdict through fraud, misrepresentation and other criminal misconduct and the misconduct prevented Fields from fully and fairly presenting his case and/or defense in that the "false facts" precluded the introduction of "true facts" and the end result was that not only was an innocent man convicted, but he's destined to be murdered in the pretense of Justice. See Pfizer Inc. v. Int'l Rectifier Corp. 538 F. 2d 180, 195 (8th Cir. 1976), cert. denied, 429 U.S. 1040, 97 S.Ct. 738, 50 L. Ed. 2d 751 (1977). The prosecutions unconscionable plan or scheme that they designed to improperly influence the Court/Jury in its decision and prevented Fields from fully and fairly presenting his defense violated Fields' due process rights. The prosecution perpetrated a species of fraud that subverted the integrity of the Court itself so that the Judicial machinery could not perform in the usual manner and the impartial functions of the Court have been directly corrupted; The prosecutors violated their duty of honesty to the Court. Sawyer v. Collins, 986 F. 2d 1493, 1497 ( 5th Cir. 1993 ); citing Barefoot v. Estelle, 463 U.S. 880, 893, 103 S.Ct. 3383, 3394, 77 L. Ed. 2d 1090 (1983). The Fifth Amendments guarantee of due process and the Eighth Amendments prohibition on Cruel and Unusual punishment  are both violated by the incarceration and/or execution of a man like Mr. Fields, who can make a persuasive post-trial demonstration that he is actually innocent of the crime(s) for which he was convicted and sentenced. See, e.g. Herrera v. Collins, 506 U.S. 390, 419 (1993) ( O'Connor, J., Joined by Kennedy, J., concurring ); Id. at 429 ( White, J., concurring; Id. at 430 ( Blackmun, J., joined by Stevens and souter, JJ., dissenting; House v. Bell, 547 U.S. 518, 554-55 (2006); United States v. Nobles, 422 U.S.

28

225, 230 (1975) ( " The dual aim of our criminal Justice system is that guilt shall not escape or innocence suffer."); See also Herrera, 505 U.S. at 398 ( " [T]he central purpose of any system of criminal justice is to convict the guilty and free the innocent.") Moreover, a conviction based on false testimony violates Due process; Mooney v. Holohan; Supra. The evidence here within this Motion/Writ undoubtedly proves that the prosecution corruptly endeavored to influence, obstruct or impede the due administration of Justice; "Endeavor" as used here describes any effort or assay to accomplish the evil purpose the criminal statute was enacted to prevent; The facts herein, proven, plainly constitutes an "endeavor" for the purpose of criminal conspiracy, solicitation of murder and Fraud on The Court. As the Court is well aware the Due Process Clause forbids interferences with the due administration of Justice, i.e., Judicial procedure; The due process clause reaches all corrupt conduct capable of producing an effect that prevents Justice from prevailing, regardless of the means employed; And the Clause aims to "prevent a miscarriage of Justice". The prosecution impedes the due administration of Justice within the meaning of due process because the prosecution suborned perjury, defrauded the Court(s), engaged in contemptuous conduct and aligned themselves with a criminal venture. Fields' Rule 60 claims, by the abundance of, degree of, and overwhelming evidence supporting Fields' claims proves that there is no doubt that the constitutional violation(s) are substantial, and criminal in nature, and the prosecution entered into a scheme to Defraud the Court(s) and deprive Fields of Life and Liberty. Fields' constitutional right to be free from a malicious prosecution have been severely infringed upon; In a case where the real evidence proves that Mr. Fields is Actually and factually innocent the government went "seeking jailhouse testimony" and hired a bunch of crooks, many that Mr. Fields don't know and had never seen before until they got up on the witness stand and lied, to Defraud the Court and shift the Burden of Proof onto an innocent man, knowing that the bar on Actual innocence is exceedingly high and virtually impossible to meet in cases like this. It's clear that the government committed a host of criminal and procedural violations and had the government not Defrauded the Court the evidence would have lacked sufficiency to convict; Even considering the evidence in the light most favorable to the verdict any reasonable jury would find that the contested elements are proven beyond a reasonable doubt. U.S. v. Hull, 456 F. 3d 133, 141 (3d Cir. 2006) (internal marks omitted), cert. denied, 127 S.Ct. 2877, 167 L.Ed 2d 1155 (2007) This is the extraordinary circumstance where the real evidence preponderates heavily against the verdict, and the verdict was against the manifest weight of the real evidence. The Fraud On the Court is extensive and touched every phase of the judicial proceedings, from the investigation, the grand jury, Guilt innocence at trial, the punishment phase, the Appeals process, all the way up to cert. in the Supreme Court. The steps taken by the prosecution to Defraud the Court is clearly transparent in its rightful context and Fields have shown that the government did indeed engage in intentional, deliberate and knowing Fraud and misrepresentation, and they did so willingly, willfully with criminal malice aforethought; Murphy v. Mo. Dept. of Corr, 506 F. 3d 1111, 1117 ( 8th Cir. 2007 ) ( quoting United States v. Metro. St. Louis Sewer Dist. 440 F.3d 930, 935 ( 8th Cir. 2006 ). " Fraud On The Court claims merit separate analysis not only

because they are exempt from the one year time-period for filing claims under Rule 60 (b) (3) but because they are much more difficult to prove") Zurich, 426 F. 3d at 1291 ( Citing II Charles Alan Wright & Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure 2860, 2870 (2d ed. 1995). Fields have shown beyond "any doubt" that the prosecutor's in this case willfully, intentionally, and knowingly with malice aforethought, as attorney(s) and officer(s) of the Court fabricated evidence and engaged in criminal conduct punishable by a term of years in prison, and did so with the intent to Defraud the Court(s) into becoming an extension of their deception, so they could meet their end result of murdering Sherman Lamont Fields via lethal injection using innuendo, half truths, rhetorical hyperbole and outright lies to propel Fields towards, and into the prosecutions slaughter-house. DNA exonerations cases have now proven that convictions based on jailhouse testimony are scientifically unreliable and shouldn't be used as the basis for any conviction, yet the prosecutor's here in Fields are saying that the false jailhouse testimony that they willfully procured with malicious intent is " overwhelming evidence " of Fields' guilt and they want the Court's to assist them in murdering this innocent man because of it; That's outrageous!

29

And as we conclude this issue Fields would just like to make a couple more points: First and foremost the prosecution used Fields' past conviction and the incident where the Hit Man was shot as a way to (1), give Fields an " Upward adjustment " on the gun charges in ( Case No. W-01-CR-114 ), and (2), It was used as an " Aggravating Factor " in the instant case. The jury was intentionally never told by the prosecution that in both cases the "men" involved had tried to murder Fields twice before he eventually reacted to their actions, and the jury was maliciously given the impression that Fields was a mad man just out there shooting "innocent" people for nothing. There have never been another case where a Hit Man was hired to kill someone and when the Hit Man was shot in the process criminal charges were pursued against the person that wasn't the aggressor " because he should have just called the police." And furthermore, although the Hit Man LaDon King was available to testify at trial the prosecution didn't call him to the stand because they didn't want Fields to cross examine him and show the jury who LaDon King really is; Instead the prosecutor's procured one of their coconspirators Detective Steve January, to lie and mislead the jury with "false facts" about what happened that day. As an "attorney" the prosecutor's knew that if they were going to use LaDon King as an aggravating factor then it was their duty to call King to the stand and allow Fields to sufficiently challenge what Detective January claim is LaDon King's testimony, January was not the proper vehicle to carry these lies to the jury, and the prosecutor's procuring Detective January to do so while knowing that the material misrepresentations and omissions or concealment of material facts was a scheme to defraud and it was calculated to deceive. United States v. Hasson, 333 F. 3d at 1270-71; ( citing Neder V. United States, 527 U.S.1  25, 119 S.Ct. 1827, 1841, 144 L.Ed. 2d 35 (1999))); Langford v. Rite Aid of Ala., Inc., 231 F.3d 1308, 1312 (11th Cir. 2000) (" Intent to defraud need not be shown through active misrepresentation —material omissions can be fraudulent if they are intended to create a false impression.") The Fraud here in Fields is undeniable, but along that vein it also stimulates Due Process. ( " A state denies a defendant due process when it knowingly uses perjured testimony at  trial or allows untrue testimony to go uncorrected. See Napue; Supra. See also Creel v. Johnson, 162 F.3d 385, 391 (5th Cir. 1998). The Defendant must show that (1). The testimony was false; Fields have shown that. (2). The state knew it was false; Fields have shown that the prosecution knew the testimony was false; And ( 3) The testimony was material." ( internal citations omitted ). At trial in the (Guilt / Innocence ) phase the jury came back with only one question; they asked if they could see the "DNA" results from the Grand Am that Fields was driving that night. ( See App. A38   ). There is no doubt that had the prosecution not aligned themselves with Outley and Scroggins criminal venture and helped them hide, conceal and/or suppress the Jaguar Guilt / Innocence would have undoubtedly came down to the forensics results of both cars. Forensics cleared the car that Fields was in, but the Jaguar was never tested because of the conspiracy to hide the car; there is no doubt whatsoever that the Jaguar was "material" evidence and the prosecution helping Scroggins and Outley hide it robbed Fields of his right/opportunity to show beyond "any doubt" that Outley and Scroggins murdered Coleman and got her blood and DNA in the Jaguar along with their blood and DNA. There is no "excuse" whatsoever for Outley, Scroggins and the prosecutor's lying saying that the Jaguar was BLUE when they all knew that the car was GOLD. ( " It is well settled that to obtain a conviction by the use of testimony known by the prosecution to be perjured offends due process.") See e.g., Durley v. Mayo, 351 U.S. 277, 290-91, 76 S.Ct. 806, 100 L. Ed. 1178, (1956). With that Fields have satisfied the requirements of Rule 60 (d) (3) which exempts this claim from the strict one year time-bar for setting aside a judgement and from falling under procedural default.

