Shalaykea Scroggins Grand Jury testimony.                    22

Q. And where did he tell you he was going?

A. He was supposed to follow behind --

Q. To trade cars?

A. -- Trey Boy. Yeah, I was just getting out. You know, he was still following, and I told him to go ahead and let me out and --

Q. Now about what -- what time is this taking place?

A. This about --

Q. Are we at eleven o'clock yet?

A. Yeah, right at 11:00.

Q. Okay.

A. Probably right at 11:00.

Q. So he dropped you off, and where do you go?

A. And I went to my apartment --

Q. Okay.

A. -- and I stayed there for about five minutes and -- no, probably about ten, and Trey Boy came and knocked on my door. He asked me, "Where did Sherman go," and I said, "I don't know where he went; he was supposed to follow behind you." He was like, "Well, I don't know where he at," and I was like, "Well, I don't know where he at because" -- you know, and I was like -- so he told me that he was going to go over to his house -- to his apartment with my sister, and if I

Shalaykea Scroggins Grand Jury testimony.

23

heard from him or if he came by to call him and let him know --

Q.   Okay.

A:   -- so this is like 11:00, and I -- I went to my sister's apartment, and I --

Q.   To Sheekie's?

A.   Yeah, to Sheekie's, and I went to sleep. I got a phone call.  It was Sherman about probably 1:00, maybe 2:00.  I'm not exact of the time.

Q.   Sometime between 1:00 and 2:00 in the morning?

A.   Between 1:00 and 2:00, and he called from the New Road Inn, and he asked me what was I doing, and, you know, I was like, "What are you doing," and he was scraping on something in the background.  I don't know what it was, but I just keep hearing a scraping sound, and I asked myself, "What is you doing, are you scraping on" -- "it sounds like you're scraping something."  He was like, "Girl, I don't know what you're taking about; I'm not scraping nothing, so it must be on your" -- "your phone line," and I was like, "No, you're scraping something, or you're bothering something."  He didn't say nothing, and I was like, "Well, where have you been," and he say he rode around -- he had to go hit a lick.  He hit a lick. That's how he used it.

Direct Examination of Edward Outley by Mr. Snyder——1821

A.   Yes.   That was right after he got out.   As soon as we left Alberta's apartment, he called Suncerey Coleman, Shining Star, on my cell phone when we was on our way to Proctor to tell her that he would be out there in about ten minutes, for her to come outside.   He'll be out there to pick her up and talk to her in about ten minutes.

Q.   Did you go to the hospital?

A.   No, sir.

Q.   Not only then, but any time that night did you go to the Hillcrest Hospital?

A.   No, sir.

Q.   Let's go back to the motel for a minute.   After you left the motel, who was in the car and who was following whom?

A.   After we left the motel, we wasn't really following one another then.   I got in the Jaguar.   Me and Alberta Hampton got in the Jaguar and left and him and Shalaykea had got in the Grand AM and left.

Q.   And where did you go?

A.   I went and took Alberta back to the house and basically was working off my phone going to some of my customers selling crack bites.

Q.   You were selling crack?

A.   Yes, sir.

Q.   And also, sir, is -- you also work, if you will, with

Edward Outley's Grand Jury testimony.

31

got a -- his cousin came pulling through there, and he got a ride with them, got in the car and left, and I called my mama and told her. I said, "Man, I'm going to come over there, because that dude killed this girl and then he started running over here around me and all this old type of stuff thinking he's going to ride around with me and be with me, and it ain't going down like that," and she told me, "You come on over here," and I went to my mama's house, and I was over there for about a week until they called me to come back over. They say -- we got a call saying that me and Fields was at Rene's house, so they called me to come over there, and we came over there.

Q. And that's the night you got arrested?

A. And that's the day I got arrested.

Q. Did you ever have any discussions with Sherman -- did you ever ask him what happened to Shining Star, what happened to that girl?

A. Yeah, after -- after Bird had told me that, I had talked to him. After I left, he called me, told me something had happened when I didn't come back. Didn't nothing happen; I just wasn't coming back.

Q. Right.

A. You know, we -- I told him that the law was -- you know what I'm saying -- hot --

Edward Outley's Grand Jury testimony.

32

Q.  Right.

A.  -- so he was like, "Yeah, man, I'm all right, man; I ain't tripping; I told you something had happened."  I said, "Man, you told him that killed the girl."  He said, "Man, I messed up, man."

Q.  Is that what he said, his exact words?

A.  He said, "Man, I messed up."  That's what he say.  He said it just like this.  He said, "Man, I messed up.  Man, I did it.  Man, I'm going to talk to you about it."  I said, "No, you don't talk to me about it.  I don't even want to know about it."  You know what I'm saying, just like that, and I left it at that.

Q.  Did he ever tell you any details about it?

A.  No.  He never told me any details, but, you know, my little cousins and dudes that he was running -- running around those spots out there, just ripping and running and stuff, saying that he was coming around telling people about it, and there were a lot of people that had different type of stories and stuff, but he was telling all of them that he did it, you know.

Q.  Do you know where -- do you know where he killed her?

A.  No, I don't know exactly where.  I guess it happened -- from what -- I know from what Bird and

Direct Examination of Edward Outley by Mr. Snyder——1826

A.    The exact words was -- I approached him because I heard that he had told Alberta and Shalaykea that he had, you know, murdered her and I told -- I asked him, "Man, you telling these girls that you done murdered this girl, man?"  And he say, "Yeah.  I messed up."  And I stopped him.  I told him I don't even want to know what happened, man.

Q.    And why didn't you not want to know what had happened?

A.    Because, you know, it -- it's -- you know, I don't really want to be involved in it, but I was so what kind of like caught up, involved in it because -- you know what I'm saying -- we --

Q.    You had given him the gun?

A.    Yes, sir.

Q.    Is that fair to say?

A.    Yes, sir.

Q.    After that did you try to avoid Sherman Fields?

A.    Yes, sir.

Q.    Why?

A.    Because I didn't -- he had broke out of jail and then talking about this girl was murdered or whatever.  I didn't want him around me.

Q.    And in fact -- is -- the law fell all over you, correct?

A.    Yes, sir.



NOV-13-2003   4:06PM   US-ATTY WD TX PROS+ATSOFFICE

①

＊ FAXED – Special Investigative Section a request on 9-9-03    409-626-3703 (1412hc

＊ Unit Manager Buddy Parker called 9-11-03 409-727-8188 ext 4311

William Young, Jr.    #56038-080

Interview Conduct VIA TELEPHONE 9-11-03    1310 hrs

Young had previously requested an interview over the phone concerning Edward Outley, and the Sherman Fields Case.

Young states that Edward Outley, also known as Treyboy was originally sent to his unit and that they had conversations about what happened in Waco. Outley was trying to impress everyone after his arrival to the penitentiary where Young is confined. Outley has since been transferred to the Medium Security Unit across from where Young is being housed which is the Maximum Security Unit in Beaumont, Tx.



②

Young states Outley told him what had gone on concerning the escape and eventual killing of the girl.

Young states Outley said Sherman sent word that he was getting ready to escape and would be needing some things. Outley also told Young that if Outley had known Sherman was going to do him like that, Outley would not have helped his ass out when he escaped from the jail. According to Outley, After Sherman escaped he ran to where Outley was at. Sherman then asked Outley for a gun and money. Outley gave Sherman a gun and in case he needed it but Outley told Sherman not to kill anyone with it.

Outley Also told Young that Outley and Renea Sister After was with his former girlfriends sister Alberta Renea Hampton when sherman killed that girl. Outley said Sherman took the girl out of the car and left. Outley heard 2 gunshots

NOV. 13. 2003    4:07PM    US DIST. COURT PROBATION OFFICE

③

Sherman came back to the car and said "I Killed that Girl." Outley told Young that the girl was shot 2 times in the Head and Young could bet his money on that.

Outley told Young that Outley was the only person to try and hide Sherman, by using Outley's Uncle, Aunt, and friends house but that someone told on them to get them in trouble.

Young told Outley he read paper and read about a 32 gun being found where Dotson killed the Baylor Student. Young also told Outley that the gun didn't have anything to do with Dotson's he thought.

Outley got Mad and said someone had to have lead them to the gun he gave Sherman.

