Chris Casson's Grand Jury testimony.

19

approximately on November the 15th he committed a carjacking allegedly there at Hillcrest Hospital, so the question, I think, is based on your investigation did you find out anything about a tie that he had to Hillcrest Hospital or to that area?

A.   I know he -- he had several -- his mom was on Lyle Street, which is fairly close to Hillcrest Hospital.  He had other places he could go to within that close vicinity, friends, relatives, what have you, where he could stay, and Hillcrest offered a lot of cars coming in and out of there.  He might have been staking it out for a day or two, watching to find a target.  That's my guess, and that -- in that essence, he did have relatives who were close by Hillcrest where he could stay and go to should the carjacking go bad and run to.

GRAND JUROR:  Okay.

Q.   (BY MR. GLOFF)  Roughly, based on your investigation, approximately what time do you believe that he escaped from the jail?

A.   Approximately 6:00 PM, approximately 6:00 PM.

Q.   Okay, and then at that point -- well, let me ask you this.  Based on your investigation, are -- are inmates required to wear orange jumpers over at the jail?

Direct Examination of Chris Casson by Mr. Snyder———1868—

MR. SNYDER: Just a moment, Your Honor.

BY MR. SNYDER:

Q. And, sir, is -- did you have an occasion to investigate a wreck-out of an automobile at a -- at a junior high school I believe here in Waco, Texas?

A. Yes, sir.

Q. And what day did that occur?

A. That was late hours of November 11th, 2001.

Q. And if you would, sir, is -- when you say it's the late hours that it occurred, what was the vehicle that was wrecked out?

A. A red Chevrolet Cavalier.

Q. And where did the wreck-out occur at?

A. At Dean Highland Elementary School here in Waco.

Q. And if you would, sir, is -- do you know the address for Alice Swinnie?

A. 2106 Lyle. At the time it was 2106 Lyle.

Q. And in fact, sir, is -- you had went by that house on several occasions looking for Sherman Fields?

A. We did. Yes, sir.

Q. And if you would -- is -- how far was the wreck-out of the Cavalier from her residence?

A. Not far. Couple of blocks, maybe.

Q. And how far is Hillcrest Hospital from her residence?

A. Maybe a block and a half.

Cross-Examination of Chris Casson by Mr. Casson————1869—

MR. SNYDER:  Nothing further.

CROSS-EXAMINATION

BY MR. FIELDS:

Q.    Mr. Casson?

A.    "Casson," please.

Q.    "Casson"?

A.    Yes.

Q.    Excuse me.

You say that my mother's residence is about a block and a half from Hillcrest?

A.    Roughly.

Q.    Hillcrest is on what?  North 30th, 31st?

A.    I believe.  The address I don't have in front of me. The exact address I do not have.

Q.    My mother live on 21st, correct?

A.    2106 Lyle.  Yes.

Q.    21.  So that will be like ten, 11 blocks, correct?

A.    Again, I don't have the exact address of Hillcrest Hospital in front of me.

Q.    And the place where you say this car wrecked at, where was this at?

A.    Dean Highland Elementary School here in Waco.

Q.    And do you know what block that's on?

A.    I believe 34th and Trice.

Q.    And how far you say that was away from my mother's

Cross-Examination of Chris Casson by Mr. Casson———1870—

house?

A.    A few blocks.

Q.    21st and Lyle --

A.    I said a few blocks.  Yes.

Q.    -- to 31st, you said?

A.    I believe 34th and Trice.  Again, I'm not exact on the address.

Q.    So that's about 13 blocks?

A.    If it's 34th and Trice.

Q.    Okay.  And Lyle to Trice is about ten blocks, correct?

A.    If we're using your numbers, yes.  It would be.

Q.    So it's ten blocks this way and ten blocks this way, correct?

A.    Of where Trice and Lyle are, I don't know what the difference and Trice and Lyle, how far they are apart.

MR. FIELDS:  I have no further questions, Your Honor.

MR. SNYDER:  Nothing further.

THE COURT:  You may step down, sir.

THE WITNESS:  Thank you, sir.

MR. SNYDER:  Government will recall Jill Urban.

                    DIRECT EXAMINATION

BY MR. SNYDER:

Q.    You're still under oath, Doctor.

A.    Okay.

Direct Examination of Steve January by Mr. Snyder——1326

A.    Same -- same thing, fingerprinted, trace lifters, vacuuming.

Q.    And had it vacuumed and everything, correct?

A.    I believe they vacuumed it.  Yes.

Q.    And when you say vacuumed it, you're looking for trace evidence, correct?

A.    Yes.

Q.    Hairs, fibers, anything you can find?

A.    Yes.

Q.    And the results of that was this thing was clean, correct?

A.    That is correct.

Q.    Now, did you obtain a set of keys that were in evidence at the Waco Police Department?

A.    Yes.  I did.

Q.    And these keys were -- the keys had been found in the apartment on Ruby; is that correct?

A.    Yes.  It is.

Q.    And what did you do with these keys after you removed them from evidence?

A.    This particular car had -- I took the keys out of the property room is what I did.

Q.    Okay.

A.    It had an electronic chip in the key itself and -- which indicated it would only start one specific ignition.  And

```
==================================================================
==============                                        | SUPPLEMENT
              W A C O   P O L I C E   DEPARTMENT       | Report
              WACO, TEXAS                              |
==================================================================
Reported Date: 11/15/01   Time: 07:35        Case: 01-075644 (003)PAGE: 1 of 2
Code: 29.03 1F PC         Crime: AGG ROBBERY   Class: 030110
Occurrence Date: 11/15/01-           Day: THURSDAY -        Time: 07:30-07:35
Status: AC  ACTIVE INVES             Closing Officer: 000201 JANUARY S
Location: 3000 HERRING, WA                                  RD:  335
         PARKING LOT
```

=========================== NARRATIVE ============================

On 11/28/01 on coming to work, I found inside the Waco PD Laser Lab at 721 N. 4TH was a GRAY CHEVROLET LUMINA, 4DR, with TX tags D95MFG. I contacted ID TECH SANDERS, who put the vehicle in the lab and he told me DET. JANUARY found this vehicle which was used in an AGGRAVATED ROBBERY and requested printing of the vehicle to see if any prints could be found. On processing the outside of the vehicle, found a lot of water marks, some smudging, no good ridge detail on the inside. On dusting the inside of the trunk area, I found a set of plates that were F84KRK. On running the 28 on these plates, it came back to this 1999 CHEVROLET LUMINA. The plates that were on this vehicle were one rear plate being D95MFG. This also comes back to a 1999 CHEVROLET, but not with the same VIN# of this LUMINA. This one plate that did not belong to the vehicle was removed and printed. Results will be further in this report. The two plates that were found in the trunk area that belonged to this vehicle; one was put on the back and the other one was left in the sack in the trunk area. Also, there was a FORD key with a remote key ring on it. This will also be taken and placed in the property room as evidence. The inside of the vehicle, the windows and the mirrors were fingerprinted with the following results:

CARD # 1 - PRINTS FROM THE INSIDE DRIVER'S SIDE WINDOW

CARD # 2 - PRINTS FROM THE INSIDE DRIVER'S WINDOW, AFIS QUALITY

CARD # 3 - INSIDE BACK RIGHT PASSENGER WINDOW. APPEARS TO BE A PARTIAL
           PALM

CARD # 4 - AFIS QUALITY PRINTS FROM THE INSIDE DRIVER'S WINDOW

CARD # 5 - PRINT OVER PRINTS FROM INSIDE DRIVER'S WINDOW

CARD # 6 - PRINT OVER PRINTS. SOME OF THESE DO SHOW GOOD RIDGE DETAIL FROM
           THE INSIDE DRIVER'S WINDOW

CARD # 7 - VERY LIGHT PRINTING FROM THE INSIDE DRIVER'S WINDOW

CASRD # 8 - PRINT OVER PRINTS, SOME RIDGE DETAIL FROM THE INSIDE BACK
            PASSENGER WINDOW BEHIND DRIVER'S SEAT

CARD # 9 - TWO SMUDGE PRINTS FROM INSIDE BACK LEFT PASSENGER WINDOW BEHIND
           DRIVER

CARD #10 - LIGHT PRINTING AND SMUDGING FROM INSIDE BACK LEFT WINDOW

CARD #11 - PARTIAL PRINT FROM BACK OF LP# D95MFG

```
=============================================================
              W A C O   POLICE   DEPARTMENT        | Continuation
                    WACO, TEXAS                    | Page
=============================================================
Reported Date: 11/15/01  Time: 07:35        Case: 01-075644 (003) PAGE: 2 of 2
Code: 29.03 1F PC        Crime: AGG ROBBERY   Class: 030110
```

CARD #12 - PARTIAL PRINT FROM BACK OF LP # D95MFG

The other plates that belong to the vehicle also printed, F84KRK; however, only smudging could be detected and no prints were located. The LP D95MFG will be placed in the property room along with the FORD KEY and the 12 print cards will be given to JOANN in fingerprints.

