subpoena, I don't care what the situation is, they would be facing a knock on the door. I was just concerned that you wanted to do that now and have her held in custody.

MR. PETERSON: Well, Mr. Youngblood said he's tried to serve her four times, and my concern was that she's dodging the subpoena. That's the way he's presented it to me. My concern was if he's not able to present her with the subpoena in the next five days or so what our options might be and --

THE COURT: The options would be to secure a writ of attachment and have the marshals go see if they have better luck.

MR. PETERSON: Yes, sir, and that's why I brought it to the Court's attention.

THE COURT: Okay.

MR. PETERSON: And, Your Honor, if I may turn the podium over to my co-counsel regarding the next ex parte matter.

THE COURT: All right.

MR. SWANTON: Judge, as you are aware, Mr. Fields has recently filed another motion seeking to have this Court appoint new trial counsel.

THE COURT: Yes.

MR. SWANTON: We have, I guess, fairly recently been informed of that fact and have informed Mr. Fields that we did not think this Court was going to do that. In fact, this Court expressed in pretty clear terms that he was not going to do

that the last time we had a hearing such as that.  Mr. Fields has informed us that if the Court does not allow him new trial counsel, that he intends to represent himself.

I wanted to inform the Court first that for a number of months now Mr. Peterson and I, along with Jane McHan, who is the mitigation specialist that has been appointed in this case, along with Don Youngblood, our investigator, have had numerous conversations with Mr. Fields about the problems that a pro se representation could have, especially in a case of this magnitude.  We have on numerous occasions talked to him about the procedures involved, the difficulties in picking a jury, the difficulties of responding to evidence and objections to that particular evidence, the difficulties of dealing with witnesses and the difficulties of making opening statements and final arguments in addition to all the punishment issues that would cause difficulties.  It was our hope that Mr. Fields would change his mind about that after those conversations.  In my conversation with him this morning -- excuse me -- a few minutes ago this afternoon he has indicated that he is going to ask the Court to appoint him new counsel and if the Court does not do that, that he intends to ask the Court to let him represent himself pro se.  For the last few minutes Mr. Peterson and I have again tried to talk him out of that, tried to talk to him again about the dangers of doing that and all the procedural problems that he will face if he represents

himself pro se, and I believe he is still maintaining that he wants to do that and would probably want to address the Court with that concern and I assured him that you would want to address him with concerns you would have about that.

THE COURT: Sure.

MR. SWANTON: Before he addresses the Court, and I have told Mr. Fields this on numerous occasions, that even though we are in an ex parte proceeding and the court has been cleared of everybody except essential court personnel, I have advised him that he should not reveal trial strategy in his statements to you or to anybody else in this courtroom today, that he should be very careful about revealing any attorney/client privilege, that he should not make any admissions that may incriminate him. I've tried to explain to him that he should be very circumspect in his remarks to you about any evidentiary matters and not reveal anything to the Court or to the personnel in the courtroom that could come back to hurt him in his case. He indicates to me he understands that. I've told him I won't have any real control over what he tells you or the Court once he starts talking, but I wanted to say on the record again in front of Mr. Fields and front of Your Honor that that's my advice to him. I know that's Mr. Peterson's advice to him.

And, again, on the record I want to urge Mr. Fields to reconsider his desire to represent himself, that I think he's in grave danger if he does that and I'm ready and willing to

assist him, as I know Mr. Peterson is, in any way possible to the best of our ability to represent him in this case and I think if he represents himself, he will be doing himself great harm and I've tried to relay that information to him.

With that in mind, Your Honor, I suppose we don't have anything else to say at this point with respect to that issue on -- one moment, Your Honor, if I may.

There is one other issue that's come up, Your Honor. Fairly recently -- there is a large number of records with respect to Mr. Fields' juvenile record. Back in 1987, I believe in April of 1987, there is a small entry in that juvenile record that indicates Mr. Peterson when he was working for the McLennan County district attorney's office either authorized prosecution of Mr. Fields for a -- if I remember correctly, it was a burglary of a habitation case. I'm not sure that Mr. Peterson was actually directly involved in that prosecution. Frankly, Mr. Peterson cannot remember being involved in that, and it simply may be that somebody from the police or the probation department called somebody at the D.A.'s office and asked for permission to file a petition. We have talked to Mr. Fields about that and while we don't really perceive it as a conflict, Mr. Peterson has certainly worked diligently on this case and that has never been an issue through the two years of representation. We talked to Mr. Fields about that and let him know that somebody somewhere

10

down the line may see that as a perceived conflict of interest and that if he had any concerns about that, he should talk with the Court about it.

Last Monday, the first time we had had a chance to talk to him after we learned about that, I asked him to consider that information and possibly sign a waiver of that potential conflict of interest or at least the appearance of a conflict of interest. I don't really believe it is, Your Honor. And at that point he indicated he did not want to sign that because he didn't think we were going to be his attorneys anyway or he was going to be representing himself. So I wanted to raise that issue with the Court and see how the Court wanted to handle that. We'd certainly be happy to offer information or testimony from Mr. Peterson if you thought that was necessary as to what he thinks his involvement was in that prosecution and put something on the record in that regard.

THE COURT: I think that latter suggestion would probably be of some benefit, but before that, I wonder at this point if it's not appropriate to allow the government's attorneys to come back in and at least sit and listen because they would have an interest in this -- these two matters to the extent that it might have an effect on a later appeal and they would want their record protected or at least be aware of where they stand.