30

## INEFFECTIVE ASSISTANCE OF COUNSEL

It's erroneous for Appellate counsel to overlook and/or refuse to file or disregard meritorious issues, especially in a Capital Death Penalty case where their client is Actually and factually innocent. Granted "Fraud On The Court", "Solicitation of Murder", "Conspiracy" and other criminal elements that plague Fields' case aren't the "traditional" way one would file an appeal, but the Court's have recognized that every case is unique and what is appropriate in one case might fall short in another; Counsel has a duty to address these issue(s); Freels v. Hill, 843 F.2d 958 (6th Cir. (1988); Range v. United States, U.S. App. LEXIS 14415 (1994). Because counsel failed to raise the criminal elements Fields' case have been improperly adjudicated because it allows the Conspirators to continue their Fraud on the Courts, which now haunts the appeals process. Furthermore, if relief were to be granted on any of the issues that they filed the most favorable would be a new trial, but even that decision would be insufficient because it will only serve to put Fields back in the same position; On trial facing the same false and fabricated evidence with the Fraud On The Court and Criminal Conspiracy as the foundation.

In October 2013 Fields filed a Pro Se Brief with the 5th Circuit and although they kept the Brief the Court refused to consider it because "Fields have attorney's". This brief lays out the governments conspiracy and the Fraud perpetrated on the Court(s) in intricate detail. The 5th Circuit refusing to consider the brief "incapacitated" Fields. Appeallate Counsel should have took the Brief and perfected the appeal. United States v. Snitz, 342 F.3d 1154 (10th Cir. 2003). The "traditional" method of filing Actual Innocence, as Fields Attorney's have elected to do is not the way to go in this case, it have allowed the prosecution to prevail with responses that have no merit whatsoever simply because they are supposed to be "officer's of the court", and it allows the prosecution the chance to keep the conspiracy alive as they continue to defraud the Court(s) at every stage.

And instead of counsel attacking jurors bias Counsel chose to take the juror(s) word at face value when they claimed that they killed Fields because he didn't show any emotion.

The record reflects that their "excuse" is a blatant lie and is being used to mask their bias. Fields was so emotional at trial the prosecutor even commented on it in closing stating, " I hear a whole lot of sobs coming from the defense table." Counsels argument should have been that there is an unacceptable risk that the jury imposed Fields' conviction and Death Sentence " under the influence of passion, prejudice, or some other arbitrary factor " as defined by 18 U.S.C. § 3595 (c)(2)(a) and those arbitrary and prejudicial factors include, but are not limited to their belief that "black males" commit most violent crimes", or the fact that "a group of blacks" jumped on a jurors daughter and son in law; or maybe they wanted to "even the score" and not let Fields walk away like the man that killed one of the jurors preacher's father " and didn't do not one day in jail." Fields is innocent and the law dictates that innocent people be exonerated/acquited, he can't help the fact that he's a "black male", charged with a "violent crime", and he had nothing whatsoever to do with any of the numerous other prejudices that the other jurors cited; This is the argument counsel failed to make, along with the fact that District Judge Walter Smith raised the issue that Fields had also struck one black juror when Smith denied Fields' Batson challenge. The fact that the defense may have removed some members of a protected class is of no moment, because it has no bearing on the prosecutor's intent as to the individual jurors the prosecutor's removed. See e.g., Holloway v. Horn, 355 F.3d 707, 729 (3d Cir. 2004) (Defense strikes are irrelevant to the determination of whether the prosecutor has engaged in discrimination.)

Fields understands that there are issue(s) in every attorney/client relationship and wants the Court to know that the Ineffective Assistance of Counsel claim is not a "critique" of their performance per se but rather a "notice" to the Court that Fields wanted the issues herein filed. What counsel have done thus far probably would have been sufficient in any other Circuit, but the 5th Circuit, a Circuit that have killed more people than all of the other Circuits combined, and a number of them were thought to have been innocent. Also Fields' case is very very unique and filing the criminal elements in order to show the Court(s) how we got to where we are today is essential. Counsel can't keep allowing the prosecution to keep defrauding the Court, claiming that this false inmate testimony is "overwhelming" evidence of an innocent man's guilt when in fact they know the testimony was false before they even put it before the Court to consider and the basis of it is rooted in conspiracy. But most importantly Direct appeal and/or habeas isn't and haven't been sufficient to cure the criminal act(s) that the prosecution perpetrated against Fields and the Court(s), only the Supreme Court's extraordinary writ can do that; For the reason(s) stated above Fields files this issue.

IMPORTANCE TO THE PUBLIC OF THE ISSUE(S)

(1). The issue(s) herein are important to the public because police and prosecutor's have created a new "species" of potential murderers, one's that can kill under the radar, in the pretense of justice and it goes undetected.

(2). Fields is the perfect case to show the public how easy it is for crooks to fabricate evidence and kill innocent people in the pretense of justice.

(3). Fields is the type of case that the "gateway" to innocence was designed for, and clearly established Federal Law for Fraud On The Court was enacted to prevent.

(4). When prosecutor(s) fabricate evidence and convict the innocent the real murderer(s) are still walking around in society, and the crook(s) that the prosecution procured to Defraud the Court, per their deals, are released back into society early to victimize "the people" once again.

(5). Today the prosecution chooses to take Mr. Fields' life and Liberty away from him because of their unethical, illegal and criminal conduct, but who will it be that they choose to do this to in the future? Your mother? Your father? Your Sister? Your brother? You?

(6). Prosecutors in Waco Texas are known for procuring inmates to lie in Capital cases and frame the innocent. We've been able to find at least one other case; ( See App. A39 ). But how many cases are there that we don't know about? The illegal and criminal conduct down in Waco Texas must be known to the public, it's very important for potential jurors to know that if and when they are faced with a case like Fields they will be able to guage the level of deception and make the right decision.

(7). These issues are important to the public because the police, prosecutor's and their "hired" crooks is an imminent danger to the public.

(8). Because society have this misconception that our State(s) and government are only killing guilty people who are the worst of the worst and if the State or the government commits murder the public have a right to know.

32

## CONCLUSION

This Court should exercise its supervisory powers in order to protect the Constitutional and appellate rights of every American citizen that have been, and will be the victim of these malicious prosecutions. Also the Court should exercise its supervisory powers in order to deter any future acts of criminal, illegal and unethical activity by those that are supposed to pursue justice honestly, with integrity and ethical fortitude.

Without the Court's intervention, such petitioners, like Fields, will be left at the mercy of wicked rulers that obviously have no fear of consequences for their actions and who thinks nothing of using the Court(s) as an extension and/or instrument of their deceit and deception.

In light of the evidence herein, under these circumstances, there can be no question that reasonable jurist could find that Fields' conviction and death sentence is due to Fraud on The Court with an underlying criminal conspiracy. And because reasonable jurist certainly could debate whether Mr. Fields proffered sufficient facts that not only prove that the prosecution engaged in criminal conduct, but someone else is guilty of the crime(s) of conviction and Fields is Actually innocent this Court should grant certiorari, vacate all opinion(s) and order(s), and remand the case with instructions to properly resolve this case in Fields' favor.

Authorized by the Act
July 7, 1955 to Administer
Oaths (18 U.S.C. 4004)

Case Manager

Respectfully Submitted,

6/9/14

Sherman L. Fields (Pro Se)
#15651-180
USP Terre Haute
P.O. Box 33
Terre Haute, IN 47808

33

**SUPREME COURT OF THE UNITED STATES**
**OFFICE OF THE CLERK**
**WASHINGTON, DC  20543-0001**

June 18, 2014

Sherman L. Fields
#15651-180
PO Box 33
Terre Haute, IN 47808

    RE: Sherman L. Fields
        USCA5 #13-70025

Dear Mr. Fields:

    The above-entitled petition for writ of certiorari was postmarked June 10, 2014 and received June 18, 2014.  The papers are returned for the following reason(s):

    It appears that your case is still pending in the United States Court of Appeals for the Fifth Circuit.