NOV. 13. 2003  4:00PM  US ATTY WDIX PROSKRIJOFFICE



Young thinks Outley misunderstood
what he had told him about
the article with the gun.

After Outley read the paper-
Outley said her body was
found further out and told
Young "I thought you said
they found Skermans gun
where they found Dotsons Roommate.

Young told Outley that was not
what he said.

Shalaykea Scroggins Grand Jury testimony.                    36

like 5:00, and I asked him where was Sherman at, because Sherman wasn't with -- him and Sherman, you know, he left Sherman -- he had left the apartment with Sherman, and my sister was still at the apartment, so he told me he was over -- is this the 7th?  Now, okay, this is the 7th.  He told me he was over there, and I told him I was going to walk over there and, you know, see, so I walked over there, and him and my sister was --

Q.  This is at NaNa's?

A.  This is NaNa's --

Q.  Okay.

A.  -- and it was -- him and my sister were talking, and he had the gun again.

Q.  The same gun?

A.  The same little, silver gun, playing with the bullets, but this time he only had a little bullets, and my sister was asking him -- Rene, she was like -- wait a minute.  By then we had seen that the girl, Shining Star, was missing, so we knew this by now.  It was on the newsstand, last seen with Sherman --

Q.  Okay.

A.  -- so -- but my sister was asking him where did all the bullets go that was inside the gun because it was her gun.  Trey Boy had gave her that gun, and it

Shar...

It's all over with!!!! You gave me that center fucking 32 and if they need you you dam should need there. I aint taking no time. & I sure kinna tell them everything they wanna heard for my freedom. I was free trying to have things. Cuddy brought this on his self. He wanted to get it and kill that girl. thats him!!!! Youre best bet is to tell them that you gave me that gun. They are gone come ask you and all you gotta to is say that you gave me the gun like you did. But whatever they got you charged with tell them to drop that bullshit after its all over with. Now Shar, this aint me but being locked up for so years aint me then. So you can play hard if you want to but you best to be real with youreself. Fuck that dum shit. lahke steady telling shit and I gotta shit about me. What about you ?!?

Tray Boy

Q. A.
I didnt have no gun so you gave me that 35. You aint and it get in no trouble for giving me that gun. you did that and I let nosan get it. I didnt know that he was gonna kill that girl and the bottom line is "You need to be real are get fucked over!!!" You ant with me and Sherman so you cant get in trouble. All you did was

1767

Letter from Treyboy to Christian Chae Walker

Shae...

It's all over with!!! You gave me that motherfucking .32 and if they need you you damn show'll need them. I ain't taking no time. I am finna tell them everything they wanna know for my freedom. I was free trying to have thiangs. Cuddy brought this on hisself. He wanted to get out and kill that girl. That's him!!! Your best bet is to tell them that you gave me that gun? (They are gone come ask you and all you gotta do is say that you gave me, the gun like you did. But whatever they got you charged with tell / them to drop that bullshit after it's all over with.

Now Shae, this ain't me but being locked up for fifty years ain't me either. So you can play hard if you want to but you best to be real with yourself. Fuck that dumb shit. Lakie steady telling shit and I gotta think about me. What about you?!?

                                        Treyboy

P.S.

I didn't have no gun so you gave me that .32. You ain't and, can't get in no trouble for giving me that gun./ You did that and I let Sherman get it. I didn't know that he was gonna kill that girl and the bottom line is " You need to be real or get fucked over!!!" You wasn't with me and Sherman so you can't get in trouble. All you did was...

                        (Back side)

...gave me that .32 days before he broke out. Keep it real with yourself and go help your mama and sister them. I am!!!

    'Shae I'm finna get you over here with me'

                                        HOLLAR

Direct Examination of William Young by Mr. Fields—1941

that's when you contacted Steve January of the Waco Police Department and told them what Outley had told you, correct?

A.   Yes.

MR. FIELDS:   I pass the witness.

CROSS-EXAMINATION

BY MR. GLOFF:

Q.   Mr. Young, my name is Greg Gloff.  We've met before, haven't we?

A.   Right.

Q.   I want to make sure that we're clear about this. Mr. Fields just asked you if Mr. Outley admitted that he was there at the murder.  Mr. Outley didn't --

A.   No.  No.

Q.   Mr. Outley didn't tell you he was present when the murder took place, did he?

A.   No.  No.  No.

Q.   Mr. Outley didn't tell you that he was at the murder scene at all, did he?

A.   No.  He didn't.

Q.   And he didn't tell you that he knew anything about the murder, did he?

A.   No.

Q.   But you told people that, didn't you?

A.   Me?

Q.   Yeah.

Cross-Examination of William Young by Mr. Gloff———1942

A.    No.    He told me the girl was shot in the head two times.

Q.    But he didn't tell you that he was there, did he?

A.    No.

Q.    So when you answered that question awhile ago when Mr. Fields asked you, were you confused about what he was asking you?

A.    Right.

MR. GLOFF:  Pass the witness.

MR. FIELDS:  I have no further questions, Your Honor.

THE COURT:  You may step down, sir.

(Conference between Mr. Fields and defense counsel)

MR. FIELDS:  The defense calls Mr. Timothy Robinson.

(The witness was sworn)

DIRECT EXAMINATION

BY MR. FIELDS:

Q.    Mr. Robinson, --

A.    Yes, sir.

Q.    -- would you please state and spell your name for the court reporter?

A.    Timothy Donnell Robinson, T-i-m-o-t-h-y, D-o-n-n-e-l-l, R-o-b-i-n-s-o-n.

Q.    Mr. Robinson, I want to direct your attention to January 2001.  And at this time you and I were incarcerated together at the McLennan County Jail; am I correct?

## MCLENNAN COUNTY CORRECTIONAL CENTER
## INCIDENT / MEDICAL REPORT

| Name | Race | Sex | DOB | ID# |
|---|---|---|---|---|
| TRACY WILLIAMS | B | F | 1-16-62 | 56139 |
| MISTY Smallwood | W | F | 3-16-75 | 117306 |
| SHALAYKEA Scroggins | B | F | 1-30-83 | 116616 |

| Incident Date | Incident Time | Cell Location | Location of Incident | Page # |
|---|---|---|---|---|
| 11-22-01 | 1915 | A1 | A-WING | 1 OF 2 |

Jail Rules (if applicable) / General Orders (if applicable)

ON THE ABOVE DATE AS INMATES FROM A1 WERE COMING IN FROM GYM. INMATE TRACY WILLIAMS #56139 TOLD ME I NEED TO TALK TO YOU. I SAID OK. INMATE WILLIAMS SAID "SHERMAN FIELDS KILLED THAT GIRL. HE THREW HER BODY OUT IN DOWNSVILLE." HE SHOT HER TWICE IN THE HEAD. THE FIRST SHOT SHE DIDN'T DIE, SHE WAS MAKING A GURGLING SOUND SO I SHOT HER AGAIN." INMATE WILLIAMS ALSO STATED THAT "FIELDS WOULD go OUT TO WHERE HE DUMPED THE BODY every so OFTEN TO SEE IF ANYONE HAD FOUND HER". INMATE WILLIAMS SAID "WHERE THE BODY is LAYING THERE IS A BUNCH OF MATTRESSES AND STUFF THAT people HAD DUMPED. LATER ON IN THE DAY INMATE MISTY SMALLWOOD #117306 SENT A REQUEST SLIP TO A WING ASKING TO SPEAK WITH THE FEDS ABOUT A HOMICIDE CASE. I CALLED INMATE SMALLWOOD TO THE PICKETT AND ASKED HER WHAT DID SHE NEED TO TALK TO THE FEDS ABOUT EXACTLY. INMATE SMALLWOOD SAID "SCROGGINS IS RUNNING HER HEAD ABOUT HER BOYFRIEND KILLING THAT girl." SHALAYKEA SCROGGINS' #116616 IS IN TANK A1 WITH THE TWO INMATES MENTIONED ABOVE. INMATE SMALLWOOD TOLD ME EVERYTHING THAT INMATE WILLIAMS HAD TOLD ME EARLIER, EXCEPT FOR THE PART THAT FIELDS WANTED TO KNOW WHEN SCROGGINS WENT TO THE GYM

| Signature of Reporting Officer | Name Of Reporting Officer and Rank PRINT |
|---|---|
| | KALLA R. ACTON / Jailer |

| Signature of Sgt. or Cpl. on Duty | Name of Sgt. or Cpl. on Duty PRINT |
|---|---|
| | SGT. THOMAS A. WARD SGT. |