I notified DET. JANUARY, who was going to contact the owner of this 1999 CHEVROLET LUMINA nad have them come retrieve their vehicle from the laser lab.

```
=============================================================
W A C O    Police Department                    Continuation Page
=============================================================
Reporting Officer: BLAIR J         Number: 000179  Date: 11/29/01  Time: 12:30
         Typed by: BROUSSARD       Number: 384     Date: 11/29/01  Time: 13:11
Approving Officer: BROUSSARD       Number: 000384  Date: 11/29/01  Time: 13:22
```

```
==================================================================================
                    W A C O   POLICE   DEPARTMENT          | SUPPLEMENT
                         WACO, TEXAS                        | Report
==================================================================================
```

Reported Date: 11/15/01  Time: 07:35          Case: 01-075644 (006) PAGE: 1 of 1
Code: 29.03 1F PC          Crime: AGG ROBBERY   Class: 030110
Occurrence Date: 11/15/01-        Day: THURSDAY -              Time: 07:30-07:35
Status: AC  ACTIVE INVES .        Closing Officer: 000201 JANUARY S
Location: 3000 HERRING, WA                                    RD:  335
          PARKING LOT

```
======================= NARRATIVE ================================================
```

On 11-29-01 I received twelve latent fingerprint cards from Laser lab
Officer Blair. On these cards there are twelve latent lifts.  I find
quality of print for AFIS submission.  Prints are of good eye comparison
quality.  Fingerprints will be entered in AFIS and remain on file in the
AFIS Lab until needed.

```
==================================================================================
W A C O   Police Department                               First Page
==================================================================================
```

Reporting Officer: GUERCIO .       Number: 000361   Date: 11/30/01  Time: 12:10
        Typed by: GUERCIO          Number: 361      Date: 11/30/01  Time: 12:02
Approving Officer: MCELYEA M       Number: 000387   Date: 12/03/01  Time: 08:17

```
================================================================================
                    W A C O   POLICE   DEPARTMENT                |  SUPPLEMENT
                         WACO, TEXAS                             |  Report
================================================================================
Reported Date: 11/15/01  Time: 07:35    Case: 01-075644 (007)      PAGE: 1 of 1
Code: 29.03 1F PC         Crime: AGG ROBBERY   Class: 030110  CAD#:     Hate:
Occurrence Date: 11/15/01-           Day: Thursday -          Time: 07:30-07:35
Status: CA  CLEAR ADU AR              Closing Officer: 000201 JANUARY S
Location: 3000 HERRING, WA                                   RD:  335  Beat:
          PARKING LOT
======================= NARRATIVE ==============================================
```

On this case I was asked to do a comparison with subject, SHERMAN FIELDS, DOB 7/14/74, and CHRISTIAN CHAE WALKER, DOB 10/11/73. On the comparison there is no match. Latent prints remain on file in the AFIS Lab until needed.

```
================================================================================
W A C O   Police Department                                   First Page
================================================================================
Reporting Officer: GUERCIO       Number: 000361  Date: 12/11/03  Time:
         Typed by: HUBBARD       Number: 321     Date: 12/16/03  Time: 11:05
Approving Officer: HUBBARD,BETTY  Number: 000321  Date: 12/16/03  Time: 11:07
```

Recross-Examination of Dominique Tubbs by Mr. Fields—1217

A.    Well, what are you trying to say?

Q.    Seems that you're the only one that didn't know that Shining Star was dead?

A.    No.  I didn't.  About three or four days after didn't nobody know Shining Star was dead.  So whoever told you that, apparently they was telling a story because didn't nobody know -- when everybody first find out that Shining Star was dead, everybody read it in the Waco newspaper.

Q.    So if another government witness come in here and say that they know, they was in jail, you --

MR. SNYDER:  Your Honor, once again, this is an improper form of the question.

THE COURT:  He hasn't completed the question.

What's the question, Mr. Fields?

MR. FIELDS:  I was fixing to ask him if another government witness come in here that was in jail say that he knew Shining Star was dead in that amount of time, then that government witness would be lying?

BY THE WITNESS:

A.    Evidently.

THE COURT:  Overrule the objection.

Go ahead and answer.

BY MR. FIELDS:

Q.    Could you repeat -- could you repeat your answer, Mr. Tubbs?

Cross-Examination - Christopher Quigley by Mr. Fields—1231

A.    Yes.  Yes.

Q.    On November 27th?

A.    I did.

Q.    Mr. Quigley, when did you first find out that Ms. Coleman was deceased?

A.    After -- when they came back and let us know, when the police officer came in to talk to me and Mr. Tubbs.

Q.    When was that?

A.    I can't recall the day.

Q.    You can't recall the day?

A.    No, but you was free.

Q.    I was still free?

A.    Yes, sir.  You was.

Q.    So would you say it was like a week after my escape, two weeks, or --

A.    About a week -- a week -- a week after your escape.

Q.    About a week after my escape?

A.    Yes.

Q.    So that'll make it around the 13th?

A.    Yes.

Q.    Your statement right here was wrote on the 15th?

A.    Uh-huh.

Q.    So you agreeing that at the time you composed this statement, you had already heard that Shining Star was deceased?

Government's closing argument.

2037

changing his story. And what was the promise he got -- is -- he said? Nothing. Because you want to know something? Chae Walker has something that the defendant doesn't have and will never be able to get, and that's called a conscience.

He said something during his final argument that I thought was remarkable, because it really -- for a second he slipped and told you. He told you when he was referring to Chris Walker and he referred how easy he was to manipulate. Remember that he said that? Now, you -- from looking at Edward Outley, you know Edward Outley couldn't manipulate anyone at all except with a gun or his fists. Only one man could manipulate him with words, and he's sitting over there.

Other little things that are foolish. He attacks Dominique and he attacks Quigley, Dominique, Tubbs and Chris Quigley. They're liars. They made this up. They're trying to do this. Dominique Tubbs is off supervision. There ain't a thing we can do for him. Chris Quigley, he's out of the joint. But how do you know what they said is true? They're in evidence, their statements. Their statements were given before her body was found and they were saying he said he was going to kill her. Her body hadn't been found yet. For all they knew -- they didn't know Shining Star from Adam. For all they knew she could have run off with him and wouldn't they look foolish giving signed statements that said, "Oh, he was going to kill her and she shows up two days later"? Huh-uh. They

```
===================================================================================
                    W A C O   POLICE   DEPARTMENT          | Continuation
                          WACO, TEXAS                      | Page
         ==================================================|========================
eported Date: 11/08/01  Time: 15:15          Case: 01-074130 (001)  Page: 2
ode: 580000 NO          Crime: INFO ONLY     Class: 580000
```

.ime.

n 11/14/01 I spoke by telephone to TANESHA HILLIARD, who was supposed to ;ave been the BF that was present at the hospital when SHERMAN FIELDS was :alking to SUCERNERY COLEMAN out in the parking lot. I did make contact /ith her by telephone. She stated while they were out in the parking lot, ;HERMAN FIELDS was present and he was talking to SHINING STAR and he was .n a RED GRAND AM at that particular time.

;he stated they left and went back in the hospital and SHERMAN FIELDS .eft. Approximately 2 hours later, he returned and came up to the hospital :oom where TANESHA HILLIARD and SUCERNERY COLEMAN and the actual father of ier baby, that she had previously to this date, were at.

ccording to TANESHA HILLIARD, SHERMAN FIELDS had requested that SHINING ;TAR to come out and talk with him and they left the room. She said that .s the last time she has seen SHINING STAR or talked to her and she does iot know anyone else that has been able to talk to her or communicated /ith her.

llso on 11/14/01 at around 0130 hours, I received a phone call at my :esidence from US MARSHALL DEPUTY PARNELL MCNAMARA. He stated they had irrested TREY BOY, who is also known as EDWARD OUTLEY, III and a good 'iend of SHERMAN FIELDS'. He said after the arrest EDWARD OUTLEY had ,iven them information concerning the RED GRAND AM that SHERMAN FIELDS had )een using over the time period he has escaped from the county jail. ipparently, this was a car owned by a person by the name of ROGER THOMPSON ind they were currently at the ASTRO MOTEL when he made this call to me at iome. He was inquiring about whether or not I had enough information to .mpound the vehicle at this time. It was decided over the telephone that :hey leave the vehicle with ROGER THOMPSON at that particular time.

)n 11/14/01 I met with both McLennan Co Sheriff Deputies BUBBA COLLIER and rOHNNY SPILLMAN. It was decided they would impound the vehicle in :eference to their missing person case and have it towed to our laser lab :or processing. They were able to find the vehicle and towed the above .isted vehicle into the Waco PD laser lab.

ilso on 11/14/01 I received a phone call from DET. MIKE ALSTON, who was at :he McLennan Co courthouse. He had run into bail bondsman RONNIE HILL, who :old him his office had just received a call from someone that hung around ;HERMAN FIELDS. This caller told his secretary the girl's body, referring :o SHINING STAR, was in the field behind the officer of the LA MIRAGE (PARTMENT complex. This is the second call we have received in reference :o SHINING STAR possibly being deceased at this time.

```
===================================================================================
I A C O    Police Department
===============================================================| Continuation Page
                                                               |==================
:eporting Officer: JANUARY S      Number: 000201  Date: 11/14/01  Time:
         Typed by: BROUSSARD      Number: 384     Date: 11/14/01  Time: 14:32
pproving Officer: BLUNT           Number: 000309  Date: 11/26/01  Time: 08:04
```

Cross-Examination of Steve January by Mr. Fields——1333

that any of the processing of the car turned up negative.

Q.   All right.  The car that you say that there was grass or what have you in, which car was that?

A.   I don't -- I'm just saying that on the vacuum bags there was probably grass or other fibers or stuff.  I didn't participate in the actual analyzing of the stuff that was collected.

Q.   Oh, I misunderstood you.  Awhile ago I thought you said there was grass.  I'm sorry.

All right.  Did you participate in the arrest of Edward Lee Outley on 11-13-01?

A.   Yes.  I did.

Q.   And could you tell us did y'all arrest Edward Lee Outley?

A.   The Marshal's Service did, I believe.

Q.   Do you know why?

A.   I believe they found some ammunition in his apartment.

Q.   And anything else?

A.   Not that I'm aware of.

Q.   You wasn't aware that they found a 22-caliber revolver?

A.   I don't remember that.  Like I said, I went over there to assist them as far as them being in the city limits of Waco, but they conducted the investigation.

Cross-Examination of Steve January by Mr. Fields——1334

Q.    You was the first one on the scene; isn't that correct?

A.    No.  It isn't.

Q.    You wasn't?

A.    No.  They were over at his apartment and contacted me by phone requesting me to come over there.

Q.    I must have misread because I thought they say you called them over.

MR. SNYDER:  Your Honor, he is making -- he is testifying, not asking questions.

THE COURT:  Sustain the objections.

MR. FIELDS:  I'm sorry.

I have no further questions, Your Honor.

                    REDIRECT EXAMINATION

BY MR. SNYDER:

Q.    Mr. January, these cars you process, they're not off the show room, correct?

A.    They're what?

Q.    They're not off the show room?

A.    No.  They're not.

Q.    They've got dirt in them?

A.    Yes.

Q.    Leaves?

A.    Yes.

Q.    Grass?

**U.S. Department of Justice**
United States Marshals Service



# REPORT OF INVESTIGATION

Page 1 of 1

| 1. CASE # (WIN) W-01-110M | 2. DATE(S) OF INVESTIGATION 11/13/01 | 3. REPORTED BY: CASSON, Christian J. 254-750-1570 |
|---|---|---|
| 4. CASE TITLE FIELDS, Sherman Lamont | | AT: W/TX - Waco |

| 5. OTHER PERSONNEL |
|---|
| Izgarjan, Shaddix, Sheely, McGill, Greenwood, Parnell McNamara, Mike McNamara |

| 6. TYPE OF REPORT |
|---|
| Arrest |

On 11/13/01, at approximately 1430 hours, USMS Waco received information from the Waco Police Dept. that FIELDS had been seen at 1100 N. 6th, Waco, TX (apartment complex). Upon arrival, DUSMs encountered Waco Police Detective Steve January speaking with Edward Outley (DOB: 04/19/01) in front of apartment G-2.