MR. SWANTON: And I completely agree with that. Certainly

with both of those issues, actually, Your Honor. My only concern is I don't know what Mr. Fields is going to say during this hearing and how he may respond to questions you might ask of him and I am truly concerned that he may reveal information that as his trial counsel I don't believe he should reveal. I don't know how to handle that other than to have you I guess have an initial questioning period of Mr. Fields and see if that's truly what he wants to do and then bring the government's lawyers in.

THE COURT: Well, let me express my opinion about an aspect of that. I believe that Mr. Fields has the absolute right to represent himself if that's his choice and if it's voluntarily and intelligently made. Anybody disagree with that?

MR. SWANTON: No, sir.

THE COURT: Well, I don't think that being the case that I have any need to have him reveal to me any specific reasons why he insists on doing that. And that's -- that's the only context in which I can see that he might intentionally or unintentionally reveal something that would be damaging to him in the -- in the way of evidence he might want to present or something in that regard.

MR. SWANTON: Would the Court grant us this opportunity, that during the course of your admonishments to Mr. Fields, which I assume you're going to give him --

12

THE COURT: Sure.

MR. SWANTON: -- about pro se representation, if we feel he is -- and if he's speaking to the Court and if we feel he's revealing information, will you allow us the opportunity to at least stand up and advise Mr. Fields that he should not be revealing that kind of information?

THE COURT: Certainly. And I don't intend to ask him any questions that I would feel would have that result.

MR. SWANTON: And I didn't think you would, Your Honor. I'm just concerned about how Mr. Fields may respond to anything at this point.

THE COURT: Okay.

MR. SWANTON: Your Honor, Mr. Peterson has just informed me in talking with Mr. Fields that he initially -- Mr. Fields wants to initially take up the issue of new counsel and he intends to go into factual issues which I think may be questions about evidence and trial strategy that I do not encourage him in any way or fashion to reveal to the Court or to personnel in the court or put on the record, and that's my concern.

THE COURT: Well, that being your concern and with those admonishments that you have made on your behalf, I'll join you in suggesting to Mr. Fields on my behalf that it would --

Well, I don't know, Mr. Fields, what you -- what you want to tell me that might reveal something that you would later

Trial transcripts.

13

wish the government hadn't heard or that I hadn't heard, although I don't know why I'm going to be affected by anything you might say, but let's go ahead and give Mr. Fields an opportunity to tell me whatever he wants me to know in relation to your request, Mr. Fields, for replacing Mr. Swanton and Mr. Peterson with other attorneys to represent you.

And if we can get him a cordless mike, he can do that sitting right there where he is.

Okay. Mr. Fields, tell me whatever you want to tell me regarding why you want to replace Mr. Swanton and Mr. Peterson with other lawyers or another lawyer, bearing in mind one more time that you should be careful about what you -- what you say that might reveal matters that you would later wish you hadn't revealed. Go ahead, sir.

MR. FIELDS: No. Your Honor, it just that my court appointed counsel now, their actions are suspicious and I think they're working with the prosecutor instead of working for me and I've asked on several different occasions for documented evidence to no avail. Also there are sure fired ways to prove that several other witnesses are lying and my attorneys refuse to pursue it. They prepared a strategy to lessen the impact in an attempt to try to get me a life sentence when I repeatedly profess my innocence. My view is that when you're innocent, life is no better than death. I've tried to work with my attorneys. I've even tried to compromise, but I can't take no

14

more of their being unfair and completely unreasonable. I like my attorneys both of them, but they put me in a no win situation. Their strategy guarantees me the death penalty. And if I have to go to court with them, I might as well do it myself.

THE COURT: Well, Mr. Fields, as Mr. Swanton pointed out, he and Mr. Peterson have been working on your behalf in this case for approximately two years. That's not necessarily how long it always takes in a case of this nature, but it's not unusual because there are a lot of things that have to be done. If other attorneys were appointed to represent you, there would be a lengthy delay, and as I told you the last time we were here, that's not going to happen. There have been questionnaires mailed out and returned to by -- I don't know. What? 300 people or more. 400 people who have filled out these 25-page questionnaires. I've spent hours reviewing those. My staff and I have spent hours preparing for this trial, and none of that is important, but these 400 potential jurors are all planning to be here when they're told to be here, and the long and short of it is that this matter has progressed too far to stop at this point and appoint you new lawyers and start over. So your request to have new lawyers is not going to be granted.

If you want to represent yourself, as I just said, you have the right to do that if I determine that you're doing that

15

voluntarily and intelligently, which means you know what you're doing and you understand the consequences of doing it. If that's what you truly want to do, then I need to ask you some questions on the record in order to satisfy myself that you're making a decision that would be considered by an appellate court to have been voluntarily and intelligently made. Do you understand what I'm saying?

MR. FIELDS: Yes, sir.

THE COURT: Is that what you want to do at this point?

MR. FIELDS: Yes, sir.

THE COURT: Then let's ask the government attorneys to come back in and sit and I'll explain to them where we are.

(Government counsel entered the courtroom at 2:04)

THE COURT: All right. Let the record reflect that the counsel for the government have taken their place in the courtroom.

To let you know where we are, gentlemen, Mr. Fields has requested that the Court replace Mr. Peterson and Mr. Swanton with other counsel. After briefly discussing that, the Court has refused to do that. Mr. Fields has said that he wants to represent himself in that case and I told him that before that could be finally approved I had to convince myself that he was voluntarily and intelligently making that decision and I am about to ask him some questions on the record to see if I can be satisfied in that regard, and that's where we are.

16

I thought you had the right to be here to protect the record if for nothing else.

All right. Mr. Fields, for the record, have you ever studied law?

MR. FIELDS: No, sir.