    Your case must first be reviewed by a United States court of appeals or by the highest state court in which a decision could be had. 28 USC 1254 and 1257.

                Sincerely,
                Scott S. Harris, Clerk
                By:

                Clayton R. Higgins, Jr.
                (202) 479-3019

Enclosures

To the Clerk:

On or about February 17, 2014 I filed a Motion with this Court pursuant to Rule 60 for Fraud On the Court And in that Motion I showed by clear and convincing evidence that the prosecution Aligned themselves with a criminal venture Solicited my murder via lethal inIection, Engaged in a criminal conspiracy and Aided And Abetted the crooks that Spearheaded the conspiracy. Committing Fraud On the Court(s) in the process And it's because of these illegal And Criminal Act(S) that I'm on Death Row.

On or About May, 1, 2014 this Court responded telling me to restructure the Motion (writ of certiorari) and refile by July 1, 2014. I refiled June 10, 2014.

Today, June 24, 2014 I received the writ back with a letter Stating," It appears that your Case is still pending in the United States Court of Appeals for the Fifth Circuit" And " Your case must first be reviewed by a United States court of Appeals or by the highest State Court in which a decision could be had USC 1254 and 1257."

I filed my writ of cert. AS An EXTRAORDINARY writ up under Rule 20 And pursuant to 28 U.S.C. § 2101(e) which states "An Application to the Supreme Court for a

Case 2:14-cv-00315-WTL-WGH Document 13 Filed 10/16/14 Page 43 of 86 PageID #:323

writ of certiorari to review a case before Judgment has been rendered in the Court of Appeals may be made at any time before Judgment." And 28 U.S.C § 1651(A) Showing that "exceptional circumstances warrant the exercise of the Court's discretionary powers, and that adequate relief cannot be obtained in any other form or from any other Court."

Yes I have a C.O.A petition pending in the Fifth Circuit, but the issues were filed over my objections to it, and the issues filed won't and/or can't make me whole. On May 21, 2014 Counsel argued at oral arguements that I shouldn't have been allowed to proceed Pro Se, asking for a new trial, but would be happy with a new punishment phase. I'm INNOCENT and even a new trial won't be sufficient because that will only put me back in the same position; back on trial facing the same false and fabricated evidence with the Conspiracy and Fraud On the Court as the foundation.

My sentence is illegal and "An illegal sentence can be corrected at anytime". See Nesbitt v. Sec'y Dept. of Corr., 2012 u.s. Dist. LEXIS 65482 (M.D.Fla. May 10th 2012); Also United States v. Jackson, 923 F 2d 1494 (11th Cir. 1991). Also it's clearly established Federal law that the Due Process clause prohibits the conviction of either a legally and/or factually innocent person. See

2

Garden v. Stephens, Sup. Ct. # 13-546 (2013) cert. pending, 5th Cir. 8/21/13. By and through my writ of cert. via the appendix I showed with very clear and convincing evidence that I'm innocent and I'm the victim of a knowing and willful malicious prosecution where the prosecution, with malice aforethought willfully set out to murder me in the pretense of Justice. These "exceptional circumstances" warrants the exercise of this Court's discretionary powers. From day one I told my attorney's to file the Fraud On the Court with the criminal elements but they filed Habeas without doing so. I tried to file it myself and both the district Court and the Fifth Circuit refused me access to the Courts, the Supreme Court is my only "gateway."

When a defendant's life is at stake, Courts must be "particularly sensitive to insure that every safeguard is observed." Gregg v. Georgia, 428 U.S. 153, 187 (1976); See Also Woodson v. North Carolina, 428 U.S. 280, 305 (1976) (" Because of that qualitative difference [between death And any other punishment] there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case"); Eddings v. Oklahoma, 455 U.S. 104, 118 (1982) (O'Connor, J., concurring) (Noting that, because of the exceptional and irrevocable nature of the death penalty, "extraordinary measures" are required by the Eighth and Fourteenth Amendments to ensure the reliability

3

in Capital proceedings); Ford v. Wainwright, 477 u.s. 399, 411 (1986) (The heightened standard of reliability in Capital cases is "A natural consequence of the knowledge that execution is the most irremediable and unfathomable of penalties; that death is different").

My writ of cert. proves that had the prosecutor's not defrauded the Court(s) there wouldn't have been no evidence to indict me, prosecute me, and/or convict me. And because the Fraud originated in the lower Court(s) and "Trickled up", the fact that we are here today means that the Supreme Court was, and still is a victim of that Fraud as well which led to the denial of cert. on direct appeal; It has been held that "the proper forum in which to Assert that a party has perpetrated a "Fraud On the Court" is the Court which Allegedly was a victim of that Fraud" Wilson v. Comm'r, 309 F. App'x 829, 833 (5th Cir. 200' The District Court and the 5th Circuit both refused me the opportunity to prove they've been defrauded, thus the Supreme Court should Grant me that chance; The fact that this Court have been defrauded in relation to this case gives this Court Jurisdiction to entertain my writ of cert., or in the Alternative A Rule 60 and Rule 20 Motion. "The inherent power of A Federal Court to investigate whether a Judgment was obtained by Fraud is beyond question" Universal Oil Prods. Co. v. Root Ref. Co., 328 U.S. 575, 580, 66 S.Ct. 1176, 90 L. Ed. 1447 (1946). If this Court order the prosecution to respond to the writ that was served on them earlier this month Not only will the Court see that the writ is meritorious, but the Court will see that their response is Just A continuation of the "Fraud on the Court" because I

4

will prove to you by clear and convincing evidence that any response they give is a lie and meant to defraud this Court, and it's an unconscionable plan and/or scheme designed to improperly influence this Court's decision.

Restricting me from filing in this Court simply because I have a COA petition pending in the Fifth Circuit when the petition is severely inadequate and insufficient to obtain the Justice warranted in this extraordinary case violates the Fifth, Eighth and Fourteenth Amendments to our Constitution. It is clearly established Federal law that consideration of an otherwise untimely petition for Federal habeas relief may be appropriate upon a showing that a "fundamental miscarriage of Justice" has occured, whereby "a constitutional violation has resulted in the conviction of someone who is actually innocent." Murray v. Carrier, 477 U.S. 478, 495-96, 106 S.Ct. 2639, 91 L.Ed. 2d 397 (1985); See Also Wyzykowski v. Dept. of Corr., 226 F.3d 1213, 1218-19 (11th Cir. 2000). The Actual Innocence exception "is exceedingly narrow in scope", and a petitioner seeking to invoke it must "show that it is more likely than not that no reasonable Juror would have convicted him". Johnson v. Alabama, 256 F.3d 1156 1171 (11th Cir. 2001) (quoting Schlup v. Delo, 513 U.S. 298, 327, 115 S.Ct. 851. 130 L.Ed. 2d 808 (1995)" In addition, to be credible, a claim of actual innocence must be based on reliable evidence not presented at trial." Id. (quoting Calderon v. Thompson, 523 U.S. 538, 559, 118 S.Ct. 1489, 140 L.Ed. 2d 728 (1998).

My writ proves unequivocally that I'm innocent and a

"fundamental miscarriage of Justice" has occured because of the criminal act(s) committed by the prosecution. The evidence presented in the writ is undoubtedly reliable and not only debateable amongst Jurist of reason, but no reasonable Juror would have convicted me if they were allowed to hear, see and /or consider the evidence presented in the writ.

I know and understand that the "All writs act" empowers federal Courts to fashion extraordinary remedies when the need arises. Whereby I respectfully pray that this Court allow me to file my "Extraordinary writ."

Respectfully,

Sherman L. Fields
# 15651-180
USP Terre Haute
P.O. Box 33
Terre Haute, In 47808

The first clerk, Clayton R. Higgins, Jr. signed the letter telling me to restructure the original petition and serve opposing counsel and the Solicitor General. The letter I received today telling me I can't file because I have a COA pending is signed by someone with the initials D.M. I can't read the rest but I'm hoping it's just a lack of communication and Mr. Higgins was right.

6

Direct Examination of Steve January by Mr. Snyder——1327—

I went to the laser lab where the car was at, inserted the key into the ignition and it started the car, indicating that that was the key for that car.

Q. And your knowledge is -- of vehicles is when they have the electronic chip in it, it will only -- it'll only start one car and no other, correct?

A. That's my understanding. Yes.

Q. Okay. And on that basis -- is -- you believe that the keys were the set of keys for this particular car?

A. Yes.

Q. And later was the car returned to Tammy Edwards?

A. Yes. It was.

Q. Along with the keys?

A. Yes.

Q. And the Grand AM, you said you couldn't remember if it was processed before or after the Lumina.

A. The Grand AM was impounded the same night that Sherman Fields was arrested, I believe. I think it was the same night or just there shortly after or before.

Q. And go ahead.

A. And it was also impounded and taken to the Waco Police Department where it was also processed.

Q. And when you say processed, what did you have done to it?

A. I had it fingerprinted, photographed, trace lifters,

Direct Examination of Steve January by Mr. Snyder————1328

vacuuming.