A copy of the Disciplinary Report will be delivered to the inmate within 24 hours of preparation and at least 24 hours prior to a hearing. Confirmation of Service and Receipt is to be filled out when served. If additional space is needed or more than one inmate is involved use additional report forms. *DO NOT USE BACK OF FORM*

| Reviewed and Entered on Computer By: | Date: |
|---|---|

J-24

Revised 05-01-00

## MCLENNAN COUNTY CORRECTIONAL CENTER
### INCIDENT / MEDICAL REPORT

| Name: T. William M. Smallwood S. Scroggins | | | Race: B W B | Sex: F F | DOB: 1-16-62 3-16-75 1-30-83 | CID: 5139 17706 16616 |
|---|---|---|---|---|---|---|
| Incident Date: 1-22-01 | Incident Time: 1905 | Cell Location: A1 | Location of Incident: A-WING | | | Page #: 2 of 2 |

| Jail Rule # (if applicable): | General Order # (if applicable): |
|---|---|

HE TOLD HER HE WAS GOING TO BUST HER OUT OF JAIL. BECAUSE HE HAS A TECH 9. ALSO INMATE SCROGGINS SAID THAT FIELDS IS RIDING IN THE HOOD AROUND PARKSIDE AND HE IS GOING BACK AND FORTH TO DALLAS TO A CLUB CALLED CRYBABIES. INMATE SCROGGINS WAS EMPLOYED AT CRYBABIES AT SOME POINT AND TIME. INMATE SMALLWOOD SAID SCROGGINS IS CALLING FIELDS ON A THREE-WAY CALL ALMOST EVERY NIGHT. FIELDS TOLD SCROGGINS THAT HE WAS NOT GOING BACK TO JAIL THAT THE LAW WOULD HAVE TO KILL HIM FIRST.

| Signature Of Reporting Officer: | Name Of Reporting Officer and Rank PRINT: KARLA R. ALTON / Jailer |
|---|---|
| Signature of Sgt. or Cpl. on Duty: SGT. | Name of Sgt. or Cpl. on Duty PRINT: THOMAS A. WOOD SGT. |

A copy of the Disciplinary Report will be delivered to the inmate within 24 hours of preparation and at least 24 hours prior to a hearing. Confirmation of Service and Receipt is to be filled out when served. If additional space is needed or more than one inmate is involved use additional report forms. *DO NOT USE BACK OF FORM*

| Reviewed and Entered on Computer By: | Date: |
|---|---|

J-24

Revised 05-01-00

CASE# 01-8754
DATE 1-22-01    PAGE 1 OF 2

STATEMENT OF:

My Name is Misty Smallwood. I'm a inmate at the McCleanon Co. Jail. There's a woman in my tank named Lakie Scroggins. Sherman Feild's girl friend. She has told me many things about that missing girl from Hilcrest Hospital in Waco, Tx. First off is that, that girl is dead. That Sherman killed her. He shot her in the Head twice, and that he heard gurgiling sounds in her throat. Lakie said; that, that girl was always getting in the way, of hers and Shermans relationship and that was her worst enemy (the girl) anyways. That she didn't care that that girl was dead, She shouldn't of gotten in the way. Lakie Snal Lakie Scroggins talked to Sherman on the phone everyday 4 or 5 times a day. She was calling her sisters' Sheki's a house (296-1243) and calling Sherman 3 way. Shelakie also said, that, Sherman used to take her out there were the body was dumped at. Scroggins said that the girls body was going out towards the lake through the light and there was a bunch of trees and it was real dark. They used to go out there and smoke "blunts" and ride around, that also this place the was had a couple of mattresses out there. Lakie also said that She couldn't believe no-one had found the girls body was some day; Which made me think that the girls body was some close to the road. Lakie also said, She and Sherman ere in a motel room the night Sherman escaped they

WITNESS: _____    SIGNATURE

WITNESS: M-R-Cog

had sex and Sherman took off for a couple of hours "2" nd when he came back to the motel he was scrubbing in the rest room of the Motel. She had

CASE# 01-8754

DATE 11-22-01    PAGE 2 OF 2

STATEMENT OF:

continued..... as I was saying from the 1st page. They got a motel Sherman left for two hours, came back to Room, went to the restroom and started cleaning his Shoes. Lakie later called "someone" I dont know who, and they told her that girl was missing from the hospital. She asked Sherman did he Kidnap that girl? and at first Sherman Kept telling her "no". Sometime within the next couple of days she kept asked him again about the girl and he admitted to killing the girl. Sherman and Lakie are two of the most cold hearted people I have ever met. If yall need anything else from me I will be more than willing to testify or take a lie detector test to prove Im not Kiddin.

In return all I ask is that me and my mother who is Gala Ruth Smallwood be protected from those two and theyre "friends" out there. My mom is currently residing here at the McClanon co Jail also. Unfortunately, She is fixing to be at State Jail for 6 more months. Please dont let anything happen to her or me. I hope to get probation cus I have alot of restitution to pay. Plus people in prison will kill me. As Crazy as they are they know people in these prisons. Thanks

SIGNATURE

WITNESS: MR Cole

WITNESS:

Direct Examination of Misty Smallwood by Mr. Fields—1953

A.    I don't know.  What's his name?

Q.    Rob Swanton.

A.    Yes.  He defended me.

Q.    And when was this?

A.    March of 2002.

Q.    And have you spoken to him since then?

A.    No.

Q.    Do you know my investigator Mr. Don Youngblood?

A.    No.

Q.    Have you ever met a woman that goes by the name of Shalaykea Scroggins?

A.    Yes.

Q.    When did you meet her?

A.    November 2001.

Q.    And where did you meet her at?

A.    At McLennan County Jail.

Q.    How long were you all in the jail together?

A.    Four months, I think.

Q.    Did y'all ever talk?

A.    Yes.

Q.    Did she ever talk to you about a murder?

A.    Yes.

Q.    When did she talk to you about the murder?

A.    In November 2001.

Q.    Did she tell you privately or did other people hear

Direct Examination of Misty Smallwood by Mr. Fields—1954

what she had to say?

A.    Well, there was eight of us in there and she pretty much spoke about it pretty freely.

Q.    Who did she say had been killed?

A.    Sherman's ex-girlfriend.

Q.    And did she say whether or not she was present at the time of the murder?

A.    No.

(Conference between Mr. Fields and Mr. Peterson)

BY MR. FIELDS:

Q.    Ms. Smallwood, did Shalaykea Scroggins ever describe like any details to that murder?

MR. SNYDER:  Your Honor, I'm going to object on the grounds of hearsay.

THE COURT:  Sustained.

MR. FIELDS:  Your Honor, I'm not offering it for the truth of the matter asserted.  I'm using it to impeach Laykea. Laykea said she only said -- Laykea said that she only told U.S. Marshals and U.S. attorneys about the murders, that she never told anyone else.

MR. SNYDER:  But he didn't specifically confront her with the predicate questions as required by the rule.

THE COURT:  Sustain the objection.

MR. FIELDS:  I pass the witness, Your Honor.

CROSS-EXAMINATION

## LENNAN COUNTY SHERIFF'S OFFICE
## )LLOW-UP REPORT

Case No.     01-8754
Report No.   01-8754.28
report Date:  11/29/01

MCLENNAN COUNTY
SHERIFF'S OFFICE
219 N 6TH
WACO, TX 76701
254 757-5108

**1**

Page 1 of 1

| | | | | |
|---|---|---|---|---|
| Subject: | HOMICIDE | | | |
| Case Report Status | I - IN PROCESS | Date Entered | 11/29/01 9:27:59 AM | Reporting Officer |
| | | Entered By | 0023 - WILLIS, TAMMA | 1826 COLYER MORRIS |
| Occurred On (and Between) | 11/21/01 5:22:00 PM | Date Verified | | |
| | | Verified By | | |
| | | Date Approved | | |
| Location | JERICHO LANE (BETWEEN HILLIARD LN & ESTELLA LN) | Approved By | | Assisted By |
| Census/Geo Grid | G4 - GRID 4 | Connecting Cases Disposition | ACTIVE | |
| Call Source | OFFICE | Clearance Reason Date of Clearance | | |
| Vehicle Activity | | Reporting Agency | MCLENNAN COUNTY SHERIFF'S OFFICE | |
| Vehicle Traveling Cross Street | | Division Notified | CID | |
| Means Other Means Motive Other Motives | | | | |

Report Narrative

ON 11-27-01, MYSELF AND DET. SPILLMAN DID GO TO HWY 6 JAIL TO SPEAK WITH EDWARD OUTLEY III, AKA TREY BOY. DET. SPILLMAN DID READ OUTLEY HIS MIRANDA WARNINGS AND WE DID BEGIN TO DISCUSS SHERMAN FIELDS.