Since FIELDS escaped, USMS Waco, along with local law enforcement, has received numerous pieces of information from several sources stating OUTLEY is/has been assisting FIELDS in his fugitive status. In particular, sources have stated OUTLEY provided FIELDS with clothing, money, and transportation. Attempts to locate OUTLEY by USMS Waco had been unsuccessful.

DUSMs began to immediately interview OUTLEY, inside the apartment, regarding FIELDS. At the same time, DUSMs performed a security check of the residence (with consent). While being interviewed, DUSMs Casson and Sheely formally requested verbal consent to search apartment G-2 for firearms and ammunition. Consent was given from Alberta Rene HAMPTON. She is the tenant of record for the apartment. This request/consent was also witnessed by Elizabeth HAMPTON, mother of Alberta.

This request was predicated on the fact that plastic bag with 9mm rounds was found, in plain view, by DUSM Eric McGill in the bedroom (during security search). The consent search revealed the following:

1) One loaded (4 rounds) H&R Model 676, .22 cal. revolver pistol Serial #A595C3–found in linen closet near bathroom.

| 7. SIGNATURE | 8. DATE 11/13/01 | 11. DISTRIBUTION: |
|---|---|---|
| 9. APPROVED (Name & Title) ASDUSM | 10. DATE 11/15/01 | USMS ISD ATF File |

FORM USM-11 (REV: 2/99)

*THIS REPORT IS THE PROPERTY OF THE UNITED STATES MARSHALS SERVICE. NEITHER IT NOR ITS CONTENTS MAY BE DISSEMINATED OUTSIDE THE AGENCY TO WHICH LOANED.*

Direct Examination of Edward Outley by Mr. Hunt
134

A. The police. The police officers that gave me trespass, the warning citation.

Q. Okay. As they are escorting you out of the apartment --

A. They escorted me away from the apartment and we're going to get in the car to leave, another officer, police officer steps up and told me to wait because the marshals, U.S. Marshals, wanted to come talk with me.

Q. So another Waco Police Department officer said the U.S. Marshals are on their way?

A. Detective Steve January.

Q. And did you go back to the apartment then?

A. Yes. I stayed right there outside and waited on the marshals to come.

Q. And they arrived later, correct?

A. Yes. They arrived.

Q. Was -- was your indication when they arrived that you were going to jail, they were just going to arrest you?

A. Not at first, not till they got out the cars and started telling me that.

Q. Okay. They took you back in the apartment?

A. Yes.

Q. And they questioned you about the gun and about the ammunition?

A. Yes.

Direct Examination of Parnell McNamara by Mr. Gloff—1556

holding up or hiding out in Apartment 54 at 707 Ruby and we proceeded to that location and there were officers from several different agencies on the task force that were there.

Q.    Okay.

A.    And at one point several officers and I approached the apartment at which time Officer Mason with the Waco Police Department got on the loud speaker in his patrol car and ordered Mr. Fields to come out of the apartment with his hands up.

Q.    Did Mr. Fields comply?

A.    Yes, sir. He did.

Q.    And what happened?

A.    We approached Mr. Fields. As he was walking toward us, we affected the arrest and handcuffed Mr. Fields at that time.

Q.    Okay. Now, at that time did anyone read Mr. Fields or give Mr. Fields his constitutional protections?

A.    Yes, sir. I did.

Q.    And that's commonly known as Miranda warnings?

A.    Yes, sir.

Q.    And you gave those to Mr. Fields?

A.    Yes, sir. I did.

Q.    After giving him his Miranda warnings or his constitutional protections, what, if anything, did you ask him?

A.    I asked Mr. Fields if he had a gun in the apartment.

Direct Examination of Parnell McNamara by Mr. Gloff—1557

Q.   And what did Mr. Fields say?

A.   He said, yes, he did.

Q.   Did he say anything else?

A.   I asked him where the gun was located and he said under the carpet.  I asked him where under the carpet.  He said under the carpet under the table in front of the couch.

Q.   Okay.  Now, based on that information, was a gun recovered?

A.   Yes, sir.  Mr. Fields stated it was a .22 automatic, and that was the type of firearm that was recovered from that location.

Q.   Okay.  Did Mr. Fields say anything else?

A.   At the time of his arrest as soon as we put the handcuffs on him, he turned to me and asked two questions.  He asked, "Where's my mama?"  "Is my mama out there?"

Q.   Okay.  And that's all he said?

A.   Yes.

MR. GLOFF:  Pass the witness.

MR. FIELDS:  I have no questions, Your Honor.

THE COURT:  You may step down.

MR. GLOFF:  May this witness be excused, Your Honor?

THE COURT:  Yes, sir.

MR. GLOFF:  Government calls Ben Burch.

(The witness was sworn)

DIRECT EXAMINATION

Hubert Steadman's Grand Jury testimony.

20

they got on the loud speaker, and they told Fields that he needs to turn on all the lights and that he needs to get -- come out slow and get on the ground, and pretty much he did everything they told him to do, and -- and they apprehended him, handcuffed him, and put him in the car, and they had came back to me and asked me could they search my apartment, because I had told him, "He has a gun, a black gun," because I seen the gun --

Q. Right.

A. -- you know, and they went in, and I told them probably under the couch, because that's where he was, you know, when he was in the apartment, and they were looking all up under the coach. When I came back in, they couldn't find it, so I pulled the -- I got -- I had this big Chinese -- China -- China rug on my floor. I pulled it back, and that's where he had put the gun, up and under the rug, and he left the keys to the Lumina in the kitchen. They -- they didn't even know the keys there, because they found the car. They'd already picked up the car. They said they was waiting to see who was going to come back to the car. They'd already picked up the car, and I seen the keys laying on my -- my kitchen table, and I gave them the keys, as well --

Q. Okay.

**Gordon W. Bulla & Associates**
2525 East 21st Street, Suite 106
Tulsa, OK 74114
918 743-4747 (office)
918 743-4749 (fax)
e-mail: bulla@tulsacoxmail.com

April 14, 2010

Jeffrey E. Ellis, Esq.
Law Offices of Ellis, Holmes & Witchley, P.L.LC.
705 Second Avenue, Suite 401
Seattle, WA 98104

Re: **Sherman Lamont Fields v. United States of America**
     Our file #272-001

## REPORT OF INVESTIGATION

This report contains a summary of an interview with Frederick Waggoner.

### Frederick Waggoner

On this date, Frederick Waggoner was spoken with over the telephone. He called back after a message was left on his number, 817 366-4890.

Waggoner first advised that he had received permission to speak from the warden at the federal facility he works at in Ft. Worth, TX.

He was first given the names of the three men who were also housed in the same facility with Fields, who later testified at Field's trial. Waggoner admitted that he could not recall the names. He was asked if any men in the facility were plotting or conspiring to get their stories straight, in preparation of testifying against Fields. He was not aware that happening, but he stated that he had an opinion.

It was Waggoner's belief, or observation, that Fields did not speak with the other inmates, except for one. He stated that there was "an old Spanish guy" who was in the cell next to Fields. Waggoner stated that Fields communicated only with this man, himself and some of the other correctional officers. Since their cells were next to each other, they were able to communicate through the vent. Waggoner thought they talked quite a bit. Waggoner also said, "The older guy gave him food."

As the conversation continued, Waggoner was asked if this older Spanish man had been Homero Deleon. Again, Waggoner could not recall his name.

Jeffrey E. Ellis, Esq.
April 14, 2010
Page 2

The conversations between Fields and the older guy could not be heard by anyone out in the hallway, yet Waggoner made it clear that others in cells could often hear those conversations through vents, as voices will carry.

As to speaking with someone across the hall from Field's cell, Waggoner stated that is possible, too. He advised that there is "a little hole" in the cell door one can yell through. If Fields had yelled, though, he would have been heard by just about everyone. Waggoner did not say that he heard any admissions from Fields.

Finally, when discussing his previous testimony, Waggoner was asked if he was prepped for this testimony. He did not think he was, yet, he was a bit uncertain. His recollection was that he was asked to be a character witness, got on the stand and answered a few questions for the defense, and then a few more questions from the prosecutor.

Direct Examination of Homero DeLeon by Mr. Snyder——1423—

A.    Yes.

Q.    And first of all -- is -- did you talk about his case?

A.    Yes.  I asked him what he was doing there.  I thought he was here in the county jail at Highway 6.

Q.    And what did he tell you?

A.    He say he tried to escape from there.  That's why they moved him to a higher security place which was Fort Worth.

Q.    And when he told you this, did he say that he knew people that were giving information against him?

A.    Yes.

Q.    In this case?  In the murder case?

A.    Yes.

Q.    And who did he name had given information against him?

A.    Eric Snell, Jarrell Patterson, Steve Sykes, Colin Alvis Smith, Andrea Sykes.

Q.    Did he mention Steve Salazar?

A.    Steve Salazar.

Q.    And you know who Steve Salazar is?

A.    Yes, because he was here with us here in High Five, Glasshouse.

Q.    And he was a trustee there, correct?

A.    Yes, sir.

Q.    And did he testify how he knew these people had given

————Direct Examination of Homero DeLeon by Mr. Snyder————1424

information against him?

A.    Yes.

Q.    And what did he say how he knew it?

A.    He said the people that his attorney -- I guess his attorney.  He just say his attorney.

Q.    His attorney told him?

A.    Yes.

Q.    Did he testify what they had done, whether they had given statements or whether they had testified in the grand jury?