THE COURT: You have been in courtrooms before, I understand?

MR. FIELDS: Yes, sir.

THE COURT: Have you ever before represented yourself in a criminal proceeding?

MR. FIELDS: No, sir.

THE COURT: Do you understand what you're charged with?

MR. FIELDS: Yes, sir.

THE COURT: Do you understand that in Count Three you're charged with capital murder?

MR. FIELDS: Yes, sir.

THE COURT: And do you understand that if the jury answered special interrogatories in a particular way, assuming that they had first found you guilty of that charge, that the jury would have the right to recommend the death penalty, and if that happened, the Court would be obligated to sentence you to lethal injection? Do you understand that, also?

MR. FIELDS: Yes, sir.

THE COURT: There are six other counts that do not involve the death penalty, Mr. Fields. They involve various and sundry

17

different terms of imprisonment.  If the jury found you not guilty of the capital offense alleged in Count Three but found you guilty of the other offenses, one or more of them -- or if there are more than one of them, then whatever number of years could be assessed as to those offenses could be ordered to be served consecutively, or in common jargon "stacked," and you could serve a length -- a sentence that would exceed your natural life, whether it was a life sentence anyway.  Do you understand that?

MR. FIELDS:  Yes, sir.

THE COURT:  And do you understand that if the jury finds you guilty of the capital offense alleged in Count Three but does not recommend that you be put to death, that the only other alternative sentence as to that count would be life in prison without possibility of release?  Do you understand that?

MR. FIELDS:  Yes, sir.

THE COURT:  Do you understand, Mr. Fields, that if you elect to represent yourself and continue in that regard, that I have the right to, and I know no reason why I would not, appoint Mr. Swanton and Mr. Peterson as standby counsel, but you need to understand that their help to you would be limited. I would not be able to help you at all.  They would be there to answer any legal questions that you might have.  They would not be there to suggest to you questions you ask on cross-examination or direct examination of a witness.  They

18

would be not -- not be there to reach over and say, "You need to object to that question."  They would be there only to answer specific legal questions that you might have because you're not trained as a lawyer.  Do you understand that, also?

MR. FIELDS:  Yes, sir.

THE COURT:  Do you have any familiarity with the Federal Rules of Evidence, Mr. Fields?

MR. FIELDS:  No, sir.

THE COURT:  Do you understand that those Rules of Evidence control what can be presented to the jury and what can't?

MR. FIELDS:  No.  But if you say it do, I guess it do then.

THE COURT:  Well, you've been in court enough, I assume, Mr. Fields, to know that sometimes lawyers stand up and object to something that's being presented.

MR. FIELDS:  Yes, sir.

THE COURT:  That the government wants or the state wants to present something and the defense lawyer stands up and objects and then the Court rules on whether or not that objection is good or not and whether or not the evidence should be presented to the jury.  You're familiar with that procedure, aren't you?

MR. FIELDS:  Yes, sir.

THE COURT:  Well, that's what I mean by the Rules of Evidence.  When a lawyer stands up and makes an objection, he's

in effect saying that that evidence is not being presented in accordance with the Rules of Evidence. It might be because it's hearsay or something like that, but that's basically the Rules of Evidence, and if you're representing yourself, if something is presented, you would have to stand up and say, I object to that because of such and such, and you would be at a real disadvantage in doing that because you don't have the knowledge of the Rules of Evidence that lawyers spend three years in law school and the rest of their life using if they're trial lawyers. Do you understand that, also?

MR. FIELDS: I'm just going to have to object to their whole case because their whole case is hearsay.

THE COURT: Well, just because you might think something is hearsay doesn't mean that it is, because people who don't have legal training might not understand that in one instance something that somebody says is hearsay and then in another instance something that somebody says may be completely admissible and not hearsay. That's my point. Do you understand that?

MR. FIELDS: Yes, sir.

THE COURT: Do you have any familiarity with the Federal Rules of Criminal Procedure?

MR. FIELDS: No, sir.

THE COURT: Well, those are the rules that set forth how the trial proceeds, how jury selection occurs, who makes

opening statements and when, who makes final statements and when. All the ramifications of how a trial progresses, that's controlled by the Federal Rules of Criminal Procedure. There may be instances during a trial when you being unfamiliar with that, something might happen that would not be to your advantage and that you wouldn't know to protest or object to. Do you understand that?

MR. FIELDS: Yes, sir.

THE COURT: Mr. Fields, I think I've told you before that in my opinion the old adage that a person who represents himself has a fool for a client, which simply means that it is virtually always the case that a person is better off having a trained lawyer, or in your case lawyers, represent them, that in trying to represent themselves it's just generally unwise to try to do that and particularly when you're not trained in the law. It's not wise for a lawyer to try to represent himself even though -- even anymore than it's wise for a doctor to try to perform surgery on himself or on one of his children because it's just not something that can properly be done. You're not familiar with the Rules of Evidence or the Rules of Procedure. You're just simply not in a position to represent yourself and protect yourself in any way, shape or form to the extent that Mr. Swanton and Mr. Peterson together or alone, for that matter, could do that. I think you're making a terrible mistake and I urge you not to do that for your own benefit.

—21—

On the other hand, you have the right to represent yourself if you wish.  One other thing that you need to understand is that if you proceed to represent yourself, then if after the trial starts you change your mind and realize you've created a very bad situation and you want to have your lawyers jump in and start representing you after all, then that's not a matter of right anymore.  There's some pretty strict limitations on your being able to do that once a trial starts, and certainly if you were allowed to change your mind one last time and have your lawyers step in and represent you, the door for going back one more time and deciding you want to represent yourself would be forever closed.  So my point is, if you decide at this point you're going to represent yourself and if you change your mind later on, you might or might not have your lawyers come back in and represent you, but if that happened, that would be the last time you'd have a chance to change your mind.  Do you understand all of that?