Q. And, once again, a result of all this was just negative?

A. Negative.

Q. And is it uncommon that when you go through a vehicle -- is -- that you come up with negative results such as you did here?

A. Most -- the majority of the time, yes.

Q. And --

A. Occasionally you might recover fingerprints.

Q. But most of the time -- is -- you just come up with nothing?

A. That is -- that's correct.

Q. And is it fair to say, sir, is -- you cannot process -- the Waco Police Department doesn't have the resources to process every stolen vehicle? Is that correct?

A. That is correct.

Q. And it doesn't have the -- it doesn't have the resources also to process every car that's abandoned that people bail out of and run from?

A. That is correct.

Q. Because, as you said, is -- this is a daily occurrence in Waco?

A. Yes.

Q. And about how many cars are stolen a week in Waco?

Cross-Examination of Morris Colyer by Mr. Snyder——1924

MR. FIELDS: I have no further questions.

CROSS-EXAMINATION

BY MR. SNYDER:

Q.   Sir, Mr. Outley later furnished the name of the person he got the Jaguar from, did he not?

A.   Yes. He did.

Q.   And if you would, sir, is -- did you also track down the red two door car that was being driven that evening that had been rented by Edward Outley on the evening of November the 6th?

A.   Yes.

Q.   And you found the person he rented it from with only the name Roger, correct?

A.   Right.

Q.   And that was Roger Thomison?

A.   That's correct.

Q.   And you went out and looked at the vehicle and caused it to be processed; is that correct?

A.   Yes.

Q.   And that would have been on or about November the 14th, I think?

A.   Possibly. Yes.

Q.   And when you looked at the vehicle, did any -- the interior of the vehicle, did anything immediately strike you about it?

Cross-Examination of Morris Colyer by Mr. Snyder———1925

A.    Well, it struck me how clean it was.

Q.    And when you say clean it was, is --

A.    It looked like it had been detailed, wiped down, however.

Q.    And did it appear as though everything, the upholstery, the carpet?

A.    The upholstery, the trunk area.

Q.    And you submitted it for trace evidence, correct?

A.    Yes.

Q.    When you did so, did you have any hope that there would be anything found, given how clean the car had been?

A.    Not really.

MR. SNYDER:  Nothing further.

REDIRECT EXAMINATION

BY MR. FIELDS:

Q.    Mr. Colyer, --

A.    Yes.

Q.    -- you're not a forensic expert, are you?

A.    No.  I'm not.

Q.    Are you aware of some of the procedures that they use in -- when they test cars for certain type evidence?

A.    I really have not -- I'm no expert in that field. No.  I'm not.

Q.    So you're not aware that even if the car was wiped down, if blood had been in there, they got advanced

# MCLENNAN COUNTY SHERIFF'S OFFICE
# FOLLOW-UP REPORT

MCLENNAN COUNTY
SHERIFF'S OFFICE
219 N 6TH
WACO, TX 76701
254 757-5108

Case No: 01-8754
Report No: 01-8754.10
Report Date: 11/27/01

Page 1 of 1

| | | | | |
|---|---|---|---|---|
| Subject: | HOMICIDE | | | |
| Case Report Status | I - IN PROCESS | Date Entered | 11/27/01 12:55:11 PM | Reporting Officer |
| | | Entered By | 0023 - WILLIS, TAMMA | 1826 - COLYER, MORRIS |
| Occurred On | 11/21/01 5:22:00 PM | Date Verified | | |
| (and Between) | | Verified By | | |
| | | Date Approved | | |
| Location | JERICHO LANE (BETWEEN HILLIARD LN & ESTELLA LN) | Approved By | | Assisted By |
| Census/Geo | | Connecting Cases | | |
| Grid | G4 - GRID 4 | Disposition | ACTIVE | |
| Call Source | OFFICE | Clearance Reason | | |
| | | Date of Clearance | | |
| Vehicle Activity | | Reporting Agency | MCLENNAN COUNTY SHERIFF'S OFFICE | |
| Vehicle Traveling | | Division | CID | |
| Cross Street | | Notified | | |
| Means | | | | |
| Other Means | | | | |
| Motive | | | | |
| Other Motives | | | | |

**Report Narrative**

ON 11-14-01 MYSELF AND DET. SPILLMAN DID RECEIVE INFORMATION CONCERNING A RED GRAND AM. MYSELF AND DET. SPILLMAN WENT TO H & B CONTRACTORS TO SPEAK TO ROGER THOMISON. ONCE WE ARRIVED AT H & B CONTRACTORS ON HWY 84 WE WERE TOLD THAT ROGER WAS AT THE SUNWEST ADDITION DOING GROUND WORK.

MYSELF AND DET. SPILLMAN DID DRIVE TO THE SUNWEST ADDITION AND SPOKE WITH ROGER THOMISON AT WHICH TIME WE DID VISUALLY SEE A RED GRAND AM, BEARING TEXAS LP F02KRT. WE DID SPEAK WITH MR. THOMISON AND TOLD HIM OF THE SITUATION PERTAINING TO THIS CASE AND HE DID CONSENT FOR US TO SEARCH HIS CAR AND TO HAVE IT TESTED FOR EVIDENCE.

ROGER THOMISON IS KNOWN TO RENT HIS CAR OUT TO VARIOUS PERSONS IN THE EAST AND NORTH WACO AREAS IN TRADE FOR DIFFERENT TYPES OF NARCOTICS.

ROGER THOMISON DID SIGN A CONSENT TO SEARCH FORM AND THE GRAND AM WAS THEN TAKEN TO THE WACO PD LASER LAB AT 4TH AND WACO DRIVE.

I HAVE NO FURTHER INFORMATION.

**Offense Detail: 0911 - HOMICIDE - WILLFUL**

| | | | | |
|---|---|---|---|---|
| Offense Description | 0911 - HOMICIDE - WILLFUL | | | |
| IBR Code | 09A - MURDER AND NONNEGLIGENT MANSLAUGHTER | Location | 13 - HIGHWAY/ROAD/ALLEY | |
| IBR Group | A | Offense Completed? | YES | No. Prem. Entered |
| Crime Against | PE | Hate/Bias | 88 - NONE (NO BIAS) | Entry Method |
| Using | | Domestic Violence | NO | Type Security |
| Criminal Activity | | | | Tools Used |
| Weapons/Force | 95 - UNKNOWN | | | |

RMS_CR.rf v2f

Printed: November 27, 2001 - 1:10 PM

Direct Examination of James Blair by Mr. Fields——1927

I correct?

A.   That's one of the tests that we do.  Yes.

Q.   Did you find any blood?

A.   I can't -- I found suspicious stains that could possibly be blood.  So they were collected.

Q.   But were they blood?  Was it blood?

A.   I do not know the results of those tests.

Q.   Mr. Blair, you're aware that if blood were in the car and somebody tried to wipe it off, isn't it true that there's some type of technology or something that could still tell that it was blood there?

A.   Yes, sir.  That's correct.

MR. FIELDS:  Pass the witness, Your Honor.

CROSS-EXAMINATION

BY MR. SNYDER:

Q.   Sir, how long have you been in this business?

A.   I've been an investigator for the police department for 31 years.

Q.   How long does it take to process a car?

A.   An average of six to eight hours.

Q.   And, sir, is -- what you're looking for inside a vehicle is essentially what's called trace evidence, correct?

A.   That's correct.

Q.   And the reason it's called trace evidence, it's not visible to the naked eye most times?

```
                  W A C O   POLICE   DEPARTMENT                    SUPPLEMENT
                        WACO, TEXAS                               Report
===================================================================================
Reported Date: 11/08/01  Time: 15:15          Case: 01-074130 (004)  Page: 1
Code: 580000 NO           Crime: INFO ONLY      Class: 580000
Occurrence Date: 11/08/01-       Day: THURSDAY -            Time: 15:15-
Status: CL  CLOSED                Closing Officer: 000740 SPECIAL CRIME
Location: 1034 DELANO, WA                                   RD:  104
         ESTELLA MAXEY APT. COMPLEX
======================= NARRATIVE =================================================
```

On 11/14/01 I was contacted by ID TECH SANDERS. He told me a car driven by Sheriff's Department being a RED PONTIAC GRAND AM 2 DR, bearing TX LP# F02KRT was brought down to the laser lab to be processed. I was told DET. JANUARY was handling a missing person case in which he suspected foul play. A request was made to attempt to find blood inside the vehicle.

On first examining the vehicle, the crime scope was used at setting 475. Both the trunk area and the inside of the vehicle were viewed through the crime scope. Some dull staining could be seen on the back left floor board behind the driver's seat. I tested this one stain with TMB solution and I did not get an immediate reaction indicating this was blood. However, this piece of carpet will be taken and placed as evidence.