DURING THE COURSE OF OUR DISCUSSION OUTLEY DID TELL US THAT HE RENTED A RED GRAND AM BELONGING TO ROGER THOMISON ON THE SAME EVENING FIELDS BROKE OUT OF THE CIVIGENICS JAIL AND ON THAT SAME EVENING OUTLEY TOLD US HE SAW FIELDS A COUPLE OF TIMES. OUTLEY SAID HE SAW FIELDS AT THE NEW ROAD INN WITH SHALAYKEA SCROGGINS. OUTLEY ALSO TOLD ME THAT WHEN THE RENT TIME WAS UP ON THE GRAND AM HE RENTED A BLUE JAGUAR AND GAVE THE KEYS TO THE GRAND AM TO ALVIN FIELDS, AKA BIRD, B/M, DOB 5-13-82.

AT THAT POINT I ASKED TREY BOY IF RENTED THE CAR FOR FIELDS AND HE SAID THAT WHEN HE GAVE THE KEYS TO BIRD HE KNEW THAT SHERMAN WOULD TAKE POSSESSION OF THE CAR AND THAT IS THE REASON HE GAVE THE KEYS TO BIRD.

I HAVE NO FURTHER INFORMATION.

## )ffense Detail: 0911 - HOMICIDE - WILLFUL

| | | | | |
|---|---|---|---|---|
| Offense Description | 0911 - HOMICIDE - WILLFUL | | | |
| IBR Code | 09A - MURDER AND NONNEGLIGENT MANSLAUGHTER | Location | 13 - HIGHWAY/ROAD/ALLEY | |
| IBR Group | A | Offense Completed? | YES | No. Prem. Entered |
| Crime Against | PE | Hate/Bias | 88 - NONE (NO BIAS) | Entry Method |
| Using | | Domestic Violence | NO | Type Security |
| Criminal Activity | | | | Tools Used |
| Weapons/Force | 95 - UNKNOWN | | | |

RMS_CR.rtf v2f

Printed: November 29, 2001 - 10:02 AM

Shalaykea Scroggins Grand Jury testimony.                    17

that pay phone and call him again, so I -- I made that phone call and asked him -- you know, Sherman was like, "Why you all taking so long," and he was like -- Trey -- Outley said he getting food.

Q.   You can call him Trey Boy.   That's fine.

A.   Well, Trey Boy said he was getting food, because he knew that Sherman might be -- you know, might be hungry, so I got back in the car, and I -- I -- then I hung up, and I got back in the car, and told him what Trey Boy said and --

Q.   And what did he say?

A.   He was like, "Okay, did he say they're on their way now," and I was like, "Yeah," so we sat there about five more minutes, and he hadn't -- Trey Boy hadn't made it, so he told me to call again, so I got out and called on the same pay phone again, and by that time they was -- on his -- on his cell phone there was -- he said they was coming over the bridge or something, so I got back in the car, and about a minute after that they made it, and we got in the -- so they came.   They was driving a -- him and my other sister, Rene, Alberta Hampton, they was driving a blue -- it might have been a Jaguar, tinted windows, but -- so he got out, and they showed us where the room was at, and all four of us went in, me, Sherman, Trey Boy, and

# SCOTT PETERSON
## ATTORNEY AT LAW

BOARD CERTIFIED, CRIMINAL LAW
TEXAS BOARD OF LEGAL SPECIALIZATION
STATE BAR OF TEXAS

1701 AUSTIN AVENUE
WACO, TEXAS 76701-1741

TELEPHONE (254) 753-3100
TELEFAX (254) 753-5122

February 28, 2002

Sherman Lamont Fields
McLennan County Jail
3201 E. Highway 6
Waco, Texas 76705

RE:  State of Texas v. Sherman Lamont Fields
     Case No. 2002-0050-C

     U.S.A. vs. Sherman Lamont Fields
     Case No. W-01-CR-114

Dear Mr. Fields:

Enclosed is a copy of the state district court's notice that your aggravated assault case has been set for trial on *Monday, May 20, 2002 at 9:00 a.m.* I spoke with the prosecutor about this case to see if he still planned to take it to trial but he was non-committal. I have learned that LaDon King is in prison and they know he is not a very credible witness against you. I must, however, continue to treat the charges against you seriously as the state has other witnesses and the case is set for trial.

With regard to your federal charges, both the escape case and the felon in possession of ammunition and firearm cases are set for trial on *Monday, March 25, 2002 at 9:00 a.m.* The last time we spoke you indicated that you wanted a trail on each case so I have not requested that your cases be removed from the trial docket to the plea docket.

Please recall that both the state and federal prosecutors have mentioned to me that you may be indicted for carjacking and for murder or capital murder. They are unwilling to make any kind of deal on all of these cases at this time, but they are still interested in talking to you. They just are not willing to make any deals. I do not see how talking to them could help you if you intend to go to trial and are not interested in making a deal. I have recently learned from a local attorney that they prosecution is seeking "jailhouse testimony" from certain individuals who you may have shared a cell with in the past. I know you are now in isolation but please do not talk about your cases with anyone.

I will be out of town next week but plan to visit you personally the week of March 11th.

Sincerely,

Scott Peterson

Scott Peterson

SP/jsp
Enc.

Douglas Kunze's Grand Jury testimony.                                    61

of him and not calling the police right away?

THE WITNESS: I can't tell you what went through her head.

GRAND JUROR: I don't understand, I guess.

GRAND JUROR: Yeah, that's the same with "Lakie." "Lakie" says he sits there and tells her in the motel room that one of the bullets is for her, and then he goes back and picks her up, and she spends the night with him. It doesn't make a whole lot of sense.

THE GRAND JURY FOREMAN: And the first time he came to kill her and then backed out.

GRAND JUROR: "If he can escape from a federal prison, he can get to me and kill me."

MR. GLOFF: And there's -- there's --

Q. (BY MR. GLOFF) Did Tanesha Hilliard make any type of claim that she made any type of phone calls to try and find out whether or not he had actually escaped or whether or not he was on -- out on bond or something like that?

A. Yes. She did make calls down to CiviGenics, she said, to see because she couldn't believe it herself when she saw him at the hospital.

Q. And did she get any kind of straight answer?

A. No, at the time.

THE REPORTER: I -- I need paper.

MR. GLOFF: Oh, go ahead.

Johnny Spillman's Grand Jury testimony.                                    5

present at the time and also a gentleman that was asleep named Cream which was the actual father of the child that Suncerey had just had.

Q.   And that child was premature and was in the hospital?

A.   Yes, sir, and she was taking -- she was there taking classes for post-natal care for -- for a premature child --

Q.   Okay.

A.   -- and he came in. He picks up Cream's cell phone -- cellular phone and starting scrolling through the numbers and -- and at this time became very irate, told her that he needed to talk to her outside, which she did leave with him. At this time Taniesha Hillard also realized that Suncerey had money that belonged to her that was in -- in her pocket, and she wanted it back.

Q.   In Suncerey's pocket?

A.   Yes, sir, so she went down in -- into the lobby and -- and called them, and she was able to get her money back, and at this time Suncerey and -- and Fields left in the red Grand Am.

During this time my -- my agency -- several agencies was -- was already notified of the escape. The original -- actual original report was

Chris Casson's Grand Jury testimony.                                          6

phone call to the room. He comes back and enters the hospital and goes into the actual room where they are in the IC -- neonatal ward, I think, on the third floor.