A.    Can you repeat that question, please?

Q.    Did he say whether they had just given statements or whether they had testified in the grand jury against him?

A.    That they testify in front of the grand jury.

Q.    And was he in particular mad against any one individual in particular?

A.    Yes.

Q.    And who was that?

A.    Eric Snell.

Q.    And why was he so mad at Eric Snell having testified against him in the grand jury?

A.    Because he say he was one of the biggest snitches in Waco, Texas.

Q.    And after he told you this, did you ask him about how the murder had happened?

Cross
Examination of Homero DeLeon by Fields ——1434—

A.    The ones that are in the holding tank with me.

Q.    The ones that you named awhile ago?

A.    No.  I don't know them.

Q.    You don't know Eric Snell?

A.    Yes.  Yeah.  Eric Snell.

Q.    You don't know --

A.    He was with us in High Five in the Glasshouse.

Q.    In the High Five?

A.    With us.  He was a trustee, also.

Q.    And he was in Fort Worth with you, too; am I correct?

A.    Yes.

Q.    And Jerry Reed?

A.    No.

Q.    You don't know Jerry Reed?

A.    No.

Q.    The dude that just came in here?

A.    I don't know him.  I know him from now.

Q.    You know him now?

A.    I met him at the Glasshouse.

Q.    And you know Steve Sykes?

A.    Steve Sykes?  He was with us in the Glasshouse in 2001.

Q.    Who else did you say awhile ago?

A.    Jarrell Patterson.

Q.    You know Jarrell Patterson?

Cross                                          Fields

~~Direct~~ Examination of Homero DeLeon by ~~Mr. Thomas~~ —1435—

A.    He was at Fort Worth.

Q.    He was?  Who else?

A.    Alvis Smith.

Q.    You know Alvis Smith?  And who else?

A.    Andrea Sykes.

Q.    Andrea?  I'm not sure who that is.  Could you --

A.    Steve Sykes' sister.

Q.    Oh, Steve Sykes' sister.  Anybody else?

A.    No.

Q.    Nobody else?

All right.  You say -- man, you say I was across from you at Highway 6?

A.    No.  You was across from me in the special housing unit in Fort Worth.

Q.    Oh, I was across from you in Fort -- and when was this?

A.    That was in December of 2002.

Q.    Do you know approximate time?

A.    I arrived there the 4th of December of 2002.

Q.    And I was there already when you got there?

A.    No.  You was -- you arrived there on a weekend.  I remember.

Q.    I came on --

A.    On a Sunday I think.  It was on a weekend because we had fried chicken and I remember you mentioned it that you was

Direct Examination of Douglas Kunze by Mr. Gloff——1876—

County Sheriff's Office.  He's the evidence officer and then I transferred it to the Texas Department of Public Safety crime lab in Austin.

Q.    So essentially you were the last link in the chain before it got to DPS in Austin?

A.    That's correct.

MR. GLOFF:  Your Honor, we would offer Government's Exhibit No. 10.

MR. FIELDS:  I have no objection, Your Honor.

THE COURT:  10 is admitted.

(Exhibit(s) admitted:  G10)

BY MR. GLOFF:

Q.    Special Agent Kunze, I want to ask you a couple of questions.  First of all, in conducting your investigation, you talked to different witnesses; is that correct?

A.    That's correct.

Q.    Now, I'm not going to talk to you about generally investigations because I want to just talk about this investigation because that's the only one that matters.  Okay?

A.    Yes.

Q.    In this particular investigation when you go to talk to a witness, is it your practice to tell those witnesses how a crime occurred?

A.    No.

Q.    Is it your practice to tell those witnesses what

Direct Examination of Douglas Kunze by Mr. Gloff——1877

other witnesses have said?

A.    No.

Q.    Is it your practice to tell the witnesses what you want them to say or --

MR. FIELDS:  Objection, Your Honor, bolstering.

THE COURT:  Overruled.

BY THE WITNESS:

A.    No.

BY MR. GLOFF:

Q.    Okay.  And did you do any of those things in this case?

A.    No.  I did not.

Q.    Now, with respect to -- you were here in the courtroom here yesterday when Mr. DeLeon testified; is that correct?

A.    That's correct.

Q.    And you heard him rattle off a name -- bunch of names of people that testified before the grand jury?

A.    Yes.

Q.    Did you give lists to witnesses during the investigation on who testified before the grand jury?

A.    No.

Q.    Who are the people that had those names available to them besides the government prosecutors and the case agents?

A.    The defense attorneys.

Direct Examination of Douglas Kunze by Mr. Gloff——1878—

Q. And those were provided to the defense attorneys, the grand jury witnesses and their transcripts very early on in this case; is that correct?

A. That's correct.

Q. So, to your knowledge, did -- were any witness lists -- did you provide them to anybody or were they floating around out there in the public?

A. No. They were not.

Q. By the way, based on your investigation, was Mr. Fields out on the streets during the '91 and most of '92 time frame?

A. Yes.

Q. You also heard Jerry Keith Reed testify yesterday. You were present in his testimony?

A. Yes.

Q. Now, did you interview Jerry Keith Reed at the Federal Medical Center in Fort Worth?

A. Yes. I did.

Q. And approximately what was the date of that interview?

A. March 19th, 2003.

Q. And you wrote a report about what was reflected in that interview?

A. Yes.

MR. GLOFF: Could -- I need the ELMO. Exhibit No. 46. I

Government's closing argument.

2002

Downsville to that lonely country road, but I'll tell you this much. I submit to you that whether it took him 18 minutes to go out there or it took him 24 minutes to go out there, every single minute he's driving her out there to meet her fate is premeditation. He planned the whole thing.

So what happens when he gets out there? Well, you heard from several witnesses, and I want to point out a couple things. If Homero DeLeon was lying about what he was testifying about, about what the defendant told him, how did he know the people who had testified in the grand jury when the only people that knew that were the people at this table, the people at that table? How did he know that? Unless the defendant told him.

I want you to think about something else. How did Jerry Keith Reed who says that he met Sherman Fields up in Fort Worth in January of '03, how did he on March the 10th of '03, when he talked to investigators, how did he know what Sherman Fields was going to say on January the 26th of 2004, Monday morning when he came in here and in his opening statement he said Laykea and Trey Boy killed that girl, not me. How did Jerry Keith Reed know that last March? Unless he talked to the defendant.

I want you to focus on Christian Chae Walker. When he testified, I submit to you that it was a little chilling. The reason it was chilling, it was because the description was so

SCOTT PETERSON
ATTORNEY AT LAW
1701 AUSTIN AVENUE
WACO, TEXAS 76701-1741

BOARD CERTIFIED, CRIMINAL LAW
TEXAS BOARD OF LEGAL SPECIALIZATION
STATE BAR OF TEXAS

TELEPHONE (254) 753-3100
TELEFAX (254) 753-5122
E-MAIL: jspeterson@mindspring.com

July 30, 2003

COPY

Gregory S. Gloff
Stephen L. "Jake" Snyder
Assistant U.S. Attorneys
800 Franklin Avenue, Suite 280
Waco, Texas 76701

RE:    State of Texas v. Sherman Lamont Fields
       No. W-01-CR-164(1)

Dear Greg & Jake:

This letter is to memorialize our group meeting on July 18, 2003 and the agreements and understandings that were reached:

1.    There is no objection by the U.S. Attorney's Office to having Mr. Fields released to the custody of the Bureau of Prisons, upon defense counsel's written request. Such request will be provided after the hearing on August 1ˢᵗ, assuming the court grants the agreed motion for continuance.

2.    The government expressly agrees not to use the testimony of Officer Stan Mason concerning his interview of Sherman Fields on November 27, 2001, and in exchange defense counsel will refrain from filing a motion to suppress the testimony of Stan Mason concerning his interview of Sherman Fields on November 27, 2001.

3.    The government has revealed the following potential Brady material:

       a.    Shalayka Scroggins' testimony at her supervised release revocation hearing could assist defense counsel in the cross-examination of this witness.

       b.    Criminal histories on all government witnesses, specifically including Nathan "Cream" Lloyd and Shalayka Scroggins ,will be provided to defense counsel prior to trial.

       c.    There currently is no physical evidence linking Sherman Fields to the alleged murder. The weapon that caused the death of Suncerey Coleman has not been found. There was a hair found on Ms. Coleman's clothing that has been sent for DNA analysis. This could take 10 weeks.

4.    Certain letters by Sherman Fields have been recovered by the U.S. Attorney's Office. Copies of these letters will be provided to defense counsel.

5.      The government is aware that defense counsel is interviewing witnesses, including government witnesses, and the government will immediately advise defense counsel if a potential witness expressly states that they will not speak to defense counsel or their agents.

6.      Open file discovery will continue to be offered and, for the convenience of all counsel involved, one of the case agents will review the cell phone records with defense counsel and provide copies of pertinent documents.

7.      Grand Jury transcripts will be provided to defense counsel a reasonable time ahead of trial.

Sincerely,

Scott Peterson

SP/jsp

Cc:     Rob Swanton
        Sherman Fields

Direct Examination of Edward Outley by Mr. Snyder——1826——

A.    The exact words was -- I approached him because I heard that he had told Alberta and Shalaykea that he had, you know, murdered her and I told -- I asked him, "Man, you telling these girls that you done murdered this girl, man?"  And he say, "Yeah.  I messed up."  And I stopped him.  I told him I don't even want to know what happened, man.

Q.    And why didn't you not want to know what had happened?

A.    Because, you know, it -- it's -- you know, I don't really want to be involved in it, but I was so what kind of like caught up, involved in it because -- you know what I'm saying -- we --

Q.    You had given him the gun?

A.    Yes, sir.

Q.    Is that fair to say?

A.    Yes, sir.

Q.    After that did you try to avoid Sherman Fields?

A.    Yes, sir.

Q.    Why?

A.    Because I didn't -- he had broke out of jail and then talking about this girl was murdered or whatever.  I didn't want him around me.

Q.    And in fact -- is -- the law fell all over you, correct?

A.    Yes, sir.

Cross-Examination of Douglas Kunze by Mr. Gloff———1966

CROSS-EXAMINATION

BY MR. GLOFF:

Q.   Special Agent Kunze, did you have any follow-up conversations with Mr. Young?

A.   Yes.  I did.

Q.   And did that occur as recent as yesterday?

A.   Yes.  It did.

Q.   And did you ask him about the conversation that he had had with you earlier about Mr. Outley?

A.   I did.

Q.   And what did he say?

A.   He said, "Outley?  I don't know any Outley."  I said, "Do you remember the conversation that we had had at Beaumont prison about him and what you told me?"  And he said, "It's a story.  I lied."

MR. GLOFF:  No further questions.

MR. FIELDS:  I have no further questions, either.

THE COURT:  You may step down, sir.

MR. FIELDS:  The defense rests, Your Honor.