MR. FIELDS:  Yes, sir.

THE COURT:  And my having explained all that to you, do you still want to represent yourself?

MR. FIELDS:  Sir?

THE COURT:  Do you still want to represent yourself?

MR. FIELDS:  Yes, sir.

THE COURT:  Has anybody tried to convince you to do that?  Has anybody tried to -- coerced you in any way into doing that?

22

Is there any reason you're wanting to do that except by your own choice and based on your own decision and what you know, Mr. Fields?

MR. FIELDS: Like I told you, man, my attorneys act like they working with the prosecutor, man. I can't win. I'm in a no win situation. I might as well do it myself.

THE COURT: Well, in that regard, Mr. Fields, I don't know how I can convince you and perhaps I can't and I don't know that it's my job to really try and convince you of anything, but I can -- I can tell you that there is no possibility that these two lawyers are working with the government to try and get you convicted. They are not doing anything that wouldn't be and is not in your best interest. Now, that doesn't mean that they haven't advised you regarding a possible plea agreement or anything of that nature because that's part of their job, too, but there's just no possibility that they are doing what you suggest and working with the government or acceding to the government's position or doing anything other than representing you to the very best of their ability. And I don't know how I can say that any stronger except just to tell you that I know that as well as I know my own name, Mr. Fields.

Now, is your -- are there any questions you want to ask at this point? Is there anything I've said that you don't understand or any other point you want to make?

MR. FIELDS: No. I just -- I just needs to know can I get

—23—

access to a law library?

THE COURT:  Well --

MR. SWANTON:  Judge, if I may just speak.

THE COURT:  Yes, Mr. Swanton.

MR. SWANTON:  I will certainly -- if this is the path that Mr. Fields chooses, I'd note Mr. Peterson and I will make whatever books we have available in our personal libraries available for his usage.

THE COURT:  Well --

MR. SWANTON:  I don't know whether that's going to be complete, but we will certainly try to do that.

THE COURT:  Books or copies of -- I was going to suggest, Mr. Fields, that -- that there is no law library as such that's available.  A law library would fill up more than this room if you're talking about a complete law library.  What you will have is access to the law through these two standby lawyers if that's where we're going to go.  That's what they will be for, to answer legal questions, and if you ask them a legal question and if you tell them you would like to see some legal authority or you would like to see a portion of the Rules of Evidence that -- that apply to something you're concerned about, then that would be, Mr. Swanton says, available to you.  I would suggest that would be more appropriate than trucking a bunch of books up to the jail that you may never see again.  But that would be the access you would have to legal references and to

24

the law, Mr. Fields, would be through these two attorneys who have law libraries and Xerox machines and they can provide you with whatever you reasonably request in that regard.

MR. FIELDS:  Yes, sir.

THE COURT:  Okay?

MR. FIELDS:  Yes, sir.

THE COURT:  Then with all of that, do you still want to represent yourself?

MR. FIELDS:  Yes, sir.

MR. SNYDER:  Your Honor?

THE COURT:  Mr. Snyder?

MR. SNYDER:  If I could, may I approach the bench for just a moment?

THE COURT:  Yes, sir.

(On-the-record bench conference, to wit:

MR. SNYDER:  I don't wish to intrude upon the Court and I think the Court did a good job, but because of the seriousness of the penalty, I'm concerned that later on I have not -- to my knowledge this man has not been examined by a psychiatrist.  I have indications that a defense psychologist may or may not have spoken to him.  I say that because of the mitigating factors they submitted in which they said that he had diminished capacity and other matters, that he could not appreciate the wrongfulness of his conduct.  I'm concerned then the state of the record -- is -- particularly with the penalty

—25—

so serious that a court may be concerned that there's been no previous finding -- remember that kid down in Florida recently went forward and they said, well, they should have -- they should have sent a shrink in.  The government don't want to see what it is, but maybe it might be good to have Dr. Mark or someone like that that the Court trusts to sit down with the defendant and make sure he is not suffering from any mental disease or defect or have any organic background in like damage to the head or something that would affect his ability to make a rational, intelligent decision.

MR. GLOFF:  And that may have already been done by the defense.

MR. SNYDER:  We just don't know.

THE COURT:  This business of diminished capacity is new to me.  I don't know about that.

MR. SNYDER:  If you look at their proposed instructions.

THE COURT:  I haven't seen it.

MR. SNYDER:  They were furnished to us last -- yesterday evening.  And one of his second mitigation he said the defendant is suffering from diminished capacity and an inability to appreciate the wrongfulness of his conduct, and then they related it to his childhood and things like this and I was going to bring it up today -- is -- is that appears to be the wording of it because it uses the word "diminished capacity and wrongfulness of conduct, inability."  Those are psychiatric

—26—

terms.  And I was concerned and if the Court wishes to address these lawyers out of the presence of us, I don't have any problem with that, either.  But I'm concerned with that type of thing in the record with us taking this serious step that an appellate court looking over your shoulder might have said, "You should have stopped and made sure the guy was on all fours."

THE COURT:  Well, it's 2:20 on a Friday afternoon.  When are we going to do that before 9:30 Monday morning and how are we going to do it before 9:30 Monday morning?  I guess it's possible you can find somebody to do it.

MR. SWANTON:  Well, I would like to speak to you without the government here for just one moment.