After viewing the entire inside of the vehicle for possible blood stains, it was then fingerprinted. A total of 15 print cards were obtained. Print cards numbered 1 through 11 will be given to JOANN GUERCIO in fingerprints to view these prints and see if any of them are of AFIS quality or can be matched to the suspect. Prints #12 through 15 will be attached to the laser request form. These prints show very little ridge detail that I could see that could be used to make an identification.

A trace lift was done of the front passenger's seat, the driver's seat and the rear seat. Also, a vacuum was done of all the floor mats and also the trunk carpet was taken for possible trace evidence. The following items that will be placed in the property room will be:

     ONE PIECE OF CARPET FROM THE BACK LEFT FLOOR BOARD
     THREE TRACE LIFTS
     ONE VACUUM CANISTER WITH TRACE EVIDENCE FIBER
     ONE SACK CONTAINING CARPET FROM THE TRUNK AREA OF THIS PONTIAC

35 mm photographs were taken of the outside and the inside of the vehicle. This 35 mm film will also be turned in to the photo lab for processing if needed at a later date.

```
===================================================================================
 A C O   Police Department                                   First Page
===================================================================================
eporting Officer: BLAIR J        Number: 000179  Date: 11/15/01  Time: 09:00
         Typed by: BROUSSARD      Number: 384     Date: 11/16/01  Time: 16:25
oproving Officer: BROUSSARD       Number: 000384  Date: 11/16/01  Time: 16:35
```

```
:===============================================================================
                    W A C O   POLICE   DEPARTMENT                    | SUPPLEMENT
                          WACO, TEXAS                                |  Report
================================================================================
  orted Date: 11/08/01   Time: 15:15                     Case: 01-074130 (005)   Page: 1
 ode: 580000 No            Crime: INFO ONLY           Class: 580000
 ccurrence Date: 11/08/01-                      Day: THURSDAY -                Time: 15:15-
 tatus: CL  CLOSED                         Closing Officer: 000740 SPECIAL CRIME
 ocation: 1034 DELANO, WA                                            RD:   104
         ESTELLA MAXEY APT. COMPLEX
=======================  NARRATIVE  =============================================
```

 n 11-15-01 after moving this red PONTIAC 2DR and releasing it to MCLENNAN COUNTY SO, it was found that a large amount of dirt had fallen from inside  he fender wells of this PONTIAC, bearing TX. plate F02KRT.  A dirt sample  as taken and will be placed in the property room, along with the other  vidence.

```
:===============================================================================
A C O   Police Department
================================================================================
                                                                     First Page
 orting Officer: BLAIR J         Number: 000179   Date: 11/15/01    ============
         Typed by: MAUER         Number: 365      Date: 11/16/01    Time: 11:00
 roving Officer: MAUER           Number: 000365   Date: 11/16/01    Time: 16:43
                                                                   Time: 16:45
```

```
==========================================================================
              W A C O   P O L I C E   D E P A R T M E N T          | SUPPLEMENT
                      WACO, TEXAS                                  | Report
==========================================================================
Reported Date: 11/08/01   Time: 15:15          Case: 01-074130 (002)   Page: 1
Code: 580000 NO        Crime: INFO ONLY     Class: 580000
Occurrence Date: 11/08/01-          Day: THURSDAY -             Time: 15:15-
Status: CL  CLOSED                  Closing Officer: 000740 SPECIAL CRIME
Location: 1034 DELANO, WA                                      RD:  104
          ESTELLA MAXEY APT. COMPLEX
========================= NARRATIVE ======================================
```

On 11-15-01 I received eleven latent fingerprint cards from Laser lab
Detective Blair. On these cards there are twelve latent lifts. I find
sufficient quality of print for AFIS submission. Prints are of very good
eye comparison quality.  Fingerprints remain on file in the AFIS Lab
until needed.

```
==========================================================================
 C.O   Police Department
==========================================================================
                                                              First Page
                                                        ==================
rting Officer: GUERCIO       Number: 000361  Date: 11/16/01  Time: 10:45
    Typed by: GUERCIO        Number: 361     Date: 11/16/01  Time: 10:43
 ving Officer: MCELYEA M     Number: 000387  Date: 11/17/01  Time: 14:49
```

FILED

APR 0 4 2002

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY_____
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| v. | § | CRIM. NO. W-01-CR-164(1) |
| | § | |
| SHERMAN LAMONT FIELDS | § | |

## *SHERMAN FIELD'S MOTION FOR DISCOVERY PRODUCTION, AND INSPECTION OF EVIDENCE*

TO THE HONORABLE WALTER S. SMITH, JR.,
UNITED STATES DISTRICT JUDGE:

SHERMAN LAMONT FIELDS, "Defendant" herein, by and through his undersigned attorney of record, pursuant to the authority of Rule 16, Federal Rules of Criminal Procedure, files this motion and would show the following.

1.      The government, by and through its Assistant United States Attorney, Mark Frazier, has offered defense counsel "open file" discovery, so long as a motion for discovery is filed with the court. The "open file" policy in this venue generally allows defense counsel to read reports made by law enforcement agents, government witnesses and potential government witnesses. Such disclosure by the government is strictly voluntary, *see* Rule 16(2), Federal Rules of Criminal Procedure, and supplements the disclosure of information made available through Rule 16(1) "upon request of the Defendant".

2.      Rule 16 allows for the timely disclosure of certain information that may not be readily available through "open file" discovery. For example, physical evidence, photographs, documentary evidence, the results of scientific tests, and the written summary of testimony of expert witnesses are often not kept in an "open file" but must be specifically requested by the prosecuting attorney. The undersigned believes the prosecuting attorney will provide such

discoverable information to defense counsel, but in order to protect Defendant's rights in the event of a misunderstanding as to what additional information is discoverable, or in the event such information is not disclosed in a timely fashion, Defendant specifically moves for an order requiring the government to provide all information to defense counsel that is discoverable pursuant to Rule 16 and that a reasonable deadline for this disclosure also be ordered. Defendant would respectfully suggest to the court that an order stating a discovery request is "moot" in light of an "open file" policy can lead to disclosure problems in the areas of timeliness of disclosure of photographs, documents, tangible objects, results or reports of scientific tests or experiments, and disclosure of written summaries of testimony of expert witnesses.

Wherefore, Defendant moves for an order requiring the government to disclose to Defendant, by and through defense counsel, all information to which Defendant is entitled to discover pursuant to Rule 16, Federal Rules of Criminal Procedure, by a date certain.

Respectfully submitted,

Scott Peterson
Attorney for Defendant
1701 Austin Avenue
Waco, Texas 76701
NO.:    254 753-3100
FAX:   254 753-5122
TBA #15836300

04/08/02  MON  Case 6:04-cr-00074-WSS  Document 3 PETERSON Filed 03/22/10  Page 4 of 4  @007

## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the above and foregoing "Sherman Field's

Motion for Discovery. Production and Inspection of Evidence" has been delivered in accordance with

law to the Office of the U. S. Attorney for the Western District of Texas, Waco Division, on this 4th

day of April, 2002.

_____

SCOTT PETERSON

FILED

JAN 3 0 2004

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY _____
                    DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION

UNITED STATES OF AMERICA          §
                                  §
vs.                               §        CRIMINAL ACTION W-01-CR-164
                                  §
SHERMAN LAMONT FIELDS, (01)       §

JURY NOTE NUMBER  4

Request the testimony (or evidence, if it is available) of the results of DNA testing on the car. A summary of what the testing and results is acceptable.

_Tom Michaelis_
PRESIDING JUROR

1/30/04            1540 hours
DATE and TIME

* * * * * * * * * *

COURT'S RESPONSE:

See Attachment

WALTER S. SMITH, JR.
UNITED STATES DISTRICT JUDGE

DATE and TIME

179

403

## Attachment

As I instructed right after you were sworn:

> Under normal circumstances, no written testimony of witnesses can be made available to you during your deliberations; nor, under normal circumstances, can all of any significant portion of a witness's testimony be read to you during your deliberations.

When a jury requests a specific question about a portion of a particular witness's testimony, then that can often be provided. It is, however, quite time consuming. First, the parties and I have to listen to the tape of that testimony, and determine which portion would answer your questions, and then the Court Reporter has to transcribe it. This can take several hours.

I cannot answer the type of question you have asked. However, if you have a specific question about a particular witness's testimony, please send me another note. If not, please continue your deliberations.