In the room is the father of this infant. He is asleep on the bed in the hospital. It's one of these rooms where families can stay. Also in the room is a lady by the name of Taniesha Hillard. She is a relative of Fields, third or fourth cousin down the line. She, coincidentally, also is an employee of the Civogenics jail, the downtown detention facility, who according to her report to us was on maternity leave at if time. She's in the room, and then, of course, you have Suncerey Coleman, a/k/a "Shining Star," in the room.

The father of the baby, a/k/a -- his nick -- his street name is "Cream." I believe his first -- oh, God, I forgot his first name now. Anyway, he is on the bed asleep. Sherman Fields goes into the room, looks at his cell phone, apparently sees numbers on the man's cell phone that he recognizes, becomes apparently, according to -- according to Ms. Hillard, angry. He and Suncerey Coleman leave the room to get --

Q. Mr. Fields and --



# Escapee believed still in Waco area

## Search focused locally; family fears for woman said to be with him

By MIKE ANDERSON and PAUL JONES
Tribune-Herald staff writers

Authorities continued to search Friday for an inmate whose escape from a downtown jail prompted the mother of a woman believed to be with him to say she is worried about her daughter.

Sherman Lamont Fields, 27, of Waco, reportedly used a fire escape to break out of the third floor of the McLennan County Detention Center on Tuesday, prompting a massive search.

McLennan County Sheriff Larry Lynch said Friday he believes Fields is in the Waco area. The U.S. Marshals Service and other local law enforcement agencies are involved in the search.

Sherman Lamont Fields, 27, reportedly used a fire escape to break out of the McLennan County Detention Center on Tuesday.

"We have alerted everybody, and we are looking for him very actively" Lynch said. "We are putting out the dragnet."

Fields was being held at the privately-run jail on a federal charge of being a felon in possession of a firearm. That count stemmed from a Sept. 11, 2000, attempted murder charge for which he was indicted in January, records show. Fields previously served eight years for an attempted murder charge connected to a drive-by shooting in Waco in 1992.

Authorities are investigating whether a woman, Suncerey Coleman, 24, of Waco, is with Fields. Coleman's mother, Lela McMillon, said Fields visited her daughter in her room at Hillcrest Baptist Medical Center on Tuesday night. McMillon said her daughter was staying overnight at Hillcrest so she could get used to caring for her baby, who was about to be released from the hospital after being born prematurely two months ago.

McMillon said someone who was in the room with her daughter saw Fields at the hospital. The witness, who declined be identified because of safety concerns, said Fields called the hospital room, and Coleman went to meet him in the parking lot. Coleman returned the room, the witness said, but a short time

Please see ESCAPEE, Page 3B

## ESCAPEE
### Woman's family waits, worries
■ From Page 1B

later Fields reportedly came to the room and asked Coleman to step outside. She never returned, the witness said.

Coleman's sister, Josalyn Rawlins, said her sister had left word with a cousin that she would be in the hospital if Fields should call looking for her.

"She met him in Waco just before he was arrested," McMillon said. "She wrote to him and visited him in jail. I am worried because I think she was angry because she had a baby with another man."

The person who reportedly saw Fields at the hospital said he did not appear angry at the time.

McMillon said her family has pulled together while awaiting word about Coleman.

"Everybody's just holding on," she said. "We are praying she returns to us alive and safe. He's such a bad boy, why won't he let her go? She's got three kids, and one's a baby! She has a family who loves her."

Anyone with information in the case should call the McLennan County Sheriff's Department at 757-5222. Fields is 5 feet 9 inches tall and weighs 187 pounds.

Mike Anderson can be reached at manderson@wacotrib.com or at 757-5755.

Cross-Examination of Tanesha Hilliard by Mr. Fields—1350

A.   No.

Q.   Have you ever known me to act violent towards Shining Star?

A.   No!

Q.   Was I upset when I came to the hospital either the first time or the second time?

A.   No.

Q.   Have you ever heard me say that I thought Star's baby was mine?

A.   No.

Q.   Isn't it true that I knew Star's baby was by Cream?

A.   Yes.

Q.   Ms. Hilliard, do you know why Star's baby was born premature?

A.   No.

Q.   Isn't it true that Star drunk liquor and vinegar in an attempt to abort --

MR. GLOFF:   I'm going to object to that.  That's irrelevant.  She said she didn't know.

THE COURT:   Sustained.

BY MR. FIELDS:

Q.   Ms. Hilliard, isn't it true that Star and I made jokes about the issue -- the whole issue of her and Cream?

A.   I don't know.

Q.   Do you remember Star making a statement, quote, "I

————Direct Examination of Lutrill Payne by Mr. Fields————1936—

MR. GLOFF:  Nothing further, Your Honor.

THE COURT:  You may step down.

MR. FIELDS:  The defense calls Mr. William Young.

(Conference between Mr. Fields and Mr. Swanton)

MR. FIELDS:  Your Honor, can they stop him from getting that witness because one of our other witnesses is back.

THE COURT:  Which one do you want?

MR. FIELDS:  The one out there first.

THE COURT:  Who's that?

MR. FIELDS:  The defense calls Mr. Lutrill Payne.

(The witness was sworn)

DIRECT EXAMINATION

BY MR. FIELDS:

Q.    Mr. Payne, would you state your name and spell it for the court reporter?

A.    Lutrill Payne, L-u-t-r-i-l-l, Payne, P-a-y-n-e.

Q.    Mr. Payne, I want to direct your attention to the night of November the 6th, 2001.  Do you recall renting your car out to an individual?

A.    Sir, at that particular time I was a drug user.  A lot I don't recall.  Particular nights are fuzzy with me.

Q.    But you do rent your car out, correct?

A.    I have done that before, sir.

Q.    Mr. Payne, what color is your car?

A.    It's a Jaguar, gold, sir.

Cross-Examination of Lutrill Payne by Mr. Snyder———1937

Q.    It's a gold Jaguar?

MR. FIELDS:   I pass the witness, Your Honor.

CROSS-EXAMINATION

BY MR. SNYDER:

Q.    Did your daddy used to have a Jaguar?

A.    Yes, sir.

Q.    What color was it?

A.    Blue.

MR. SNYDER:  Nothing further.

REDIRECT EXAMINATION

BY MR. FIELDS:

Q.    Mr. Payne, do you also rent your daddy's Jaguar out?

A.    Sir, my father was killed in 1998 in his Jaguar.

Q.    And the Jaguar was totaled or something?

A.    Sir, he was killed in that car and that car was totalled.

Q.    So on November 2001 you only had the gold Jaguar, correct?

A.    Yes, sir

MR. FIELDS:  I have no further questions.

RECROSS-EXAMINATION

BY MR. SNYDER:

Q.    But a lot of people knew and saw you in the blue Jaguar, right?

A.    No, sir.

Recross-Examination of Lutrill Payne by Mr. Snyder——1938

Q.    But people had seen it, correct?  You were living with your parents?

A.    Yes, sir.

Q.    And people had seen it?

A.    People may.  Sir, my father had the car for a short time before he was killed in it.

Q.    And, oh, by the way, is -- it was the government that tracked you down, correct, and first came and talked to you about this?

A.    Yes, sir.

MR. SNYDER:  Nothing further.

THE COURT:  You may step down, sir.

MR. FIELDS:  Your Honor, can I ask him one more question?

THE COURT:  All right.

                    FURTHER REDIRECT EXAMINATION

BY MR. FIELDS:

Q.    Mr. Payne, when the government tracked you down, wasn't it because they got your name off a ledger at a motel?

MR. SNYDER:  Your Honor, not only is that argumentative, but that is just blatantly false.

THE COURT:  It's argumentative.  Sustained.

MR. FIELDS:  I have no further questions, Your Honor.

THE COURT:  You may step down, sir.

THE WITNESS:  Thank you, sir.