(Defendant rests)

THE COURT:  Does the government have any rebuttal evidence?

MR. FIELDS:  We have nothing further, Your Honor.

THE COURT:  I heard that.

MR. SNYDER:  Could we have just a moment, Your Honor?

Cross-Examination of Edward Outley by Mr. Fields——1837

BY MR. FIELDS:

Q.   Mr. Outley, were you at the scene of Shining Star's murder?

A.   No.  I wasn't.

Q.   Do you know a guy named William Young?

A.   No.  I don't know no William Young.

Q.   AKA Skeeter?

A.   Yeah.  I know Skeeter.

Q.   Was y'all cellies in federal?

A.   No.  We wasn't cellies.

Q.   Were you ever living in a federal correctional institute in Beaumont, Texas?

A.   Yes.  I was in the USP with him.

Q.   Did you ever speak to Mr. Young about Shining Star's murder?

A.   No.  I didn't speak with him about Shining Star's murder.

Q.   Did you ever speak with anyone about Shining Star's murder?

A.   No.  I didn't speak with him about the murder.  The confusion was going on about you being hot on the yard or the USP if you tell on somebody between me, Skeeter, your cousin, Timothy Robinson and Antoine Shapell.

Q.   Did you ever tell Mr. Young a different story than what you told the jury today?

Direct Examination of William Young by Mr. Fields——1939

(The witness was sworn)

DIRECT EXAMINATION

BY MR. FIELDS:

Q. Mr. Young, will you please state and spell your name for the court reporter?

A. William Young, Jr.

Q. Could you spell it for the court reporter?

A. W-i-l-l-i-a-m Y-o-u-n-g, Jr.

Q. Mr. Young, do you know a guy named Edward Outley?

A. Edward? Yes. I do.

Q. And do he go by any other name?

A. Trey Boy.

Q. And how do you know him?

A. How do I know him?

Q. Yes, sir.

A. Well, from the -- from the street when he was a child.

Q. Where are you housed at now, Mr. Young?

A. USP Beaumont.

Q. And how long have you been there?

A. About six years.

Q. Were there a time when you and Mr. Outley were at that facility together?

A. Yeah.

Q. When?

Direct Examination of William Young by Mr. Fields——1940

A.   I can't recall when.  Exact when.

Q.   But when you all were there together, did you and he talk?

A.   Yes.  We did.

Q.   Did he ever talk to you about a murder in Waco involving a woman named Suncerey Coleman or Shining Star?  A simple "yes" or "no" will do.

A.   No.

Q.   He didn't?

A.   No.

(Conference between Mr. Fields and Mr. Peterson)

BY MR. FIELDS:

Q.   Did you ever write a letter to a Detective Steve January stating that that conversation took place?

A.   Yes.  I don't know the victim's name.  I never did know the victim's name.

Q.   But you did have a conversation with Mr. Outley involving a murder, correct?

A.   [Right]

Q.   Did he tell you whether or not he was personally present the night the victim was killed?

For clarification, he didn't say he committed the murder. He just said he was there, correct?

A.   Yes.

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION

UNITED STATES OF AMERICA       §
      §
v.       §       CRIMINAL NO. W-01-CR-164(1)
      §
SHERMAN LAMONT FIELDS       §

## *EX PARTE PETITION FOR WRIT OF HABEAS CORPUS AD TESTIFICUNDUM FOR WILLIAM YOUNG*

TO THE HONORABLE WALTER S. SMITH, JR.
CHIEF U. S. DISTRICT JUDGE,
WESTERN DISTRICT OF TEXAS, WACO DIVISION:

SHERMAN LAMONT FIELDS, defendant in the above entitled and numbered cause, by counsel, respectfully requests that this Court order the Clerk of Court to issue a Writ of Habeas Corpus Ad Testificandum for **William Young aka "Skeeter", DOB 5-14-65, Federal BOP Inmate Number 56038-080, U.S. Prison, Beaumont, Texas**, and as grounds would respectfully show the following:

1.      Jury selection in this case is set to begin at 9:00 a.m. on Monday, January 12, 2004.

2.      The government has notified defense counsel that William Young, incarcerated in FCI Beaumont, may have potential exculpatory evidence in this case. Defense counsel has interviewed William Young and confirmed that he in fact states that a key government witness has told him a completely different story than what has been revealed in witness statements and grand jury testimony. Such testimony is exculpatory as it would impeach the credibility of at least one key government witness, Edward Lee Outley III, and possibly another key government witness.

WHEREFORE, Petitioner requests that this Court order the Clerk of Court to issue a Writ of

Habeas Corpus Ad Testifucandum to the warden of the United States Prison in Beaumont, Texas, to

deliver **William Young aka "Skeeter", DOB 5-14-65, Federal BOP Inmate Number 56038-080,**

to the United States Marshal for the Western District of Texas, Waco Division, or his lawful deputy, to

be brought by him before this court on Monday, January 19, 2004, at 9:00 a.m. or such other time as this

court may direct or defense counsel may call William Young as a witness, and to be promptly returned

to the warden's custody when his testimony is completed.

Respectfully submitted,

| | |
|---|---|
| Robert T. Swanton, Jr. | Scott Peterson |
| 1105 Wooded Acres, Suite 630 | 1701 Austin Avenue |
| Waco, Texas 76710 | Waco, Texas 76701 |
| Telephone: (254) 776-3980 | Telephone: 254-753-3100 |
| Facsimile: (254) 741-1894 | Fax: 254-753-5122 |
| State Bar No. 19557100 | State Bar No. 15836300 |

ATTORNEYS FOR SHERMAN LAMONT FIELDS

BY: ___*Scott Peterson*___

Scott Peterson

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| V. | § | CRIMINAL NO. W-01-CR-164(1) |
| | § | |
| SHERMAN LAMONT FIELDS | § | |

**ORDER ISSUING WRIT OF HABEAS CORPUS AD TESTIFICANDUM**

It is hereby ORDERED that the CLERK OF COURT shall issue a Writ of Habeas Corpus Ad Testificandum to the warden of the United States Prison in Beaumont, Texas, to deliver **William Young aka "Skeeter", DOB 5-14-65, Federal BOP Inmate Number 56038-080**, to the United States Marshal for the Western District of Texas, Waco Division, or his lawful deputy, to be brought by him before this court on Monday, January 19, 2004 at 9:00 a.m. or such other time as this court may direct or defense counsel may call William Young as a witness, and to be promptly returned to the warden's custody when his testimony is completed.

SIGNED on this ____ day of _____, 2003.


_____
WALTER S. SMITH, JR.
CHIEF U. S. DISTRICT JUDGE,
WESTERN DISTRICT OF TEXAS
WACO DIVISION



*Submitted ExParte Motion Under Seal to be Heard In Camera*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## WACO DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| V. | § | CRIMINAL NO. W-01-CR-164(1) |
| | § | |
| SHERMAN LAMONT FIELDS | § | |

## MOTION TO SEAL ALL PETITIONS FOR WRIT OF HABEAS CORPUS AD TESTIFICUNDUM

**TO THE HONORABLE WALTER S. SMITH, JR.**
**CHIEF U. S. DISTRICT JUDGE,**
**WESTERN DISTRICT OF TEXAS, WACO DIVISION:**

**SHERMAN LAMONT FIELDS,** Defendant in the above entitled and numbered cause, files this *pro se, ex parte* motion to request that the court seal ALL PETITIONS FOR WRIT OF HABEAS CORPUS AD TESTIFICUNDUM AND ORDERS THEREON and would show the following:

1.      Defendant has a right to keep confidential and privileged all defense strategies and communications between defense counsel and others pursuant to the Sixth Amendment, U.S. Constitution and Rule 501, Federal Rules of Evidence. Since the above-described petitions contain potential confidential information and trial strategy, defendant requests that the Petitions and Orders relating to the petitions be sealed.

Respectfully submitted,

SHERMAN LAMONT FIELDS
*Pro Se* Defendant

*Submitted ExParte Motion Under Seal to be Heard In Camera*

## IN THE UNITED STATES DISTRICT COURT
### FOR THE WESTERN DISTRICT OF TEXAS
### WACO DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| V. | § | CRIMINAL NO. W-01-CR-164(1) |
| | § | |
| SHERMAN LAMONT FIELDS | § | |

### SEALED ORDER

Be it remembered that on this the _____ day of January, 2004, came on to be considered the foregoing *"MOTION TO SEAL ALL PETITIONS FOR WRIT OF HABEAS CORPUS AD TESTIFICUNDUM"*. The Court finds that the Defendant has made a proper showing to the Court to justify the sealing of the Motion and accompanying Order. The Motion to Seal is hereby **GRANTED**. It is accordingly,

**ORDERED** that this Order, the *"MOTION TO SEAL ALL PETITIONS FOR WRIT OF HABEAS CORPUS AD TESTIFICUNDUM"*, and all petitions for writ of habeas corpus testificundum filed by the defendant shall be filed of record in this case *UNDER SEAL.*

Signed and entered on this _____ day of _____, 2004.

WALTER S. SMITH, JR.
CHIEF U. S. DISTRICT JUDGE,
WESTERN DISTRICT OF TEXAS
WACO DIVISION

Q.    -- Mr. Fields has asked you a bunch of questions about y'all's relationship.

A.    Yes.

Q.    And you said you were scared of him. Why are you scared of him?

A.    Because he's just known to shoot people.

Q.    Has he ever threatened you?

A.    No. Not personally.

Q.    Has he ever tried to rob you?

A.    Yes.

MR. GLOFF:  Pass the witness.

RECROSS-EXAMINATION

BY MR. FIELDS:

Q.    Excuse me.  Could you tell me when did that happen? When did I try to rob you?

A.    On Proctor.  William Hayes told me that you were going to rob me.

Q.    And when was this?

A.    At the same time.  In the same amount of time period when you were at the house.

Q.    When me and you had this conversation?

A.    Yes.  It was before that.

Q.    So, Mr. Burton, --

Cross-examination of Kevin Burton by Fields.