THE COURT:  Sure.

(Government counsel left the bench)

MR. SWANTON:  Judge, frankly, Scott and I were going to ask you the same thing before you made the ruling, and in all honesty it is not because we believe our client is insane.  The issue about dimished capacity I believe has more to do with his upbringing and his lack of father figures, that type of thing.  It's not a diminished capacity necessarily in the insanity type situation.

Is that correct, Scott?

MR. PETERSON:  Yes.

MR. SWANTON:  Okay.  I will tell the Court that Dr. Randy

27

Price who is a well respected psychologist in the Dallas/Fort Worth area who I've used on a number of occasions, who the Fort Worth district attorney's office has used in death penalty cases before, has evaluated Sherman. He has an IQ of 114. He is not mentally retarded and, frankly, according to Dr. Price is fairly bright.

THE COURT: It appears that way to me.

MR. SWANTON: But that doesn't -- I mean, I think that any time someone wants to put theirself in a situation to represent themself -- I also think that it would be a good idea to have him evaluated. Who knows? Maybe something has happened in the last day or so. I don't -- I don't honestly believe that, but out of an abundance of caution, we are going to request that you have him examined. I don't believe he's insane. He is not mentally retarded. He's never given us any indication that he is incompetent in the sense that he doesn't understand what's going on, but because of his request, I think that, in and of itself.

THE COURT: All right.

MR. SWANTON: I agree with Mr. Snyder that maybe we ought to bend over backwards in resolving that issue.

THE COURT: And have a psychiatrist represent him rather than relying on a psychologist.

MR. SWANTON: Well, yes, and frankly I don't know it's because the difference between just a psychologist and a

28

psychiatrist. Your Honor, in some respects I think a psychologist is much more qualified to determine competency and IQ and that sort of thing, but I think maybe somebody just totally independent ought to come in and look at him in light of this situation.

THE COURT: Well, I'll take this under advisement for this -- at this point and have my secretary call Dr. Mark and see if he could possibly visit with him this evening, tomorrow or Sunday and have something for me Monday morning.

MR. SWANTON: Well, again, in all honesty with the Court, I'd be very surprised if Dr. Mark came back with anything that would cause the Court concern.

THE COURT: I would, too, but I understand that it's precautionary. Are there any other local psychiatrists that are already involved in this case?

MR. SWANTON: Involved in this case? Dr. --

THE COURT: I mean somebody I wouldn't want to call to do this.

MR. SWANTON: Yes. They've at least contacted -- who's the guy who has -- I can tell you in just one moment, Judge.

THE COURT: He's the only one I know who can do this kind of thing quick.

MR. PETERSON: With regard to your admonishments, if I may enlighten the Court on one other issue, the government has bent over backwards in this case to provide us with discovery

29

materials from the very git-go. They've provided us with copies of police reports, witness statements and everything, and I can see how from a client's perspective that would look like defense lawyers are in cahoots with the prosecutors because we're cooperating on this thing to get ready for trial and we've tried to explain that to our client that just because we haven't pursued motions for discovery and that sort of thing, it's because we're getting more than we're entitled to.

THE COURT: Is that what he's complaining about?

MR. PETERSON: Well, that was one of his statements was that we look like we're in cahoots with the government.

THE COURT: Yeah. I understand that.

MR. PETERSON: And I just thought that as part of that admonishment if that helps you admonish him that that's one of my thoughts.

THE COURT: As far as I'm concerned, he's admonished.

MR. PETERSON: Okay.

MR. SWANTON: There are no local psychiatrists that they've contacted. They contacted Dr. Richard Coons in Austin. I thought there was somebody local they had talked to, but they've not talked to anybody local. If Dr. Mark's available ...

THE COURT: I'm not for sure how to proceed from this point on. I had a few jury matters of people that I want to excuse, but I want to give you an opportunity to complain about

—30—

it and I wanted to tell you there's some people that -- if we want to continue on the record. It's so frustrating. I've spent four hours a night for the last week going over these questionnaires and I go through one and it takes about 20 or 25 minutes. I'm sure it takes y'all longer than that, but I go through it all and I mark and I tab and I highlight and get to the very last question, whatever, I find out this is somebody that has a six-year-old kid at home and no day care.

MR. SWANTON: Yeah. Why they didn't reveal that in their yellow sheets, I don't know.

THE COURT: So, anyway, there's some of those that I found that have statutory reasons for not being on the jury that I need to make you aware of and a couple I question and I want to see if you have any objections to and then --

(Off-the-record discussion between law clerk and Court)

MR. PETERSON: If we might make a motion for the Court not to rule on that request to represent pro se until such a time as he's evaluated, maybe that would be the appropriate thing.

THE COURT: I just said I'd take it under advisement. The other thing I was going to ask you is if you would like to trade off and agree to excuse the guy you represented in a DWI and excuse Scott's -- Mark Frazier's cousin. Did you see both of those?

MR. PETERSON: Yeah. We knew that stuff. Yeah.

(End of bench conference)

31

THE COURT: Okay. Let's take a short recess. I'll be right back.

LAW CLERK: All rise.

(A recess was taken from 2:27 to 2:33)

LAW CLERK: All rise.

THE COURT: Be seated, everyone.

Counsel and Mr. Fields, here's the situation. I just had a brief telephone conversation with Dr. Steve Mark, a psychiatrist who does examinations for the Court when called upon. His schedule is unfortunate in that from now until Monday morning he is the psychiatric physician on call. So he can't do anything for us during that period of time. However, he will be downstairs at the front door as close to 8:00 o'clock as he can to perform the service I've asked him to perform.