_____
WALTER S. SMITH, JR.
UNITED STATES DISTRICT JUDGE


1/30/04          4:12 p.m
DATE AND TIME

/2002 16:48 2547765701 EXECUTIVE SUITES PAGE 17

Song: I dont mind i L
Artist: R. Kelly

Hey Sweetie,                                    7-7-02
              By the time my notation arrives
I hope you are in the very best of health.
Before I even get into this letter. I know
I tripped out. I really didn't think I would
fuck the card up for real. Baby, I'm sorry I hope
you can forgive me. Baby it's just that
Now that were back together, I'm not taking
any chances so someone trying to take you
from me. I've been through that once. I will
not let it happen to me again. So please
understand why I don't want you talking to
anyone. Sherman finds... I LOVE you baby.
I do. I really don't want to lose you. I hope
that this time its just me & you. Baby
Please do not talk to anyone because
I did that. When you get your card.
Call me, I'm not going to mess it up. Baby
these 2 days I've missed your voice. I really
feel bad for what I did. Baby, I'm
sorry. I Love you baby. I hope we can work
this out. I know you still got that q.N.
I can't. why you don't ride by call me.
Anyway, Baby, I was real upset because
I saw myself loosing you again. I had I

002  16:48   2547765701                    EXECUTIVE SUITES                    PAGE  18

happen again. I told you I'm killing bitches. So, I hope your't ready for it to be me & you baby. It's the way it should be. I love you. I didn't know if you love me like I love you. We need to try to regain that trust. I really want to be with you. Nicky, long, I think of you constantly, now that I've hurt you. It's killing me on the inside. I know I need to hear your voice. Really I need you. I'm not going to give up until I have you Sherron. You are my world baby. It's always been like that. I stop being with you because, the way you were handling things. Then I seen that it's harder getting over you. I was glad that it wasn't too late for us. See baby, it's just the beginning for us. When we brought it was the end. I love you baby, with all my heart & soul. Whatever it takes to make things ok with you I'm willing to do. I'm getting ready to go with a restricted Monday 3-11pm. So when you call, call before 3pm. Please don't be mad baby. I love you baby more than anything in the world. I mis. I wrote you a letter from I'm I won't going

302  16:48    2547765781                    EXECUTIVE SUITES                    PAGE  19

to write you. I miss your voice Baby, I promise to do things better than i was. I just have to trust you again. It's hard. When I've betrayed me before I've been trying before all this happen, it wasn't that hard to trust you. I am trying baby. I do love you baby. I miss you with all my heart. Know that forever baby I will always

~You~

Ma Shia al Koo.

Tickls.

Song: I don't mean it
Artist: R-Kelly

Hey Sweetie,                                             7-7-0?

        By the time my notation arrives I hope you are in the very best of health. Before I even get into this letter, I know I tripped out. I really didn't think I would fuck the card up forreal. Baby, I'm sorry. I hope you can forgive me. Baby it's just that now that we're back together, I'm not taking any chances on someone trying to take you from me. I've been through that once. I will not let it happen to me again. So please understand why I don't want you talking to anyone. Sherman Fields...I love you baby. I do. I really don't want to lose you. I hope that this time it's just me and you. Baby please don't go talk to anyone because I did that. When you get your card call me. I'm not going to mess it up. Baby these two days I've missed your voice. I really feel bad for what I did. Baby, I'm sorry. I love you baby. I hope we can work this out. I know you still call that girl. I don't know why you didn't have her call me. Anyway, baby, I was real upset because I saw myself losing you again. I let it happen the First time, I'm not going to let it happen again. I told you, I'm killing bitches. So I hope you're ready for it to be me and you baby. That's the way it should be. I love you. I don't know if you love me like I love you. We need to try to regain that love. I really want to be with you. All day long I think of you constantly. Now that I've hurt you, it's killing me on the inside. I know I need to hear your voice. Baby I need you. I'm not going to give up until I have you. Sherman, you are my world baby. It's always been like that. I stop being with you because of the way you were handling things. Then I seen that I couldn't get over you. I was glad that it wasn't too late for us. See baby, it's

just the beginning for us, when we thought it was the end. I love you baby with all my heart and soul. Whatever it take to make things up with you I'm willing to do. I'm getting ready to go to work. I started Monday 3-11 pm. So when you do call, call before 3 pm. Please don't be mad baby. I love you baby. More than anything in the world. I'm mad I haven't got a letter from you. I wasn't going to write you. I missed your voice. Baby, I promise to do things better than I was. I just have to trust you again. It's hard when you betrayed me before. I've been trying, before all this happened it wasn't that hard to trust you. I am trying baby. I do love you baby. I miss you with all my heart. Know that Forever baby, I will always.

Love,

Mrs. Shalaykea

Fields.

/2002  16:48    2547765781                    EXECUTIVE SUITES                          PAGE  13

Sng. Incomplete
Artist Siago

Hey my precious prince!                    7-9-03

I'm glad to hear you calmed
down. I know I said some pretty fple shit the
other day. Sometimes I know that you I didn't mean
it baby. I was relieved to get this letter from you.
I was glad to receive it. It made me feel so
better on the inside. I was so afraid of you doing
something to get back at me. I am sorry. You better call
me. I'm not going to fuck off my money baby. I
did trip out starting that same shit again I promise.
I'm not going to fuck with anyone I haven't even been
to killeen From now on, I'm not going to tell no
more lies. You say you through and you better be.
You need to find somebody to get that shit off
you. I'm going to get your name on my neck when
I get paid. Next Monday. So You need to make some
arrangement for that. You are going to be my husband.
I'm getting your name ASAP. On my next Mrs. Shaman.
Alecia. So if you doing with me then I don't want
to make any more mistakes. I already told you last
some bitch get you once. But never again will
I. I love you with all my heart & soul. So
please baby let's do this right. You. I mean You baby,
I know I need to control my temper. But I get
so mad, shit slip by me, not knowing about.
It. It's not going to happen again. Everyday
Say I'm stupid because You going to be whole
girl. But I hope we make them out of this.
I want you. I need you. I am so stupid. You
know it's like confession. You haven't seen nothing
yet. I can't begin to explain how crazy I love you.
Baby now, I haven't been doing anything but trying

but trying up to see how we gone do trivis. I know
as of thoug you has my all. Shild neve. But
fuck over me Sherron. We are so much for you.
within this last year. All I have been is good.
Because a few misdemeanor are mistake. I never
cheated on you. No I me. So Baby please take
this & run with it. I will show you a bruter
person. I love you. I don't like fighting Either.
We need to start working on the future. what
we can do to make things better. I was tripping
Baby. I'm ready now. I know where my heart is.
I will be waiting for you- Faithfully. Everything
We are, I told you. That's also real. I just hope
I hope you love me & want to be with me like
you say. I will be so heart broken. So please and
fuck over me. Baby today is thursday I cant
Want to talk to you in the morning. So I can tell
you how sorry I am, How much I wish you tried
to stop being so damn insecure. It hard-
You got Tatos & shit. Baby that hurts me. Of see that
I will break down. Have call you so true to me. I really
don't want to get your name I because you trued trut.
That's why you never true off. Real soon. You have
to do something. Baby, I need to marry you
I'm ready to be mrs Ticks. On my work badge
I say Mrs. Ticks. I like them I was married
Baby you are my everything. We've been through
So much still. I'm glad it is over. Now we can
relax. Work on our true. Faithfully. When you
come home I will make it all up to you. I promise
you that. I will be the best wife in the world.
The best wife to you. We will do things

03/08/2002  16:48    2547765781            EXECUTIVE SUITES                    PAGE  15

a little different than the rest. I love you always. Sherman loves the hell out of you, baby. I hope to see you real soon. Call me back. Until next time Stay strong & sweet. You will be in all my prayers. Sweetie.

Your wife

Shalayhea Jeter

Shalayhea
Hope's kisses
Sherman

Love you
Lots of
Love.

Forever and always
Until death do
us apart.

Bye- Bye
Baby.

PS. I love you, I could never tell you to much. I love you. I miss you so so so much. Hurry up and come home baby I need you.

Song: Incomplete
Artist: Sisqo

Hey my precious prince!                                    7-9-01

I'm glad to hear you calmed down. I know I said some pretty file shit the other day. Somethings I know I hurt you. I didn't mean it baby. I was relieved to get this letter from you. [I was glad to receive it]. You made me feel so better on the inside. I was so afraid of you doing something to get back at me. I am sorry. You better call me. I'm not going to fuck off <u>my money</u>! Baby, I did tripout starting that same shit again. I promise I'm not going to fuck with anyone. I haven't even been to Killeen. From now on I'm not going to tell no more lies. You say you through and you better be. You need to find somebody to get that shit off you. I'm going to get your name on my neck when I get paid. Next Monday. So you need to make some arrangement for that. You are going to be my husband. I'm getting your name ASAP on my neck, Mrs. Sherman Fields. So if you playing with me, stop. I don't want to make any more mistakes. I already told you, I let somebody get you once, but never again will I. I love you with all my heart and soul. So please baby, let's do this, me and you. I miss you baby. I know I need to control my temper. But I let so much shit slip by me, not knowing about it. It's not going to happen again. Everybody say I'm stupid because you going to be with ole girl. But I hope we make them out of a lie. I want you. I have you. " Ain't no stopping it!" Yea, I know it's like obsession. You haven't seen nothing yet. I can't begin to explain how deeply I love you. Baby, now, I haven't been doing anything but trying but trying to see how we gone do this. I know as of today you have my all. That's real. Don't fuck over me Sherman. I've done so much for you within this last year. All I have been is good. Besides a few misdemeanor ass mistakes. I never cheated on you. Not once. So baby please take this and run with it. I will show you a better person. I love you. I don't like fighting either. We need