MR. FIELDS:  The defense calls Mr. William Young.

| DEPARTMENT OF THE TREASURY<br>BUREAU OF ALCOHOL, TOBACCO AND FIREARMS<br>REPORT OF INVESTIGATION | Page 1 of 2 |
| --- | --- |

| ADDRESSED TO:<br>Special Agent in Charge<br>Houston Field Division | MONITORED INVESTIGATION INFORMATION:<br>Houston Field Division<br>FY-04<br>Report 020 |
| --- | --- |

**TITLE OF INVESTIGATION:**
FIELDS, Sherman Lamont

| CASE NUMBER:<br>782010-02-0042 | REPORT NUMBER:<br>20 |
| --- | --- |

**TYPE OF REPORT:** *(Check Applicable Boxes)*

| X | REPORT OF INVESTIGATION | | COLLATERAL REPLY |
| --- | --- | --- | --- |
| | REPORT OF INTELLIGENCE | | |

| SUBMITTED BY *(Name)*<br>Douglas J. Kunze | SUBMITTED BY *(Title and Office)*<br>Special Agent, Waco Satellite Office | SUBMITTED BY *(Date)*<br>12/18/2003 |
| --- | --- | --- |
| REVIEWED BY *(Name)*<br>Mark W. Curtin | REVIEWED BY *(Title and Office)*<br>Resident Agent in Charge, Waco Satellite Office | REVIEWED BY *(Date)* |
| APPROVED BY *(Name)*<br>Donnie A. Carter | APPROVED BY *(Title and Office)*<br>Special Agent in Charge, Houston Field Division | APPROVED BY *(Date)* |

## DESCRIPTION OF ACTIVITY:

Interview of Lutrill Amos PAYNE.

## SYNOPSIS:

On October 28, 2003, Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) Special Agent (S/A) Douglas J. Kunze interviewed Lutrill Amos PAYNE (DOB 9/14/70) at 6801 Sanger Avenue, Waco, Texas in reference to this investigation.

## NARRATIVE:

1. On October 28, 2003, S/A Kunze interviewed Lutrill Amos PAYNE (DOB 9/14/70) at 6801 Sanger Avenue, Waco, TX.
2. S/A Kunze explained the reason for the interview with PAYNE was to determine if he owned a Jaguar vehicle and had rented it to anybody in the past. PAYNE was also asked if he remembered renting any motel rooms for an individual in the past.
3. PAYNE stated that he did remember an incident because that was the only time he remembered renting a motel room. It was either in the spring or fall between 1999 and 2001.
4. At the time, he was going to a house at 4th and Proctor in Waco. It was a drug house and the "house guy" (lived in the house) was named Walter Last Name Unknown (LNU). PAYNE described Walter as a black male, 40s to 50s, approximately 5'9" tall, weighing about 180 pounds with a mustache or goatee.
5. PAYNE believed Walter's last known address to be a house on 13th or 14th behind West Elementary School in Waco. Walter was the 'house man' there as PAYNE bought 'crack cocaine' there in the recent past.

| DEPARTMENT OF THE TREASURY<br>BUREAU OF ALCOHOL, TOBACCO AND FIREARMS<br>REPORT OF INVESTIGATION | Page 2 of 2 |
| --- | --- |

| ꓱRESSED TO:<br>ꞁecial Agent in Charge<br>ꞁuston Field Division | MONITORED INVESTIGATION INFORMATION:<br>Houston Field Division<br>FY-04<br>Report 020 |
| --- | --- |

| TITLE OF INVESTIGATION:<br>ꞁIELDS, Sherman Lamont | |
| --- | --- |

| CASE NUMBER:<br>782010-02-0042 | REPORT NUMBER:<br>20 |
| --- | --- |

6. When asked how recent, PAYNE stated that he did not want to answer that because he was on State probation and under a motion to revoke from Bell County, TX. PAYNE said he was on probation for burglary of vehicle in Killeen, TX.

7. PAYNE explained that the 'house man' was paid a small amount of money or drugs for allowing the drug dealers to use their house.

8. PAYNE stated that he remembered buying a large amount of 'crack' and renting his Gold Jaguar to a 'crack' dealer. He described the dealer as a black male, under 30 years of age, 5'8" to 6'0", medium afro hair, dark skin, weighing 175-180 pounds. He did not know the dealer's name or street name as he bought from whoever was dealing at the house at the time.

9. He said he never got anything for the car rental because the dealer was supposed to come by later and never showed up. The dealer asked if PAYNE would rent a motel room in his (PAYNE's) name. PAYNE stated that he went with the guy to a nicer, cheap motel on Interstate 35 in Waco. The guy gave PAYNE money for one (1) night and PAYNE rented the room in his name.

10. PAYNE went back to Proctor with the guy and let the guy take his Jaguar. PAYNE believed that an hour or so later another guy came up to him at the house on Proctor. PAYNE was not sure but the guy may have been Walter. The guy said to walk down two blocks to another house. He said another hour or so after that a black male brought his Jaguar back. PAYNE did not believe it was the same guy he originally rented the Jaguar to earlier.

11. S/A Kunze told PAYNE that this interview was related to the investigation of Sherman FIELDS. When asked if he had any further information about FIELDS, PAYNE said he had a conversation with a Marvin POWELL in the McLennan County Jail about September 2003.

12. POWELL told PAYNE that he saw FIELDS during the time he had escaped. POWELL supposedly gave FIELDS $100 and went for a ride with him. POWELL had a firearm in the car and FIELDS took the firearm when the Waco PD chased them.

$IR* EDWARD LEE OUTLEY III "TRAY BOY"

MR* SCOTT PETERSON

RE* IN SUPORT OF SHERMAN FIELDS * AS TO ANY UNKNOWN STATEMENTS THAT YOU HAVE * UPOSELY BEN WRITEN BY ME * "$IR* EDWARD LEE OUTLEY III" TRAY BOY ***

DEAR SCOTT,

I AM WRITING YOU TODAY CONCERNING THESE UNKNOWN STATEMENTS * THAT YOU HAVE AND I SUPOSELY HAVE WRITEN * SHERMAN FIELOS IS TELLING ME THAT YOU HAVE SOME STATEMENTS THAT I WROTE * I HAVE NOT WROTE ONE STATEMENT ON SHERMAN FIELOS * I WROTE A STATEMENT CLEARING MY NAME FROM ANY FAID ALL CHARGES PENDING ME * I OIO NOT OO NO WRONG AND I WAS NOT GONE SIT BACK AND NOT CLEAR MYSELF * THEY SAIO THAT I GAVE SHERMAN A FIREARM * BUT THATS A LIE THAT I REFUSED TO TESTIFY TO * I OIO NOT GIVE SHERMAN ANY THING * SHERMAN ALSO WANTED YOU TO GET A COPY OF SHALAYKEA SCROGGINS LETTER FROM ME IT'S A LETTER THAT'S IN MY FILE STATING THAT THEY WANT ONE OF US TO SAY WE WAS WITH SHERMAN * MR* SCOTT, I WAS NOT WITH SHERMAN, I OIO NOT GIVE SHERMAN ANY THING * AND THEY GAVE ME EIGHT YEARS, BECAUSE I WOULD NOT LIE SAYING THAT I OIO * I COULD HAVE GOT A SKI BUT I DIDN'T GIVE SHERMAN ANY THING AND OON'T NEED NO TIME CUT. I'm NOT SURE REATHER ARE NOT I'LL HAVE TO TESTIFY AT SHERMAN'S TRIAL * BUT I OO KNOW THAT ALL THE STATEMENT YOU HAVE * WERE NOT WRITEN BY ME, AND I'm NOT GONE LIE ON SHERMAN ***

SINCERELY,
$IR* Edward Lee Outley III "TrayBoy"
$IR* EOWARO LEE OUTLEY III "TRAY BOY"
$IR* Edward Lee Outley III

CC* 10/20/02

SHERMAN L. FIELOS



JEREMY GLOER
NOTARY PUBLIC
State of Texas
Comm. Exp. 05-08-2006

10-21-02

Direct Examination of Chance Alexander by Mr. Fields

### DIRECT EXAMINATION

BY MR. FIELDS:

Q.   Mr. Alexander, --

A.   Yeah.

Q.   -- would you please state your name and spell it for the court reporter?

A.   Chance Alexander, C-h-a-n-c-e A-l-e-x-a-n-d-e-r.

Q.   Mr. Alexander, first, do you know who I am?

A.   No.

Q.   Mr. Alexander, at one point you went to the -- to law enforcement and told them that you had knowledge about this murder; am I correct?

A.   No.  They came to me and asked me did I know of him.

Q.   Oh, they came to you?

And at this time did you tell them anything specific?