1392

Q. you saying that I was -- let me get this right now. I was going to rob you and then I came and told you that --

A. No, but he told you that don't do it. That's the word that came from him.

Q. Excuse me? This was what I was fixing to say. I was fixing to rob you, correct?

A. Yes. That what he told me.

Q. And then I came and told you that I killed my girl?

A. Yes. This was after the fact.

Q. And when you say rob -- what did -- what did you have -- what did -- what did you have that I wanted?

A. Money.

Q. You had some money and I knew you had money?

A. Yes.

Q. And I was supposed to rob you for it?

A. You was out there with me.

Q. I was out there with you. Was I any -- what was I driving that day? Was I in some specific kind of car or something?

A. Specific car you was in a red Grand AM.

Q. And what date you say this was?

A. It was November 16th.

Q. November the 16th. And you say I was in a red Grand

Cross-Examination of Shaylakea Scroggins by Mr. Fields-1621

A.    No, sir.

Q.    Ms. Scroggins, have you ever been to the green store that's around the corner from Parkside?

A.    Yes, sir.

Q.    You have?  Do you know the name of that store?

A.    Stop and Shop No. 3.

Q.    And what did -- what exactly do they sell?

MR. SNYDER:  Your Honor, is -- I wonder what relevance there is what a convenience store sells.

THE COURT:  Sustain the objection.

BY MR. FIELDS:

Q.    Do you know what time they open and close?

MR. SNYDER:  Your Honor, I question what relevance it is what time a convenience stores opens and closes.

THE COURT:  What's the relevance, Mr. Fields?

(Conference between Mr. Fields and Mr. Peterson)

MR. FIELDS:  Your Honor, I want to -- I'm just proving that at one point she claimed that she had walked to the store and the store was closed at this time.  She couldn't have possibly walked to that store at that time.

BY THE WITNESS:

A.    Okay.  Let's talk about --

THE COURT:  Let's just -- you be quiet.

That's not impeachment on a matter that's relevant.  The objection will be sustained.

2032

Go ahead, Mr. Snyder.

MR. SNYDER:  The point of it is -- is this:  He will say misstatement after misstatement after misstatement to you.

He has no conscience.  He has no shame.  You want to see what he's made of?  When the medical examiner was on the stand and he stood up and said, "You know I didn't kill that girl. You know I didn't kill her."  How would a pathologist from Dallas, Texas know anything about who she --

MR. FIELDS:  Your Honor, he's still stating facts not in evidence.  When I made that statement, I was talking to the prosecutor.

THE COURT:  Mr. Fields, that would have been totally inappropriate if you'd been doing that.

Overrule the objection.

MR. SNYDER:  He's still trying to get his two cents worth in.  Because you know why?  You remember when Shalaykea was on the stand and I started then using objections?  Remember that? And I know I did it to the point where some of you were probably wondering, what is this guy doing?  Why is he doing this?  To show one thing to you and to have one thing come out, to let you see, and if you looked, you saw it.  He can't stand to not be in control.  The second he's not in control, even in something as technical as the ability to follow the Federal Rules of Evidence, he can't take it.  He can't stand it.

Let's go through some of his I guess you'd call them high

Recross-Examination of Edward Outley by Mr. Fields——1855

Reask the question, Mr. Fields, and we'll see if it's appropriate.

MR. PETERSON:  Would the Court allow advising counsel to approach the bench?

THE COURT:  Sure.

(On-the-record bench conference, to wit:

MR. PETERSON:  Your Honor, as advisory counsel, we're not able to make objections, but as officers of the Court, we're seeing an unfair prejudice to our client taking place right now with Mr. Snyder making repeated speaking objections and making side-bar statements and asking improper questions during direct examination and we ask the Court to use its advisory capacity to control this.  We know that under normal circumstances it's up to defense counsel to --

THE COURT:  My advisory capacity?

MR. PETERSON:  Yes, sir.

THE COURT:  I don't know what you're talking about, Mr. Peterson.

MR. PETERSON:  Well, Your Honor, you know that it's improper for an officer of the Court, a lawyer, to knowingly ask improper questions and to knowingly make side-bar statements, to knowingly make long speaking --

THE COURT:  You made it clear that that last so-called objection was improper, Mr. Peterson.  The rest of what you're talking about is -- I don't know what you're talking about.

Recross-Examination of Edward Outley by Mr. Fields——1856——

You can't go back and say he asked improper questions as a general statement.

Mr. Snyder, don't do that again.

MR. SNYDER:  Yes, Your Honor.

MR. PETERSON:  I just felt we had to get something on the record.

(End of bench conference)

(Conference between Mr. Fields and Mr. Swanton)

BY MR. FIELDS:

Q.   Mr. Outley, --

A.   Yeah.

Q.   -- you said that I told you to write this letter, correct?

A.   You talked to me about it, writing it.  Yes.  Yeah. We -- you was telling me that your lawyer was saying that he had, you know, these different statements saying different type of thing and I was denying that I had wrote the statement and stuff like that.  I don't write a statement on you.  Like I say, I wrote a statement clearing my name as to having anything to do with this girl being murdered or anything, man, and helping you break out of jail as all being labeled.

Q.   So, Mr. Outley, you're now admitting that you lied when you wrote this letter and got it notarized, correct?

A.   Yes.  Yeah.  Your lawyer knew it then.  You did, too, when you seen the statement.

Cross-Examination of Edward Outley by Mr. Fields——1848

BY MR. FIELDS:

Q.    Mr. Outley, --

A.    Uh-huh.

Q.    -- I want to direct your attention to Defense Exhibit No. 8.  Is that your letter?

A.    Yes.  It is.

Q.    Your handwriting?

A.    Yes.  It is.

Q.    Now could you explain to us what 5K1 is?

MR. SNYDER:  Your Honor, is -- may I see the exhibit?'

THE COURT:  Yes, sir.

MR. PETERSON:  Your Honor, may I approach counsel and give him a copy?

THE COURT:  Certainly.

MR. SNYDER:  Sure.  That'd be helpful.  Thank you, counsel.

You can return it to the witness and he can go ahead and answer the question as long as I have something to refer to, Your Honor.  Thank you.

MR. FIELDS:  I ask that Exhibit No. 8 be admitted into evidence.

BY MR. FIELDS:

Q.    Now, Mr. Outley --

MR. FIELDS:  Your Honor, was Exhibit No. 8 admitted into evidence?

THE COURT:  Not yet.  Mr. Snyder hasn't finished reading it yet, Mr. Fields.  He may have an objection to it.

MR. FIELDS:  I'm sorry, Your Honor.

MR. SNYDER:  Go ahead.

THE COURT:  Do you have an objection to Exhibit 8, Mr. Snyder?

MR. SNYDER:  No, Your Honor.

THE COURT:  It's admitted.

(Exhibit(s) admitted:  D8)

BY MR. FIELDS:

Q.  Mr. Outley, now will you explain to us what 5K1 is?

A.  Okay.  A 5K1 supposed to be a down -- some type of form of a downward departure for testimony.

Q.  Could you go a little bit further in depth so I can understand?

A.  Okay.  Well, I could explain it more in my words like this:  When I got arrested, the statements that I gave was not on you.  It was on the fact of me clearing my name of what was going on and having dealings with anything.  I was on level 20, which was 41 to 51 months.  I could have took -- accepted responsibilities for this case and, you know, gave the statement to come up here and testify and would have got like 27 to 33 months or something like that on my acceptance of responsibilities and my testimony, but I refused to take the 5K1 or be railroaded, as I feel at that time being railroaded

171

that Alberta Renea Hampton told the marshals, "It's not mine." The gun and the ammunition belong to the defendant, my boyfriend Edward Lee Outley, Trey Boy as she called him. So what do they do? They arrest him. They take him to jail.

The next day Special Agent Doug Kunze with the ATF goes to the jail to interview the defendant and ask him some questions. What does he do? The first thing he does is he reads him his rights and he explains to him what his rights are and the defendant agrees to talk to him voluntarily waiving his rights and he says, "Okay. I'll talk to you." So what does he tell Special Agent Kunze? Special Agent Kunze testified. The defendant says to him, "Calvin Rollins brought the gun over there for protection and I've been keeping it under the mattress of the bed." Now, there's only one mattress in that apartment and there's only one bed and that's the bed in the one bedroom where he and Alberta Renea Hampton slept. Not every day, not all the time, but that's where they stayed when they were there.

What else did he say? He also said about the ammunition. "I don't know nothing about the ammunition. It's not mine, but I think it might be Willie Hampton," who's the brother of Alberta Renea Hampton.

So what happens next? Well, the defendant was charged and that's why we're here today because of this trial. Now, besides the marshals and the ATF agent that testified, who

175

didn't take anything.

Then the next time Greg Robinson with the United States probation office testified, and you heard me ask the defendant, "Did you ever tell anybody that you knew about the ammunition?" "No."

THE COURT: You've used nine minutes, Mr. Gloff.

MR. GLOFF: Thank you.

"No. Never did." Greg Robinson came up here and testified as his United States probation officer, "I interviewed him on March 12th, 2002, asked him about it and he said, yes. He knew the ammunition was there." So once again I ask you, what does the defendant say about this? It depends on which time, because you heard a fourth version today in trial. That's the fourth version of the story.

He said everybody's lying in this case except him. I want you to ask yourself, does your common sense tell you that that's what's going on, or is it simply that the defendant is trying to get himself out of a pickle? He's told three different stories before, today's the fourth, and he's trying to keep it all straight.

And I want to also -- if he didn't know about any of that stuff in his bedroom where he was sleeping with his girlfriend in the house. He didn't know about any of it.

I submit to you that the government has proven this case beyond a reasonable doubt. I ask that you convict the

STATEMENT FORM. OFFICER WARNING.
VOLUNTARY STATEMENT OF _____
I, _____, after having been first duly warned
by _____ who is the
                          (Officer Name)
_____ of McLennan County, Texas at
            (Title)
_____ o'clock, _____ M., at _____
                                        (Place of Warning)
on the _____ day of _____ 19___, of the accusation
against me in clear language and of the affidavit, if any, filed in support of such accusation;
(1) I have the right to retain counsel;
(2) I have the right to remain silent and not say anything;
(3) I have the right to have an attorney present during any interview with peace officers or
    representing the State;
(4) I have the right to terminate the interview at any time;
(5) I have the right to request the appointment of counsel if I am indigent and cannot
    afford counsel;
(6) I have the right to an examining trial;
(7) I am not required to make any statement and that any statement made by me be used
    against me.
I understand my rights as set out in this warning and knowing what they are I freely and
voluntarily, without being forced or compelled by promises, threats, or persuasion, waive
these rights and make the following statement in writing to _____
My name is _____, I live _____

sked him how did he get out. That's when
e told me about the officer give him a key
I told him not to do it on his shitf. So the
ame day the officer gave him the key he left the
arp next moving at about 7:30 he but before he
t he said that he called Tray Boy on his cell
hone an ask him to come an get ▓ C.W. him cause
e is fixing to leave. But Tray Boy told him no
hat he wasn't going ▓ C.W. to be apart of C.W. that. then
hat's when I asked him abot Shinig Stal and
told me that C.W. she was ok and why was I
hing him C.W. ▓ that then he told me he don't know
ho to trust so we drove around twon C.W. for C.W. about ▓ ▓
ther hour or two then that's when he droped me
f at my girlfriends house Vicki Cox when he
ped me off it was about 12:30 midnright.