Mr. Fields, I want you to understand what the lawyers and I have been talking about up here is their concern that while neither of them has any feeling or doubts whatsoever concerning your intelligence and your competence and your ability to make a decision voluntarily, that the record would be better if a psychiatrist had visited with you and could assure the Court that he sees no evidence of any organic problems or any psychiatric difficulties whatsoever.

The first thing he will tell you, Mr. Fields, is that you don't have to talk to him in the least if you don't want to.

So that's going to be up to you and I'm just explaining to you what's going to happen and why he's going to come to visit with you and attempt to talk to you Monday morning just so that I can be satisfied before I make a final decision about you representing yourself, that you are completely capable to make that decision voluntarily and intelligently and you don't have any problems that I wouldn't be aware of because I'm not a doctor and that your lawyers wouldn't be aware of because they're not doctors, either. That's what that was all about.

Okay. We need to talk about jury selection just briefly. I have spent more time than I wanted to going over these questionnaires, and in doing so I discovered that there, unfortunately, were some people who didn't reveal until the last page of their questionnaire -- and I didn't learn until after I'd gone through over 120 that it was a good idea to read the last page first -- that they hadn't revealed that they had a problem that constitutes a legal excuse for serving on jury duty. And I need to give you those numbers and the reasons so that you'll know that you don't need to concern yourself with those people anymore.

No. 32 has a six-year-old child and no child care.

No. 29 has a nine-year-old child, same situation. And you're aware that anyone who has care of a child under ten years of age and that would cause a problem to be called for jury duty is entitled to be excused.

64

and create trial errors so that if their client is convicted there will be a better chance of that conviction being reversed on appeal. That is a real disadvantage that you would have in trying to represent yourself because those types of decisions and those types of attempts to create error in the record is something that certainly cannot only best be done, but can almost only be done by someone who has proper legal training and experience. So I just want to point that out to you and ask you if you have any questions about that aspect of representing yourself, and if you do, let me know, and if you don't, then this would be your last opportunity to tell me whether or not you want to represent yourself or have Mr. Peterson and Mr. Swanton represent you.

MR. FIELDS: First of all, Your Honor, I don't -- I don't even want to get to no -- to the point where I have to go to appeal. I want a -- I want an acquittal. Do you know what I'm saying? And the way they're going, I can't see it.

THE COURT: Mr. Fields, I understand that's the primary goal of everyone who goes to trial anywhere any time. I understand that.

MR. FIELDS: And I just want to tell you that I'm not sure I can do this, you know. I have no knowledge of the law and I believe I'll be hindered by a severe case of stage fright. I want to ask you one last time to appoint me new counsel. As I stated Friday, my attorneys and I have a major conflict of

65

interest, and if you refuse me new counsel, you'll be forcing me to proceed pro se against my will.

Furthermore, I've heard you state on two different occasions that I was attempting to delay the trial. With all due respect, I want you to know that I've been verbally opposing each delay thus far. If you think I'm lying, all you have to do is ask Mr. Peterson and Mr. Swanton. The government is the one whom has delayed the trial this long for various reasons, the last being that they found some physical evidence that needed to be tested, a hair that they claim was found on the victim's body or clothes or somewhere. As I'm sure you know, the delay was a waste of my time but it was beneficial to the government because from my understanding they claim to have found several more inmates that have come forward claiming that I confessed to them or something like that. You've been unfairly admonishing me about delays when it's the government that has delayed the trial in order to gain an advantage.

THE COURT: Mr. Fields, my memory is that I told you the last time you decided -- well, you had suggested that you wanted to represent yourself and then you changed your mind and decided you wanted your attorneys to represent you, and at that point I told you that were you to change your mind once again, as you have now done, that that would not constitute or result in a delay in the trial. If I have taken the position that you yourself have been a cause of a delay, I'm not aware of having

FILED

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION

JAN 2 2 2004

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY_____
          DEPUTY CLERK

UNITED STATES OF AMERICA          §
                                  §
v.                                §          CRIMINAL NO. W-01-CR-164(1)
                                  §
SHERMAN LAMONT FIELDS             §

## DEFENDANT'S *BATSON* CHALLENGE

TO THE HONORABLE WALTER S. SMITH, JR.
CHIEF U. S. DISTRICT JUDGE,
WESTERN DISTRICT OF TEXAS, WACO DIVISION:

SHERMAN LAMONT FIELDS moves the court to examine into whether the government has exercised one or more peremptory challenges on the basis of race alone and for grounds would show the following:

1.      Defendant is a black male of African-American heritage. Defendant made note of the prospective juror's whose race would also be characterized as "black" or "African – American" and who were not struck for cause. Those jurors are:

#95;  #36;  #61;  #57;  #124;  #76

2.      The government has challenged for cause the following black or African-American individuals who defendant believes, based on their answers to individual voir dire questions, would have been fair and impartial jurors:

✓ #95        ___ #36        ✓ #61        ✓ #57        ✓ #124        ✓ #76

*M–chall*
*Gvts strike based*
*on Batson*

154

363

3.    Since the court provided a pool of 60 perspective jurors, and 6 of these jurors (10%) are black or African-American, statistically one would expect that only 10% of the government's peremptory challenges, or 2 individuals, would involve a person of African-American heritage. The government has exceeded this statistical expectation by striking _5_ persons of African-American heritage. Defendant thus moves for a mistrial based on what appears to be á non-race-neutral reasons for the government's peremptory challenge of these prospective jurors.