to start working on the future. What we can do to make things better. I was tripping baby. I'm ready now. I know where my heart is. I will be waiting for you <u>Faithfully</u>. Everything I've done, I told you. That's also real. I just hope hope you love me & want to be with me like you say. I'll be so heartbroken. So please don't fuck over me. Baby today is Thursday I can't wait to talk to you in the morning. So I can tell you how sorry I am, How much I love you. I need to stop being so damn insecure. It's hard. You got tatoos & shit. Baby that hurts me. If I see that I will break down. How could you do that to me. I really don't want to get your name because you have that. That's why you need that off. Real soon. You have to do something. Baby I need to marry you. I'm ready to be Mrs. Fields. On my work badge it say Lakie Fields, I told them I was married. Baby you are my everything. We've been through so much shit. I'm glad it's over. Now we can relax. Wait on each other Faithfully. When you come home I will make it all up to you. I promise you that. I will be the best mother to our kids, the best wife to you. We will do things a little different than the last. I love you always Sherman. I miss the hell out of you, baby. I hope to see you real soon. Call me boo! Until next time stay strong & sweet. You will be in all my prayers sweetie.

Your Wife

Shalaykea Fields



Love You

Shalaykea

Hugs & kisses &

Lots of Love

Sherman

Forever and always until death do us apart

Bye-Bye

Baby

P.S. I love you, I can't never tell you to much. I love you I miss you so so so much. Hurry up and come home baby I need you.

knew that that was done then.

And the other question concerns what the Court would require in the way of information to issue a writ of attachment or a material witness warrant for a witness that -- I've been advised by -- Mr. Youngblood, who's in the courtroom, has told him one story and the government gave the name of this witness as Brady material and said that she knew something exculpatory. He went back to her. She then admitted to the investigator she told him a lie and that the truth was she didn't have exculpatory information. She told him that, but then she said, "I'm not talking to you. I'm not going to accept any subpoenas. I'm not coming to court." And he's tried to serve her now four or five times. And we just need to know what the Court would need in order to issue a writ of attachment for that witness if we're unable to get her in otherwise.

THE COURT: Can you enlighten me somewhat on what her testimony might be?

MR. PETERSON: Yes, sir. Her testimony is going to be that one of the star government witnesses in this case, Shalaykea Scroggins, had a heated exchange in words and a motive to have done harm to the victim in this case. And the defense -- one of the defenses in this case is -- or in Mr. Fields' defense if he represents himself and part of our defense is going to be that he did not commit the murder that he's been alleged of but Shalaykea Scroggins did do so because

of the motive of the ill will she bore towards the victim because they were competitors for Mr. Fields' attention or affection.

THE COURT: Okay. Is her location something that should be -- could she be readily located by the marshals?

MR. PETERSON: If I may ask Mr. Youngblood to respond to that.

THE COURT: Sure.

MR. PETERSON: Mr. Youngblood, if you'd step forward.

MR. YOUNGBLOOD: Your Honor, she has a current City of Waco address, 2513 South 26th Street. I've made contact with her in the past at that location. I talked to a black male at that residence yesterday who indicated that that was her residence and she contacted me as per a business card I gave her. Also I spoke with her mother last night at that location indicating that she did live there but she was not going to be there yesterday evening.

THE COURT: So you've spoken to her on the telephone but not in person?

MR. YOUNGBLOOD: Not in person at this time.

MR. PETERSON: In the past he has.

MR. YOUNGBLOOD: In the past I've spoken to her in person.

THE COURT: Well, I don't understand why you don't think that she could be served with a subpoena at some point between now and the time she'd be needed, which wouldn't be next week,

I wouldn't think.

MR. YOUNGBLOOD: Well, the only thing she's indicated she's not going to be here and she's not going to accept and she's going to be --

THE COURT: Well, I don't know what you mean by "accept."

MR. YOUNGBLOOD: Well --

THE COURT: If she's served with a subpoena, she's served with a subpoena. She doesn't have an option to accept it or not, if I'm correct.

MR. YOUNGBLOOD: That's true, sir, but her appearance --

THE COURT: So you're saying she's not going to comply with it?

MR. YOUNGBLOOD: That's my belief that she will not comply with it.

MR. PETERSON: Your Honor, if I may.

THE COURT: Thank you, Mr. Youngblood.

MR. YOUNGBLOOD: Okay.

MR. PETERSON: Our intent was to ask Mr. Youngblood to continue to serve her. Then after she's served if she didn't appear as instructed in the subpoena that then we would then come to the Court and request the writ of attachment and I wanted to bring this to the Court's attention that it was an issue.

THE COURT: Well, doing it in that course of events would be completely normal. If somebody doesn't comply with a

Cross-Examination of Shaylakea Scroggins by Mr. Fields-1626

MR. SNYDER: Your Honor, I object to that question unless he can show some basis on how this witness would know what someone else did.

THE COURT: Sustain the objection.

(Conference between Mr. Peterson and Mr. Fields)

BY MR. FIELDS:

Q. Do you recall on November the 5th, 2001 the phone company calling you while me and Shining Star was on the other end of the line?

A. Yes.

Q. And isn't it true that Star told the phone company that you, whom was my ex-girlfriend, went and got your phone cut on in my name and you calling her house threatening her?

MR. SNYDER: Your Honor, Your Honor, I object. First of all, this is hearsay, and, second of all, he's simply testifying under the guise of asking a question.

THE COURT: Sustain the objection.

BY MR. FIELDS:

Q. Ms. Scroggins, did the phone company cut your phone off?

A. No, sir. They didn't.

Q. They didn't?

A. No.

Q. On November the 5th?

A. No. They didn't.

Cross-Examination of Tanesha Hilliard by Mr. Fields—1356

Q. How often did Star and I conversate via telephone?

A. Every day.

Q. But you're not sure how often me and Shalaykea conversate, are you?

A. No.

Q. Isn't it true, Ms. Hilliard, that Shalaykea was upset because she wasn't getting the attention from me that she desired?

A. Yes.

Q. And isn't it true that as a result of that anger, she lashed out at Star?

A. They had arguments. Yeah.

Q. And isn't it true that on November the 1st or 2nd of 2001 Shalaykea called Star and threatened to kill her if she didn't leave me alone?

A. I didn't know about that.

Q. Can you tell us what me and Star's response was to that? You don't -- you're not sure?

A. If I don't remember the first question, I --

Q. Isn't it true, Ms. Hilliard, that Star and I called and got Shalaykea's phone cut off?

A. Yes.

Q. Do you remember now who wanted to harm Star and who cared about her?

A. Repeat that.

Cross-Examination of Tanesha Hilliard by Mr. Fields 1361

Q. You said in your grand jury statement first when I came to the hospital me and Shining Star was -- well, I'm going to quote you. You say, first him and Suncerey was talking. She sat --

MR. GLOFF: Your Honor, I object to him reading from a document. Is he trying to impeach the witness?

THE COURT: Sustain the objection.

You can't read from a document that's not in evidence, Mr. Fields.

BY MR. FIELDS:

Q. Isn't it true that Star and I was hugging and kissing in the car?

A. Yeah.

MR. FIELDS: I have no further questions, Your Honor.

MR. GLOFF: I have just a couple of questions.

REDIRECT EXAMINATION

BY MR. GLOFF:

Q. Number one, you just said that in response to one of Mr. Fields' questions that he was playing a game between them. Explain to the jury what kind of game he was playing with them.

A. He would like -- okay. He'll tell Suncerey that he don't talk to Shalaykea or he'll tell Shalaykea he don't talk to Suncerey, but then they both -- on his visiting list they both go see him. I mean, that's a game to me. Talking to both



**CITY OF WACO**

Page _1_ of _3_    Case Number: _01-74130_

## Waco Police Department

### Statement of Witnessed Actions

**Statement Of:**

Name: _Shalaykea Scroggins_    Date of Birth: _1-30-83_

Resident Address: _1403 N 9th #C (2009 N.7th)_ City: _Waco_

State: _TX_    Zip Code: _____    Resident Telephone: _235-5320_

Business Address: _N/A_    City: _N/A_

State: _N/A_    Zip Code: _N/A_    Business Telephone: _N/A_

Occupation: _N/A_    Days of the week you work: _N/A_    Hours worked: _N/A_

Name of person who will be able to get in touch with you between the hours of 0800 and 1700:

Name: _Judith Franklin_    Relation: _Mother_

Address: _2009 N.7th_    City: _Waco_

State: _TX_    Zip Code: _____    Telephone: _235-5320_

Officer taking statement: _January_    Badge #: _201_

Time: _1725_    Place: _McLennan County Jail_

### Written Statement of Fact

In your own words, describe in detail exactly what you saw. Include date, time and location of the incident. Put facts in the order in which they occurred. Include suspect description along with vehicle information.