A.   I told them -- they told me somebody knew about it. Somebody told me about it, that I was there with you talking to you.

Q.   And did you tell them that you'll cooperate or something for a deal or something?

A.   No.  It wasn't -- it wasn't just like that, but they told me they'll let me out of jail if I -- they get me out of jail if I told them about you.

Direct Examination of Chance Alexander by Mr. Fields—1931

Q.    But did you tell them you know me?

A.    Yeah.

Q.    And your purpose for telling them that you knew me was so that you could get out of jail; am I correct?

A.    Yeah.

Q.    And you're on the government's witness list; am I correct?

A.    I don't even what that is.

(Conference between Mr. Fields and Mr. Swanton)

BY MR. FIELDS:

Q.    But, Mr. Alexander, for some reason you didn't testify; am I correct?

A.    Say that again.

Q.    For some reason you chose not to testify; am I correct?

A.    I don't even understand what you're trying to say.

Q.    I'm saying for some reason did you choose not to testify against me for the prosecutors?

A.    Yeah.  I've been -- told them that I made that up.

Q.    That you made it up?

A.    Yeah.

MR. FIELDS:  I pass the witness, Your Honor.

CROSS-EXAMINATION

Direct Examination of Edward Outley by Mr. Snyder——1815

Q.   Did he get -- did he ask you to get him a gun?

MR. FIELDS:  Objection, Your Honor, leading the witness.

THE COURT:  Sustained.

BY THE WITNESS:

A.   Yes, sir.

BY MR. SNYDER:

Q.   You mentioned there was a gun in the house.  Where had you gotten the gun?

A.   Christian Chae Walker.

Q.   Why had you gotten the gun?

A.   He left it over there for me to take it to Sherman, bring it up there to Sherman Fields.

Q.   So that gun there was there for Sherman Fields?

A.   Yes, sir.

Q.   Mr. Outley, did you -- was the gun given to Sherman Fields?

A.   Yes, sir.

Q.   What kind of gun was it?

A.   A .32 revolver.

Q.   Where did -- was the gun given to him?

A.   Right there inside of Alberta apartment.

Q.   Did you obtain a car for him?

A.   Yes, sir.

Q.   Why did you obtain a car for him?

A.   Just basically because I knew him -- you know what

Cross-Examination of Christian Walker by Mr. Fields—1780

Q.   Well, it's no big deal.   I just want --

MR. GLOFF:   I'm going to object to the comment, the side-bar.

THE COURT:   Sustained.

Just ask questions, Mr. Fields.

MR. FIELDS:   Yes, sir, Your Honor.

BY MR. FIELDS:

Q.   Okay.   Mr. Walker, you sold Mr. Outley a 32-caliber; is this correct?

A.   Yes, sir.

Q.   Did Mr. -- did Mr. Outley specify what he wanted a gun for?

A.   Yes, sir.

Q.   Could you tell us?

A.   He said he needed him a pistol for some protection.

Q.   So all you know is that you sold Mr. Outley a 32-caliber, correct?

A.   Yes, sir.

Q.   Could you describe this gun again, please?

A.   It was like a nickel plated color with pearl white grips on it with a hideaway hammer and it was a seven shot .32 revolver.

Q.   Being the big gun expert that you are --

MR. GLOFF:   I'm going to object to that.

THE COURT:   Sustained.

**OFFICER WARNING STATEMENT**              CASE# 01-8754

VOLUNTARY STATEMENT OF Christian Shea Walker

I, Chris Walker , after having been first duly warned by Colyer
(Officer's Name)

who is the Detective of McLennan County, Texas at 1043 o'clock A M., at Hwy L Jail
(Title)                                                                  (Place of Warning)

on the 30 day of January , 20 02, of the accusation against me in clear language and of the affidavit, if any, filled in support of such accusation;

1) I have the right to retain counsel;
2) I have the right to remain silent and not say anything;
3) I have the right to have an attorney present during any interview with peace officers or officers representing the State;
4) I have the right to terminate the interview at any time;
5) I have the right to request the appointment of counsel if I am indigent and cannot afford counsel;
6) I have the right to an examining trial;
7) I am not required to make any statement and that any statement made by me may be used against me.

I understand my rights as set out in this warning and knowing what they are, I freely and voluntarily, without being forced or compelled by promises, threats, or persuasion, waive these rights and make the following statement in writing to Colyer

My name is Christian Walker . I live at 4816 Inwood Drive

About one month befor trial go got out I was over on Proctd St. an I came in Walter house an Outley came over there an he come inside the house a I ask him if he still needed a gun an he told me yes an I let him see it an he told me that he would pay me for the gun in a few more days. The gun was like a gray color but shiny it was a 32 calliber an it had off wite grips. I bought the gun from a guy name Robert it was about four a clod in the morning a 513 proctd an Walters house. I sold Outley so many guns that I realy don't remember how they all look. But after talking to Bubba I did remember the fact of what kind of gun I sold Outley.

C.W.

C.W.

I have read this statement consisting of 1 page(s) each of which bears my signature, and I affirm that all the facts and statements contained herein are true and correct. I further affirm that I knowingly, intelligently and voluntarily waived the above rights prior to and during the making of this statement.

THIS STATEMENT WAS COMPLETED AT ___ M. ON THE ___ DAY OF _____, 20 ___ .

M-R Col
Witness

x Christian Walker
Signature of person giving statement

_____
Witness

Government's closing argument.

2033

points. And at this point a prosecutor's supposed to stand up and exhort you and call the defendant names. I'm not going to do that. You know, that at this stage in trial and after listening to this for four, five days, you know, listening to Sherman Fields right now just kind of makes me tired all over. He said all this had to be a lie -- is -- because she said he called on her sister's phone and we would have brought her phone records in and proved it up if that was the truth so therefore it's got to be a lie. Ladies and gentlemen, when was the last time you opened up your phone bill and it has the local calls being made to your number the people around you or are cell phones.

He wants to tell you -- is -- this was this giant conspiracy and all these people lied about the color of the Jaguar. Remember this? This is the second thing he's throwing out. And they're all lying because it's the Jaguar that contains all the trace evidence and therefore they've lied about color so the government couldn't find it. Remember Mr. Colyer's testimony today? Edward Payne said, yeah. It was a blue Jaguar and then gave him the name of the man that owned it. Boy, that sure seems like a strange way to cover up when you give him the name of the man that owns the vehicle to track it down.

But also -- and I'll grant you, Edward Lee Outley is --

Direct Examination of Amrad Patel by Mr. Gloff————1408

BY MR. GLOFF:

Q.    Mr. Patel, I show you what's been marked as Government's Exhibit No. 13. Do you have that in front of you?

A.    Yes, sir.

Q.    And what is Government's Exhibit No. 13?

A.    That's my place, New Road Inn.

Q.    Is that a picture of the New Road Inn?

A.    Yes, sir.

Q.    And is that a fair and accurate depiction of the New Road Inn in that picture?

A.    Yes, sir.

MR. GLOFF:    Your Honor, we would offer Government's Exhibit No. 13.

MR. FIELDS:    No objection, Your Honor.

THE COURT:    It's admitted.

(Exhibit(s) admitted:  G13)

BY MR. GLOFF:

Q.    Now, would you please look at Government's Exhibit No. 14?

A.    Yes, sir.

Q.    And what is that?

A.    That's our daily sheets.

Q.    Now, when someone comes to the New Road Inn to rent a room, --

Direct Examination of Amrad Patel by Mr. Gloff————1409

Q.   — they would fill out a name on daily sheets there as reflected in Government's Exhibit No. 14?

A.   We fill out the name and address on here.  I mean the name.

Q.   Okay.  Someone does.  The clerk or you do it there at the New Road Inn?

A.   Yes, sir.  Uh-huh.

Q.   And then they would pay for the room?

A.   Right.

Q.   Now, so is Exhibit No. 14, is that an original business record of the New Road Inn?

A.   Yes, sir.

MR. GLOFF:  Your Honor, we would offer Government's Exhibit No. 14.

MR. FIELDS:  No objection, Your Honor.

THE COURT:  14 is admitted.

(Exhibit(s) admitted:  G14)

MR. GLOFF:  Thank you.