I have read this statement consisting of __8__ (page(s), each of which bears my signature, and
I affirm that all the facts and statements contained herein are true and correct. I further
affirm that I knowingly, intelligently and voluntarily waived the above rights prior to and
during the making of this statement.
THIS STATEMENT WAS COMPLETED AT 2:00 P.M. ON THIS ___5TH___ DAY OF
__December__, 2001.

_____
WITNESS

_Christan Walker_
SIGNATURE OF PERSON GIVING STATEMENT

_____
WITNESS

DEC. -10' 01(MON) 16:37    US MARSHAL SERV WACO                    TEL:254 750 1575                    P. 020

01-8754

STATEMENT FORM, OFFICER WARNING.
VOLUNTARY STATEMENT OF ___Christian Shea Walker___
I, _____, after having been first duly warned
by _____
(Officer Name)                                                who is the
_____ of McLennan County, Texas at
(Title)
_____ o'clock, _____ M., at _____
                                    (Place of Warning)
on the _____ day of _____ 19____
against me in clear language and of the affidavit, if any, filed in support of such accusation;
(1) I have the right to retain counsel;
(2) I have the right to remain silent and not say anything;
(3) I have the right to have an attorney present during any interview with peace officers or representing the State;
(4) I have the right to terminate the Interview at any time;
(5) I have the right to request the appointment of counsel if I am indigent and cannot afford counsel;
(6) I have the right to an examining trial;
(7) I am not required to make any statement and that any statement made by me be used against me.
I understand my rights as set out in this warning and knowing what they are I freely and voluntarily, without being forced or compelled by promises, threats, or persuasion, waive these rights and make the following statement in writing to _____
My name is _____. I live _____

he an Star went into the hallway an he ask
er to leave whit him cause he said he needed
o talked to her. Then he told me that he an
tar left to a motel room an had sex. Then
' told me that he took he back to the hospital
fd left which I did not believe because I
now Star. An I believe she would has called,
omeone.

C.W.

C.W.

I have read this statement consisting of __2__ (page(s), each of which bears my signature, and
I affirm that all the facts and statements contained herein are true and correct. I further
affirm that I knowingly, intelligently and voluntarily waived the above rights prior to and
during the making of this statement.
THIS STATEMENT WAS COMPLETED AT 2:00p M. ON THE __16__ DAY OF
__December__, 19 2001.

MR Cd~
WITNESS

_____
WITNESS

Christian Walker
SIGNATURE OF PERSON GIVING STATEMENT

Chris Walker's Grand Jury testimony.

27

so defensive about it, "Why you worried about her?" He was like, "Man, you don't have to worry about her; she's okay," so in the back of my mind, I was thinking, "Well, maybe he's just got her tied up somewhere." You know, I'm hoping, you know, that he's got her tied up somewhere, you know. I mean -- but it turned out not to be like that.

Q. (BY MR. GLOFF) Has he tried to talk to you while you've been in jail?

A. No, no, sir.

Q. Have you tried to talk to him?

A. No, sir.

MR. GLOFF: Okay, any other questions?

GRAND JUROR: You said your mother told you to stay away from him, right?

THE WITNESS: Yes, sir.

GRAND JUROR: She knows you do drugs and everything?

THE WITNESS: My mom, does she know that I -- well, I mean she -- she --

GRAND JUROR: Is she okay with it?

THE WITNESS: She knows that I'm on the streets, that I hustle and stuff like that, but she don't think she knows that I was involved

FILED

OCT 1 8 2002

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY _____
DEPUTY CLERK

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
WACO DIVISION

UNITED STATES OF AMERICA            *

V.                                  *            CRIMINAL NO. W-01-CR-102

CHRISTIAN CHAE WALKER              *

GOVERNMENT'S MOTION FOR DOWNWARD DEPARTURE
PURSUANT TO SENTENCING GUIDELINE SECTION 5K1.1

TO THE HONORABLE JUDGE OF SAID COURT:

NOW COMES the United States Attorney for the Western District of Texas, by and through

the undersigned Assistant United States Attorney, and files its Motion for Downward Departure

pursuant to Section 5K1.1 of the Sentencing Guidelines and would show the Court the following:

I.

On September 5, 2002, Defendant, CHRISTIAN CHAE WALKER, pled guilty to a one

count Information. Defendant provided substantial assistance in the investigation or prosecution of

another person who has committed an offense.

The defendant's information was truthful, complete, and reliable in the opinion of the case

agents. The case agents believe Defendant, CHRISTIAN CHAE WALKER, has been completely

truthful in admitting his criminal activities. Defendant agreed to testify against others at any

proceeding. The information provided by the Defendant was corroborated by Doug Kunze of the

Bureau of Alcohol, Tobacco & Firearms.

Prosecutions have been completed based, in part, on the Defendant's information, including

the successful prosecution and conviction of Edward Lee Outley.    On August 27, 2002,

CHRISTIAN CHAE WALKER, testified in the trial of United States v. Edward Lee Outley. Outley was on trial for felon in possession of a firearm and ammunition. Walker testified that he had provided several firearms to Outley, and Outley was convicted by a jury.

On February 26, 2002, Defendant also testified before the Federal Grand Jury investigating Sherman Lamont Fields and Benny Donnell Garrett. Walker is a material witness in the case against Sherman Lamont Fields, and it is anticipated that the Defendant will be required to testify at the trial of Sherman Lamont Fields.

WHEREFORE, the Government moves the Court, in its discretion, to grant this motion and reduce Defendant's sentence commensurate with the interests of justice with respect to the Defendant.

Respectfully submitted,

JOHNNY SUTTON
United States Attorney

By:  GREGORY S. GLOFF
     Assistant United States Attorney

MARK L. FRAZIER
Assistant United States Attorney
700 South University Parks, Suite 770
Waco, TX  76706
(254) 750-1580

CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing Government's Motion for Downward Departure Pursuant to Sentencing Guideline Section 5K1.1 has been forwarded on this _____ day of October, 2002:

Brian R. Pollard
Attorney at Law
5400 Bosque Blvd., Suite 600
Waco, TX 76710

GREGORY S. GLOFF
Assistant United States Attorney

Letter from Shalaykea Scroggins to Fields.

So after 2 1/2 years, of pain, hell and suffering this is the goodbye I get. I stood by your side when you were at your lowest. When I had no one on your side. I put up with lies, deceit, headaches and only God knows whatever else. This is what you do to the woman you loved? Oh, I ain't tripping on the not writing each other anymore, I'm tripping on your stupidity by itself. Yea, I loved you - Still do, but you have really lost the little mind that you have left, convincing yourself that I had something to do with that girl. That was your girl. I quote what you said, you loved her. You were having the problems with her, not me. Just because things didn't go the way you plan, after you killed her, doesn't mean I'm gonna have sympathy for you. I still was by your side knowing what you had done, while I was incarcerated. You can't think of anything else but to put it on me. You are one sick bastard. I can't wait until the day when I testify against you. I served my time in jail for what I did, thats, was harboring you. Thats all I'm guilty of. I see now, everybody's been telling me your putting it off on me, + I can't believe I was willing to spend more time in jail on your behalf, by just testifying against you. I felt a little bad when the D.A announced what you were facing, Death. Thats the kind of love I had. See you still don't fucking get it. You get off by hurting others. The problem is, you ran your mouth to much. You told to many people. So your fucked!! Face it. Quit trying to bring others down because of your problem. You made that bed now lie in it, by your damn self. I really thought you loved me. What a fool I was. Not, not me. I'm not gone look forward to a around. This is my goodbye. The final one will be after the trial. When you go

happen! You won't see me, but just know I will be there to see you suck in your last breath. :: You deserve it, only thing I'm gone regret about that day is that they didn't shoot you twice in your head like you did Shining Star. I've been writing Shae to so I'm gone find out what you did with the gun. Yea I'm gone help them in any way I can to kill you...... Trying to give me the charge. You are really sick. You need to find the lord while your their. He's the only one can help you. —Goodbye—

P.S. Keep Jacking off to every girl that came down there :: You may as well fuck one of them niggas cause thats who you'll be seeing for the rest of your life or until your death. The girl had 3 kids, man!! 3 damn kids, 24 years old. I'm a mother Sherman so I can relate. I guess cause I'm 5½ months pregnant your going to try to get me next. You always say watch your next stunt, watch mine in Cort!!!
!!!

PPS I didn't turn states evidence against you for a lesser sentence, I did it willingly. Ask the Detectives!! I signed statements on you the 2nd day I was here.

Have a NICE LIFE

BITCH

Letter from Shalaykea Scroggins to Sherman Fields

So after two and a half years, of pain and suffering this is the goodbye I get. I stood by your side when you were at your lowest. When you had no one on your side. I put up with lies, deceit, headaches and only god knows whatever else. This is what you do to the woman you loved? **Oh, I ain't trippin' on the not writing each other any more.** I'm trippin' on your stupidity by itself. Yea, I loved you and still do, but you have really lost the little mind that you have left, convincing yourself that I had something to do with that girl. That was your girl. I quote what you said " You loved her." You were having the problems with her not me. Just because things didn't go the way you planned after you killed her doesn't mean I'm gone have sympathy for you. I still was by your side knowing what you had done, while I was incarcerated and you can't think of anything else but to put it on me. You are one sick bastard. I can't wait until the day when I <u>testify</u> against you. I served my time in jail for what I did, that was harboring you. That's all I'm guilty of. I see now everybody's been telling me me you're putting it off on me and I can't believe I was willing to spend more time in jail on your behalf by not testifying against you. I felt a little bad when the D.A. announced what you were facing. <u>Death</u>. That's the kind of love I had. See you still don't fucking get it. You get off by hurting others. The problem is, you <u>ran your mouth</u> too <u>much</u>. You told too many people. So you're fucked!! Face it. Quit trying to bring others down because of your problems you made that bed now <u>bitch</u> you gone lay in it, by your damn self. I really thought you loved me. What a fool I was. not no more. I'm not gone look forward to a answer. This is my goodbye. The final one will be after the <u>trial</u>. When you go to Huntsville and die, cause that damn

sure what's gone happen! You won't see me, but just know I will be there to see you suck in your last breath. :)  You deserve it, only thing I'm gone regret about that day, is that they didn't shoot you twice in your head like you did Shining Star, **I've been writing Shae too** so I'm <u>gone</u>  find out what you did w/the gun. Yea, I'm <u>gone</u> help them in any way I can to kill you......trying to give me the charge you are really sick. You need to find the lord while you're there. He's the only one can help you-Goodbye-

P.S. Keep jacking off to every girl that come down there :) You may as well fuck one of them niggas cause that's who you'll be seeing for the rest of your life or until your death. The girl had three kids, man!! Three damn kids, twenty four years old I'm a mother Sherman, So I can relate. I guess cause I'm five and a half months pregnant you're going to try to get me next. You always say watch your next stunt, watch mine in court!!!