4.    A peremptory strike to remove a potential juror on the basis of race violates the Fourteenth Amendment, *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986); *Bush v. Vera*, 517 U.S. 952, 116 S.Ct. 1941, 135 L.Ed.2d 248 (1996).

5.    The right to equal protection under the law also applies to the jury selection process, *Holland v. Illinois*, 493 U.S. 474, 110 S.Ct. 803, 107 L.Ed.2d 905 (1990).

6.    Even more fundamental, defendant is entitled to a fair and impartial jury, Sixth Amendment; *Irvin v. Dowd*, 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961).

WHEREFORE, defendant respectfully requests that this Court examine into whether or not the government's peremptory challenges were race neutral and, if not, order a mistrial.

Respectfully submitted,

_Sherman Lamont Fields_
SHERMAN LAMONT FIELDS

364

# CERTIFICATE OF SERVICE

I hereby certify that a copy of the above motion has been delivered to the U. S. Attorney's Office, Western District of Texas, Waco Division, in accordance with law, on this 22ND day of January, 2004.

_____
Scott Peterson
Advisory Counsel for Sherman Lamont Fields

3

365

1153

strike and Mr. Fields three, and shortly thereafter I realized that was something that wasn't authorized by the rules. Actually, neither is, but I don't think Mr. Fields can complain about being given additional strikes.  So Mr. Fields was actually allowed four extra strikes and the government was allowed its 20 conferred by the rules.

Go ahead, Mr. Peterson.

BATSON CHALLENGE

MR. PETERSON:  Your Honor, the written Batson challenge sets forth six prospective jurors that between Mr. Swanton and I we made -- in our notations because Mr. Fields is a black male, we made notations of the race of each prospective juror and there were six out of the 60, and that would be ten percent of the prospective jurors.  And those prospective jurors, the black or African American race, are set forth in that written challenge.  Having been provided the government's strikes, we took notice that five of those six were struck by the government, and because the government had 20 strikes, just on a percentage basis, one would expect if there's ten percent black prospective jurors in the pool that just percentage-wise they would only strike ten percent, which would be two of 20, and since five of 20 were stricken, it is our contention that that is a prima facie showing that the strikes may have not been race neutral.  And based on that, we feel that there's a possible violation of the Fourteenth Amendment as well as the

1154

Sixth Amendment right to an impartial jury and so we challenge under the holding of Batson vs. Kentucky.

THE COURT:  I'm going to ask the government if it can articulate race neutral reasons for each of those five strikes.

MR. SNYDER:  Yes, Your Honor.

THE COURT:  I'm not going to do that yet.

MR. SNYDER:  Oh, excuse me.

THE COURT:  The Court would be curious and the record might be more complete if Mr. Fields' reasons for striking Vera Cobbs, who was removed by both sides, was made a part of the record, Mr. Peterson.

MR. PETERSON:  I'm sorry, Your Honor?

THE COURT:  I said the record might be more complete if Mr. Fields' reason for striking Vera Cobbs who was also removed by the government and of which you complained.  What is the reason Mr. Fields struck that particular black juror?

MR. PETERSON:  Well, we thought that she was too pro prosecution, Your Honor, based on her answers concerning death penalty, the fact that she worked as a -- with the Texas Department of Criminal Justice, and we were quite surprised to see the double strike.

THE COURT:  And if that constitutes a valid race neutral reason, then the government should have no difficulty in expressing its reasons, but I think it should go a little further than that, Mr. Snyder.

1155

MR. SNYDER: Yes, Your Honor -- is -- in analyzing all jurors on this, we utilized a neutral system of doing it in which we looked at three questions, the answer to three questions. First, any person who answered below 54-B was automatically struck, with the exception of one person, the gentleman yesterday had said he didn't understand the word "invoke." So he circled "C" incorrectly. The second factor -- any person who did that was an automatic strike by the government who was below 54-B.

Race had nothing to do with it.

THE COURT: Does that apply -- well, go ahead and finish yours.

MR. SNYDER: The second factor we looked at was the answer to 23-D. If a person wrote "four" to "six" in any of those blocks, they were listed as -- immediately as a potential strike. We then turned to --

THE COURT: I'm sorry. Page 23. Not Question 23.

MR. SNYDER: Yeah. 23-D. On Page 23.

And then we turned to 23-M. Any person who wrote "one" to "three" in that box was listed as a potential strike. After we finished adding up the people that did that, we had 13 people that met the three criteria -- is --

THE COURT: All three or one of the three?

MR. SNYDER: Well, some of them met all three, but what -- any one of those was enough to list them on the strike list.

1156

We then removed one person, Mr. Weaver -- is -- because he determined his answer to 23-D was obviously in error. That was the only exception made.

Since we had 12 strikes, 12 people listed, we had 20 strikes -- is -- we struck all of them immediately. That left us with eight discretionary strikes. All eight discretionary strikes were used against white Caucasians. And that is the short of it.

And it was an objective -- it was a race neutral form and we -- if the Court would like -- is -- we have all our forms where it lists the answer to every question of those three questions that every person gave was listed out on each of our forms. It was tallied and at that point -- is -- because we did not want to get into trying to evaluate, well, they -- these words said this and those words said that. These were straight answers that had a numerical value or a letter value, thus, there would be no interpretation of it. And it was on those three criteria. Also those three criteria directly relate to their ability to impose the death penalty.

THE COURT: We all have copies of the questionnaires. Do you want to take a moment and verify that those numerical gradings were as Mr. Snyder reflects the government believes they were?

MR. PETERSON: Yes. We would, Your Honor, and I don't believe that the questionnaires are part of the Court's record

1157

and --

THE COURT:  Oh, they certainly are and they certainly will be.