_On the night Sherman Fields escaped, my sister was on the phone with Sherman's mother, Alice Fields. Alice Fields clicked over to call-waiting, when she clicked back she said it was Shining Star that Shining star was at the Hospital. Shining Star said that Sherman had been there and_

_Shalaykea Scroggins_

Page _2_ of _3_        Case Number: _01-74130_

was coming back to get her. Sherman had told her someone at the jail had given him a key to escape. Tanesha Hilliard was with Shining Star when Sherman showed up. The next time, I had contact with Sherman was on Saturday November 10. A ~~little~~ guy knocked at my sisters door and asked for me and told me Sherman was in a car around the corner. I went to meet him. I saw someone flicking the lights. It was Sherman and he was in a small red car with dark tinted windows. He told me to get in so I did. I tried to get him to turn himself in. He said he wasn't going to turn himself in. He said I am gonna be shooting. I asked him about Shining Star. He said he didn't want to talk about. I asked him what he did to the girl. He said "I fucked up, I made a mistake." I asked where is she. He said

I will assist the Waco Police Department in the investigation and prosecution of this case. I have been given the opportunity, before signing this statement, to make any additions or deletions I desire in order that this statement is accurate. I understand if I give a false statement which is material to a criminal investigation I may be prosecuted for False Report to Peace Officer or Law Enforcement Employee. The above is true and correct and happened in Waco, McLennan County, Texas.

Signed this _21_ day of _November_, 200_1_.

Shataykoa Snoggins

Page **3** of **3**    Case Number: **01-74130**

"She's Gone." I got out of the car and he left. I called the Sheriffs department after I couldn't get ahold of the Marshalls. That is the only time he has talked about Shining Star. Since I have been locked up I have talked to Sherman 3-way from the jail, but he didn't want to talk about the girl. All the conversations that Sherman and I have had, I told Sherman the government thinks I am helping him, he gets pissed because he knows I am not helping.

I will assist the Waco Police Department in the investigation and prosecution of this case. I have been given the opportunity, before signing this statement, to make any additions or deletions I desire in order that this statement is accurate. I understand if I give a false statement which is material to a criminal investigation I may be prosecuted for False Report to Peace Officer or Law Enforcement Employee. The above is true and correct and happened in Waco, McLennan County, Texas.

Signed this _____ day of _____, 200_____.

CASE# 01-8754

DATE 11-26-01          PAGE 5 OF 9

STATEMENT OF:

Clothing to put on. We me + Renee started asking about Shining Star. Before I seen him we saw on the 6:00 news she was missing. He said He didn't know. Renee asked how many bullets were in the gun because she knew how many were in it before trayboy gave it to him." He said, 7. She said You killed her or Shot her. It was 7 bullets in there. All he said was it was 6. He loss 2 of them. By then, Trayboy came and told Sherman to go Jump in some car that was outside. Sherman + Trayboy left. I went home about 20 min. after that. I got my phone + went over to my sisters house. I went to sleep About 3 or 4am, I heard the phone ring. It was Sherman saying come outside. I said no + hung up. The next day wich was (Thursday) I returned to my house to cook food for my daughter, a short while after I left the federal agent + the U.S marshalls came to my apartment, locatsa at 1408 8 9th St. looking for Sherman. I told them I didn't know where he was. I told them to leave me a number + I will see what I can do. I went back to my sisters house + stayed all day. About 9:00 p.m Someone knocked on my sisters (Sheris!) door + asked for me. They said Sherman wanted me. So I went outside. and walked down the street. I saw a red

WITNESS: _____          Shalaylea Scroggins

WITNESS: _____                    SIGNATURE

FIELDS 014219

CASE# 01·7154

DATE 11·26·01          PAGE 6 OF 9

STATEMENT OF:

For door car blinking the head lights on + off. So I assume
that was him. I walked up to the drivers side + said
what. He said getin I aint gone do nothing to you,
stop being so scared. So I got in. He said I heard the
laws came to your house. What they say. I told him that
they was just looking for you. I tried to talk him to
turning himself in. He said He wasn't trying to hear it.
I ask where was shining star He said, I fucked up + made
a mistake, she gone. I said gone where. He said gone. He
told me bye. I went home + called the police + told them
that I had just spoken with him personally. I went to
sleep. I don't think I heard from him until that Tuesday or
Wednesday. at 2:00 in the morning. He beat on my sisters
door. And ask for my key. I told him no, + I told him
Trayboy was in jail. He ~~said~~ said forget + left.
He said He would call + leave the number where he was
staying on the caller id. He called the next day
from somebodys phone + told me he was on proctor. So
by that time my sister + Tray boy had been harrasing
me all night today. I guess the police told them if
they found Sherman They would let Trayboy go. So Trayboy
told me to hook up with Renee + try to find him, that

WITNESS: _____          Shadaykea Scoggins

WITNESS: _____                    SIGNATURE

FIELDS 014220

CASE# 01·8754
DATE 11·26·01        PAGE 2 OF 9

STATEMENT OF:

The Police would be watching out for us. So later that day, me & Renee went looked for him & we seen him in a abanoned house on the corner of 17th st. Behind the house. He called my name while I was walking past. I told my sister Renee I thought it was Sherman & to come with me. So we went & he was sitting down on the ground, dressed in black. He had a blue a green hat on. He asked what the hell are you doing down here. I simply just tried to make conversation. I told him get out of dodge because the Police were looking for him. He told us to leave & we left. I phoned a U.S. marshal & told them where sherman was. He got away. About 8:00 pm that night. Sherman called me and said he need to see me. I told him no, whatever else he had to say would have to be on phone. He started off saying. Lakie, I will never hurt you no matter what happens. I said Sherman spit it out. what do have to say. He told me. The night he went to the hospital, He took shining star with him. He took her to the country some where and they talked about a few things. When it was time to take her back she didn't want to go. She kept making excuses not to leave. He said He got so fed up that he seen she did turn to walk away He shot Her in her Head. He said He heard blood bubbling in her throat. So He shot Her again because he didn't want her to suffer.

WITNESS: _J L Spll_____

WITNESS: _ML Cl_____

_Shakaykea Scroggins_
SIGNATURE

FIELDS 014221

·DEC. -10'01(MON) 16:30    US MARSHAL SERV WACO              TEL:254 750 1575              P. 003

CASE# 01-8754
DATE 11-26-01      PAGE 2 OF 9

STATEMENT OF:

Sherman was becoming impaitent. So HE had ME call Trayboy again. I called and told Trayboy that Sherman said to hurry. Trayboy said, to tell Sherman HE was getting him some food becaus HE thought he might be hungry. So I hung up. I told Sherman. about 5 minutes later Tray Boy pulled up with Renee Hampton in the car with him. They had McDonalds sacks in there hand. We all went into the room. I noticed Sherman had a change of clothing in his hand & a small silver hand gun. HE was messing with the bullets. I told him I was ready to go. HE said O.K. As soon As Trayboy take him to get another car HE would come back and get me. So ME & Sherman got back in the car. Trayboy & Renee got back in theres. DOG was sppose to follow them to renee's apartment in the villages on 6th street. Instead Sherman let me out on 9th & he left. about 3 minutes after that Trayboy pulled up & ask where was Sherman. I replied, "I don't know I thought he was with you. Tray boy said, I'm going to see if I can find him, I will call you later. I went into my sisters house. She had told me that she was glad to see me. I walked to the store around the corner

WITNESS: _____              Shalaykea Scroggins
                                                    _____
WITNESS: _____                    SIGNATURE

**FIELDS 014216**

DEC. -10' 01 (MON) 16:30    US MARSHAL SERV WACO                    TEL:254 750 1575                    P. 004

CASE# 01-3754
DATE 11-26-01      PAGE 3 OF 9

STATEMENT OF:

To get something to drink. + a box of Black & milds. When I came back my sister told me. Trayboy called and said he couldn't find Sherman. He hope he didn't do what he said He was going to do. My sister (Shakie) said that Sherman told Trayboy He was going to fuck Shining star off. Trayboy didn't want her too tell me. So I didn't ask him about it. About 1:30 a.m Sherman called me from the motel we were at earlier. I asked him where had he been, he said just riding. While we were talking I heard him or something scraping. I ask what it was, but he said he dont know what I was talking about. He told me he was going to go get Trayboy So He can drop us back off at the room. So about 20 minutes later they picked me up. I noticed Sherman was dressed different. He had on a different shirt + pants. The same orange + white shoes. When we got out. Trayboy handed Sherman $50. That was to check in the room again the next day. So we went in the room. He took a shower and got in the bed. He ask me if I would put those shoes in the trash. The orange shoes. He had some more. Some black ones. I threw them away + double sacked the clothes he had put in the trash. left them sitting where the room service lady could get them.

WITNESS: _____                    Shalaykea Scroggins
WITNESS: _____                                SIGNATURE

FIELDS 014217