May I publish those to the jury, Your Honor?

THE COURT:  Yes, sir.

BY MR. GLOFF:

Q.   Now, Mr. Patel, I want to ask you a couple of questions about Government's Exhibit No. 14, the -- I'm sorry. What did you call this?  The sign-in sheet?

A.   That's the -- we put the name on there.  That's daily

Direct Examination of Amrad Patel by Mr. Gloff————1410

sheets.

Q. The daily sheets.  I'm sorry.

A. Yes, sir.  Uh-huh.

Q. I'd like for you to look down on the left-hand column --

A. Uh-huh.

Q. -- down to where it says 126 --

A. Yes, sir.

Q. -- K.

A. Uh-huh.

Q. What is 126?

A. That's the room number.

Q. That's a room number.  And what does the letter "K" mean next to it?

A. That's king size bed.

Q. Okay.  So if there was a -- for instance, over on the right-hand column if there was a 123, 2D, that would mean what?

A. That mean two beds in room.

Q. Two double beds in that room?

A. Yes, sir.

Q. Now, this particular sheet reflects the rooms that were rented on November the 6th, 2001; is that correct?

A. Yes, sir.

Q. And the name on 126K, Room 126 King size bed, what's the name next to that?

Direct Examination of Amrad Patel by Mr. Gloff——1411

A. Start with a P.

Q. Payne?

A. Yes, sir.

Q. Thank you.

Now, back in November of 2001 was the number -- the main number there at the New Road Inn 662-2442?

A. Yes, sir.

Q. Okay. Now, when someone makes a phone call to the New Road Inn, that's the number they would call?

A. Yes, sir.

Q. Now, what if someone were in one of the rooms, if they had rented one of the rooms and they wanted to make a telephone call outside to order a pizza or something like that?

A. They can call from the room.

Q. And would that go through the main switchboard?

A. No. It go to direct.

Q. Okay. They could call directly?

A. Yes, sir.

Q. Now, does each of those rooms have a different phone number?

A. No, sir.

Q. Okay. Just one phone number for the New Road Inn?

A. Yeah. Incoming is only one phone number.

Q. Inside?

A. Yes, sir.

Direct Examination of Amrad Patel by Mr. Gloff——1412

Q.    Now, back in November of 2001 was there a pay phone outside the New Road Inn right out there close to the door?

A.    Yes, sir.

Q.    Okay.  And was the number of that pay phone 662-2469?

A.    Yes, sir.

Q.    And did you own that pay phone or did you just pay to have it there?

A.    Just have it there.

Q.    You paid just to have the service there available for your clientele?

A.    Yes, sir.

MR. GLOFF:  I have no further questions.  I pass the witness.

CROSS-EXAMINATION

BY MR. FIELDS:

Q.    Mr. Patel, --

A.    Yes, sir.

Q.    -- in November 2001, --

A.    Uh-huh.

Q.    -- isn't it true that the police did a thorough search of Room 126?

A.    Next day I believe.  I'm not real sure what they did, sir.

Q.    And they did a thorough search of the whole room?

A.    Yes.  I'm sure, sir.

Cross-Examination of Amrad Patel by Mr. Fields————1413

Q.    Did you find a bag of clothes in that room that you gave to the police?

A.    I don't quite remember, but I'm sure the police took whatever in room.

Q.    So they took whatever was in the room?

A.    Yes, sir.

Q.    They did a thorough search?

A.    Yes, sir.

MR. FIELDS:  I have no further questions, Your Honor.

MR. GLOFF:  We have nothing further from this witness.

THE COURT:  You may step down, sir.

MR. GLOFF:  The government calls Ray Bell.

(The witness was sworn)

DIRECT EXAMINATION

BY MR. GLOFF:

Q.    Would you please state your name?

A.    Raymond William Bell, Jr.

Q.    And who do you work for?

A.    Hillcrest Health System.

Q.    And that's basically Hillcrest Hospital here in Waco?

A.    Yeah.  Hillcrest Baptist Medical Center.

Q.    What are your general duties?

A.    I'm the telecommunications manager.  I'm responsible for all the communications.

MR. GLOFF:  Okay.  May the clerk please come forward?

Page: _1_ of _1_        Case Number: _81- 75644_

STATEMENT OF:

On 11-15-01 I had pulled into the Hilcrest hospital parking lot and started to get out of my car, when I saw a Black male approach me at my driver's side door. The Black male then told me to get back into my car, I kept getting out of my car and pushed him back away from me, he then grabbed me with his left hand around the throat and pulled out a gun with his right hand and tried to point it at me. I grabbed the gun with my left hand and tried to push it away from me, and used my right to try to fight him off, I was screaming and yelling for help the entire time. I was able to get away from his hold and ran towards the back of my car, towards the hospital. The Black male then got in my car, backed up and drove off. The male drove through the back of the parking lot then up to the exit at 30th. He then drove South 30th towards Pine then turned east on Pine. I did not know who the Black male was, then one of the hospital security guards showed me a picture of a Black male and I said that was him, he said this is Sherman Fields. Officer Carrizales also showed me a pic of another Black male, and I said that was the same person the guard showed me. Officer Carrizales told me this pic of a man named Sherman Fields. I will assist the Waco P.D. with the prosecution of this case.

I will assist the WACO POLICE DEPARTMENT IN THE INVESTIGATION AND PROSECUTION of this case. I have been given the opportunity, before signing this statement, to make any additions or deletions I desire in order that this statement be accurate. I have stated all the above is true and correct and happened in WACO, MCLENNAN COUNTY, TEXAS.

Signed this _15th_ day of _November_ , 200_1_ .

Tammy Edwards deposition.

A.    He was probably about three car lengths away.

Q.    Okay.

A.    And he started walking towards me and I started looking at him and looking at him closer and then once he got all the way close to me --

Q.    Okay. Let me stop you there. While he was walking that three car lengths, what were you doing?

A.    I had both of my feet on the ground.

Q.    Were you just sitting there watching him or were you actually continuing to get out of the car?

A.    Actually, I was sitting there waiting for him to just pass so I could get out of my car.

Q.    Was there another car next to you or was it open?

A.    No, there was another car next to me.

Q.    Okay.

A.    And I was sitting there waiting for him to pass so that I could get up and go to work and he just came closer to me and closer. And then for a moment before he even got all the way up on me, I thought he was just going to ask me the time at first.

Then when he got close to me, it went off in my head like an alarm that that was Sherman Fields. We've had his picture posted all over Hillcrest. That was Sherman Fields. So I stood up, just abruptly just stood up.

Tammy Edwards deposition.

hand raise and he raised his hand like that.

Q. Okay.

A. And I ducked.

Q. Did you hear anything?

A. I heard a gunshot. And then I saw him sped away in my car and he almost hit this girl and that's when I got up and ran across the street and all the people in the world showed up then. Nobody was there when I needed them.

And then when I got across the street, there was Darrell Hodges that works in the warehouse. I ran up there and I knew him so I hugged him and I just started crying.

Q. Okay. Do you know -- if he shot at you, did it hit the -- did the bullet hit something?

A. No.

Q. Any car windows?

A. I think it was just air but I don't know what it hit, no.

Q. How full was the parking lot?

A. There was a lot of cars there because it was seven o'clock. It was seven o'clock shift, you know. You relieve the night shift.

Q. Okay. And so you said you went -- when you ran toward the trunk of your car. Right? Did you cross over

Tammy Edwards deposition.

Q.   Okay.   What college?

A.   I'll probably start junior and then move to a bigger one.

Q.   Any specific school?

A.   Probably Mclennan because it's right here. Mclennan Community.

Q.   And what would you hope to study?

A.   I think I'll do nursing.  Get my basics out of the way at a junior college.

Q.   How would you plan to finance that?

A.   I hope to win and use that money to put me through college.

Q.   Were you disciplined for any reason when you worked at Saint Catherine's?

A.   Was I disciplined?

Q.   Yeah.  Did you --

A.   What does that mean?

Q.   Were you ever suspended or put on probation?

A.   Not that I recall.

Q.   Were you ever suspended or put on probation while you worked at Hillcrest?

A.   No, not that I recall.

Q.   Do you remember a time when your supervisor at Hillcrest approached you about the vital signs you were entering in the computer where you entered the same vital