P.P.S. I didn't turn states evidence against you for a lesser sentence, I did it willingly. Ask the detectives!! I signed statements on you the second day I was here.


HAVE A NICE LIFE

<u>BITCH</u>

Cross-Examination of Christian Walker by Mr. Fields—1777

time riding.

Q. You don't remember? Okay.

You stated that you didn't want to tell the truth at first because you didn't want to put your family in jeopardy; am I correct?

A. Yes, sir.

Q. Could you explain? What do you mean by that?

MR. GLOFF: I'm going to object to the form of the question, Your Honor.

THE COURT: Sustained.

(Conference between Mr. Fields and Mr. Swanton)

BY MR. FIELDS:

Q. Mr. Walker, in your first statement you told them that you gave me a gun and so forth, the .22 and all this here; am I correct?

A. Yes, sir.

Q. But you didn't tell them that I said I took Shining Star's life, correct?

A. Yes, sir.

Q. How many of the government witnesses have you talked to?

A. Nobody.

Q. You don't talk to Outley?

A. Yeah, but we don't talk about this case.

Q. You don't talk to Jerry Reed?

Chris Walker's Grand Jury testimony.

20

all that. Where was the gun during this time?

A. The one that I gave him?

Q. Yeah.

A. He was -- it was in his possession.

Q. Okay. Did you have a gun during that time?

A. No, sir.

Q. Okay. Did you all go to any pawn shops while you all -- while you all were on the road?

A. No, sir.

Q. Did he ever talk about having to get rid of any kind of gun?

A. No, sir.

Q. Okay. Do you know what happened to that .32 caliber that you gave to Trey Boy?

A. No, sir, but I do now.

Q. How do you know now?

A. Because I talked to Outley when I was down in the holding tank with him for a few -- about an hour ago, and he told me that he let Fields get it.

Q. Okay, but prior to that you didn't know what happened to it?

A. That's right.

Q. You just know that you gave it to him and --

A. And he let Fields get it.

Q. Okay. The time you -- the time you were with

A.    Did I say that?

Q.    Let me show you.

A.    I'm not sure why I said that.  I certainly don't know that to be a fact.

Q.    It may be because that was the last page of a very long questionnaire.

A.    Could be.

Q.    Okay.  If you don't know that to be a fact, Ms. Williams, then I assume that's not an attitude or opinion you have that would cause you any difficulty in viewing or weighing the evidence?

A.    No.

Q.    All right.  In a couple of other questions you were asked about your impression of prosecutors in general and you said they do the people's work and the criminal defense attorneys in general you said they're doing what's required.  I think those are perfectly reasonable answers myself. Prosecutors represent the government.  They present evidence when a grand jury returns an indictment.  They vigorously represent the government and seek convictions.  By the same token, their job is to see that justice is done, and I can assure you that either of these attorneys, if they think something has happened that someone's rights are not being protected, they will go so far as to dismiss the case rather than pursue it.

MR. SNYDER: Your Honor, I'm going to object to this entire line of questioning because all Mr. Fields is attempting to do is to testify under the guise of asking questions.

THE COURT: Sustain the objection.

BY MR. FIELDS:

Q.    Ms. Scroggins, --

A.    Uh-huh.

Q.    -- when you and Shining Star were arguing, I told Outley to hold you; am I correct?

MR. SNYDER: Same objection.

THE COURT: Sustained.

(Conference between Mr. Fields and Mr. Swanton)

THE COURT: Do you have a question, Mr. Fields?

MR. FIELDS: Your Honor, it was my understanding that all relevant facts as far as proving who or whatever committed the murder is admissible; am I correct?

THE COURT: No, sir. You're certainly not.

MR. FIELDS: I'm not?

THE COURT: Do you have any other questions of this witness, Mr. Fields?

MR. FIELDS: Yes. I have a bunch of more questions, Your Honor.

THE COURT: Well, let's see if you can find one that's admissible. Otherwise, we're going to cut short the cross-examination and go on to something else. Finish up with

Cross-Examination of Shaylakea Scroggins by Mr. Fields-1665

A.   I mean, at the time it was mud because of course I'm saying we didn't -- nothing was known.  Now that I know, it was blood.

Q.   It's blood?

A.   Yeah.

Q.   Okay.  Ms. Scroggins, --

A.   Yes.

Q.   -- don't you know that if there was even a little spec of blood, they would have found it and DNA would have matched it to the victim?

MR. SNYDER:  Your Honor?

THE COURT:  Sustain the objection.  That's merely argument, Mr. Fields.

We're going to do something different at this point and conclude the cross-examination for this point in time.  We'll come back to it and we'll have the government complete its direct examination of this witness.

MR. SNYDER:  Yes, Your Honor.  Would the clerk -- first of all, the government would offer into evidence Government's Exhibit No. 56A and B into evidence.

THE COURT:  Those have already been identified.  They just weren't offered is what my notes show.

Any objection, Mr. Fields?

(Conference between Mr. Fields and Mr. Peterson)

MR. FIELDS:  No, sir, Your Honor.

Redirect Examination-Shaylakea Scroggins by Mr. Snyder-1666

THE COURT:  They're admitted.

(Exhibit(s) admitted:  G56A, G56B)

REDIRECT EXAMINATION

BY MR. SNYDER:

Q.    And one other thing.  Did you and Mr. Fields go to a professional photographer to have your photographs made as a couple?

A.    Yes, sir.

Q.    And Government's Exhibit No. 49, is that the photograph you had taken of yourself at the professional photography studio?

A.    Yes, sir.

Q.    And that's a true and accurate representation as you and Mr. Fields looked when you were a couple, correct?

A.    Yes, sir.

MR. SNYDER:  Government will offer into evidence Government's Exhibit 49.

THE COURT:  Any objection, Mr. Fields?

MR. FIELDS:  No, sir, Your Honor.

THE COURT:  It's admitted.

(Exhibit(s) admitted:  G49)

BY MR. SNYDER:

Q.    Ma'am, I'd like to take you back when you were -- when Mr. Fields first picked you up on the evening of November 6th and went out to the road in Downsville in the dark which

Redirect Examination-Shaylakea Scroggins by Mr. Snyder-1667

you said was lined by trees.

A.   Yes.

Q.   And you said at some point he stated to you that he needed to do something, then he changed his mind and said it could wait, correct?

A.   Yes, sir.

Q.   And at that time you didn't think much of it.  Is that fair to say?

A.   Yes, sir.

Q.   It just struck you as odd?

A.   Yes.

Q.   Did he later tell you what he intended to do to you out there?

A.   Yes.

Q.   And what did he intend to do to you?

A.   He intended to kill me.

Q.   And he told you this?

A.   Yes, sir.

Q.   And, ma'am, you've stated earlier that at times like when you were in the room he would joke about killing you, correct?

A.   Yes, sir.

Q.   When he was telling you this time that he intended to kill you out on that Downsville road, was he joking?

A.   No, sir.

Redirect Examination-Shaylakea Scroggins by Mr. Snyder-1668

Q.   He was serious?

A.   Yes.

Q.   Was that a side of Mr. Fields you had never seen?

A.   Yes.

Q.   Okay.

A.   I mean, he --

Q.   Go ahead.

A.   That particular point, but he's always been, you know.

Q.   Okay.  That's fine, ma'am.

MR. SNYDER:  And that will conclude the government's.

THE COURT:  All right.  We're going to recess for the day at this time until 9:00 o'clock in the morning.

Ladies and gentlemen, remember the instructions you've been given not to talk to anyone about the case, not to allow anyone to talk to you and to try to insulate yourself from any media reports.

I'd like for the attorneys and everybody else -- the audience can certainly leave and the jury's going to go home. The rest of you stay here, please.

LAW CLERK:  All rise.

(Jury exited the courtroom at 4:24)

LAW CLERK:  Court stands in recess till 9:00.

(Break was taken from 4:24 to 4:27)

LAW CLERK:  All rise.

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION

FILED

JAN 0 9 2004

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY _____
DEPUTY CLERK

UNITED STATES OF AMERICA

V.

SHERMAN LAMONT FIELDS

CRIM. NO. W-01-CA-164(1)

MOTION TO FIRE COUNSEL And PETITION THE COURT TO
APPOINT NEW COUNSEL.

TO THE HONORABLE WALTER S. SMITH. JR.
UNITED STATES DISTRICT JUDGE:

1. On December 19, 2003 Defense Counsel informed Me of their Strategy and I disagreed therefore rose a conflict. I'm scheduled for trial January 12, 2004 and my life hangs in the balance. I cannot go to trial with Attorneys that are not Looking out for my best interest. This Motion is not for the purpose of delay as you so callously remarked when I filed a motion to proceed pro se. There is a serious conflict of interest and if my Attorneys would have informed me of their strategy sooner, this motion would have reached you sooner.

WHEREFORE, Defendant prays for the relief requested herein.

Respectfully Submitted
Sherman Fields

Sherman Fields
P.O. Box 15330
Fort Worth, Texas 76119

MIRRANDA WILLIAMS
NOTARY PUBLIC STATE OF TEXAS
COMMISSION EXPIRES:
MAY 1, 2007

Mirranda _____, notary, 12/30/03
expires 5/1/07

128

223