MR. PETERSON:  Okay.

THE COURT:  The originals will be boxed up and included as a part of the record.

MR. PETERSON:  The other issue, Your Honor, is, we want to be sure that there's no future contesting the issue of whether or not the six prospective jurors set forth in the written Batson challenge were black male or females, and I don't know if the government is challenging that or not.  It --

MR. SNYDER:  No.  They all appeared -- they all appeared to be of African American descent.

THE COURT:  They all appeared the same to the Court.

MR. PETERSON:  I just wanted to make that clear, but if we could look at the questionnaires.

THE COURT:  Yes, sir.

MR. SWANTON:  Judge, if I may be excused.  All our questionnaires are down in my vehicle down in front of the courthouse.

THE COURT:  Why don't you just borrow mine?

MR. SWANTON:  Thank you, Your Honor.

(Conference between Mr. Snyder and Mr. Swanton)

MR. SNYDER:  And just for the record, Your Honor, I provided them with the actual scoring sheet that was used so

1158

they can see the answers as we reflected them, and we had another person that was checking at the same time to make sure that what was done was being accurately transcribed. So as far as we know, it is accurate.

MR. PETERSON: Your Honor, if it please the Court, if I may continue.

THE COURT: Yes, sir.

MR. PETERSON: I don't think that the defendant can reasonably argue an intent argument with regard to Batson in this case. We have no reason to question the -- what the government has stated concerning their basic platform that they set up for their strikes as being race neutral in that regard with respect to their intent. However, as this Court knows, the Fourteenth Amendment protections of the constitutional protections that prohibit discrimination is -- also looks at the results of actions taken by government officials. In this case the results of the actions, their system, be it flawed or otherwise, resulted in a discriminatory selection or deselection of jurors and to the discrimination of Mr. Fields by resulting in striking five of the six prospective black jurors, and because of that we feel that -- that an impartial jury cannot be selected, has not been selected, and that we would therefore move for a mistrial under the authority of the --

THE COURT: Mistrial is not the remedy, Mr. Peterson.

1159

Rejecting the government's strikes would be the only remedy that would be considered in the -- if a Batson challenge is successful.

MR. PETERSON: Your Honor, that would be the follow-up remedy that we would request. We are asking for the greatest relief first and then our second request is that the strikes be denied.

THE COURT: All right. Let me suggest that you suggest to the Court a race neutral method that the government could use in this matter or a method that would be more race neutral and would be race neutral, as you put it, and result as well as intent. If you can come up with such a scheme, what would your suggestion be, Mr. Peterson?

MR. PETERSON: Your Honor, I couldn't begin to pretend to tell the government how to make its strikes.

THE COURT: I'm not asking you to tell the government. I'm telling you to suggest to me what remedy might be enforceable.

MR. PETERSON: Because their argument is the result is discriminatory, not the intent, I don't think there is such a remedy. I think that misdirects where we're headed in this case. So the result --

THE COURT: So you -- go ahead.

MR. PETERSON: I'm just saying that the result is that we've stricken five of the six black jurors. I don't know that

1160

there is a scheme that they can come up with -- that I can come up with on the spur of the moment that would avoid that. We can avoid the result at this time.

THE COURT: So you're suggesting that the government must be forced to accept at least four black jurors regardless of what they said, regardless of how they acted, regardless of anything? Is that your position?

MR. PETERSON: I believe that there are some black jurors, Your Honor --

THE COURT: Answer my question yes or no if you can, please. That's what you'd do if you were cross-examining me.

MR. PETERSON: Would you repeat the question?

THE COURT: Yes. Is it your position that the government must accept at least four black jurors regardless of what they said, how they acted, what they looked like or anything else?

MR. PETERSON: No.

THE COURT: Then tell me how they should go about the process and come up with a race neutral result.

MR. PETERSON: Your Honor, if it please the Court, I don't believe that's the issue.

THE COURT: That's what you told me was the issue, that the result is not race neutral and therefore it can't be accepted.

MR. PETERSON: But you're asking me to tell them how to make --

1161

THE COURT:  I'm asking you to tell me what I should impose on them.

MR. PETERSON:  What we would request is that the Court review the questionnaires and the Court's notes regarding the prospective jurors and that there are at least one or two prospective jurors in those list of five that were stricken that would be fair and impartial, and so we can modify the result in this case by finding those that are fair and impartial and disallowing the strikes and that would change the result.

Now, there may be one or two in there that the Court might look at and say, well, I think these people do have a bias and therefore the strike is appropriate.  But there may be one or two and I believe there are one or two in there as shown by the fact there was a double strike on this one prospective juror, Vera --

THE COURT:  Cobb.

MR. PETERSON:  Cobbs.  That would indicate that there are some -- there's a real question of whether or not that's a juror that's leaning one way or the other.  That's how I would correct the result.

THE COURT:  Based on that suggestion, Mr. Peterson, would it be appropriate for me to review all of the strikes or just particularly all of the ones that were double strikes in addition to Ms. Cobbs?

1162

MR. PETERSON: Your Honor, since Mr. Fields has stricken Ms. Cobbs, I would ask that prospective juror to be removed from the formula because he's -- he has exercised that strike. But there are then four other prospective jurors of African American descent that I'd just ask the Court to look at those four to see if there is one or two in particular that the Court would find fair and impartial in order to make the result a better result that would be disallowed.

THE COURT: Well, it's the Court's finding that the government has not only articulated a race neutral basis for striking the black jurors that it did remove from the list, but that it has in fact exercised those strikes in a race neutral manner and the Batson challenge would not be granted.