# No. 13-70025

## IN THE

# United States Court of Appeals

### FOR THE FIFTH CIRCUIT

---

### UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

- against -

### SHERMAN LAMONT FIELDS,

*Defendant-Appellant.*

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS, WACO DIVISION (W-09-CV-009, W-01-CR-164)

---

## DEFENDANT-APPELLANT
## SHERMAN LAMONT FIELDS' MOTION TO RECUSE THE
## HONORABLE EDITH H. JONES

---

### THIS IS A CAPITAL CASE

JEFFREY ELLIS
OREGON CAPITAL RESOURCE CENTER
621 SW Morrison St., Suite 1025
Portland, OR  97205
(206) 218-7076

PETER J. ISAJIW
CADWALADER, WICKERSHAM & TAFT LLP
One World Financial Center
New York, NY  10281
(212) 504-6000

*Attorneys for Defendant-Appellant
Sherman Lamont Fields*

---

## CERTIFICATE OF INTERESTED PERSONS

Pursuant to Fifth Circuit Rule 28.2.1, the undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

1.    APPELLANT: Sherman Lamont Fields

2.    APPELLANT'S ATTORNEY: Jeffrey Ellis, Oregon Capital Resource Center, 621 SW Morrison Street, Suite 1025, Portland, OR  97025

3.    APPELLANT'S PRO BONO ATTORNEY: Peter J. Isajiw, Cadwalader, Wickersham & Taft LLP, One World Financial Center, New York, NY  10281

4.    APPELLEE: United States of America

5.    APPELLEE'S ATTORNEY: Joseph H. Gay, Jr., United States Attorney, Western District of Texas, 601 N.W. Loop 410, Suite 600, San Antonio, TX  78216

6.    APPELLEE'S ATTORNEY: Jennifer Sheffield Freel, United States Attorney, Western District of Texas, 816 Congress Avenue, Suite 1000, Austin, TX  78701

/s/ Jeffrey Ellis
　　　Jeffrey Ellis
　　　Peter J. Isajiw
　　　*Attorneys of Record for Mr. Fields*

-i-

Defendant-Appellant SHERMAN LAMONT FIELDS, through his undersigned counsel, hereby moves to recuse Hon. Edith H. Jones, Circuit Judge, from any further participation in this appeal pursuant to 28 U.S.C. § 455, the Fifth Amendment to the U.S. Constitution, and Canon 3C of the Code of Conduct for United States Judges as incorporated in this Court's local rules.

## PRELIMINARY STATEMENT

Defendant-Appellant Sherman Lamont Fields ("Fields") brings this motion for recusal based on facts set forth in a complaint for judicial misconduct concerning remarks by Circuit Judge Jones during a public lecture entitled "Federal Death Penalty Review" at the University of Pennsylvania School of Law on February 20, 2013, which was supported by several sworn affidavits by witnesses in attendance during that lecture and filed by thirteen separate complainants, including representatives of the Mexican Capital Legal Assistance Program, the NAACP, and several distinguished legal ethics professors, among others ("Complaint"). Ex. A.[1] The allegations in the Complaint, if true, undermine Judge Jones' ability to impartially determine Fields' appeal should she be assigned to any further proceedings in this matter.

In the Complaint, Judge Jones is alleged to have made public remarks which demonstrate personal biases against racial minorities and the mentally disabled. Her alleged comments evince her insensitivity toward the justification

---

[1]    All references to "Ex." herein refer to the Exhibits to the Declaration of Jeffrey Ellis In Support of Defendant-Appellant Sherman Lamont Fields' Motion to Recuse the Honorable Edith H. Jones, dated February 25, 2014.

-1-

and administration of capital punishment and, specifically, cast doubt on her ability to impartially apply controlling legal precedent with respect to constitutional claims brought by those on death row who have challenged their convictions and death sentences on grounds of actual innocence or mental disability – like Fields has done. The Complaint's allegations, substantiated by detailed affidavits sworn by disinterested witnesses, create the appearance of partiality, if not outright bias, against Fields, an African American defendant challenging his conviction and death sentence based on claims of actual innocence and mental illness.

## STATEMENT OF FACTS

### A.    Procedural History

In January 2004, Fields was convicted of escape and murder, among other counts, and was subsequently sentenced to death. Brief for Defendant-Appellant Sherman Lamont Fields, No. 13-70025 (Dkt. No. 00512440612) ("Br.")[2], at 4. In January 2009, Fields filed a motion for a new trial and to vacate his conviction and death sentence pursuant to 28 U.S.C. § 2255, and amended his motion in April 2010. *Id.* at 5. The District Court denied Fields' motion and also denied a subsequent motion for reconsideration. *Id.* at 6.

On August 1, 2013, Fields timely filed a notice of appeal of the District Court's denial of Fields' § 2255 motion to this Court. Br. at 6; Dkt. No. 00512335473. On November 13, 2013, Fields filed a motion seeking a Certificate of Appealability and a brief in support thereof. Dkt. Nos. 00512440609 (Motion),

---

[2]    All "Br. at ___ " references are to the physical pages of the brief, not the sequential pagination assigned by the ECF system.

00512440612 (Brief). This motion is still pending and has not been fully briefed. While Fields does not know whether Circuit Judge Jones will be assigned to the panel that will decide Fields' appeal, Judge Jones has already participated in these proceedings. *See* Dkt. No. 512499350 (Jan. 14, 2014 Order).

### B.   Fields' Background and Relevant Social History

Fields has been on death row since his conviction in 2004. He is African American and was born into a poor family in Waco, Texas. Br. at 7. His family had been victimized by racial intimidation and animus for generations, enduring brutal mistreatment during a period of intense racial violence in central Texas. *Id.* at 7-9. Fields' upbringing was characterized by shocking loss, including the violent deaths of several close friends and family members. *Id.* at 9-12. Complicating his profoundly tragic upbringing, and likely as a result of it, Fields was diagnosed with severe Posttraumatic Stress Disorder ("PTSD") and atypical bipolar disorder as a teenager, and is prone to paranoia and delusions. *Id.* at 11-12. Fields has suffered from these conditions throughout his adult life, including during his trial and subsequent proceedings. *Id.* Fields' § 2255 motion and present appeal asserts, *inter alia,* that he was denied his constitutional right to a fair trial because the District Court permitted Fields to represent himself despite his incompetence resulting from his mental illness. *Id.* at 12-14. Additionally, Fields contests his conviction on the ground that he is actually innocent of the crimes for which he was convicted. *Id.* at 121-30.

-3-

**C.    The Complaint For Judicial Misconduct Alleged Against Circuit Judge Jones**

As alleged in the Complaint, on February 20, 2013, Judge Jones gave a public lecture at the University of Pennsylvania School of Law entitled "Federal Death Penalty Review", which was ostensibly an opportunity to "discuss federal death penalty review through the perspective of a federal judge." Ex. A at 1 n.2; Ex. A, Bookman Aff. ¶ 3. Judge Jones's lecture discussed several topics reflecting a bias against certain racial groups. Judge Jones allegedly stated:

> "[C]ertain racial groups like African Americans and Hispanics are predisposed to crime" and "'prone' to commit acts of violence." She made "generalized and stereotypical comments about racial groups and their 'criminal tendencies.'" Judge Jones stated that "race" was merely a "red herring" "thrown up by opponents of capital punishment," and that no case had ever been made for "systemic racism." She also asserted that "certain systemic classes of crimes" exist and that "certain racial groups commit more of these crimes than others." She said that "sadly some groups seem to commit more heinous crimes than others." When asked to explain her remarks, she stated that there was "no arguing" that "Blacks and Hispanics" outnumber "Anglos" on death row and "sadly" it was a "statistical fact" that people "from these racial groups get involved in more violent crime." By way of example, she asserted as a "fact" that "a lot of Hispanic people are involved in drug trafficking," which itself "involved a lot of violent crime." She "dismissed race as a legitimate concern in how the death penalty was administered". . . . During the question-answer portion of the program, Judge Jones "lost her composure" to an extent that "the host of the program ended the program abruptly". . . .

Ex. A at 3 (citations omitted).

In addition to these racially charged remarks, Judge Jones allegedly made certain derogatory comments which demonstrated her lack of partiality with respect to capital defendants who claim they were unlawfully convicted as a result of mental disabilities. According to the Complaint, Judge Jones

> characterized capital defendants' assertions of "mental retardation" as "red herrings." She stated that she believes it is a disservice to the "mentally retarded" to exempt them from the death sentence, and "expressed disgust at the use of mental retardation as a defense in capital cases." She consistently asserted that the manner in which these defendants committed their crimes . . . proved that they were not "mentally retarded." As one audience member stated, "in describing . . . what Judge Jones said about these cases, I am not able to capture the complete outrage she expressed over the crimes or the disgust she evinced over the defenses raised, particularly by the defendants who claimed to be mentally retarded". . . . Judge Jones's disgust at how these defendants were "using mental retardation" was very evident and very disconcerting.

*Id.* at 5 (citations & footnotes omitted). Judge Jones also criticized the U.S. Supreme Court's death penalty jurisprudence, specifically its decision in *Atkins v. Virginia*, 536 U.S. 304 (2002), which held that it was unconstitutional to execute the mentally retarded. *Id.* at 1, 5 n.11.

Judge Jones allegedly doubted that innocent defendants would ever be sentenced to death, and, therefore, convicted defendants who claim innocence were likely lying. *See* Ex. A at 6. According to the Complaint, Judge Jones was "very dismissive of claims of innocence. She did not take seriously the possibility that innocent people had been sentenced to death." *Id.* "'[R]eversals of those who

-5-

were allegedly innocent were really based on "technicalities", not innocence.'" *Id.* (citation omitted).

Moreover, Judge Jones allegedly "advocated her personal religious views as a basis for justifying the death penalty." Ex. A at 7. According to the Complaint, she stated that "'a killer is only likely to make peace with God and the victim's family in that moment when the killer faces imminent execution, recognizing that he or she is about to face God's judgment.'" *Id.* (citation omitted). According to Judge Jones, she was inspired to adopt this philosophy after reading an online article called "Hanging Concentrates the Mind," in a Catholic magazine titled *Crisis. Id.* That article, which purports to summarize the Vatican's position on capital punishment, concludes by observing that "'the coercive power of legitimate human authority' has its roots in 'the *sources of revelation and traditional doctrine*' . . . [which] have 'a general and abiding validity.'" Ex. B at 3 (citation omitted).

The Complaint alleges that Judge Jones violated Canons 1 through 4 of the Code of Conduct for United States Judges, which, among other things, require judges to "'uphold the integrity and independence of the judiciary'" (Canon 1), "'avoid impropriety and the appearance of impropriety in all activities'", "'act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary'" (Canon 2), be "'patient, dignified, respectful, and courteous'" and avoid comments on "'pending or impending'" matters (Canon 3), and avoid participating "'in extrajudicial activities that detract from the dignity of

the judge's office or reflect adversely on the judge's impartiality . . .'" (Canon 4).
Ex. A at 7-10 (*citing* Code of Conduct for United States Judges, Canons 1-4).[3]
These allegations are supported by affidavits of legal ethics experts, who
concluded that Judge Jones violated the canons of judicial conduct, including
Canon 3. *See* Ex. A, McCormack Aff. ¶ 17 ("[I]t is my opinion that Judge Jones
violated the ethical standards applicable to federal judges under the Code of
Conduct for United States Judges); *see also* Ex. A, Hardwick Aff. ¶¶ 12-55
(concluding that Judge Jones would be sanctioned for violations of Texas rules of
judicial and professional ethics).

The Chief Judge of the Fifth Circuit requested a transfer of the
proceedings against Judge Jones, and on or around June 12, 2013, Chief Justice
John Roberts granted this request and transferred the proceedings to the Judicial
Council of the District of Columbia Circuit. *See* Ex. C. To the best of Fields' and
his undersigned counsel's knowledge, the allegations against Judge Jones are
pending and no findings of fact have issued.

Judge Jones' remarks and the allegations set forth in the Complaint
were widely reported by respected news organizations. The *New York Times*
quoted a prominent legal ethics expert who opined that "'[i]f I were a parent of a
black with borderline IQ accused in a capital case, would I be distressed in
knowing that Judge Jones was sitting on my case? . . . Yes, I would. She seems to
have made up her mind on these issues. ***She is slanted. That is the whole point of***

---

[3] http://www.uscourts.gov/RulesAndPolicies/CodesOfConduct/CodeConduct United States
Judges.aspx.

*the impartiality requirement.*'" Ex. D (citation omitted; emphasis added). In the same article, another respected legal ethics expert suggested that if Judge Jones "really did say that death penalties serve the condemned by forcing them to face God . . . 'during sentencing, that sentence would be vacated . . . . *It suggests that she believes she is helping the accused by giving a death sentence.* That is totally inappropriate.'" *Id.* (citation omitted; emphasis added); *see also* Ex. E; Ex. F.

## ARGUMENT

A judge must recuse herself "in any proceeding in which [the judge's] impartiality might reasonably be questioned,"[4] 28 U.S.C. § 455(a), or if the judge "has a personal bias or prejudice concerning a party. . . ." 28 U.S.C. § 455(b)(1). Section 455(a) is interpreted under an objective standard, and a judge must recuse herself if "a reasonable and objective person, knowing all of the facts would harbor doubts concerning the judge's partiality." *United States v. Jordan*, 49 F.3d 152, 155 (5th Cir. 1995); *see Liljeberg v. Health Servs. Acq. Corp.*, 486 U.S. 847, 860 (1988) ("'The goal of section 455(a) is to avoid even the appearance of partiality'") (citation omitted); *United States v. Cooley*, 1 F.3d 985, 995 (10th Cir. 1993)

---

[4]   Canon 3C of the Code of Conduct for United States Judges, as adopted by the Judicial Conference of the United States, incorporates § 455.   In the "Other Internal Operating Procedures" of this Court's local rules, the "Recusal or Disqualification of Judges" subsection (a) states, in relevant part, "Judges must disqualify themselves under circumstances set forth in 28 U.S.C. § 455 or in accordance with Canon 3C, Code of Conduct for United States Judges as adopted by the Judicial Conference of the United States."   Rules and Internal Operating Procedures of the United States Court of Appeals for the Fifth Circuit, Other Internal Operating Procedures, http://www.ca5.uscourts.gov/clerk/docs/5thcir-iop.pdf.   As such, a violation of Canon 3C is a separate ground for recusal.   A legal ethics expert who submitted an affidavit in support of the Complaint concluded that Judge Jones violated Canon 3. Ex. A, McCormack Aff. ¶ 17.

(requiring recusal as a result of judge's public remarks, because the judge "deliberately ma[de] the choice to appear in such a forum at a sensitive time to deliver strong views on matters which were likely to be ongoing before him", creating the appearance of bias). Recusal "must be guided, not by comparison to similar situations addressed by prior jurisprudence, but rather by an independent examination of the facts and circumstances of the particular claim." *United States v. Bremers*, 195 F.3d 221, 226 (5th Cir. 1999). If close, the balance must tip in favor of removal. *See Patterson v. Mobil Oil Corp.*, 335 F.3d 476, 484-85 (5th Cir. 2003).

A criminal defendant's right to an impartial judiciary is embedded in the Due Process Clause of the Fifth Amendment to the U.S. Constitution, which mandates a "fair trial in a fair tribunal" for every defendant. *In re Murchison*, 349 U.S. 133, 136 (1955). A judge violates a defendant's due process rights if she is biased against the defendant. *Bracy v. Gramley*, 520 U.S. 899, 904-05 (1997). And even if a judge has no actual bias, but a bias may be apparent, a judge must recuse to avoid offending due process. *Aetna Life Ins. Co. v. Lavoie*, 475 U.S. 813, 825 (1986); *United States v. Couch*, 896 F.2d 78, 82 (5th Cir. 1990) (Due process "requires a judge to step aside when a reasonable judge would find it necessary to do so").

Circuit Judge Jones must recuse herself because her impartiality might reasonably be questioned as a result of her alleged public remarks. These actual or apparent biases bear directly on the circumstances of Fields' case.

First, Judge Jones' comments suggest that she lacks partiality with respect to matters of race. Specifically, she made derogatory statements

concerning African Americans and Hispanics by making the unfounded and offensive generalization that such racial groups were "'predisposed to crime'" and "'"'prone" to commit acts of violence.'" Ex. A at 3 (citation omitted). Judge Jones further opined that "'some groups seem to commit more heinous crimes than others,'" and "'dismissed race as a legitimate concern in how the death penalty was administered.'" *Id.* (citation omitted). Fields is an African American whose family has long been victimized by racial antagonism and violence, and Fields claims that this victimization and racial violence, among many other factors, contributed to his mental illness and inability to competently represent himself during the guilt phase of trial. Br. at 7-12, 94-107. Fields also claims that he did not commit the violent crimes for which he was convicted and sentenced to death and that his trial counsel failed to effectively challenge critical pseudo-scientific "expert" testimony concerning Fields' risk of "future dangerousness." *Id.* at 121-44. Should Judge Jones participate in this appeal, her comments that members of certain racial groups – including African Americans such as Fields – are prone to violence would, at the very least, create the appearance of partiality on matters of race and future dangerousness which require recusal.

Second, if her remarks as alleged are true, Judge Jones appears to hold a bias against death row inmates who have challenged their convictions on the basis of mental disabilities. Judge Jones "stated that she believes it is a disservice to the 'mentally retarded' to exempt them from the death sentence, and 'expressed disgust at the use of mental retardation as a defense in capital cases.'" Ex. A at 5 (citation omitted). She insisted that "the manner in which these defendants committed their crimes" proved that they were not, in fact, mentally disabled. *Id.*

-10-

Those in the audience at Judge Jones' lecture described "'the disgust [Judge Jones] evinced over the defenses raised, particularly by the defendants who claimed to be mentally retarded.'" *Id.* These alleged biases plainly bear on Fields' present appeal. In his motion for a Certificate of Appealability, Fields argues that he was deprived of his constitutional rights as a result of the District Court's decision to allow Fields to represent himself at trial despite his debilitating mental illnesses. Br. at 94-107. Fields is bipolar and suffers from severe paranoid delusions and PTSD. *Id.* at 11. These conditions prohibited Fields from adequately representing himself at trial, and thus the District Court committed reversible error in allowing Fields to proceed *pro se. Id.* at 94-107. Judge Jones' well-documented skepticism of death row inmates who have challenged their convictions and sentences as a result of mental deficiencies therefore disqualifies her from participating in any further proceedings relating to Fields' appeal.

Third, the Complaint alleges that Judge Jones was "'very dismissive of claims of innocence. She did not take seriously the possibility that innocent people had been sentenced to death.'" Ex. A at 6. Further, Judge Jones "'said that reversals of those who were allegedly innocent were really based on "technicalities", not innocence.'" *Id.* (citation omitted). Effectively, Judge Jones has already passed judgment on Fields because in his § 2255 motion and his present appeal, Fields vigorously argues that he is actually innocent of the crimes for which he was convicted, a position he has consistently maintained since his trial. Br. at 121-30. Thus, Judge Jones could not impartially render judgment on Fields' appeal.

-11-

Fourth, Judge Jones allegedly "advocated her personal religious views as a basis for justifying the death penalty." Ex. A at 7. She is alleged to have stated that "'a killer is only likely to make peace with God and the victim's family in that moment when the killer faces imminent execution, recognizing that he or she is about to face God's judgment.'" *Id.* Judge Jones allegedly "'talked about how the imminent prospect of execution forced the criminal to confront his deed, and she said this as justification for the death penalty." *Id.* This apparent appeal to religious authority for a judicial matter as serious as the federal government's attempt to take the life of one of its citizens clearly creates a situation where Judge Jones' impartiality could reasonably be questioned.

Fifth, Judge Jones sharply criticized the Supreme Court's death penalty jurisprudence, observing that the Court's decision in *Atkins* – in which the Court held that it was unconstitutional to execute the mentally retarded – was "ill-advised" and created a "'slippery slope'" by which a defendant's intelligence must be considered under certain circumstances. Ex. A at 1; Ex. A, Bookman Aff. ¶¶ 20-21. According to Judge Jones, the Supreme Court has "micromanaged" capital punishment, and she speculated that "the Supreme Court's next attempt at meddling with the death penalty will come by 'back-dooring' through the *Martinez* case the right to counsel in post-conviction proceedings. [Judge Jones] seemed to think that this would be a travesty."[5] Ex. A, Bookman Aff. ¶ 21. These views do not comport with the fair administration of capital punishment under the Constitution, which affords, among other things, certain procedural protections to

---

[5]   *See Martinez v. Ryan*, 132 S. Ct. 1309 (2012); *Trevino v. Thaler*, 133 S. Ct. 1911 (2013).

-12-

the accused as well as a right to a fair determination of punishment for the convicted. However, according to Judge Jones, the imposition and effectiveness of the death penalty is justified through extralegal means – her personal religious philosophy. *See* Ex. A at 7. Judge Jones' disdain for the Supreme Court's capital punishment jurisprudence raises doubts that she could impartially apply controlling authority. Fields challenges both his conviction and sentence pursuant to bedrock principles of Constitutional law. Judge Jones' participation in Fields' appeal would result in an unconstitutionally biased determination and undermine public confidence in the judiciary.

Judge Jones' public comments demonstrate a judicial bias against Fields and those similarly situated. Judge Jones' impartiality "might reasonably be questioned" and it is reasonable to infer her bias against Fields here. *See Cooley*, 1 F.3d at 992, 994. Judge Jones' participation in Fields' appeal would deprive him of his Fifth Amendment rights to a fair proceeding. Accordingly, Judge Jones should be recused from any further proceedings in connection with Fields' appeal.

-13-

## CONCLUSION

For the foregoing reasons, Fields respectfully requests that this Court grant his motion to recuse the Honorable Edith H. Jones.

Dated:    February 25, 2014

Respectfully Submitted.

By: /s/ Jeffrey Ellis
Jeffrey Ellis

Oregon Capital Resource Center
621 SW Morrison St., Suite 1025
Portland, OR  97205
Telephone:  (206) 218-7076
Email:        JeffreyErwinEllis@gmail.com

Peter J. Isajiw
Cadwalader, Wickersham & Taft, LLP
One World Financial Center
New York, New York  10281
Telephone:  (212) 504-6000
Facsimile:  (212) 504-6666
E-mail:        Peter.Isajiw@cwt.com

*Attorneys for Mr. Fields*

## CERTIFICATE OF CONFERENCE

I hereby certify that on February 18, 2014, counsel for the Government advised me that the Government opposes the relief requested in this Motion.

Dated:    February 25, 2014

/s/ Jeffrey Ellis
  Jeffrey Ellis
  Peter J. Isajiw

*Attorneys for Mr. Fields*

-15-

## CERTIFICATE FOR ECF PLEADINGS

I hereby certify that: (1) required privacy redactions have been made pursuant to 5th Cir. R. 25.2.13; (2) the electronic submission is an exact copy of the paper document pursuant to 5th Cir. R. 25.2.1; and (3) the document has been scanned for viruses with the most recent version of a commercial virus scanning program and is free of viruses.

Dated:    February 25, 2014

/s/ Jeffrey Ellis
Jeffrey Ellis

# No. 13-70025

## IN THE

# United States Court of Appeals

## FOR THE FIFTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

- against -

SHERMAN LAMONT FIELDS,

*Defendant-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS, WACO DIVISION (W-09-CV-009, W-01-CR-164)

## DECLARATION OF JEFFREY ELLIS IN SUPPORT OF DEFENDANT-APPELLANT SHERMAN LAMONT FIELDS' MOTION TO RECUSE THE HONORABLE EDITH H. JONES

### THIS IS A CAPITAL CASE

JEFFREY ELLIS
OREGON CAPITAL RESOURCE CENTER
621 SW Morrison St., Suite 1025
Portland, OR  97205
(206) 218-7076

PETER J. ISAJIW
CADWALADER, WICKERSHAM & TAFT LLP
One World Financial Center
New York, NY  10281
(212) 504-6000

*Attorneys for Defendant-Appellant*
*Sherman Lamont Fields*

JEFFREY ELLIS, pursuant to 28 U.S.C. § 1746, hereby declares:

1.      I am affiliated with the Oregon Capital Resource Center, and I am counsel of record to Defendant-Appellant Sherman Lamont Fields ("Fields"). I submit this declaration in support of Fields' Motion To Recuse The Honorable Edith H. Jones.

2.      Attached hereto as Exhibit A is a true and correct copy of a document titled "Complaint of Judicial Misconduct" and exhibits thereto, http://www.nola.com/crime/index.ssf/2013/06/judge_edith_jones_controversia. html (last accessed Feb. 21, 2014).

3.      Attached hereto as Exhibit B is a true and correct copy of Rev. George W. Rutler, *Hanging Concentrates the Mind*, Crisis, Feb. 8, 2013, http://www.crisismagazine.com/2013/hanging-concentrates-the-mind          (last accessed Feb. 21, 2014).

4.      Attached hereto as Exhibit C is a true and correct copy of a letter from Chief Justice John Roberts to Chief Circuit Judge Merrick Garland, dated   June   12,   2013,   http://www.ca5.uscourts.gov/DisplayNews.aspx? NewsItem=382 (last accessed Feb. 21, 2014).

5.      Attached hereto as Exhibit D is a true and correct copy of Ethan Bronner, *Complaint Accuses U.S. Judge in Texas of Racial Bias*, N.Y. Times, June 4, 2013, http://www.nytimes.com/2013/06/05/us/federal-judge-in-texas-is-accused-of-racial-bias.html?smid=tw-share&_r=1& (last accessed Feb. 21, 2014).

6.      Attached hereto as Exhibit E is a true and correct copy of Jordan Smith, *Judge Edith Jones:  Blacks and Hispanics More Violent*, Austin Chron.,   June   4,   2013,   http://www.austinchronicle.com/daily/news/2013-06-

-1-

04/judge-edith-jones-blacks-and-hispanics-more-violent/ (last accessed Feb. 21, 2014).

7.     Attached hereto as Exhibit F is a true and correct copy of Lise Olsen, *Houston Federal Judge Accused of Misconduct*, Hous. Chron., June 6, 2013, LexisNexis (News & Business, Mega News) (last accessed Feb. 21, 2014).

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 25th day of February, 2014.

/s/ Jeffrey Ellis
Jeffrey Ellis

-2-

# EXHIBIT A

# COMPLAINT OF JUDICIAL MISCONDUCT

## I.   Introduction

Pursuant to the Judicial Conduct and Disability Act and the Judicial Conference of the United States Rules for Judicial-Conduct and Judicial-Disability Proceedings,[1] Complainants file this Complaint against Judge Edith Jones of the Court of Appeals for the Fifth Circuit. Judge Jones has engaged in conduct that is prejudicial to the effective and expeditious administration of the business of the courts, undermines public confidence in the integrity and impartiality of the judiciary, and creates a strong appearance of impropriety.

This Complaint arises primarily from Judge Jones's comments at a lecture entitled "Federal Death Penalty Review" at the University of Pennsylvania School of Law on February 20, 2013.[2] In her remarks, Judge Jones made the following points:

*The United States system of justice provides a positive service to capital-case defendants by imposing a death sentence, because the defendants are likely to make peace with God only in the moment before imminent execution;

*Certain "racial groups like African Americans and Hispanics are predisposed to crime," are "'prone' to commit acts of violence," and get involved in more violent and "heinous" crimes than people of other ethnicities;

*Claims of racism, innocence, arbitrariness, and international standards are simply "red herrings" used by opponents of capital punishment;

*Capital defendants who raise claims of "mental retardation" abuse the system;

*The United States Supreme Court's decision in *Atkins v. Virginia* prohibiting execution of persons who are "mentally retarded" was ill-advised and created a "slippery slope";

---

[1] The Judicial Conduct and Disability Act allows "[a]ny person alleging that a judge has engaged in conduct prejudicial to the effective and expeditious administration of the business of the courts" to file a complaint against the judge. *See* 28 U.S.C. § 351(a). To implement that Act, as amended, the Judicial Conference of the United States promulgated the Rules For Judicial-Conduct and Judicial-Disability Proceedings. Rule 3(h) defines "cognizable misconduct" as including "conduct prejudicial to the effective and expeditious administration of the business of the courts" and "conduct occurring outside the performance of official duties if the conduct might have a prejudicial effect on the administration of the business of the courts, including a substantial and widespread lowering of public confidence in the courts among reasonable people."

[2] See https://www.law.upenn.edu/newsevents/calendar.php/seminars/regblog.org#date/20130220

\*Mexican Nationals would <u>prefer to be on death row</u> in the United States rather than in prison in Mexico;

\*The country of Mexico does not provide and would not provide the legal protections that a Mexican National facing a death sentence in the United States would receive.

Additionally, Judge Jones demonstrated extreme disrespect to a fellow Fifth Circuit Judge, lack of judicial temperament,[3] and a failure to maintain and observe the "high standards of conduct" required of federal judges[4] by (1) loudly slamming her hand on the bench during Judge James L. Dennis's questioning of counsel during oral argument, (2) disrespectfully asking Judge Dennis if he "wanted to leave" the courtroom during the argument, and (3) saying she wanted him to "shut up." In her February 20, 2013 lecture, Judge Jones also expressed "contempt" for the United States Supreme Court rules, "generally disparage[d]" the Supreme Court, and was "dismissive of the Supreme Court's death penalty decisions regarding juveniles and the mentally retarded."

Judge Jones's statements and conduct violated 28 U.S.C. § 351 and the Code of Conduct for United States Judges.[5]

---

[3] Canon 2 of the Code of Conduct for United States Judges provides: "A Judge Should Avoid Impropriety And The Appearance of Impropriety In All Activities." The Commentary to Canon 2A states that "An appearance of impropriety occurs when reasonable minds, with knowledge of all the relevant circumstances . . . would conclude that the judge's honesty, integrity, impartiality, <u>temperament</u>, or fitness to serve as a judge is impaired. Public confidence in the judiciary is eroded by irresponsible or improper conduct by judges." (Emphasis added.) Canon 3A provides that a "judge should be <u>patient</u>, <u>dignified</u>, <u>respectful</u>, and <u>courteous</u>" to all persons "with whom the judge deals in an official capacity." (Emphasis added.)

[4] See Code of Conduct for United States Judges, Canon 1 (". . . A judge should maintain and enforce high standards of conduct and should personally observe those standards[.]").

[5] The Judicial Conference's Commentary on Rule 3 states that the Code of Conduct for United States Judges may be "informative" in determining whether a judge has engaged in conduct "prejudicial to the effective and expeditious administration of the business of the courts." The Code "is designed to provide guidance to judges . . . ," and federal judicial discipline decisions have cited and relied on the Canons. *See, e.g., In re Complaint of Judicial Misconduct (Paine)*, 664 F.3d 332, 335 (U.S. Judicial Conference 2011) (stating that the Judicial Conference adopted the Code to "provide standards of conduct for application in judicial-conduct and judicial-disciplinary proceedings brought pursuant to the Act. Commentary to Canon 1. The Canons of the Code of Conduct offer general guidance"; concluding that Judge George Paine, II violated Canons 2A and 2C of the Code of Conduct for United States Judges by belonging to a country club that discriminated against African Americans and women; and overturning the Sixth Circuit's Judicial Council's finding that Judge Paine had not engaged in misconduct); *In re Porteous*, Order and Public Reprimand (Judicial Council 5th Cir. Sep. 10, 2008) (Jones, C.J.) (concluding that Judge Porteous violated Canons 1, 2A, 3C(1), 3D, 5C(1), 5(1), (4), and (6) of the Code of Conduct for United States Judges); *In re Complaint of Judicial Misconduct (Kozinski)*, 575 F.3d 279 (Judicial Council 3d. Cir. 2009) (admonishing Chief Judge Kozinski (of the Ninth Circuit), concerning an incident arising from the judge's retention of email containing sexually explicit material in a subdirectory of his personal

2

Attached are (1) affidavits from persons who attended Judge Jones's February 20, 2013 lecture and who account in detail her statements (Exhibits A-F); (2) a transcript of the relevant portion of the exchange between Judge Jones and Judge Dennis (Exhibit G);[6] and (3) the declarations of nationally recognized legal ethics experts, James C. McCormack (former Chief Disciplinary Counsel of the State Bar of Texas) (Exhibit H), and Lillian Hardwick (Coauthor, *Handbook of Texas Lawyer & Judicial Ethics*) (Exhibit L).

## II.   Judge Jones's Remarks

### Comments on Race

Judge Jones made several statements demonstrating racial bias and indicating a lack of impartiality.[7] She said that "certain racial groups like African Americans and Hispanics are predisposed to crime" and "'prone' to commit acts of violence." She made "generalized and stereotypical comments about racial groups and their 'criminal tendencies.'" Judge Jones stated that "race" was merely a "red herring" "thrown up by opponents of capital punishment," and that no case had ever been made for "systemic racism." She also asserted that "certain systemic classes of crimes" exist and that "certain racial groups commit more of these crimes than others." She said that "[s]adly some groups seem to commit more heinous crimes than others." When asked to explain her remarks, she stated that there was "no arguing" that "Blacks and Hispanics" outnumber "Anglos" on death row and "sadly" it was a "statistical fact" that people "from these racial groups get involved in more violent crime." By way of example, she asserted as a "fact" that "a lot of Hispanic people [are] involved in drug trafficking," which itself "involved a lot of violent crime." She "dismiss[ed] race as a legitimate concern in how the death penalty was administered." *See* Ex. A, at ¶¶ 27-28; Ex. B, at ¶¶ 27-28, 35; Ex. C, at ¶¶ 13-14; Ex. D, at ¶ 12; Ex. E, at ¶13; and Ex. F, at ¶ 11. During the question-answer portion of the program, Judge Jones "lost her composure" to an extent that "[t]he host of the program ended the program abruptly." *See* Ex. E, at ¶ 17; Ex. D at ¶ 15; Ex. F, at ¶ 15.

Judge Jones's biased remarks demonstrated both an utter disregard for the fundamental judicial standard of impartiality and a lack of judicial temperament. Her remarks were inflammatory and damaging to "public confidence in the judiciary." In Texas, her comments resonated even more strongly given the widespread controversy in the case of Texas death row inmate Duane Buck. Mr. Buck received a death sentence after a psychologist testified during the sentencing phase that Buck posed a future danger because of his race, specifically, because

---

computer that was publicly accessible; and citing and quoting from Canon 2A and the Commentary to that Canon).

[6] The audio portion of the exchange between Judge Jones and Judge Dennis is available at http://www.youtube.com/watch?v=lOkMZzAdyL8.

[7] *See* Commentary to Canon 2A, quoted above in note 3.

3

he was African-American.[8] The NAACP Legal Defense Fund called the psychologist-witness's testimony in the Duane Buck case a "blatant example of racial bias."[9] Scores of prominent officials are calling for a new sentencing hearing for Mr. Buck, rightly stating that "[t]he State of Texas cannot condone any form of racial discrimination in the courtroom. The use of race in sentencing poisons the legal process and breeds cynicism in the judiciary." *Id.*

Even the Texas Attorney General and the Texas Solicitor General considered such racist testimony to be so improper—and unconstitutional—that they took the highly unusual step of conceding error in the U.S. Supreme Court. *See Saldaño v. State*, No. 99-8119 (U.S.), Resp. to Pet. for Cert. at 1. As the State pointed out: "'Discrimination on the basis of race, odious in all aspects, is especially pernicious in the administration of justice.'" *Saldaño*, No. 99-8119 (U.S.), Resp. at p. 7, citing *Rose v. Mitchell*, 442 U.S. 545, 555 (1979).

Upon discovering that similar testimony was present in six other capital cases, the Texas Attorney General announced that the State of Texas would not oppose the grant of new sentencing trials in those cases. *See* Exhibit H, Press Release, Office of the Texas Attorney General, Statement from Attorney General John Cornyn Regarding Death Penalty Cases (June 9, 2000); Jim Yardley, *Racial Bias Found in Six More Capital Cases*, N.Y. Times (June 11, 2000).

Yet Judge Jones maintains and publicly defends the very unconstitutional biased beliefs that the State of Texas has rightly repudiated. Not surprisingly, Judge Jones's statements deeply offended audience members at her speech. "The reaction in the room when she made these remarks [on race] was one of shock, surprise, and offense." Ex. F, at ¶ 11 "Judging by the looks on their faces, many others in the audience were dismayed by these remarks on race. My reaction was akin to 'here we go again' – meaning that I perceived her remarks to be the type of racially insensitive comments I have heard many times in my life and professional career." Ex. E, at ¶ 13. "As an African American male, and as someone who is interested in the areas where race and law intersect, I was made uncomfortable by her comments on race and found them offensive." Ex. B, at ¶ 35. "Many of the attendees at the lecture, a group comprised of various races, looked both surprised and dismayed at these remarks [on race]. The people I was sitting next to looked at one another and me and conveyed their surprise at these remarks on the issues of race. Based on these observations as well as comments I heard after the lecture, it was clear to me that many students were offended by Judge Jones' remarks and how cavalierly she dismissed race and ethnicity as a legitimate concern in how the death penalty was administered." Ex. D, at ¶ 12.

---

[8] *See* http://www.naacpldf.org/case-issue/duane-buck-sentenced-death-because-he-black (collecting pleadings, testimony, and news articles); Editorial, *Racism in a Texas Death Case*, N.Y. Times (May 11, 2013); https://www.nytimes.com/2013/05/11/opinion/racism-in-a-texas-death-case.html.
[9] *See* http://www.naacpldf.org/news/more-100-civil-rights-leaders-elected-officials-clergy-former-prosecutors-and-judges-current.

4

### Comments on the Intellectually Disabled

Judge Jones also characterized capital defendants' assertions of "mental retardation"[10] as "red herrings." She stated that she believes it is a disservice to the "mentally retarded" to exempt them from the death sentence, and "expressed disgust at the use of mental retardation as a defense in capital cases." Ex. A, at ¶¶ 15-16, 18-19, 21; Ex. B, at ¶¶ 12, 16, 18, 21; Ex. E, at ¶¶ 7-8. She consistently asserted that the manner in which these defendants committed their crimes, such as the fact that one had allegedly worked as a "hitman" or another had gone on a "burglary spree," proved that they were not "mentally retarded." Ex. B, at ¶16; Ex. D, at ¶ 9; Ex. E, at ¶ 8. As one audience member stated, "[i]n describing . . . what Judge Jones said about these cases, I am not able to capture the complete outrage she expressed over the crimes or the disgust she evinced over the defenses raised, particularly by the defendants who claimed to be mentally retarded." Ex. A, at ¶ 19; Ex. B, at ¶18. Judge Jones's disgust at how these defendants were "using mental retardation" was very evident and very disconcerting. Ex. D, at ¶ 9; Ex. E, at ¶ 8.

These remarks were also met with disbelief and dismay. "In describing . . . what Judge Jones said about these cases, I am not able to capture the complete outrage she expressed over the crimes or the disgust she evinced over the defenses raised, particularly by the defendants who claimed to be mentally retarded." Ex. A, at ¶ 19; Ex. D, at ¶ 9. "She expressed disgust at the use of mental retardation as a defense in capital cases." Ex. B, at ¶ 18. "Judge Jones' dismissive approach to claims of 'mental retardation' surprised me. . . . [T]he whole discussion seemed disrespectful to me. She placed great emphasis on the facts of the crime as support for her position that these defendants were not 'mentally retarded,' which seemed to be a very limited – at best – analysis, and more rooted in her personal views of the crimes and the defendants than in a legal analysis." Ex. E, at ¶¶ 7-8.

In short, despite clearly established constitutional law announced by the United States Supreme Court concerning treatment of "mentally retarded" persons in capital cases,[11] Judge Jones expressed extreme bias against such persons, and against claims of intellectual disability as a whole—and thus against the law of the United States. No "reasonable mind" (in the terms of the Canon 2A Commentary) could conclude that Judge Jones could be "impartial" in ruling on cases involving claims of "mental retardation."

---

[10] This term is outdated—now generally replaced by "Intellectually Disabled"—and thus Judge Jones's use of the term "mental retardation" is kept in quotations.

[11] *See, e.g., Miller v. Alabama*, 132 S. Ct. 2455, 2464 (2012) ("[W]e have held that imposing the death penalty . . . on mentally retarded defendants violates the Eighth Amendment. See *Kennedy v. Louisiana*, 554 U.S. 407, 128 S.Ct. 2641, 171 L.Ed.2d 525 (2008); *Atkins v. Virginia*, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002).").

<u>Comments on Cases of Innocence</u>

In Judge Jones's view, even innocence is another "red herring." "She was very dismissive of claims of innocence. She did not take seriously the possibility that innocent people had been sentenced to death." Ex. B, at ¶ 29. "She said that reversals of those who were allegedly innocent were really based on 'technicalities', not innocence. She was unapologetic when making these comments." Ex. E, at ¶ 15. According to Judge Jones, "just as many innocent people [were] killed in drone strikes as innocent people executed for crimes . . . ." Ex. C, at ¶ 15. As an audience member commented, "I thought [that] was at best a curious analogy." Ex. C, at ¶ 15; see also Ex. A , at ¶ 29; Ex. E, at ¶15.

<u>Comments on Foreign Nationals</u>

Judge Jones also denigrated the system of justice in the nation of the United Mexican States (Mexico), Mexican Nationals, and the use of international standards in capital cases. She claimed it was an "insult" when United States courts looked to the laws of another country such as Mexico, as this suggested that such legal systems were "more advanced" than that of the United States. Ex. A, at ¶ 32; Ex. F, at ¶ 14. She also indicated that any Mexican National would <u>rather be on death row</u> in the United States than in a Mexican prison.[12] Id. Judge Jones stated that Mexico "wasn't about to provide any of their own citizens with the kind of legal protections the person would get in the United States." Id. She again characterized as a "red herring" the claims of foreign nationals and the use of "international standards." Ex. A, at ¶ 32; Ex. D, at ¶14; Ex. B, at ¶ 32.

<u>Discussion of Individual Cases</u>

Judge Jones discussed at some length individual cases, including that of the "Black Widow" (apparently Betty Lou Beets), Walter Bell, Larry Hatten, Larry Swearingen, Marcus Druery, Elroy Chester, and Ramiro Ibarra. Ex. A, at ¶ 11. Only two of these people have been executed. Thus the other defendants <u>could come before Judge Jones</u> in future litigation. Judge Jones authored the opinions in each case she discussed. Her description of these cases evinced disgust and contempt toward the defendants, the crimes they were convicted of, and the claims they had raised. See Ex. A, at ¶¶ 11-19, 21; Ex. B, at ¶¶ 11, 18; Ex. C, at ¶¶ 8-9; Ex. D, at ¶¶ 8-9. "It was clear that Judge Jones was disgusted by the gruesomeness of these killings. I was surprised at how personal and emotional these particular arguments were. They seemed less analytical than [how] a judge should approach a case. I drew from her remarks that her emotions and beliefs drove the results in some of these cases." Ex. F, at ¶ 7. Judge Jones made clear her personal belief in the heinousness of the crimes committed and how, in her personal view, that justified imposition of a death sentence. As one audience member reacted: "I thought that it was simplistic for her to justify the death penalty solely on the basis of the heinousness of the crimes. She conveyed a lot of disgust about the facts of these crimes – it seemed very personal to her, which surprised me." Ex. E, at ¶ 6. ; see also Ex. F, at 7. Again, no "reasonable mind"

---

[12] Mexico officially outlawed the death penalty in 2005.

could believe that Judge Jones could be impartial in future legal proceedings involving those cases.[13]

### Discussion of Religion as a Justification for the Death Penalty

Judge Jones advocated her personal religious views as a basis for justifying the death penalty. She stated that the death penalty had Biblical origins, in Deuteronomy. Ex. D, at ¶ 5; Ex. E, at ¶ 5. She stated that "a killer is only likely to make peace with God and the victim's family in that moment when the killer faces imminent execution, recognizing that he or she is about to face God's judgment." Ex. A, at ¶ 9. In support of that justification, Judge Jones cited an article that she said her husband had found on the Internet, entitled "Hanging Concentrates the Mind" (attached as Exhibit J), which she said discussed the Vatican's perspective on capital punishment while executions were occurring within the Vatican's jurisdiction. *Id.* "Judge Jones used what I would call moral language in praising the death penalty as a means to help people come to terms with the crime they committed . . . . She talked about how the imminent prospect of execution forced the criminal to confront his deed, and she said this as justification for the death penalty." Ex. B, at ¶ 10. As one of the attendees stated: "I thought it seemed out of place for a Court of Appeals Judge to cite the Bible as legal support for the death penalty." Ex. E, at ¶ 5.

### III.      Violations of the Code of Conduct for United States Judges

### Violations of Canon One

Canon 1 of the Code of Conduct for United States Judges provides that "[a] judge should uphold the integrity and independence of the judiciary." (Emphasis added.) The explanation of Canon 1 states that an "honorable judiciary is indispensable to justice in our society. A judge should maintain and enforce high standards of conduct and should personally observe those standards, so that the integrity and independence of the judiciary may be observed." (Emphasis added.) The Commentary to Canon 1 further provides that "[d]eference to the judgments and ruling of courts depends on public confidence in the integrity and independence of judges." (Emphasis added.)

Judge Jones's statements on race, on mentally retarded persons, on innocence claims, and on foreign nationals violate Canon 1. Judge Jones has repudiated fundamental national, moral, and constitutional principles of equality. She has repudiated basic, indisputable principles of

---

[13] Judge Jones's record in capital cases confirms her bias and lack of impartiality. In the many capital cases that have come before her, she has issued or joined in decisions granting substantive relief only when the United States Supreme Court either has directly commanded the Circuit Court to do so or has issued an intervening decision bearing directly on a pending case. In decisions by the en banc court or panels on which she participated that granted relief other than in response to Supreme Court action, Judge Jones dissented in every case. See the decisions listed in Exhibit K, attached hereto.

7

federal constitutional law as established by decisions of the United States Supreme Court. She advocated for the death penalty based upon her personal religious views. She expressed "contempt" toward the United States Supreme Court rules and "generally disparage[d] the Supreme Court. Ex. F, at ¶ 8. Her conduct neither "maintains" nor "observes" a "high standard of conduct," as required by Canon 1. Her inflammatory, hostile rhetoric severely undermines "public confidence" in the federal judiciary.

### Violations of Canon Two

Canon 2 of the Code of Conduct for United States Judges provides that "a judge should avoid impropriety and the appearance of impropriety in all activities." (Emphasis added.) Canon 2A is entitled "Respect for Law." It provides that "A judge should respect and comply with the law and should act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary." (Emphasis added.) This rule is "critical—the judiciary's ability to decide cases efficiently and effectively would be severely impaired, and public confidence in the courts would be undermined, if litigants had reason to suspect judicial bias. In other words, 'to perform its high function in the best way "justice must satisfy the appearance of justice.""[14]

The Commentary to Canon 2A provides in relevant part: "An appearance of impropriety occurs when reasonable minds, with knowledge of all the relevant circumstances disclosed by a reasonable inquiry, would conclude that the judge's honesty, integrity, impartiality, temperament, or fitness to serve as a judge is impaired. Public confidence in the judiciary is eroded by irresponsible or improper conduct by judges. A judge must avoid all impropriety and appearance of impropriety. This prohibition applies to both professional and personal conduct. A judge must expect to be the subject of constant public scrutiny and accept freely and willingly restrictions that might be viewed as burdensome by the ordinary citizen." (Emphasis added.)[15]

Complainants submit that Judge Jones's statements quoted above constitute extreme impropriety and the appearance of impropriety that violate Canons 2 and 2A. Complainants further submit that any "reasonable mind" would conclude that Judge Jones's "integrity, impartiality, temperament, [and] fitness to serve as a judge" are "impaired."[16] Judge Jones has

---

[14] *In re Complaint of Judicial Misconduct (Paine)*, 664 F.3d 332, 335 (U.S. Judicial Conference 2011) (citing and quoting *In re Murchison*, 349 U.S. 133, 136 (1955) (quoting *Offutt v. United States*, 348 U.S. 11, 14 (1954)).

[15] *See also In re Complaint of Judicial Misconduct (Paine)*, 664 F.3d 332, 335 (U.S. Judicial Conference 2011) ("The judiciary therefore must take every appropriate measure to instill public confidence in the impartial administration of justice. For this reason, and especially in view of the 'constant public scrutiny' that 'judge[s] must expect,' Commentary to Canon 2A, members of the judiciary are required to accept unique and heightened restrictions on their personal lives that would not pertain to ordinary citizens.").

[16] *See* Hon. Carl E. Stewart, *Abuse of Power and Judicial Misconduct: A Reflection on Contemporary Ethical Issues Facing Judges*, 1 U. St. Thomas L.J. 464, 477 (Issue no. 1, 2003) ("A hallmark of the judiciary has been its historical posture of neutrality and impartiality toward litigants and the disputes they bring to the courts for resolution. Ascendance to the bench therefore represents more than a mere cloak of

repudiated and criticized fundamental constitutional principles declared by the United States Supreme Court. She has expressed and exhibited bias and lack of impartiality concerning African Americans, Hispanics, "mentally retarded" persons, Mexican nationals, the justice system of the entire nation of Mexico, constitutional law decisions of the United States Supreme Court, and several individual defendants who well may appear before her court in the future. The "impropriety" and "appearance of impropriety" are obvious. Judge Jones has failed to "act at all times in a manner that promotes public confidence in the . . . impartiality of the judiciary." No "reasonable mind" could conclude that she is impartial on those issues, principles, or cases.

## Violations of Canon Three

Canon 3 of the Code of Conduct of United States Judges provides that "a judge should perform the duties of the office fairly, impartially, and diligently." (Emphasis added.) Canon 3A(3) provides that "[a] judge should be patient, dignified, respectful, and courteous" to all persons "with whom the judge deals in an official capacity." The Commentary to Canon 3A states that "[t]he duty to be respectful includes the responsibility to avoid comment or behavior that could be interpreted as harassment, prejudice or bias."

The statements and conduct of Judge Jones, described above, evince a dramatic and appalling lack of "fairness" and "impartiality." Based upon those statements, African Americans, Hispanics, persons who are "mentally retarded," Mexican nationals, and the nation of Mexico cannot reasonably expect "fairness" or "impartiality" from Judge Jones. Further, no objective observer could conclude that Judge Jones's treatment of Judge Dennis was consistent with "the duty to be respectful."

Judge Jones also violated Canon 3A(6), which states: "A judge should not make public comment on the merits of a matter pending or impending in any court." (Emphasis added.) The Commentary explains that the prohibition against public comment "about the merits of a pending or impending matter continues until the appellate process is complete. If the public comment involves a case from the judge's own court, the judge should take particular care so that the comment does not denigrate public confidence in the judiciary's integrity or impartiality, which would violate Canon 2A."

Yet Judge Jones discussed several individual cases during her February 20, 2013 lecture, including the *Ibarra* case, which was pending in her court at the time of the lecture. At the time of Judge Jones's lecture, *Swearingen* and *Druery* were pending in the state courts. Chester was scheduled for execution at the time of her lecture, and is currently facing a June 12, 2013 execution date—and the pendency of an imminent execution date always raises the possibility of last minute litigation in the state or federal courts. Judge Jones wrote the panel opinions in the *Ibarra*, *Chester*, and *Druery* cases. (She was on the *Swearingen* panel as well; the Court

power; it also suggests a symbolic and practical detachment of the judge from his or her prior role as a partisan advocate.")

9

issued a *per curiam* decision.) In short, Judge Jones made "public comments" on the merits of multiple matters that were "pending or impending"—in direct violation of Canon 3A(6).

Moreover, Judge Jones's disrespectful conduct toward Judge Dennis, a fellow member of the Fifth Circuit Court of Appeals, showed a very troubling lack of judicial temperament. No judge would want to be treated the way that Judge Jones treated Judge Dennis. Judge Jones clearly violated the duty to be "patient, dignified, respectful, and courteous" set forth in Canon 3A and the Commentary to Canon 3.

Judge Jones also improperly expressed "contempt" for the United States Supreme Court rules, "generally disparage[d]" the Supreme Court, was "dismissive of the Supreme Court's death penalty decisions regarding juveniles and the mentally retarded," and criticized the conduct of Justice Department prosecutors who handle federal death penalty cases, including accusing them of treating "the death penalty process as an 'elaborate game'" and using methods that were "wasteful of taxpayer dollars."[17]

### Violations of Canon Four

Canon 4 recognizes that a judge may engage in "extrajudicial activities, including lecturing on both law-related and nonlegal subjects." However, Canon 4 imposes important limitations on such activities, including that "a judge should not participate in extrajudicial activities that detract from the dignity of the judge's office [or] reflect adversely on the judge's impartiality . . . ." (Emphasis added.) Similarly, Canon 4 states that participation in extrajudicial activities is permissible only "[t]o the extent that the judge's . . . impartiality is not compromised . . . ." As discussed at length above, Complainants submit that no objective observer or "reasonable mind" could conclude after Judge Jones's speech that Judge Jones is "impartial" on the death penalty, the constitutionality of the death penalty, or capital cases involving the defenses of racism, actual innocence, "mental retardation," or international standards.

### IV.     Request for Transfer

This Complaint concerns the former Chief Judge[18] of the Judicial Council of the Fifth Circuit. Complainants respectfully request that under Rule 26 of the Rules for Judicial-Conduct and Judicial-Disability Proceedings, the Judicial Council for the Fifth Circuit ask the Chief Justice of the United States to transfer this proceeding to the judicial council of another circuit. Rule 26 expressly authorizes this transfer. The Commentary to Rule 26 states that "[s]uch transfers may be appropriate . . . where the issues are highly visible and a local disposition may weaken public confidence . . . ." The nature of the allegations in this Complaint both are highly visible and involve the issue of the former Chief Judge's treatment of and conduct toward another member of the Fifth Circuit. Therefore, transfer is appropriate. The Ninth Circuit followed this transfer

---

[17] *See* Ex. F, at ¶¶ 8, 10; Ex. B, at ¶¶ 12, 23; Ex. D, at ¶ 11; Ex. E, at ¶ 11.

[18] Judge Jones served as Chief Judge from 2006 to October 1, 2012.

32 of 158

procedure in connection with a complaint filed against Chief Judge Alex Kozinski, and the Chief Justice granted the transfer request. *See In re Complaint of Judicial Misconduct (Kozinski)*, 575 F.3d 279, 280 (Judicial Council 3d. Cir. 2009) ("The Judicial Council of the Ninth Circuit asked the Chief Justice of the United States to transfer the identified Complaint to the judicial council of another circuit pursuant to Rule 26. On June 16, 2008, the Chief Justice granted the request and selected the Judicial Council of the Third Circuit to exercise jurisdiction over the Complaint. *See* Rule 26.").

## V.      Rule 6(d) Certification

In accordance with Rule 6(d) of the Rules for Judicial-Conduct and Judicial-Disability Proceedings, the factual statements in the Complaint are true and correct, as verified in the Declarations, made under penalty of perjury, attached hereto as Exhibits A-F.

Respectfully Submitted,

COMPLAINANTS:

*Gregory J. Kuykendall, Director, Mexican Capital Legal Assistance Program (MCLAP)
*League of United Latin American Citizens (LULAC), by Luis Roberto Vera, Jr.
*NAACP — Austin Chapter, by Nelson E. Linder
*National Bar Association, Houston Affiliate — J.L. Turner Legal Association, by Mandy Price
*Texas Civil Rights Project (TCRP), by James C. Harrington
*La Union del Pueblo Entero (LUPE,) by Juanita Valdez-Cox
*Charles W. Wolfram, Professor Emeritus, Cornell Law School; Author, *Modern Legal Ethics*
*Renato Ramirez, Investor/Philanthropist
*Professor Robert P. Schuwerk, Co-Author, *Handbook of Texas Lawyer and Judicial Ethics*
*Mark I. Harrison, Osborn Maledon; Former Chair, ABA Commission to Revise the Model Code
 of Judicial Conduct
*Susan Martyn, Distinguished Professor of Law & Values, University of Toledo College of Law
*Ronald Minkoff, Frankfurt Kurnit Klein & Selz; Past President, Association of Professional
 Responsibility Lawyers
*Ellen Yaroshefsky, Clinical Professor and Director, Burns Center for Ethics in the Practice
 of Law, Cardozo School of Law

[Signatures and addresses listed below.]

12

. League of United Latin American Citizens (LULAC)

By:  Luis Roberto Vera, Jr., Esq.
111 Soledad, Suite 1325
San Antonio, Texas 78205
(210) 225-3300

NAACP – Austin Chapter

By: Nelson E. Linder
President, Austin Chapter
1709 E. 12th Street
Austin, Texas 78702
(512) 476-6230

J.L. Turner Legal Association
(Affiliate Chapter, National Bar Association)

By: Mandy Price, President
2101 Ross Avenue
Dallas, Texas 75201
(214) 741-1888

12

**Mexican Capital Legal Assistance Program (MCLAP)**

By: Gregory J. Kuykendall, Director
531 S. Convent Ave.
Tucson, Arizona 85701
(520) 792-8033

13

**Texas Civil Rights Project**

By: James C. Harrington, Director
1405 Montopolis Drive
Austin, Texas 78741
(512) 474-5073


**La Union del Pueblo Entero**


By: Juanita Valdez-Cox, Executive Director
P.O. Box 188
San Juan, Texas 78589
(956) 782-6655


Charles W. Wolfram
Charles Frank Reavis, Sr. Professor
Cornell Law School
Myron Taylor Hall
Ithaca, NY 14853-4901
(510) 841-5542


Renato Ramirez
Investor/Philanthropist
P.O. Box 125
Zapata, Texas 78076
(956) 251-3224


Lillian Hardwick
4013 Dominion Cove

13

**COMPLAINANT**

Celeste I. Villarreal
President, MABA –TX

        Contact address:        1108 Lavaca Street, Suite 110-319
                                      Austin, Texas 78701
                                      (512) 968-6957

4829-4266-8820, v. 1

**COMPLAINANT**

Robert P. Schuwerk
Professor of Law

Contact address:    207 Bonnieview Street
Austin, Texas 78704
(512) 441-9178

**COMPLAINANT**

Mark Harrison
Former Chair, ABA Commission to Revise the Model Code of Judicial Conduct

Contact address:   Osborn Maledon, A Professional Association
2929 North Central Avenue, Suite 2100
Phoenix, Arizona  85012
(602) 640-9324

**League of United Latin American Citizens (LULAC)**

_____

By:  Luis Roberto Vera, Jr., Esq.
111 Soledad, Suite 1325
San Antonio, Texas 78205
(210) 225-3300

14

Susan Martyn, Professor
University of Toledo College of Law
2801 W. Bancroft Street
Toledo, Ohio 43606
(800) 586-5336

25

Ellen Yaroshefsky, Professor
Cardozo School of Law
55 Fifth Avenue, Room 1115
New York, New York 10003
(212) 790-0386

26

COMPLAINANT

Charles Wolfram
Charles Frank Reavis Sr. Professor of Law, Emeritus

Contact address:     2804 Cherry Street
                     Berkeley, California 94705-2310
                     (510) 841-5542

COMPLAINANT

Ronald Minkoff
Past President, Association of Professional Responsibility Lawyers

Contact address:      Frankfurt Kurnit Klein & Selz PC
488 Madison Avenue
New York, New York 10022
(212) 705-4837

Texas Civil Rights Project

_____

By: James C. Harrington, Director
1405 Montopolis Drive
Austin, Texas 78741
(512) 474-5073

La Union del Pueblo Entero

_____

By: Juanita Valdez-Cox, Executive Director
P.O. Box 188
San Juan, Texas 78589
(956) 782-6655

_____

Charles W. Wolfram
Charles Frank Reavis, Sr. Professor
Cornell Law School
Myron Taylor Hall
Ithaca, NY   14853-4901
(510) 841-5542

_____

Renato Ramirez
Investor/Philanthropist
P.O. Box 125
Zapata, Texas 78076
(956) 251-3224

United Mexican States

_____

By: Gregory J. Kuykendall
Counsel for United Mexican States
Kuykendall & Associates
531 South Convent Ave.
Tucson, Arizona 85701-2612
(520) 792 0113

League of United Latin American Citizens (LULAC)

_____

By: Luis Roberto Vera, Jr., Esq.
111 Soledad, Suite 1325
San Antonio, Texas 78205
(210) 225-3300

National Association for the Advancement
of Colored People (NAACP) – Austin Chapter

_____

By: Nelson E. Linder
President, Austin Chapter
1709 E. 12th Street
Austin, Texas 78702
(512) 476-6230

J.L. Turner Legal Association
(Affiliate Chapter, National Bar Association)

_____

By: Mandy Price, President
2101 Ross Avenue
Dallas, Texas 75201
(214) 741-1888

Texas Civil Rights Project

_____

By: James C. Harrington, Director
1405 Montopolis Drive
Austin, Texas 78741
(512) 474-5073


La Union del Pueblo Entero

_____

By: Juanita Valdez-Cox, Executive Director
P.O. Box 188
San Juan, Texas 78589
(956) 782-6655


_____

Charles W. Wolfram
Charles Frank Reavis, Sr. Professor
Cornell Law School
Myron Taylor Hall
Ithaca, NY 14853-4901
(510) 841-5542

Renato Ramirez
Investor/Philanthropist
P.O. Box 125
Zapata, Texas 78076
(956) 251-3224

State of Pennsylvania  )
                     )
County of Philadelphia )                                Declaration of Marc Bookman

Appeared before the undersigned authority duly designated to administer oaths, Marc Bookman states on oath:

1.        My name is Marc Bookman. I am a resident of Wyndmoor, Pennsylvania. I am over 18 years of age and am otherwise competent to give this declaration. No promises or agreements have been made to me in exchange for this statement, and I do not expect any in the future.

2.        I am the Director of the Atlantic Center for Capital Representation, an organization based in Philadelphia that provides services to capital defense teams in Pennsylvania and Delaware. Before that I was employed by the Defender Association of Philadelphia, and was in their Homicide Unit since its inception in 1993. I graduated from the University of North Carolina Law School in 1982, and have been a lawyer in Pennsylvania since 1982. I graduated from the University of Pennsylvania with a B.A. in 1978.

3.        On February 20, 2013, I attended a lecture at the University of Pennsylvania Law School given by Edith Jones, formerly Chief Judge of the Fifth Circuit Court of Appeals. The Law School advertisements described the lecture as "Federal Death Penalty Review with Judge Edith Jones (5th Cir.)," and noted that "Circuit Judge Edith Jones will discuss federal death penalty review through the perspective of a federal judge." The lecture was open to the public and the audience appeared to be made up largely of law students. The lecture lasted roughly an hour and a quarter.

## EXHIBIT "A"

4.        In her introductory remarks, Judge Jones noted that she had reviewed more than a hundred capital cases and that, while she was personally a supporter of the death penalty, her job as a judge obliged her to apply whatever legislation the legislature enacted.

5.        Judge Jones noted at the outset that she intended to structure her initial remarks so as to answer three questions: Is the death penalty constitutional? Is the death penalty morally justifiable? Is the death penalty working? Judge Jones did answer these questions and then went beyond them to address several additional matters, as I've noted below.

6.        Judge Jones said there was no arguing that the death penalty is constitutional. She noted that the Founding Fathers wrote it directly into the constitution and that it has ancient roots in Deuteronomy. She also noted that she does not share others' views that the death penalty is no longer constitutional because of evolving standards of decency.

7.        Regarding the question of whether the death penalty is morally justifiable, Judge Jones answered that it is "absolutely" justifiable, and then provided several reasons.

8.        It is, she said, justifiable because it provides vindication for a life that has been taken by another who has shown wanton disregard for that life. Such a person must be penalized to the maximum extent possible, and life imprisonment did not meet that bill.

9.        Moreover, Judge Jones said, we do the convicted killer a service by imposing capital punishment on him or her, because a killer is only likely to make peace with God and the victim's family in that moment when the killer faces imminent execution, recognizing that he or she is about to face God's judgment. In support of the propriety of this justification, Judge Jones referred her audience to an article her husband had gotten from the internet entitled, "Hanging Concentrates the Mind." She said the article talked about the Vatican's perspective on capital punishment while executions were occurring within the Vatican's jurisdiction, suggesting that

the Vatican approved the practice of capital punishment for the very reason she had just articulated.

10.      In further answer to the question whether the death penalty is justifiable, Judge Jones offered her opinion that a review of several of the most recent capital cases for which she had written opinions amply illustrated the morality of state-authorized executions. She described the fact scenarios about each of these cases that demonstrated why the accused deserved to die.

11.      Judge Jones mentioned seven defendants that I can recall: a woman named Beets, whom she described as the "Black Widow;" Walter Bell; Larry Hatten; Larry Swearingen; Marcus Druery; Elroy Chester; and a Mexican national named Ramiro Ibarra. I do not recall all of the details that Judge Jones recounted about these cases but these are the descriptions I remember:

12.      The Black Widow was so-called because she had been married five times and each of her husbands had died. The fifth husband had last been seen going out in a rowboat and had then disappeared. A vial of his medication was found near the boat. It turned out Beets had poisoned the husband. His remains were later discovered in a planter or urn by her front door.

13.      Judge Jones described one defendant who was a college student. She said he had left campus with a group of his friends one night, had been out drinking with them, and had then shot several of them, execution-style, killing at least one of them. She said he had done this simply to get their wallets and the drugs in their pockets.

14.      She described one defendant who had broken into someone's house and had viciously attacked some people in an upstairs bedroom. As the defendant was trying to leave the house, the uncle of the victims arrived to try to protect the family but the defendant shot and killed him.

15.        One of the defendants (I believe this was Bell) had tried to claim he was mentally retarded so he wouldn't get executed. Judge Jones said he did have some IQ scores that were in the 60's range, but he also had one that was 70, which did not qualify him as being mentally retarded because he didn't have adaptive deficits. She thought it was clear this defendant was not mentally retarded. He had offered to take the police to where the murder weapon was hidden. When they got to the location, the defendant climbed up on a chair in four-point shackles, reached up behind a ceiling tile to retrieve the gun, and pulled down a loaded firearm, which he began shooting at the police. Judge Jones thought this action demonstrated this man was far too canny to be mentally retarded.

16.        I'm not sure if she was talking about the same defendant or another, but Judge Jones said someone who was "claiming" to be mentally retarded clearly was not because he had been working as a hitman for a corrupt police officer in New Orleans.

17.        She described another defendant who was claiming to be mentally retarded but who had been able to plan a way to get into a young woman's house where he raped and killed her. I believe Judge Jones said there had been some young children around at the time, too. I believe she said this was Ibarra and that he was a Mexican national.

18.        Judge Jones made special mention of Elroy Chester. She said that Chester claimed to be mentally retarded and had been slow in school but he still managed to go on a burglary spree. In the context of talking about this case and others involving claims of mental retardation, Judge Jones commented that she believes it may do a disservice to the mentally retarded to exempt them from death sentencing.

19.        In describing above what Judge Jones said about these cases, I am not able to capture the complete outrage she expressed over the crimes or the disgust she evinced over the

defenses raised, particularly by the defendants who claimed to be mentally retarded.

20.         Judge Jones turned next to the question of whether the death penalty was working. In answering this question, she went through a brief history of the death penalty up through the mid-1970's, and said that proper guidelines for imposing death sentences were enacted by the states and accepted by the United States Supreme Court in 1976. She said that, at that point, the Supreme Court went on a real "judicial law-making binge" and began fashioning all kinds of problematic rules. The result, she said, was that the death penalty was now "compelled by law, but didn't have to be imposed by the jury." She said the whole area of law was like a "zoo" throughout the 1980's, and only finally began to settle down under Chief Justice Rehnquist and with the passage of the Anti-Terrorism and Effective Death Penalty Act. She noted that this calmer era coincided with the time that O.J. Simpson "was convicted. I mean, let go."

21.         Unfortunately, according to Judge Jones, the Supreme Court went on a "new spree" in the early 2000's, "micromanaging" the death penalty when they decided the Atkins and Roper cases. She quoted Justice White as referring to "death penalty jurisprudence - if you can call it that." She again made disparaging comments about the Atkins decision, noting that the issue of mental retardation became a "slippery slope" if you wound up dealing with someone whose IQ was 67 or above and you had to take the person's adaptive functioning into consideration. Judge Jones mentioned that she thinks the Supreme Court's next attempt at meddling with the death penalty will come by "back-dooring" through the Martinez case the right to counsel in post-conviction proceedings. She seemed to think this would be a travesty.

22.         Judge Jones summed up her feelings about what the Supreme Court had done regarding the death penalty by saying that the Court had managed to do with the death penalty

what they had been unable to do with abortion: they "made it safe, legal, and rare."

23.    As for the federal death penalty, Judge Jones thought people would be shocked to learn there were roughly fifty death penalty prosecutions per year. She said most people were not aware that the federal government sought death in so many cases because so few cases actually went to trial. She said the federal prosecutors treat the process like it is an "elaborate game." She explained that she learned this as a result of being asked to sign off on vouchers for appointed defense lawyers and was astonished to find out "how the game worked." She described that fact that the courts were required to appoint two highly trained defense lawyers to every defendant against whom death was sought. These lawyers would typically spend two years investigating the case and would then bring the "so-called mitigation" they had found to the Justice Department. The Justice Department would then decide *not* to pursue death. Judge Jones said this would consume thousands of dollars of taxpayer money.

24.    Judge Jones thought the federal prosecutors also did a terrible job with the cases that survived this review, getting death sentences in only 50% of those cases. Judge Jones considered it a "complete joke" that after all the time, money and effort the federal government has expended on capital cases, there have only been two executions of people sentenced under the federal death penalty statute, one of whom was Timothy McVeigh. (She was incorrect about this, there have been three federal executions.)

25.    Judge Jones' conclusion was that the death penalty was not working.

26.    As part of her prepared remarks, Judge Jones next addressed what she considered "red herrings" "thrown up" by opponents of capital punishment.

27.    She said that racism was one red herring and that no case has ever been made for systemic racism. Rather, there were certain systemic classes of crimes and certain racial groups

committed more of these crimes than others. In her words, "Sadly, some groups seem to commit more heinous crimes than others."

28.        She elaborated on this during the question/answer session that followed her prepared remarks. She was asked whether she actually had meant that certain races committed worse crimes than others and, further, whether she was troubled by the fact that it was more likely that someone would be sentenced to death if the victim was white. She responded that she did not mean that certain races were "prone" to such violent behavior - just that, "sadly," they happened to engage in it more often. She noted there was no arguing that "Blacks" and "Hispanics" far outnumber "Anglos" on death row and repeated that "sadly" people from these racial groups do get involved in more violent crime. She pointed, by way of example, to the "fact" that there were an awful lot of Hispanics involved in drug trafficking, which in turn involved a lot of violent crime. She also noted it was not true that the death penalty is only given to people whose victims are white (although that was not the question that was asked.) She pointed to the fact that Ibarra, who was a Mexican national, had killed a sixteen-year-old Hispanic woman, and he was sentenced to death.

29.        Actual innocence was another red herring. She said most people were guilty, no system worked perfectly, and there were always going to be a couple of cases that were decided improperly. She noted that there were just as many innocent people killed in drone strikes as innocent people executed for crimes. In fact, all of the cases she knew of that had been reversed were reversed on technicalities.

30.        During the question/answer period, she was asked if she considered prosecutorial misconduct like Brady violations to be technicalities. She rambled a bit about Brady violations and then mentioned that she had had the Kyles case before her several years ago, and had not

believed it involved any prosecutorial misconduct or Brady violation, but that the Supreme Court had disagreed with her and overturned Kyles' conviction. When asked specifically if she would regard it as a technicality if a prosecutor withheld genuinely exculpatory evidence, she said she did not know of any case out of Texas in which a prosecutor had ever done anything to try to convict someone intentionally who was not actually guilty.

31.      Arbitrariness was yet another red herring. Judge Jones said there is nothing arbitrary about the way the death penalty is imposed. She suggested that people claimed the death penalty was arbitrary because people wound up spending twenty years on death row, a problem that was the fault of the very people who claimed the death penalty was arbitrary. They wouldn't permit executions to be carried out "efficiently" and then complained about the length of time people spent on death row. She also said that "arbitrariness is in the mind of the beholder."

32.      The final red herring was "international standards." Judge Jones said she thought this was the weakest argument of all. She again used the example of Ibarra, and suggested there was no way in the world that he would rather be in prison in Mexico than in the United States, even if he wasn't subjected to the death penalty there. She said the Mexican government might claim to object to one of their nationals facing the death penalty in the United States but Mexico certainly wasn't about to provide any of their own citizens with the kind of legal protections the person would get in the United States. She said it was an insult when the Supreme Court looked to the law of some other country and suggested that its legal system is more advanced than our own.

33.      During the question/answer session, I posed two questions. I asked Judge Jones why there were no Federal Defender Capital Habeas Units permitted in the areas served by the

Fifth Circuit Court of Appeals. I noted that in the Third Circuit, where there were such offices staffed by highly-trained capital habeas lawyers, there had not been an execution other than for a volunteer during the entire modern age of the death penalty, while there were substantial numbers of executions in areas not served by these experienced capital habeas lawyers. Judge Jones said she thought the difference in numbers reflected the fact that Pennsylvania trial courts had not been as careful in their trial procedures as the Texas courts had been, and so the Pennsylvania courts had required more reversals. She also claimed that the capital habeas units were expensive -- she asked rhetorically if people realized that every defendant needed a lawyer, and that that required a lot of lawyers; to me her implication was that there were not enough lawyers available for habeas units in Texas, because some defendants would have to do without lawyers if such units were set up.

34.      The other question I asked was the following: why did she put so much stock in the constitutionality of the death penalty based on the fact that the Founding Fathers put it in the Constitution, when the Founding Fathers also felt that women couldn't vote, and that African-Americans were only three-fifths of a person? In other words, I said, doesn't that support the idea that we should view the death penalty from the perspective of our evolving standards of decency? Judge Jones did not specifically address the question -- rather she pointed out at some length that the United States was the best country in the world.

I declare under penalty of perjury under the laws of the State of Pennsylvania and of the United States that the foregoing is true and correct. Executed this 8th day of April, 2013 at Philadelphia, Pennsylvania.

_Marc Bookman_
Marc Bookman

. . . . . and subscribed before me
this 8th . . . day of April 2013 . .

_Christine M Adler-Noble_

NOTARIAL SEAL
CHRISTINE M ADLER
Notary Public
PHILADELPHIA CITY, PHILADELPHIA CNTY
My Commission Expires Apr 29, 2014

# SUPPLEMENT TO DECLARATION
# OF MARC BOOKMAN

State of Pennsylvania )

County of Philadelphia )                     Declaration of Marc Bookman

Appeared before the undersigned authority duly designated to administer oaths, Marc Bookman, and stated upon an oath:

1.  My name is Marc Bookman. I am a resident of Wyndmoor, Pennsylvania. I am over 18 years of age and am otherwise competent to give this declaration.

2.  I have reviewed the COMPLAINT OF JUDICIAL MISCONDUCT against Judge Edith Jones of the Court of Appeals for the Fifth Circuit to which this Declaration is attached. The factual statements in that Complaint are true and correct, based upon my personal knowledge and based upon my having attended and listened to the February 20, 2013 lecture that Judge Jones gave at the University of Pennsylvania Law School.

I declare under penalty of perjury under the laws of the State of Pennsylvania and of the United States that the foregoing is true and correct. Executed on this the 29th day of May 2013, at Philadelphia, Pennsylvania.

_Marc Bookman_

Marc Bookman

SWORN TO AND SUBSCRIBED
BEFORE ME THIS 29th DAY
OF May        , 2013.

NOTARY PUBLIC

NOTARIAL SEAL
CHRISTINE M ADLER
Notary Public
PHILADELPHIA CITY, PHILADELPHIA CNTY
My Commission Expires Apr 29, 2014

<u>AFFIDAVIT AND DECLARATION OF JOSEPH SENGOBA</u>

I, Joseph Sengoba, do hereby swear and declare that the following is true and correct to the best of my knowledge, information and belief subject to the penalties for unsworn falsification to authorities set forth in 28 U.S.C. section 1746 and 18 Pa.C.S. section 4904.

1. My name is Joseph Sengoba. I am 26 years old and a resident of Philadelphia, Pennsylvania. No one has promised me anything in exchange for this statement and I do not expect to receive any benefits in the future.

2. I received my bachelor's degree from Princeton University in 2010. Following graduation I completed a two-year fellowship at the Office of District Attorney of Philadelphia. I am presently pursuing my master's degree in criminology at the University of Pennsylvania.

3. On February 20, 2013 I attended a lecture at the University of Pennsylvania Law School given by Judge Edith Jones of the Fifth Circuit Court of Appeals and sponsored by the Federalist Society. While not a member of the Federalist Society, I had attended other events sponsored by the Federalist Society and was interested in hearing Judge Jones' perspective on the death penalty. I went to the lecture by myself.

4. On April 25, 2013 I reviewed the Declaration of Marc Bookman dated April 8, 2013 [hereafter "Bookman Declaration"]. By and large, the Bookman Declaration is accurate to the best of my knowledge. Mr. Bookman's recollections of the Judge Jones lecture correspond with my own. Mr. Bookman mentioned a few more small details than I do not presently recall and therefore I cannot speak to the accuracy of those details. I recall a few details he did not mention, but I do not dispute anything stated in his Declaration.

5. Specifically, Judge Jones did note in the beginning of her presentation that she had reviewed more than a hundred death penalty cases and that, although she personally supported

1

<span style="font-size:1.5em">EXHIBIT "B"</span>

the death penalty, she understood her job as obligating her to apply the law as enacted by the legislature. Paragraph 4 of the Bookman Declaration is accurate.

6.  Judge Jones said that she would address three questions: (1) Is the death penalty constitutional? (2) Is the death penalty morally justifiable? and (3) Is the death penalty working? Judge Jones addressed all three of these questions and made other remarks, as described below. Paragraph 5 of the Bookman Declaration is accurate.

7.  Paragraph 6 of the Bookman Declaration is accurate.

8.  Paragraph 7 of the Bookman Declaration is accurate.

9.  Paragraph 8 of the Bookman Declaration is accurate.

10.  Judge Jones used what I would call moral language in praising the death penalty as a means to help people comes to terms with the crime they committed. She talked about how the imminent prospect of execution forced the criminal to confront his deed, and she said this as justification for the death penalty. In this regard she mentioned that her husband shared with her an article titled "Hanging Concentrates the Mind". I do not recall whether she specifically said that a killer is only likely to make peace with God if facing execution.

11.  Judge Jones did discuss several individual cases that had come before her and on which she wrote judicial opinions. I remember her mentioning the case involving the woman with several dead husbands and I recall her discussing a case involving a Mexican national who killed a Latina girl. I do not recall the names of any of these cases nor do I recall any of the facts except that they were pretty gruesome. I just remember that she in fact discussed the facts of each case, whatever they were. I do not dispute any of the facts set forth in the Bookman Declaration at paragraphs 10 through 14; I just do not remember them.

2

12. Judge Jones emphasized how strongly opposed she was to defendants using what she called "technicalities" to defend against the death penalty. As an example of such "technicalities" Judge Jones discussed how defendants tried to claim that they were mentally retarded. This whole discussion was very surprising to me. She was dismissive of the Supreme Court's death penalty decisions regarding juveniles and the mentally retarded. She said that she would have come out differently. But it was her dismissive attitude toward these Supreme Court decisions that was very surprising to me. It struck me as odd that a court of appeals judge would be as dismissive of the Supreme Court as she was. She said that the standard for determining mental retardation was "too lenient". Judge Jones made it clear that she did not think those who were mentally retarded should be exempt from the death penalty and that this was her current position.

13. Judge Jones also said that the cases in which the Innocence Project got its clients released did not turn out that way because of the facts or because the defendants were innocent but rather because of technicalities.

14. Paragraph 15 of the Bookman Declaration is accurate.

15. I do not recall the facts set forth in paragraph 16 of the Bookman Declaration. I do not dispute the accuracy of what is said there; I just do not remember her mentioning anything about a defendant working as a hit man for a police officer in New Orleans.

16. Regarding paragraph 17 of the Bookman Declaration, I do vaguely recall Judge Jones discussing a case in which a man who claimed to be mentally retarded was able to plan a way to enter a young woman's house, rape and kill her. I do not recall whether she said this case involved a Mexican national or what the defendant's name was. I just remember that the thrust

3

of her comments was that too many people were falsely claiming to be mentally retarded and the facts of the cases she mentioned proved, in her view, that they were not mentally retarded.

17.  I do not recall the facts set forth in paragraph 18 of the Bookman Declaration.  I do not dispute their accuracy; I just do not remember them.

18.  Paragraph 19 of the Bookman Declaration is accurate.  Judge Jones was very passionate about the victims of the crimes she discussed.  She said that criminal defendants have too many opportunities and protections under the law, and that these protections are hurting the justice system.  She expressed disgust at the use of mental retardation as a defense in capital cases.

19.  She said that she would limit defendants' access to counsel in death penalty cases.  She said that in the death penalty context the Supreme Court was "moving in the wrong direction" on the issues of juveniles, the mentally retarded and access to counsel.

20.  Paragraph 20 of the Bookman Declaration is accurate and Mr. Bookman's recollection of her quotations is accurate.  She did say that the Supreme Court went on a "judicial law-making binge" and fashioned all kinds of problematic rules.  She did say that the death penalty was "compelled by law but didn't have to be imposed by the jury".  She did say that this whole area of the law was a "zoo".

21.  Paragraph 21 of the Bookman Declaration is accurate.  This part really stood out for me, how strident she was and how dismissive she was of the Supreme Court's decisions in this area.  Judge Jones did say that the Supreme Court went on a "new spree" "micromanaging" the death penalty in its decisions on the mentally retarded and juveniles.  She did say that the issue of mental retardation was a "slippery slope" for someone with an IQ of 67 or above because adaptive functioning had to be taken into account.  Her main point was that the direction of the Supreme Court was wrong.

4

22. Paragraph 22 of the Bookman Declaration is accurate. Judge Jones compared the death penalty with abortion and did say that the Supreme Court had managed to make the death penalty "safe, legal and rare". She said this in a critical way.

23. Paragraph 23 of the Bookman Declaration is accurate. Judge Jones did say that federal prosecutors treat the death penalty process as an "elaborate game". She did say that she discovered "how the game worked" when she reviewed the pay requests of defense counsel and saw how long they worked on gathering mitigating evidence to convince the prosecutors to drop the death penalty and how successful they were at doing that. She was definitely very critical of the federal government's way of handling death penalty cases.

24. Paragraph 24 of the Bookman Declaration is accurate. Judge Jones did describe as a "complete joke" that there had only been two federal executions after all the time and money that had been spent.

25. Judge Jones said that the death penalty was not working.

26. Paragraph 26 of the Bookman Declaration is accurate.

27. Judge Jones described racism as a "red herring". I am familiar with the Supreme Court decision in McCleskey and the Baldus Study. So it came as a surprise to me that Judge Jones was as dismissive as she was of the notion that race might be a relevant consideration in the debate on capital punishment. She did say, "Sadly, some groups seem to commit more heinous crimes than others."

28. Paragraph 28 of the Bookman Declaration is accurate. Judge Jones did say that a lot of Hispanics were involved in drug trafficking. She did support her claim that the death penalty is not only given to those who kill white victims by referring to the case of the Mexican national who killed a Latina woman.

5

29. Judge Jones characterized actual innocence as another "red herring". I do not recall whether Judge Jones said that there were just as many innocent people killed in drone strikes as innocent people executed for crimes. But she was very dismissive of claims of innocence. She did not take seriously the possibility that innocent people had been sentenced to death.

30. Paragraph 30 of the Bookman Declaration is accurate. Judge Jones included in her definition of "technicalities" cases in which the state withheld evidence and cases of actual innocence. She did say that she did not know of any case in Texas where a prosecutor had ever tried to convict someone intentionally who was not guilty.

31. Paragraph 31 of the Bookman Declaration is accurate.

32. Paragraph 32 of the Bookman Declaration is accurate in full except I do not recall whether Judge Jones said that it was an insult when the Supreme Court looked to other countries for legal guidance. I am familiar with the conservative critique on the use of international standards in American court decisions, so it did not surprise me that Judge Jones shared that view. She said that the United States should not be using international standards and was dismissive of that principle.

33. Paragraph 33 of the Bookman Declaration is accurate.

34. Regarding paragraph 34 of the Bookman Declaration, I recall the question about the evolving standards but I do not recall Judge Jones' answer. I would have recalled it better if she had answered the question. Judge Jones did say that the United States is the best country in the world.

35. In regards to Judge Jones' general comments on the death penalty and prior decisions of the Supreme Court, I found the overall tone of the lecture disrespectful. As an African American male, and as someone who is interested in the areas where race and law intersect, I was made

6

uncomfortable by her comments on race and found them offensive. She created an uncomfortable situation by her remarks and I think she sensed it and then tried to clarify her position. After the lecture, I overheard that the organizer of the event was apologetic and wanted to make sure the students were not offended by what she had said.

The foregoing is true and correct to the best of my information, knowledge and belief.

Joseph Sengoba

SWORN TO AND SUBSCRIBED
BEFORE ME THIS _6 th_ DAY
OF _May_      2013.

NOTARY PUBLIC

Commonwealth of Pennsylvania
NOTARIAL SEAL
Joanne R. Vitola, Notary Public
PHILADELPHIA CITY, PHILADELPHIA COUNTY
My Commission Expires July 18, 2016

7

## AFFIDAVIT AND DECLARATION OF ▇▇▇▇▇▇▇▇▇

I, ▇▇▇▇▇▇▇ do hereby swear and declare that the following is true and correct to the best of my knowledge, information and belief subject to the penalties for unsworn falsification to authorities set forth in 28 U.S.C. section 1746 and 18 Pa.C.S. section 4904.

1. My name is ▇▇▇▇▇▇▇ I am ▇▇ years old and a resident of Philadelphia, Pennsylvania. No one has promised me anything in exchange for this statement and I do not expect to receive any benefits in the future.

2. I received my bachelor's degree in philosophy from the ▇▇▇▇▇▇▇▇▇▇▇ in ▇▇▇ Following graduation I served AmeriCorps for two years. In the first year I was in the City Year Program and the second year I served in the After-School Activities Partnerships, assisting public high school teachers in class and running after-school programs. I am currently finishing up my first year at the University of Pennsylvania Law School.

3. On February 20, 2013, at the invitation of a classmate, I attended a lecture at the University of Pennsylvania Law School given by Judge Edith Jones of the Fifth Circuit Court of Appeals and sponsored by the Federalist Society. I went to the lecture by myself.

4. On April 26, 2013 I reviewed the Declaration of Marc Bookman dated April 8, 2013 [hereafter "Bookman Declaration"]. Mr. Bookman's overall recollections of the Judge Jones lecture correspond with my own. Mr. Bookman mentioned more details than I presently recall, and I recall a few details he did not mention, but overall his Declaration is accurate. I have set out below details that I recall that are not mentioned in the Bookman Declaration. Those paragraphs of the Bookman Declaration that I do not mention either simply comport with my memory of Judge Jones' comments or reference matters that I do not recall one way or the other.

5. Specifically, Judge Jones did note in the beginning of her presentation that she had reviewed more than a hundred death penalty cases and that, although she personally supported the death penalty, she understood her job as applying the law. Paragraph 4 of the Bookman Declaration is accurate.

6. Judge Jones said that she would address three questions: (1) Is the death penalty constitutional? (2) Is the death penalty morally justifiable? and (3) Is the death penalty working? Judge Jones addressed all three of these questions and made other remarks, as described below. Paragraph 5 of the Bookman Declaration is accurate.

7. Regarding paragraph 6 of the Bookman Declaration, I only recall that Judge Jones referenced the Bible in providing support for the death penalty. I do not dispute the accuracy of the rest of what Mr. Bookman says in this paragraph; I just do not recall it.

8. Judge Jones did discuss several individual cases that had come before her and on which she wrote judicial opinions. I somewhat recall her mentioning the case involving the "Black Widow" and a case involving a defendant who broke into a house, raped and killed a teenage girl. I do not recall the names of any of these cases nor do I recall any of the specific facts except that they were pretty gruesome. I just remember that she discussed the facts of each case, whatever they were, and did so to show why in her view the death penalty was justifiable for those defendants.

9. Regarding paragraph 19 of the Bookman Declaration, it was abundantly clear that Judge Jones was disgusted by the crimes she had discussed.

10. Regarding paragraph 20 of the Bookman Declaration, Judge Jones did say that the Supreme Court went on a "judicial law-making binge" or engaged in "judicial activism". She did say that this area of the law had become a "zoo". She did say that under Chief Justice

Rehnquist the Supreme Court started to bring to the system order out of chaos. I do not recall the other facts set forth in this paragraph of the Bookman Declaration.

11. Regarding paragraph 21 of the Bookman Declaration, I recall that Judge Jones was critical of the Supreme Court decisions on exempting the mentally retarded and juveniles from the death penalty. I especially remember that she argued how the issue of mental retardation became a "slippery slope", as it was hard to draw a line on when a defendant was or was not mentally retarded. I do not recall anything about the Martinez case or the other quotations Mr. Bookman attributed to her in this paragraph.

12. Paragraph 26 of the Bookman Declaration is accurate. I clearly remember that she used the term "red herrings" to describe certain substantive criticisms of capital punishment.

13. Paragraph 27 of the Bookman Declaration is accurate. Judge Jones described racism as a "red herring". She did say, "Sadly, some groups seem to commit more heinous crimes than others." I am African American, am interested in the places where race and law intersect, and paid close attention when she began to discuss issues of race. Judge Jones said that some racial groups are "prone" to commit acts of violence. In the question and answer session of the lecture, I asked Judge Jones if she could clarify what she meant when she said that. In answering, she said that she did not mean that it was a matter of their biology, but rather that it was a "statistical fact" that certain races are more likely to commit certain violent crimes. Judge Jones said that most of these cases were intra-racial. She did say that a lot of Hispanics were involved in drug trafficking.

14. From speaking with others after the lecture and observing the reactions of others during her remarks, she upset and offended many of the attendees in the room tremendously.

15. Paragraph 29 of the Bookman Declaration is accurate. Judge Jones characterized actual innocence as another "red herring". Judge Jones did say that there were just as many innocent people killed in drone strikes as innocent people executed for crimes, which I thought was at best a curious analogy. She did say that all of the innocence cases had been reversed on technicalities.

16. Regarding paragraph 30 of the Bookman Declaration, Judge Jones did describe as "technicalities" those cases in which the state withheld evidence from the defense. The other facts set forth in this paragraph I do not recall, though I do not dispute them.

17. Regarding paragraph 34 of the Bookman Declaration, I recall the question about the evolving standards and the facts set forth by Mr. Bookman are accurate. I would add that Judge Jones did not directly answer the question, that she was very dismissive of this argument, and that she was more emotional at this time than at any other time during her presentation. She said that we have the best opportunities in the United States and this is why immigrants come to the United States.

The foregoing is true and correct to the best of my information, knowledge and belief.



SWORN TO AND SUBSCRIBED
BEFORE ME THIS  3 rd DAY
OF *May*       2013.



NOTARY PUBLIC



Commonwealth of Pennsylvania
NOTARIAL SEAL
My Commission Expires July 18, 2015

70 of 158

### AFFIDAVIT AND DECLARATION OF ███████████

I, ██████████ do hereby swear and declare that the following is true and correct to the best of my knowledge, information, and belief subject to the penalties for unsworn falsification to authorities set forth in 28 U.S.C. section 1746 and 18 Pa.C.S. section 4904.

1. My name is ██████████ I am ██ years old and a resident of New York, NY. No one has promised me anything in exchange for this statement and I do not expect to receive any benefits in the future.

2. I received my bachelor's degree in Modern Middle Eastern Studies and Religious Studies from the ██████████ in ████. Following my college graduation, I worked for a government contracting firm in Washington, D.C. On May 13, 2013, I graduated from the ██████████████████████

3. On February 20, 2013, I attended a lecture at the University of Pennsylvania Law School given by Judge Edith Jones of the Fifth Circuit Court of Appeals and sponsored by the University of Pennsylvania Law School chapter of the Federalist Society. I went to the lecture by myself. While there were a large number of law students there, I also noticed a large number of outside attendees. I stayed for the entire program.

4. On May 9, 2013 I reviewed the Declaration of Marc Bookman dated April 8, 2013 [hereafter "Bookman Declaration"]. Mr. Bookman's overall recollections of Judge Jones' lecture correspond with my own although he mentioned more details than I presently recall. I recall a few details that Mr. Bookman did not mention in his declaration, which I have set out below. Those facts and observations contained in the Bookman Declaration that I do not mention either comport with my memory of Judge Jones' comments or reference matters that I

do not recall in one way or the other. I do not dispute anything in the Bookman Declaration although I do not recall some of the specific details it contains.

5. Concerning the death penalty, Judge Jones said that the U.S. Supreme Court has made clear that it is both constitutional and justified. She noted that the Founding Fathers wrote the death penalty directly into the U.S. Constitution and that it has ancient roots in Deuteronomy. She also mentioned an article she found on the Internet that she said discussed the Vatican's one-time view that executing a condemned person may allow him or her to make peace with God.

6. Judge Jones also said that the death penalty is justifiable and provided her reasons for this position. I do not recall whether she said that it was "absolutely" justifiable, although I do not dispute the Bookman Declaration's claim that she used that term.

7. Judge Jones said that the death penalty vindicates murder victims' lives and that for certain defendants life imprisonment is not an adequate punishment.

8. In explaining her view that the death penalty is justified, Judge Jones relayed in detail the specific facts of several cases. I remember that she discussed a number of capital cases involving rape, the "Black Widow" case, a case involving a college student, and a case involving a Mexican national. I do not recall the specific facts of these cases. Her recounting of these facts seemed to reflect her outrage at the crimes and her conclusion that the heinousness of these crimes justified the death penalty.

9. Judge Jones mentioned the Supreme Court's prohibition against executing people who are intellectually disabled, who she referred to as "mentally retarded." In several of the individual cases that she described, Judge Jones noted the defendant's claims of being "mentally retarded" and suggested that these claims may be unsubstantiated. She also indicated that test results purporting to establish mental retardation may be invalid. She seemed to suggest that capital

defendants often abuse the Supreme Court's protections of mentally impaired individuals established in *Atkins v. Virginia*. Judge Jones also suggested that the manner in which some defendants committed their crimes demonstrates that they were not "mentally retarded" and that defendants might be feigning mental impairment to avoid execution.

10. Judge Jones also appeared critical of the Supreme Court's death penalty jurisprudence and claimed that it does not work well with how the death penalty works in practice. She criticized the Supreme Court for "judicial law-making" and for fashioning "problematic rules" such as categorical bans on the execution of the "mentally retarded." She said that the Supreme Court's restrictions on execution of the "mentally retarded" created a "slippery slope." Judge Jones seemed to convey her position that the Supreme Court should not create additional restrictions on the death penalty or afford capital defendants any additional protections, including increased access to counsel.

11. Judge Jones also discussed her "surprise" at what she described as the small number of federal capital prosecutions. She stated that federal prosecutors' willingness to pursue a lesser sentence when defense counsel argued that their clients' individual circumstances did not warrant the death penalty and prosecutors' methods of handling federal capital cases were wasteful of taxpayer dollars.

12. Judge Jones discussed what she described as "red herrings" raised by capital lawyers and opponents of the death penalty, including matters pertaining to race. In response to a question describing statistical evidence that the death penalty is not evenly applied across races, she said that certain racial and ethnic groups commit more crimes than other groups and noted that Hispanics are heavily involved in drug trafficking. Many of the attendees at the lecture, a group comprised of various races, looked both surprised and dismayed at these remarks. The people I

was sitting next to looked at one another and me and conveyed their surprise at these remarks on the issues of race. Based on these observations as well as comments I heard after the lecture, it was clear to me that many students were offended by Judge Jones' remarks and how cavalierly she dismissed race and ethnicity as a legitimate concern in how the death penalty was administered.

13. Judge Jones also characterized actual innocence and arbitrariness as red herrings. In response to one question regarding procedural concerns in death penalty administration, she replied that she was not aware of any cases in the Fifth Circuit involving prosecutorial misconduct indicating that the death penalty was inappropriate.

14. Judge Jones also asserted that international standards regarding the death penalty are irrelevant because the American legal system provides more protections than any other legal system.

15. Following her lecture, Judge Jones accepted questions from the audience. By the end of these questions, Judge Jones appeared to be uncomfortable with the audience's questions and disagreement with her remarks and the program ended abruptly. Conversations I had after the program with other attendees, largely fellow law students, made clear that many of them were critical of her remarks and were surprised that the lecture did not follow a more legalistic approach to the serious issue of capital punishment.

SWORN TO AND SUBSCRIBED
BEFORE ME THIS 21st DAY
OF May 2013.

NOTARY PUBLIC



COMMONWEALTH OF PENNSYLVANIA
City of Philadelphia, Phila. County
My Commission Expires October 21, 2014

## AFFIDAVIT AND DECLARATION OF CHANEL LATTIMER-TINGAN

I, Chanel Lattimer-Tingan, do hereby swear and declare that the following is true and correct to the best of my knowledge, information and belief subject to the penalties for unsworn falsification to authorities set forth in 28 U.S.C. section 1746 and 18 Pa.C.S. section 4904.

1. My name is Chanel Lattimer-Tingan. I am 30 years old and a resident of Philadelphia, PA. No one has promised me anything in exchange for this statement and I do not expect to receive any benefits in the future.

2. I received my Bachelor's degree in Sociology and a Certificate in African-American Studies from Princeton University in 2005. I received my Master's degree in Sport Management from the University of Tennessee in 2008. I received my law degree from the University of Pennsylvania in May 2013.

3. On February 20, 2013, I attended a lecture at the University of Pennsylvania Law School given by Judge Edith Jones of the Fifth Circuit Court of Appeals and sponsored by the Federalist Society. I went to the lecture by myself. I arrived a couple minutes after the lecture was scheduled to begin and stayed for the remainder of the program.

4. On May 16, 2013 I reviewed the Declaration of Marc Bookman dated April 8, 2013 [hereafter "Bookman Declaration"]. Mr. Bookman's overall recollections of the Judge Jones lecture correspond with my own. I set forth in this affidavit details I recall that he did not mention. Those paragraphs of the Bookman Declaration that I do not mention either simply comport with my memory of Judge Jones' comments or reference matters that I do not recall one way or the other. I do not dispute anything in the Bookman Declaration.

5. Paragraphs 5 through 8 of the Bookman Declaration are accurate in all respects. Judge Jones noted that the Founding Fathers wrote the death penalty directly into the Constitution and

# EXHIBIT "E"

that it had ancient roots in Deuteronomy. I thought it seemed out of place for a Court of Appeals judge to cite the Bible as legal support for the death penalty.

6. Judge Jones related in detail the facts of several cases that she was aware of or that had come before her. I remember that she discussed a number of cases that involved rape. I recall her discussing the "Black Widow" case and a case involving a Mexican national. I do not recall any of the specific facts of these cases except I believe she related that in the case involving the Mexican national he had raped and killed a woman. I thought that it was simplistic for her to justify the death penalty solely on the basis of the heinousness of the crimes. She conveyed a lot of disgust about the facts of these crimes – it seemed very personal to her, which surprised me.

7. Judge Jones spoke at length about the rules against executing people who are intellectually disabled (she used the insensitive term "mentally retarded") and many of the cases she described raised mental retardation as a defense. She cited one case where the defendant had IQ scores in the 60's range and one IQ score of 70 and said that it was clear to her that the defendant was not "mentally retarded" because the facts of the crime themselves proved that he knew what he was doing. Judge Jones was very dismissive and skeptical of these types of arguments and overall highly critical of the use of "mental retardation" to escape the death penalty. She said that "mental retardation" should not preclude death as a sentence and criticized the United States Supreme Court decision that held that it did.

8. Judge Jones' dismissive approach to claims of "mental retardation" surprised me. I thought that she did not have a very sophisticated understanding of what intellectual disabilities involved and the whole discussion seemed disrespectful to me. She placed great emphasis on the facts of the crime as support for her position that these defendants were not "mentally retarded," which seemed to me a very limited – at best – analysis, and more rooted in her personal views of

the crimes and the defendants than in a legal analysis. At one point she said that it is a "disservice" to the "mentally retarded" to exempt them from capital sentencing, which was very shocking to hear. Judge Jones was clearly unhappy with how these defendants were using "mental retardation" to claim exemption from the death penalty.

9. Judge Jones was also very critical of several of the Supreme Court's decisions concerning the death penalty. She criticized the Supreme Court for creating "problematic rules" such as exempting the "mentally retarded" from death sentences. She said that the Supreme Court was "micromanaging" the death penalty with these new rules and that the decision on "mental retardation" was a "slippery slope."

10. She said that the Supreme Court had done with the death penalty what it had been unable to do with abortion: making it "safe, legal and rare". When she said this, I was shocked and looked at one of my classmates in the audience in shared disbelief.

11. Judge Jones was also very critical of the manner in which federal prosecutors handled capital cases. I do not remember her reasons for being so critical. I just recall that she felt that the federal prosecutors were wasting a lot of taxpayer money and that she criticized them for being so unsuccessful in securing more death sentences.

12. Judge Jones discussed what she described as "red herrings" raised by capital lawyers and opponents of the death penalty. The first "red herring" she discussed was race. One of the main reasons I decided to attend a lecture on the death penalty to begin with was my interest in the areas where race and law intersect, and I am aware that race issues often arise in death penalty cases. Because of this, I would say that I paid particular attention when she began to discuss this topic. She said that "sadly" certain racial and ethnic groups commit more crimes than other groups and that Hispanics are heavily involved in drug trafficking. Although she used the term

"sadly", it was clear to me that she was not sad at all about her belief that certain groups commit more violent crimes than others. She said that the case involving the Mexican national who killed a girl who was not white proves that the death penalty is not only imposed on those who kill whites.

13. Judging by the looks on their faces, many others in the audience were dismayed by these remarks on race. My reaction was akin to "here we go again" – meaning that I perceived her remarks to be the type of racially insensitive comments I have heard many times in my life and professional career. Because of my experience with this level of racial insensitivity and ignorance, I cannot say I was offended in that moment, as I have come to expect this type of ignorance from certain types of people. I recognize that the statements she made are offensive; it's just that I personally am past getting upset when I hear these types of comments. They are offensive because they willingly ignore so much of the nuances of others' lives about which she knows so little. It struck me that she was so willing to dismiss race as a legitimate concern in how the death penalty was administered. I thought it was ironic that she seemed so willing to make generalized and stereotypical comments about racial groups and their "criminal tendencies" yet so unwilling to accept the validity of the statistics showing that those who kill whites are more likely to be prosecuted capitally and sentenced to death.

14. Judge Jones also characterized actual innocence as a red herring. Because I did some work at the Pennsylvania Innocence Project during law school, I again paid particular attention to her remarks on this subject. As the Bookman Declaration notes, she said that there were always going to be some cases that slipped through the cracks and that there were just as many innocent people killed in drone strikes as innocent people executed for crimes. She said that reversals of those who were allegedly innocent were really based on "technicalities," not

innocence. She was unapologetic when making these comments. I found her remarks on this issue highly offensive and disrespectful of those who had been wrongly convicted and sentenced to death. I was offended both because of her willingness to tolerate a legal system with such mistakes and because of her position that concerns about the mistaken conviction of the innocent was not a valid reason to oppose the death penalty.

15. Judge Jones also labeled Brady violations as "technicalities." In response to a question as to whether she considered it a technicality when a prosecutor failed to disclose genuinely exculpatory evidence, she said that she did not know of any case out of Texas in which a prosecutor had ever tried to convict someone who was not actually guilty. I felt like she was deliberately trying not to answer this question based on her canned response.

16. Judge Jones was also very critical of defense lawyers and advocates for the capital inmates who caused "delays" in executions.

17. By the end of the question and answer period, Judge Jones was angry and very emotional. I would describe her as super-defensive. She lost her composure and there was now a very tense and uncomfortable atmosphere in the room. The host of the program ended the program abruptly, and it was awkward to be in the room.

18. Overall, I was surprised by the level of informality, lack of candor, and failure to demonstrate empathy and sensitivity by Judge Jones, particularly since she spoke in her role as a Fifth Circuit judge.

_Chanel Lattimer-Tingan_
Chanel Lattimer-Tingan

SWORN TO AND SUBSCRIBED
BEFORE ME THIS _2nd_ DAY
OF _MAY_          20-13.

NOTARY PUBLIC

COMMONWEALTH OF PENNSYLVANIA
Notarial Seal
Kimberly A. Sheovers, Notary Public
Lower Morion Twp., Montgomery County
My Commission Expires Aug. 13, 2013
Member, Pennsylvania Association of Notaries

## AFFIDAVIT AND DECLARATION OF ▮▮▮▮▮▮

I, ▮▮▮▮▮ do hereby swear and declare that the following is true and correct to the best of my knowledge, information and belief subject to the penalties for unsworn falsification to authorities set forth in 28 U.S.C. section 1746 and 18 Pa.C.S. section 4904.

1. My name is ▮▮▮▮▮▮ I am ▮▮ years old and a resident of Philadelphia, PA. No one has promised me anything in exchange for this statement and I do not expect to receive any benefits in the future.

2. I received my Bachelor's degree in Science and Industrial Engineering from ▮▮▮▮▮▮ in ▮▮▮ Following graduation I worked as a management consultant for two years and was the ▮▮▮▮▮▮▮ for a firm operating charter schools in Chicago, Illinois for three years. I am currently finishing up my first year of ▮▮▮▮▮▮▮▮▮▮▮

3. On February 20, 2013, I attended a lecture at the University of Pennsylvania Law School given by Judge Edith Jones of the Fifth Circuit Court of Appeals and sponsored by the Federalist Society. I went to the lecture by myself. I arrived on time and stayed for the whole program. The lecture was open to the public and was attended mostly by law students. The lecture lasted approximately an hour and 15 minutes.

4. On May 17, 2013 I reviewed the Declaration of Marc Bookman dated April 8, 2013 [hereafter "Bookman Declaration"]. Mr. Bookman's overall recollections of the Judge Jones lecture correspond with my own. I set forth in this affidavit details I recall that he did not mention. Those paragraphs of the Bookman Declaration that I do not mention either simply comport with my memory of Judge Jones' comments or reference matters that I do not recall one way or the other. I do not dispute anything in the Bookman Declaration.

5. At the beginning of her remarks, Judge Jones said that she had reviewed more than 100 capital cases and that, although she was personally a supporter of capital punishment, her job as a judge required her to apply the law.

6. Judge Jones said that the death penalty was clearly constitutional and there was no arguing that question.

7. Judge Jones recounted in some detail the facts of several capital cases, some of which had come before her and some of which might not have. She used the facts of these crimes as her main argument why the death penalty was justifiable. Although I do not recall any of the specific facts of any of these cases, I do recall her mentioning a Mexican national who raped and killed a girl. It was clear that Judge Jones was disgusted by the gruesomeness of these killings. I was surprised at how personal and emotional these particular arguments were. They seemed less analytical than a judge should approach a case. I drew from her remarks that her emotions and beliefs drove the results in some of these cases.

8. Judge Jones discussed United States Supreme Court decisions that she felt had unfairly restricted the use of the death penalty, including the cases which banned the death penalty for juveniles and those with intellectual disabilities. She viewed the Supreme Court's new rules with some degree of contempt and she was generally disparaging of the Court. She made it clear that she was not in agreement with some Supreme Court decisions.

9. I do not recall any specifics of what Judge Jones said about "mental retardation". But I did feel as though her remarks represented a lack of appreciation of the complexities presented by intellectual disability.

10. I vaguely recall that Judge Jones was critical of how the Justice Department prosecutors handled capital cases, how they relented to pressure from the defense to withdraw the death

sentence in cases, and how little success they had in securing death sentences when they did pursue them. She said that the lawyers were gaming the system and that it was a "complete joke" how these cases were handled in federal court.

11. Judge Jones mentioned several issues that "opponents of the death penalty" raised that she considered "red herrings." Racism was one such red herring. She said that certain racial groups like African Americans and Hispanics are pre-disposed to crime, that an awful lot of Hispanics are involved in drug trafficking, and that certain races happen to engage in violent crime more than others. She used the fact that the Mexican national had received death for killing a Hispanic girl as support for her claim that it is not only defendants who kill whites that are sentenced to death. The reaction in the room when she made these remarks was one of shock, surprise and offense. As a judge, she came off sounding distasteful and tactless.

12. Judge Jones described as "technicalities" prosecutorial misconduct such as Brady violations. When she was asked whether she would consider it a technicality if a prosecutor were to fail to disclose genuinely exculpatory evidence, she said that she did not know of any Texas case in which a prosecutor had ever intentionally tried to convict someone who was not actually guilty.

13. Judge Jones said that arbitrariness was another red herring.

14. Judge Jones said that Mexican nationals would clearly prefer to be in the United States than in Mexico. She said that it was insulting for the Supreme Court to consider the laws of other countries, as that suggested that their laws were superior to our own.

15. By the end of the question and answer period, Judge Jones seemed to have lost her composure. She became combative, her tone of voice and demeanor were angry and defensive, and the atmosphere in the room was tense.



SWORN TO AND SUBSCRIBED
BEFORE ME THIS 20ᵗʰ DAY
OF *MAY*         , 2013.



NOTARIAL SEAL

City of Philadelphia, Phila. County
My Commission Expires July 24, 2016

Transcript of Exchange between (then) Chief Judge Jones and Judge Dennis during the en banc oral argument on September 20, 2011 in *United States v. Delgado*, No. 07-41041 (5th Cir.).

MR. TURNER: I think the amount of drugs in that truck supports the intent to distribute. And the jury....

JUDGE DENNIS: Well, we've said over and over that the amount.... this court, no court has said that you can infer....

CHIEF JUDGE JONES: Judge Dennis....

JUDGE DENNIS: ... just on the basis of the amount of drugs ...

CHIEF JUDGE JONES: Judge Dennis!

JUDGE DENNIS: Can I, can I, can I ask a question?

CHIEF JUDGE JONES: You have monopolized, uh, uh, seven minutes....

JUDGE DENNIS: Well, I'm way behind on asking questions in this court. I have been quiet a lot of times, and I am involved in this case....

(CHIEF JUDGE JONES slams her hand down on the bench, reportedly stands halfway up out of her chair, and points toward the door.)

CHIEF JUDGE JONES: Would you like to leave?

JUDGE DENNIS: Pardon? What did you say?

CHIEF JUDGE JONES: I want you to shut up long enough for me to suggest that perhaps....

JUDGE DENNIS: Don't tell me to shut up....

CHIEF JUDGE JONES: ... you should give some other judge a chance to ask a question ...

JUDGE DENNIS: Listen, I have been in this courtroom many times and gotten closed out and not able to ask a question. I don't think I'm being overbearing....

CHIEF JUDGE JONES: You've been asking questions for the entire seven minutes....

JUDGE DENNIS: Well, I happen to be through. I have no more questions.

CHIEF JUDGE JONES: I just want to offer any other judge an opportunity to ask a question. Some may support your position. If nobody else chooses to ask a question, then please go forward.

(The exchange reflected above starts at approximately mark 47:30 in the oral argument recording found here: http://www.ca5.uscourts.gov/OralArgRecordings/07/07-41041_9-20-2011.wma)

# EXHIBIT "G"

State of Texas         §
                       §
County of Travis       §

<u>Declaration of James M. McCormack</u>

My name is James M. McCormack. I am over the age of eighteen, have never been convicted of a crime, and am competent to make this affidavit. Except where indicated, the facts set forth below are within my personal knowledge and are true and correct. I have based my opinions set forth below on facts or data of a type reasonably relied upon by experts in my field in forming opinions on the subject of professional liability, legal malpractice, and/or the ethical duties and obligations of Texas lawyers.

1. I am a licensed attorney in the State of Texas (State Bar No. 13455500) and am in good standing with the State Bar of Texas. I have been licensed to practice law in Texas since 1984. My law office is located at 2508 Ashley Worth Blvd., Suite 210, Austin, Texas 78738.

2. I hold an "av" rating ("very high to pre-eminent legal ability") from the Martindale-Hubbell Legal Directory.

3. I am the former **General Counsel and Chief Disciplinary Counsel of the State Bar of Texas** (1991-1996) and a former Managing Attorney of the Civil Litigation Section of the Travis County Attorney's Office in Austin, Texas. **As the State Bar's Chief Disciplinary Counsel, I served as the chief prosecutor and legal ethics enforcement officer for the attorney disciplinary system in Texas.**

4. I am a graduate of the University of Texas at Austin: BBA with Honors, 1981; Doctor of Jurisprudence, 1984.

5. I have served as an **adjunct professor of law at the University of Texas School of Law in Austin** where I taught the law of professional responsibility. I am a regular lecturer on legal ethics, professional responsibility, and legal malpractice issues at continuing legal education conferences and programs. I am the author (or co-author) of several papers, articles and/or presentations on legal ethics and legal malpractice related subjects, including an article in the American Bar Association's Law Practice Management magazine entitled "Good Ethics, Smart Tactics" (named by the magazine as one of its top five articles of 1995).

6. From roughly 1998 to 2004, I served as a member of the **Texas Disciplinary Rules of Professional Conduct Committee**, which is the State Bar's standing

EXHIBIT "H"    1

committee charged with studying and recommending revisions to the Texas Disciplinary Rules of Professional Conduct.

7. I served as **Chairman** (2007-2008) of the Board of Trustees of the **Texas Center for Legal Ethics and Professionalism in Austin.**

8. My Austin-based law practice emphasizes legal ethics and legal malpractice consultations (as well as practice management advice) for law firms across Texas. I have served as a consulting or designated testifying expert witness in legal malpractice and/or legal ethics-related matters and lawsuits in Texas. Much of my legal practice is devoted to assisting law firms in preventing legal ethics and/or legal malpractice problems on a proactive basis. I serve as ethics advisor or ethics counsel to law firms and other entities and assist them with their questions, dilemmas, and concerns about legal ethics and legal malpractice issues. I have also been called upon to conduct ethics audits or ethics reviews of law firm or business operations.

9. I have served as an expert in cases involving issues of judicial ethics and judicial disqualification.

10. My *curriculum vitae* is attached hereto as Exhibit 1.

11. I have been asked to give my opinion concerning ethical issues raised by Judge Edith Jones's lecture, entitled "Federal Death Penalty Review with Judge Edith Jones (5th Cir.)," delivered at the University of Pennsylvania Law School on February 20, 2013. In that connection, I have reviewed the exhibits that I have been provided and that I understand will be attached to the Complaint when it is filed, including declarations and affidavits from several persons who attended Judge Jones's lecture.

12. **Based upon the materials I have reviewed, it is my opinion that Judge Jones violated the ethical standards applicable to federal judges under the Code of Conduct for United States Judges.**

13. Section 351(a) of Title 28 of the United States Code provides that "[a]ny person alleging that a judge has engaged in conduct prejudicial to the effective and expeditious administration of the business of the courts" may file a complaint against the judge. Rule 3(h) of the Rules For Judicial-Conduct and Judicial-Disability Proceedings (promulgated by the Judicial Conference of the United States) defines "cognizable misconduct" as including "conduct prejudicial to the effective and expeditious administration of the business of the courts" and "conduct occurring outside the performance of official duties if the conduct might have a prejudicial effect on the administration of the business of the courts,

2

including a substantial and widespread lowering of public confidence in the courts among reasonable people." The Commentary to Rule 3 explains that the Code of Conduct for United States Judges may be "informative" in determining whether a judge has engaged in conduct "prejudicial to the effective and expeditious administration of the business of the courts." Thus, in this declaration, I focus principally on that Code of Conduct for United States Judges.

14. Based upon the materials I have reviewed, I understand that Judge Jones, in public statements, made the following assertions:

   i.   The United States system of justice provides a positive service to capital-case defendants by imposing a death sentence, because the defendants are likely to make peace with God only in the moment before imminent execution;

   ii.  Certain "racial groups like African Americans and Hispanics are predisposed to crime," are "'prone' to commit acts of violence," and get involved in more violent and "heinous" crimes than people of other ethnicities;

   iii. Claims of racism, innocence, arbitrariness, and international standards are simply "red herrings" used by opponents of capital punishment;

   iv.  Capital defendants who raise claims of "mental retardation" are abusing the system;

   v.   The United States Supreme Court's decision in Atkins v. Virginia prohibiting execution of persons who are "mentally retarded" was ill-advised and created a "slippery slope";

   vi.  Mexican Nationals would prefer to be on death row in the United States rather than in prison in Mexico;

   vii. The country of Mexico does not provide and would not provide the legal protections that a Mexican National facing a death sentence in the United States would receive.

15. A fundamental principle of judicial ethics in this country is that a judge should be impartial. Indeed, that is a central concept in both our system of justice in the United States and in our constitutional guarantee of due process of law. As the United States Supreme Court stated in *Marshall v. Jerrico, Inc.*, 446 U.S. 238, 242 (1980), "[t]he Due Process Clause entitles a person to an **impartial and disinterested tribunal** in both civil and criminal cases." Similarly, Canon 2A

3

of the Code of Conduct for United States Judges states that "[a] judge should respect and comply with the law and **should act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary.**" In my opinion, Judge Jones's statements, noted above, flout that basic tenet of judicial ethics and constitutional law. Her remarks do not "promote public confidence" in her impartiality; in fact, they do exactly the opposite. Neither the specific groups that Judge Jones targeted in her remarks, nor the general public, can have "confidence" in her "impartiality" based on her statements outlined above. Her comments also bring into question her ability to adhere to the established rule of law, given that she openly based her public remarks on her own personal religious dogma, contempt for United States Supreme Court precedent (which, regardless of her personal feelings, is nonetheless the law of the United States), and unusually strident contempt for persons seeking relief from her Court. By passionately venting her personal (and unconstitutional) views rather than objectively reviewing federal death penalty law, Judge Jones left at least some in her audience with the strong impression that death penalty cases coming before her court would likely be decided based upon her personal biases rather than relevant law and appropriate judicial temperament.

16. Additionally, Canon 2 provides that "a judge should avoid impropriety and the appearance of impropriety in all activities." The Commentary to Canon 2A states that an "appearance of impropriety" exists when "reasonable minds" would conclude that a judge's "impartiality . . . is impaired." In my opinion, it is highly unlikely that any "reasonable mind" could review Judge Jones's statements and conclude that her impartiality is not impaired. The Commentary to Canon 2A also states that "[p]ublic confidence in the judiciary is eroded by irresponsible or improper conduct by judges." In my view, Judge Jones's remarks were improper, irresponsible, and will inevitably serve to erode public confidence in the judiciary. Confidence in the judiciary by lawyers and litigants, is essential to our system of justice.

17. Canon 3 of the Code of Conduct of United States Judges provides that "a judge should perform the duties of the office fairly, impartially, and diligently." The statements and conduct of Judge Jones, described above, evince a lack of "fairness" and "impartiality." Based upon those statements, neither the groups she targeted nor the general public can expect "fairness" or "impartiality" from Judge Jones. An unbiased judiciary is an essential tenet of our system of justice. Judge Jones' unabashed and biased statements undermine that precept, and thus our judiciary.

18. Further, the Commentary to Canon 3A states that "[t]he duty to be respectful includes the responsibility to avoid comment or behavior that could be interpreted as harassment, prejudice or bias." Judge Jones's remarks reflected prejudice and bias against African Americans, Hispanics, and "mentally retarded" persons, among others. At a minimum, these comments unquestionably "could be interpreted" as prejudiced and biased.

4

19. Canon 4 of the Code of Conduct of United States judges provides that "a judge should not participate in extrajudicial activities that detract from the dignity of the judge's office [or] reflect adversely on the judge's impartiality . . . ." (Emphasis added.) Similarly, Canon 4 states that participation in extrajudicial activities is permissible only "[t]o the extent that the judge's . . . impartiality is not compromised . . . ." Judge Jones's extrajudicial comments regarding African Americans, Hispanics, "mentally retarded" persons, Mexican nationals, the justice system of Mexico and the constitutional law decisions of the United States Supreme Court demonstrate that her impartiality on these subjects and issues are severely compromised.

20. In sum, it is my opinion that Judge Jones engaged in "cognizable misconduct" within the meaning of Rule 3(h) of the Rules For Judicial-Conduct and Judicial-Disability Proceedings. Specifically, she engaged in (a) "conduct prejudicial to the effective and expeditious administration of the business of the courts", and (b) "conduct occurring outside the performance of official duties [that] might have a prejudicial effect on the administration of the business of the courts, including a substantial and widespread lowering of public confidence in the courts among reasonable people." Further, as described above, her statements violate Canons 1, 2, 3 and 4 of the Code of Conduct for United States Judges. Her inflammatory remarks evince bias and prejudice and serve to lower public confidence in our judiciary.

21. I view this episode as a very sad and unfortunate chapter in the history of our federal judiciary. Most federal judges strive mightily to act fairly and impartially and to strengthen, rather than erode, public confidence in our system of justice. Judge Jones's conduct militates in the opposite direction. In my opinion, unless an appropriate disciplinary authority strongly disapproves of Judge Jones's statements and properly addresses her flagrant misconduct, our judicial system—and our federal appellate courts in particular—will suffer the consequences of diminished public respect and confidence.

James M. McCormack

Sworn and subscribed before me this 30th day of May , 2013.

Jessica Ruiz
Notary Public – State of Texas

JESSICA RUIZ
Notary Public, State of Texas
My Commission Expires
October 18, 2013

5

**JAMES M. McCORMACK**
**Attorney and Counselor at Law**
**2508 Ashley Worth Boulevard**
**Suite 210**
**Austin, Texas 78738**
Office: 512-615-2408
Fax: 512-615-2420
*Email: jmmccormack@austin.rr.com*

Mr. McCormack is the former **General Counsel and Chief Disciplinary Counsel of the State Bar of Texas (1991-1996)** and a former **Managing Attorney** of the Civil Litigation Section of the Travis County Attorney's Office in Austin, Texas. As the **State Bar's Chief Disciplinary Counsel**, he served as the chief legal ethics enforcement officer for the attorney discipline system in Texas. He is a graduate of the **University of Texas at Austin: BBA with Honors, 1981; Doctor of Jurisprudence, 1984.**

Mr. McCormack also served as an **adjunct professor of law at the University of Texas School of Law** in Austin where he taught professional responsibility. He is a regular lecturer on legal ethics and malpractice issues. His article in the American Bar Association's *Law Practice Management* magazine entitled "Good Ethics, Smart Tactics" was named by the magazine as one of the top five articles of 1995.

From 1998 to 2004, Mr. McCormack served as a member of the State Bar's **Texas Disciplinary Rules of Professional Conduct Committee**, which is charged with recommending amendments to the Texas ethics rules.

He served as the **Chairman of the Board of Trustees of the Texas Center for Legal Ethics and Professionalism (Chair-Elect, 2006-2007; Chairman 2007-2008; Immediate Past Chairman 2008-2009).**

**Mr. McCormack's Austin-based practice emphasizes legal ethics and legal malpractice consultation as well as practice management services for law firms across Texas.** Past consultations include conflicts of interest analysis, mass tort settlements, disqualification motions, lawyer advertising and solicitation questions, organizational ethics reviews, expert testimony, representation before the Texas Board of Law Examiners, and other professional responsibility and malpractice-related counsel.

**Martindale-Hubbell national legal directory peer-based rating: "AV" since 1994.**

## JAMES (JIM) M. McCORMACK
Attorney at Law

- Current practice emphasizes legal ethics and legal malpractice consultation and representation; expert witness review and testimony; and practice management advising; prior service as an adjunct professor of law, The University of Texas School of Law; Partner, Tomblin Carnes McCormack, L.L.P., Austin, Texas (1999-present); Law Offices of James M. McCormack (1996-1999; 2008-present); also Of Counsel, Law Offices of Anthony W. Tomblin (1997-1999).

### General Counsel and Chief Disciplinary Counsel
State Bar of Texas
1991-1996

- Served as the **General Counsel** and the **Chief Disciplinary Counsel** of the State Bar of Texas; as **General Counsel**, provided corporate and litigation services to the Board of Directors, Executive Departments, and other Bar-related entities, such as the Unauthorized Practice of Law Committee and the Client Security Fund; as **Chief Disciplinary Counsel**, served as the chief legal ethics enforcement officer and chief prosecutor for the statewide attorney disciplinary system; supervised ten offices and 118 employees across Texas; oversaw all litigation conducted on behalf of the State Bar and the Texas Commission for Lawyer Discipline; served as *ex-officio* member of the State Bar Board of Directors and Executive Committee. *The State of Texas is a public corporation and the administrative arm of the Judicial Department of the State of Texas.*

### Managing Attorney, Litigation Section
Travis County Attorney's Office
May 1988 to 1991

- Managed public litigation section. Supervised trial attorneys and support staff while handling a regular litigation caseload.

### Assistant County Attorney
Travis County Attorney's Office

- Handled wide variety of lawsuits in virtually all areas of public practice, including personal injury defense, civil rights defense, eminent domain, ad valorem tax collection, employment law, environmental enforcement, contract and real property disputes and miscellaneous (and often unusual) litigation.

**Staff Counsel**
Texas State Senate
1984 to 1985

- Served as **Staff Counsel** to a Texas State Senator; provided legal opinions and advice drafted legislation and amendments; monitored and analyzed proposed legislation.

## EDUCATION

- *The University of Texas Law School.* Doctor of Jurisprudence, 1984.

- *The University of Texas at Austin.* Bachelors in Business Administration with Honors, 1981 (Management).

## EXECUTIVE AND CONTINUING EDUCATION

- The Wharton School, The University of Pennsylvania, Executive Education in Managing People, 1995.

- Covey Leadership Center, Seven Habits Program, 1995.

- *The University of Texas at Austin,* Coursework in counseling psychology, 1990.

- 40 hour Mediation Training Program, Travis County Dispute Resolution Center, 1991.

- *The University of Texas at Austin,* Executive Education in Finance and Accounting for Non-Financial Managers, 1995.

## HONORS, ACTIVITIES, AND MEMBERSHIPS

- **Past President,** Board of Directors, **AUSTIN WOMEN'S CENTER;** Board Member (1987-1992), for twenty year old non-profit organization providing job training and counseling for men and women; staffed by professional staff and volunteers; recipient of federal, state, and local funds.

- **State Bar Presidential Citations** in 1993 and 1996 for leadership in implementing the new grievance system and balancing multiple responsibilities as General Counsel/Chief Disciplinary Counsel of the State Bar of Texas.

- **Member,** State Bar of Texas, since 1984.

- **Member of the Bar**, U.S. District Court, Western, Eastern and Southern Districts of Texas; U.S. Court of Appeals, Fifth Circuit; and the United States Supreme Court.

- **Member**, National Mock Trial Team, University of Texas Law School, 1984; Member, Board of Advocates, University of Texas Law School, 1983-1984.

- **Member**, Friar Society (since 1982); Cactus Yearbook Outstanding Student (1984); University of Texas Goodfellow (1983).

- **Life Fellow**, Texas Bar Foundation.

- **Past Member**, National Organization of Bar Counsel.

- **Member, Texas Disciplinary Rules of Professional Conduct Committee, State Bar of Texas, 1998-2004.**

- **Member, Board of Trustees, Texas Center for Legal Ethics and Professionalism, 2003-2009 (Chair-Elect, 2006-2007; Chairman, 2007-2008; Immediate Past Chairman 2008-2009).**


## TEACHING, WRITING AND ETHICS-RELATED PRESENTATIONS

- **Adjunct Professor of Law**, *The University of Texas School of Law*, Professional Responsibility, 1995-1997.

- **Contributing Co-Author**, *A Guide to the Basics of Law Practice*, 1995 and 1996 editions, Texas Center for Legal Ethics and Professionalism.

- **Author, "The Client Connection,"** *The Texas Lawyer,* (legal newspaper column appeared each month from September 2001 through August 2003)

- Author, "Good Ethics, Smart Tactics", *Law Practice Management Magazine*, American Bar Association, September 1995, (similar article at 57 TEX. B.J. 178, 1994). Named the publication as one of the five best articles of 1995.

- Co-author (with A. Piacenti) and Presenter, "Dual Role Conflicts of Interest," "Reporting Misconduct," and "Entering into and Withdrawing from Representation"; *National Academy of Law, Ethics, and Management Program, 1994.*

- Author and Presenter, "How to Guarantee a Grievance," *Evidence: Current Strategies For The Trial Lawyer In A New Environment Program, South Texas College of Law, 1995.*

- Author and Presenter, "Ethical Considerations for the Personal Injury Lawyer," *The Annual Page Keeton Products Liability and Personal Injury Law Conference*, The University of Texas School of Law, 1996.

- Author and Presenter, "Conflicts of Interest in Complex Litigation," *Recognizing and Resolving Conflicts of Interest Program*, The State Bar of Texas, 1997.

- Speaker, "Most Common Ethical Lapses at Trial," 3rd Annual Evidence and Procedure Symposium, The University of Texas School of Law, San Antonio, Texas, 1998 (similar presentation at "Masters of Litigation" Program for Travis County Bar Association, 1997).

- Speaker, "Ethics and Negotiations," Travis County Bar Association, Austin, Texas, 1998.

- Panel Member and Speaker, "Class Action and Mass Tort Panel; Discussion of Special Ethics Issues, 3rd Annual Evidence and Procedure Symposium, The University of Texas School of Law, San Antonio, Texas, 1998.

- Speaker, "Legal Malpractice," 21st Annual Page Keeton Products Liability & Personal Injury Law Conference, The University of Texas School of Law, 1997.

- Instructor, "Ethical Considerations for Multi-party and Complex Litigation," Continuing Legal Education Online Course, 1998-present.

- Co-presenter (with T. McCormack) "So You Want To Be A Millionaire Lawyer, Ethically ?" 5th Annual Advanced Evidence and Procedure Symposium, The University of Texas School of Law, May 2000 (similar legal ethics programs presented for the Texas Association of Bank Counsel, October 2000; and University of Texas School of Law CLE Program, April 2001).

- Panel Member, "Ethics and the Litigator", Live Statewide Satellite Presentation, Ethics and Malpractice Avoidance for Business/Corporate Lawyers and Litigators, State Bar of Texas, Dallas (and 25 Texas sites), November 2000.

- Presenter (with T. McCormack) "The Weakest Link: Pitfalls in Legal Ethics," Texas Association of Bank Counsel Annual Meeting, Austin, Texas, October 2001.

- Presenter (with T. McCormack) "The Weakest Link: Pitfalls in Legal Ethics," 25th Annual Page Keeton Products Liability and Personal Injury Law Conference, The University of Texas School of Law, Austin, Texas,

November 2001 (similar legal ethics program presented at University of Texas Law School Reunion CLE Program, April 2002).

- Presenter (with T. McCormack) "Ethics Jeopardy" Continuing Legal Education Program, 26th Annual Page Keeton Products Liability and Personal Injury Law Conference, The University of Texas School of Law, Austin, Texas, October 2002.

- Speaker, "Settling Cases Ethically," Silica Litigation Conference (HarrisMartin Publishing Company), New Orleans, Louisiana, June 2003

- Panel Member, "Ethics, Ethics, Ethics" 3 hour ethics program, Travis County Bar Association, December 2003.

- Speaker, "Ethical Pitfalls," Andrews Asbestos Conference, New Orleans, Louisiana, May 2004.

- Speaker, "Ethical Issues for Administrative Lawyers," Advanced Administrative Law Conference, Travis County Bar Association, June 2004.

- Author and Presenter, "Ethical Pitfalls Leading to Disqualification in the Texas and Federal Courts," Page Keeton Litigation Conference, The University of Texas School of Law Continuing Legal Education Program, Austin, Texas, October 2004.

- Speaker, "Six Ethics Rules I Thought I Knew Until I Read Them Again," Austin LSA Association Program, Austin, Texas, April 2005.

- Author and Presenter, "The Verdict from Kerrville: Resolving Conflicts of Interests Under Rule 1.06," Fiduciary Litigation Course, The State Bar of Texas, Houston, May 2006.

- Speaker, "Some Ethics Rules I Thought I Understood Until I Read Them Again," Texas Attorney General's Office, Distinguished Speaker's Program, Third Court of Appeals, Austin, August 2007.

- Speaker, "Attorneys and Paralegals," The Corpus Christi Bar Association, Corpus Christi, November 2007.

- Speaker, Legal Ethics Program for Clinical Programs at the University of Texas School of Law, Austin, January 2008.

- Speaker, "Ethical Insomnia: Construction Law Ethical Situations That Keep You Awake At Night," 21st Annual Construction Law Conference, The Construction Law Section of the State Bar of Texas and the Texas Institute of Continuing Legal Education, San Antonio, February 2008.

- Panelist, "The Ethics of Lawyer-Judge Interactions," The Ethics Course, The Texas Center for Legal Ethics and Professionalism, Austin, May 2008.

- Panelist, "The Ethics of Lawyer-Judge Interactions," The State Bar of Texas, TexasBarCLE, March 2008 (video program).

- Panelist, "Ethical Courtroom Behavior," The State Bar of Texas, TexasBarCLE Live Webcast program, June 2008.

- Speaker, "Ethics in Forming, Operating, and Amending Partnerships," The University of Texas CLE Program: Partnerships and Limited Liability Companies, Austin, July 2008.

- Panelist, "How to Avoid Ethical Improprieties When Dealing with Governmental Personnel," The 22nd Annual Legal Seminar on Ad Valorem Taxation, San Antonio, August 2008.

- Panelist, "Ethical Courtroom Behavior - Part II: Enforcement," The State Bar of Texas, TexasBar CLE Live Webcast program, October 2008.

- Panelist/Chair, "Lawyer-Judge Interactions," The Ethics Course, The Texas Center for Legal Ethics and Professionalism, Austin, December 2008.

- Speaker, "What Social Science Teaches About Rules, Procedures, and Ethical Behavior" ("Advising Businesses and Government in a Troubled Economy: Ethical Policies, Procedures, and Behavior"), UTCLE (The University of Texas School of Law), 13th Annual Law Use Conference, Austin, March 2009.

- Moderator, "Imposing Sanctions" and "Most Common Rule Violations" Grievance Committee Training Videos, Office of the Chief Disciplinary Counsel, The State Bar of Texas, Austin, April 2009.

- Panelist, "Ethics and High Profile Cases: Free Press v. Fair Trial", Co-sponsored by the Litigation Section of the State Bar of Texas and the Texas Center for Legal Ethics and Professionalism, The State Bar of Texas Annual Meeting, Dallas, June 2009.

- Panelist, "Tuning Up Your Law Practice: Conflicts, Contracts, and Costs of Doing Business," Live Webcast by the State Bar of Texas Continuing Legal Education, Austin, July 2009.

- Speaker (with T. McCormack), "What Happens If We Are Honest About Our Jury Trial Experience?," The Car Crash Seminar, UTCLE (The University of Texas School of Law), Austin, August 2009.

- Speaker, "Navigating the Ethics Rules," The Ethics Course, The Texas Center for Legal Ethics and Professionalism, Austin, Texas, September 2009.

- Speaker, "What Social Science Teaches About Rules, Procedures, and Ethical Behavior," The Academy of Hospitality Industry Attorneys Conference, Austin, Texas, October 2009.

- Panelist, "Presenting the Case in Chief—Defense," Trial of a Fiduciary Litigation Case, TexasBarCLE (The State Bar of Texas), Fredericksburg, Texas, December 2009.

- Speaker, "Navigating the Ethics Rules," The Ethics Course, The Texas Center for Legal Ethics and Professionalism, Houston, Texas, January 2010.

- Speaker, "Beyond the MPRE," Spring Symposium, *Pursuing Justice Through Legal Innovation*, Sponsored by the Thurgood Marshall Legal Society, The Chicano/Hispanic Law Students Association, and the National Black Law Journal, The University of Texas At Austin, Austin, Texas, February 2010.

- Speaker, "Practical Legal Ethics for Immigration Lawyers," Austin Chapter of the American Immigration Lawyers Association, Austin, Texas, March 2010.

- Speaker, "Attorney Retainer Agreements: Getting In and Getting Out," The Austin Bar Association, Litigation Section Program, Austin, Texas, April 2010.

- Presenter, "Ethical Tips and Traps for the Marketing Lawyer," Superlawyers Continuing Legal Education Webinar, Austin, Texas, June 2010.

- Speaker, "How to Terminate a Client Engagement," Advanced Tax Law Course, TexasBarCLE, Dallas, Texas, August 2010.

- Panelist, "New Disciplinary Rules: Point and Counterpoint," 34th Annual Page Keeton Civil Litigation Conference, The University of Texas School of Law (UTCLE), Austin, Texas, October 2010.

- Speaker, "Social Science and Ethics," *Strategic Management* Classes (Professor Mark Poulos), The School of Management and Business, St. Edward's University, Austin, Texas, November 2010, April 2011, November 2011, May 2012, and November 2012.

- Co-Presenter (with Jess Irwin), "Representation of Multiple Parties & Conflicts of Interest," The Advanced Administrative Law Course, TexasBarCLE, Austin, Texas, July 2011.

- Author, "The Elephant in the Room: The Referendum Defeat Is A Symptom of a Larger Problem," *The Advocate*, The State Bar Litigation Section Report, Vol. 55, Summer 2011.

- Co-Author (with T. McCormack and S. Schultz), "Probing the Legitimacy of Mandatory Mediation: New Roles of Judges, Mediators, and Lawyers," *St. Mary's Journal on Legal Malpractice & Ethics*, St. Mary's University School of Law, Vol. 1, Number 1, 2011.

- Speaker, "Ethics & Pro Bono Service," Central Texas Wildfire Response Team Volunteer Attorney Training, *The Austin Bar Association*, Austin, Texas, September 2011.

- Speaker, "Navigating the Ethics Rules," The Holiday Ethics Program, The Austin Bar Association, Austin, Texas, December 2011.

- Moderator, Panel Discussion (with Buck Files and Charles Herring, Jr.), "The Ethics of the Legal Profession and the Public Perception of the Profession," *The Dr. Richard Street Legal Symposium*, Austin College, Sherman, Texas, March 2012.

- Panelist, "Appellate Ethics Roundtable," ("Fee Agreements: 5 Easy Pieces"), The University of Texas Conference on State and Federal Appeals, Austin, Texas, May 2012.

- Speaker, "Navigating the Ethics Rules and Conflicts," 12th Annual Legal Conference, The Office of General Counsel, The University of Texas System, Austin, Texas, October 2012.

- Speaker, "Navigating the Ethics Rules and Conflicts," 8th Annual Texas Energy Law Conference, The University of Texas School of Law, Austin, Texas, January 2013.

- Speaker, "Organizational and Personal Ethics," Principles of Management Course, St. Edward's University, Austin, Texas, February 2013; also, similar presentation for three "Strategic Management" Courses; April 2013.

06/09/2000: Statement from Attorney General John Cornyn Regarding Death Penalty Cases   Page 1 of 1

## Office of the Attorney General News Release Archive

Friday, June 9, 2000

**Statement from Attorney General John Cornyn regarding death penalty cases:**

"It has been eight weeks since I first identified problems associated with the testimony of Dr. Walter Quijano, an expert witness in the capital murder trial of Victor Hugo Saldano. As I explained in a filing before the United States Supreme Court on May 3, it is inappropriate to allow race to be considered as a factor in our criminal justice system. On June 5, the United States Supreme Court agreed. The people of Texas want and deserve a system that affords the same fairness to everyone. I will continue to do everything I can to assure Texans of our commitment to an equitable criminal justice system.

"After a thorough audit of cases in our office, we have identified eight more cases in which testimony was offered by Dr. Quijano that race should be a factor for the jury to consider in making its determination about the sentence in a capital murder trial.

"Six of these eight cases are similar to that of Victor Hugo Saldano. We have sent letters to opposing counsel and to the local prosecutors involved advising them of our findings. Two of these eight cases are dissimilar to the Saldano case. In one, the defendant is not a member of a racial group included in Dr. Quijano's statistical model. In the other, the prosecution did not introduce race as a factor.

"In addition, my office has reviewed case files for all executions in Texas since 1982 and we have not found any cases in which a defendant was executed on the basis of this kind of testimony by Dr. Quijano. Also, we have reviewed the cases of all inmates currently scheduled for execution and none of those involves this kind of testimony by Dr. Quijano.

"Additionally, local prosecutors have been advised to review their cases that have not yet reached the attorney general's office."

- 30 -

Contact Mark Heckmann, Heather Browne, or Tom Kelley at (512) 463-2050

# EXHIBIT "I"

8/29/2011

Case 2:14-cv-00315-WTL-WGH   Document 1-7   Filed 10/16/14   Page 100 of 158 PageID #: 630

Case: 13-70025   Document: 00512543844   Page: 79   Date Filed: 02/25/2014

06/09/2000: Capital Case Information Provided By Attorney General Cornyn          Page 1 of 2

## Office of the Attorney General News Release Archive

Friday, June 9, 2000

AUSTIN - Texas Attorney General John Cornyn offers the following information on capital cases that involved Dr. Walter Quijano's testimony using race as a factor to determine future dangerousness.

**Gustavo Julian Garcia, Collin County, cause number 366-80185-91**
**Case status: pending in federal district court on habeas corpus review**

Convicted of capital murder on December 6, 1991 and sentenced to death. Garcia shot and killed Craig Turski while robbing a liquor store on December 9, 1990, in Plano, Texas.

Garcia confessed in writing to being the shooter. Garcia also confessed to being involved in the capital murder of Gregory Martin on January 5, 1991. Martin was killed during a robbery of a Texaco station in Plano, Texas.

**Eugene Alvin Broxton, Harris County, cause number 599-218**
**Case status: pending in federal district court on habeas corpus review**

Convicted of capital murder on April 30, 1992 and sentenced to death. In May of 1991, Broxton forced himself into the Houston hotel room of Waylon and Sheila Dockens.

Broxton bound, gagged, pistol-whipped and then shot the couple. Waylon Dockens survived.

Sheila did not. At the punishment phase of Broxton's capital murder trial, evidence was introduced that Broxton had been charged with the capital murders of Gary Stuchwisch on April 6, 1991, Gordon Miller on April 19, 1991 and Albert Krigger on May 16, 1991.

**John Alba , Collin County, cause number 219-81215-91**
**Case status: headed to Fifth Circuit Court of Appeals for review**

Convicted of capital murder on May 1, 1992 and sentenced to death. Alba shot and killed his wife Wendy Alba, after breaking into the home of friends where Wendy fled after leaving Alba. Alba also shot Wendy's friend several times, but she survived.

**Michael Dean Gonzales, Ector County, cause number D-23,730**
**Case status: pending in federal district court on habeas corpus review**

Convicted of capital murder on December 7, 1995 and sentenced to death for killing Manuel and Merced Aguirre. In April of 1994, Gonzales entered the Aguirre's home and stabbed Manuel and Merced to death. A microwave, VCR, camera, pistol, and stereo were found missing. There was no sign of forced entry. Gonzales was arrested 15 days after the murders.

Gonzales later confessed to a jail guard, who was his cousin, that he killed the Aguirres.

**Carl Henry Blue, Brazos County, cause number 23,293-272**
**Case status: pending in federal district court on habeas corpus review**

8/29/2011

06/09/2000: Capital Case Information Provided By Attorney General Cornyn                    Page 2 of 2

Convicted of capital murder on April 13, 1995 and sentenced to death. Blue poured gasoline on Carmen Richards-Sanders and her boyfriend and set her on fire. Blue then forced his way into her apartment and robbed her. Carmen Richards-Sanders later died.

**Duane Buck, Harris County, cause number 699-684**
**Case status: pending in state habeas corpus**

Convicted of capital murder in May of 1997 and sentenced to death for killing two people while on a shooting spree in the home of his ex-girlfriend, after an argument. Buck killed his ex-girlfriend, Debra Gardner, in the middle of the street, in front of her daughter. He also shot and killed a friend of Gardner's Keith Butler, who was at Gardner's home. Buck also shot his sister in the chest, who was also at Gardner's house, but she survived.

# UNRELATED CASES

Two of these eight cases are dissimilar to the Saldano case. In the Blair case, the defendant is not a member of a racial group included in Dr. Quijano's statistical model. In the Graves case, the prosecution did not introduce race as a factor.

**Michael Blair, Collin County, cause number 366-81344-93**
**Case status: pending in federal district court on habeas corpus review**

Convicted of capital murder on September 28, 1994 and sentenced to death. Late in the morning on September 4, 1993, Blair kidnapped seven-year-old Ashley Estell from a park in Plano, Texas. Ashley Estell was watching her brother's soccer tournament. Her half-clothed body was found the day after she was kidnapped next to a ditch along a dirt road a few miles away. The cause of death was strangulation.

**Anthony Charles Graves, Burleson County, cause number 28,165**
**Case status: pending in federal district court on habeas corpus review**

Convicted of capital murder on October 27, 1994 and sentenced to death. Graves, along with co-defendant Robert Carter, stabbed and then burned Bobbie Davis (age 45), Nicole Davis (age 16, who was also shot), Lea Erin Davis (age 5), Brittany Davis (age 6), Jason Davis (age 4, Robert Carter's son) and Denitra Davis (age 9), at their home in Somerville, Texas, on August 18, 1992. Robert Carter was executed on May 31, 2000.

- 30 -

Contact Mark Heckmann, Heather Browne, or Tom Kelley at (512) 463-2050

8/29/2011



# CRISIS
### MAGAZINE

FEBRUARY 8, 2013

# Hanging Concentrates the Mind
*by Rev. George W. Rutler*



Capital punishment does not inspire roaring humor in healthy minds, so wit on the subject tends to be sardonic. Two of the most famous examples, of course, are: "In this country it is wise to kill an admiral from time to time to encourage the others," and "Depend upon it, sir, when a man knows he is to be hanged in a fortnight, it concentrates his mind wonderfully."

The first, "pour encourager les autres," is in "Candide" where Voltaire alludes to the death by firing squad of Admiral John Byng in 1757 for having let Minorca fall to the French. The second was Samuel Johnson's response to the hanging of an Anglican clergyman and royal chaplain William Dodd for a loan scam. Byng's death was the last instance of shooting an officer for incompetence, while Dodd's was the last hanging at Tyburn for forgery. Dodd's unsuccessful appeal for clemency was ghostwritten by Dr. Johnson.

It is not my concern here to take a position on capital punishment which the Catechism (# 2266) acknowledges is not an intrinsic evil and is rightly part of the state's authority. This is nuanced by the same Catechism's proposition that its use today would be "rare, if not practically non-existent. (#2267)" As a highly unusual insertion of a prudential opinion in a catechetical formula, this would seem to be more mercurial in application than the doctrine of the legitimacy of the death penalty. What is oddly lacking, however, is reference to capital punishment as medicinal as well as punitive. Tradition has understood that the spiritual aspect of the death penalty is to "concentrate the mind" so that the victim dies in a state of grace. Simply put, the less I believe heartily in eternal life, the more disheartened I shall be about entering "a far, far better rest that I go to than I have ever known."

That finale to "A Tale of Two Cities" appeared thirteen years after "Pictures from Italy" in which Dickens described an execution he watched in Rome during the pontificate of Gregory XVI with its chaotic judicial system: "It was an ugly, filthy, careless, sickening spectacle, meaning nothing but butchery," But Dickens noted the presence of monks accompanied by trumpets holding a crucifix draped in black before the twenty-six year old highwayman who had killed a Bavarian countess making a pilgrimage to Rome. The execution was delayed until murderer's wife was brought to him and he at last received absolution. Back in London three years after writing that account, he witnessed in Southwark the hanging of Fredrick and Marie Manning, the last husband and wife jointly to be executed in England. His reaction was similar to that in Rome save that he thought the crowd of 30,000 more unruly and there was no mention of a religious tone.

## EXHIBIT "J"

In Rome in 1817, Pius VII reigning, Lord Byron saw three robbers beheaded in the Piazza del Popolo, and he also noted the priests attending those about to die, with banners and prayers in procession. The swift fall of the guillotine was preferable to the "vulgar and ungentlemanly" gallows in England. Although Dr. Joseph Ignace Guillotin had promoted the use of the "Guillotine," first called the "Louisson," for its relative painlessness, a precursor was in use in Edinburgh in the mid sixteenth century. Regarded as a humane improvement, it was common in many European countries and was used in the Papal States for 369 executions from 1814 to 1870. Giovanni Battista Bugatti was the official papal executioner from 1796 to 1865, having used an axe before the French introduced the guillotine during their occupation of Rome. Under papal rule, there were three normal sites for executions: the Piazza di Ponte Angelo, Piazzo del Popolo, and Via del Cerchi. Shooting was a common form of punishment in the brief Austrian receivership of Rome under the Hapsburg Queen Maria Carolina. Thus we have the firing squad scene in the last act of "Tosca." While the harshest punishment, hanging and drawing and quartering, is often thought of as peculiar to England, it was more common in the Papal States. The last to be killed that way in England were some Jacobite officers in 1745. The sentence was imposed on several Chartist rioters in 1839 but they were given the option of transportation to Australia, which they accepted. When the pope regained possession of the Papal States in 1814, hanging, drawing and quartering was imposed eleven times until it ended in 1817. For particularly heinous crimes, crushing the head with a mallet, the "mazzatello" continued until 1870.

The nickname of the papal executioner Bugatti was Mastro Titta, a slang for Master of Justice (Maestro di Giustizia.) He wore a red cloak and showed ceremonial deference to his victims. Pope Pius IX let him retire at the age of 85 with a considerable pension. This pope, beatified by John Paul II in 2000, was unflinching in the importance with which he invested public executions as an "encouragement" to others. On June 12, 1855 a deranged hat maker and political subversive named Anotonio De Felici chased the Cardinal Secretary of State with a large fork. Cardinal Antonelli escaped unscathed and appealed to the Pope to commute the sentence from beheading to life imprisonment on the grounds of the man's mental imbalance but was refused. Mastro Titta had been retired four years and replaced by his apprentice Antonio Balducci when the final executions in Rome took place on November 24, 1868. Giuseppe Monti and Gaetano Tognetti had been convicted to killing twenty-five Zouave soldiers in the Borgo. The executions ceased, not out of any policy of penal reform, but because of the loss of the Papal States. Agatino Bellomo was the last to be executed in the Papal States, in Palestrina, on July 9, 1870. When Blessed Pius IX was asked to grant a stay of execution for those condemned in 1868, the Pope firmly replied, "I cannot, and I do not want to." He certainly could have by law, which he embodied as state sovereign with "plenitudo potestatis," but by enigmatically saying that he could not, he probably was declaring this a high matter of conscience in the interest of Augustinian tranquility of order as explained by such as Bellarmine, Liguori, Thomas More and Suarez.

When a papal butler was recently arrested, many were surprised that the Vatican City even had a jail. The Lateran treaty of 1929 provided for the execution of anyone attempting to assassinate the Pope within the Vatican. In 1969 capital punishment was quietly removed from the "fundamental law" of the Vatican, without comment and only in Latin, and did not come to public attention until 1971.

The grandson of St. Elizabeth Anne Seton, Archbishop Robert Seton, long-lived but less loved, wrote that during the course of a holiday in France as a boy, the ceremonious spectacle of a man being beheaded inspired him greatly to think of the dignity of life. He was especially close to Leo XIII and St. Pius X who in 1905 reiterated the Roman Catechism of St. Pius V with reference to capital punishment: "Far from being guilty of breaking this commandment (to do no murder) such an execution of justice is precisely an act of obedience to it. For the purpose of the law is to protect and foster human life."

The medicinal reason for inflicting punishment, goes beyond preventing the criminal from repeating his crime and protecting society, to encouraging the guilty to repent and die in a state of grace. The vindictive reasoning also has this interest in mind: for by expiating the disorder caused by the crime, the moral debt of the guilty is lessened. In the early years of the nineteenth century, St. Vincent Pallotti frequently assisted the condemned to the scaffold, as St. Catherine had done in Siena. He was edified by the many holy deaths he saw, while helping the Archfraternity of San Giovanni, under the patronage of his friend the English Cardinal Acton. Headquartered in the Church of San Giovanni Decollato (St. John the Beheaded), their rule

was to urge the condemned to a good confession, followed by an exhortation and Holy Communion followed by the grant of a plenary indulgence. The whole population of Rome was instructed to fast and pray for the intention of the criminal's soul.

All other considerations of the machinery of death aside, this paramount regard for the human soul is quaint only if belief in eternal life is vague. Pope Pius XII was so eager for vindictive penalties that he lent the help of a Jesuit archivist to assist the prosecutors at the Nuremberg trials. He personally told the chief United States prosecutor, Robert Jackson: "Not only do we approve of the trial, but we desire that the guilty be punished as quickly as possible." This was not in spite of, but issuing from, his understanding of the dual role of healing and vindication. All this should not be remaindered as historical curiosities, for, as Pope Pius XII said, "the coercive power of legitimate human authority" has its roots in "the sources of revelation and traditional doctrine" and so it must not be said "that these sources only contain ideas which are conditioned by historical circumstances" for they have "a general and abiding validity." (Acta Apostolica Sedis, 1955, pp.81-82).

*Editor's note: The image above is a painting by Richard Bridgens entitled "An Execution in Rome for Murder, 1820."*
*The views expressed by the authors and editorial staff are not necessarily the views of Sophia Institute, Holy Spirit College, or the Thomas More College of Liberal Arts.*



*By Rev. George W. Rutler*

*The Rev. George W. Rutler is the pastor of the Church of Our Saviour in New York City. His latest book, Cloud of Witnesses, is available from Scepter Publishing.*

# Exhibit K

**Judge Edith Jones's opinions denying relief:**

*Ibarra v. Thaler*, 691 F.3d 677 (5th Cir. 2012); *Chester v. Thaler*, 666 F.3d 340 (5th Cir. 2011) *cert. denied*, 133 S. Ct. 525, 184 L. Ed. 2d 338 (U.S. 2012); *Druery v. Thaler*, 647 F.3d 535 (5th Cir. 2011), *cert. denied*, 132 S. Ct. 1550, 182 L. Ed. 2d 180 (U.S. 2012); *Hatten v. Quarterman*, 570 F.3d 595 (5th Cir. 2009); *Perry v. Quarterman*, 314 F. App'x 663 (5th Cir. 2009); *Garcia v. Quarterman*, 456 F.3d 463 (5th Cir. 2006), *reh'g granted and opinion vacated*, 257 F. App'x 717 (5th Cir. 2007); *Nichols v. Dretke*, 176 F. App'x 593 (5th Cir. 2006); *Nelson v. Dretke*, 442 F.3d 282, 283, *on reh'g en banc sub nom. Nelson v. Quarterman*, 472 F.3d 287 (5th Cir. 2006); *Nixon v. Epps*, 405 F.3d 318 (5th Cir. 2005); *White v. Dretke*, 126 F. App'x 173 (5th Cir. 2005); *Martinez v. Dretke*, 404 F.3d 878 (5th Cir. 2005); *Bagwell v. Dretke*, 372 F.3d 748 (5th Cir. 2004); *Kincy v. Dretke*, 92 F. App'x 87 (5th Cir. 2004); *Cotton v. Cockrell*, 343 F.3d 746 (5th Cir. 2003); *Nelson v. Cockrell*, 77 F. App'x 209, 211 (5th Cir. 2003), *cert. granted, judgment vacated sub nom. Nelson v. Dretke*, 542 U.S. 934, 124 S. Ct. 2905, 159 L. Ed. 2d 808 (2004); *Richard v. Cockrell*, 73 F. App'x 84 (5th Cir. 2003); *Robertson v. Cockrell*, 325 F.3d 243 (5th Cir. 2003), *abrogated by Tennard v. Dretke*, 542 U.S. 274, 124 S. Ct. 2562, 159 L. Ed. 2d 384 (2004); *Robertson v. Cockrell*, 325 F.3d 243 (5th Cir. 2003), *abrogated by Tennard v. Dretke*, 542 U.S. 274, 124 S. Ct. 2562, 159 L. Ed. 2d 384 (2004); *United States v. Bernard*, 299 F.3d 467 (5th Cir. 2002); *Santellan v. Cockrell*, 271 F.3d 190 (5th Cir. 2001); *Doughtie v. Johnson*, 239 F.3d 366 (5th Cir. 2000); *Hittle v. Johnson*, 229 F.3d 1147 (5th Cir. 2000); *Beets v. Johnson*, 180 F.3d 190 (5th Cir. 1999); *Little v. Johnson*, 162 F.3d 855 (5th Cir. 1998); *Green v. Johnson*, 160 F.3d 1029 (5th Cir. 1998); *Hernandez v. Johnson*, 108 F.3d 554 (5th Cir. 1997); *Ibarra v. Thaler*, 687 F.3d 222 (5th Cir. 2012); *Williams v. Thaler*, 684 F.3d 597 (5th Cir. 2012) *cert. denied*, 133 S. Ct. 866, 184 L. Ed. 2d 679 (U.S. 2013); *Parr v. Thaler*, 481 F. App'x 872 (5th Cir. 2012), *cert. denied*, 133 S. Ct. 842, 184 L. Ed. 2d 666 (U.S. 2013); *Williams v. Thaler*, 459 F. App'x 327, *opinion withdrawn and superseded on reconsideration*, 684 F.3d 597 (5th Cir. 2012), *cert. denied*, 133 S. Ct. 866, 184 L. Ed. 2d 679 (U.S. 2013); *Stroman v. Thaler*, 405 F. App'x 933 (5th Cir. 2010); *Alba v. Thaler*, 346 F. App'x 994 (5th Cir. 2009); *Prieto v. Quarterman*, 292 F. App'x 372 (5th Cir. 2008); *Rachal v. Quarterman*, 265 F. App'x 371 (5th Cir. 2008); *ShisInday v. Quarterman*, 511 F.3d 514, 517 (5th Cir. 2007); *Watts v. Quarterman*, 244 F. App'x 572 (5th Cir. 2007); *Diaz v. Quarterman*, 239 F. App'x 886 (5th Cir. 2007); *Chi v. Quarterman*, 223 F. App'x 435 (5th Cir. 2007); *Summers v. Texas Dep't of Criminal Justice*, 206 F. App'x 317 (5th Cir. 2006); *Wilcher v. Epps*, 203 F. App'x 559 (5th Cir. 2006); *Foster v. Quarterman*, 466 F.3d 359 (5th Cir. 2006); *Reyes v. Quarterman*, 195 F. App'x 272 (5th Cir. 2006); *Henderson v. Quarterman*, 460 F.3d 654 (5th Cir. 2006); *Amador v. Quarterman*, 458 F.3d 397 (5th Cir. 2006); *Griffith v. Quarterman*, 196 F. App'x 237 (5th Cir. 2006); *Shannon v. Dretke*, 177 F. App'x 431 (5th Cir. 2006); *Cannady v. Dretke*, 173 F. App'x 321 (5th Cir. 2006); *Wyatt v. Dretke*, 165 F. App'x 335 (5th Cir. 2006); *Henderson v. Dretke*, 164 F. App'x 506 (5th Cir. 2006); *O'Brien v. Dretke*, 156 F. App'x 724 (5th Cir. 2005); *Summers v. Dretke*, 431 F.3d 861, 866 (5th Cir. 2005); *Frazier v. Dretke*, 145 F. App'x 866 (5th Cir. 2005); *Goynes v. Dretke*, 139 F. App'x 616 (5th Cir. 2005); *Hughes v. Dretke*, 412 F.3d 582 (5th Cir. 2005); *In re Bagwell*, 401

F.3d 312 (5th Cir. 2005); *Cartwright v. Dretke*, 103 F. App'x 545 (5th Cir. 2004); *Jones v. Dretke*, 375 F.3d 352 (5th Cir. 2004); *Medellin v. Dretke*, 371 F.3d 270 (5th Cir. 2004); *Patterson v. Dretke*, 370 F.3d 480 (5th Cir. 2004); *McCullum v. Dretke*, 89 F. App'x 888 (5th Cir. 2004); *Morris v. Dretke*, 90 F. App'x 62 (5th Cir. 2004); *Kunkle v. Dretke*, 352 F.3d 980 (5th Cir. 2003); *Aldrich v. Dretke*, 83 F. App'x 11 (5th Cir. 2003); *Moody v. Dretke*, 77 F. App'x 722 (5th Cir. 2003); *Duncan v. Cockrell*, 70 F. App'x 741 (5th Cir. 2003); *Ransom v. Cockrell*, 62 F. App'x 557 (5th Cir. 2003); *Chester v. Cockrell*, 62 F. App'x 556 (5th Cir. 2003); *Chavez v. Cockrell*, 310 F.3d 805 (5th Cir. 2002); *Kutzner v. Cockrell*, 303 F.3d 333 (5th Cir. 2002); *Lewis v. Cockrell*, 46 F. App'x 225 (5th Cir. 2002); *Rojas v. Cockrell*, 44 F. App'x 652 (5th Cir. 2002); *Martinez v. Texas Court of Criminal Appeals*, 292 F.3d 417 (5th Cir. 2002); *Riddle v. Cockrell*, 288 F.3d 713 (5th Cir. 2002); *Neal v. Puckett*, 286 F.3d 230 (5th Cir. 2002); *Williams v. Cockrell*, 31 F. App'x 832 (5th Cir. 2002); *Gallamore v. Cockrell*, 275 F.3d 43 (5th Cir. 2001); *Miller-El v. Johnson*, 261 F.3d 445 (5th Cir. 2001), *rev'd sub nom. Miller-El v. Cockrell*, 537 U.S. 322, 123 S. Ct. 1029, 154 L. Ed. 2d 931 (2003); *Rudd v. Johnson*, 256 F.3d 317 (5th Cir. 2001); *Martinez v. Johnson*, 255 F.3d 229 (5th Cir. 2001); *Modden v. Johnson*, 252 F.3d 436 (5th Cir. 2001); *Tucker v. Johnson*, 242 F.3d 617 (5th Cir. 2001); *Alexander v. Johnson*, 211 F.3d 895 (5th Cir. 2000); *Dillingham v. Johnson*, 213 F.3d 639 (5th Cir. 2000); *Cantu-Tzin v. Johnson*, 162 F.3d 295 (5th Cir. 1998); *Cantu v. Collins*, 967 F.2d 1006 (5th Cir. 1992); *Faulder v. Johnson*, 178 F.3d 741 (5th Cir. 1999); *Fearance v. Scott*, 56 F.3d 633 (5th Cir. 1995); *Felder v. Johnson*, 180 F.3d 206 (5th Cir. 1999); *Harris v. Collins*, 990 F.2d 185 (5th Cir. 1993); *King v. Lynaugh*, 850 F.2d 1055 (5th Cir. 1988); *Lauti v. Johnson*, 102 F.3d 166 (5th Cir. 1996); *McCoy v. Lynaugh*, 874 F.2d 954 (5th Cir. 1989); *Montoya v. Collins*, 955 F.2d 279 (5th Cir. 1992); *Moody v. Johnson*, 139 F.3d 477 (5th Cir. 1998); *Jones v. Whitley*, 938 F.2d 536 (5th Cir. 1991); *Smith v. McCotter*, 798 F.2d 129, 130 (5th Cir. 1986); *Spence v. Johnson*, 80 F.3d 989 (5th Cir. 1996); *Thorson v. Epps*, 701 F.3d 444 (5th Cir. 2012); *Washington v. Johnson*, 90 F.3d 945 (5th Cir. 1996); *Wicker v. McCotter*, 783 F.2d 487 (5th Cir. 1986); Wicker v. McCotter, 798 F.2d 155, 156 (5th Cir. 1986); *Williams v. Collins*, 16 F.3d 626 (5th Cir. 1994); *Woolls v. McCotter*, 798 F.2d 695 (5th Cir. 1986); *Paster v. Lynaugh*, 876 F.2d 1184 (5th Cir. 1989); *Riles v. McCotter*, 799 F.2d 947 (5th Cir. 1986); *Wilcher v. Anderson*, 188 F. App'x 279, 280 (5th Cir. 2006) (affirming that inmate has right to drop appeals and proceed with execution).

**Judge Jones's dissents to the granting of relief:**

*Nelson v. Quarterman*, 472 F.3d 287, 337 (5th Cir. 2006) (Jones, J., dissenting); *Guidry v. Dretke*, 429 F.3d 154 (5th Cir. 2005) (Jones, J., dissenting); *Burdine v. Johnson*, 262 F.3d 336 (5th Cir. 2001) (Jones, J., dissenting); *Bridge v. Lynaugh*, 860 F.2d 162 (5th Cir. 1988) *opinion withdrawn on reh'g*, 863 F.2d 370 (5th Cir. 1989) *cert. granted, judgment vacated sub nom. Bridge v. Collins*, 494 U.S. 1013, 110 S. Ct. 1313, 108 L. Ed. 2d 489 (1990) (Jones, J., dissenting); *King v. Lynaugh*, 828 F.2d 257 (5th Cir. 1987) *opinion vacated on reh'g*, 850 F.2d 1055 (5th Cir. 1988) (Jones, J., dissenting); *McFarland v. Collins*, 8 F.3d 258 (5th Cir. 1993) (Jones, J., dissenting); *Streetman v. Lynaugh*, 812 F.2d 950, 961 (5th Cir. 1987) (Jones, J., dissenting); *Wilson v. Butler*, 825 F.2d 879 (5th Cir. 1987) (Jones, J., dissenting); *Thompson v. Connick*, 578 F.3d 293 (5th Cir. 2009) *rev'd*, 131 S. Ct. 1350, 179 L. Ed. 2d 417 (U.S. 2011) (Jones, J., dissenting).

**Limited Grants of Relief in which J. Jones participated:**

*In re Swearingen*, 556 F.3d 344 (5th Cir. 2009) (granting leave to proceed on a successive petition); *Miller-El v. Dretke*, 142 F. App'x 802 (5th Cir. 2005) (remanded pursuant to mandate of the Supreme Court); *Garcia v. Quarterman*, 257 F. App'x 717, 718 (5th Cir. 2007) (granting relief on rehearing in the wake of intervening Supreme Court decisions); *Bell v. Cockrell*, 310 F.3d 330, 333 (5th Cir. 2002) (vacating to allow state court to apply newly issued Supreme Court decision in *Atkins* v. Virginia); *Moore v. Quarterman*, 533 F.3d 338 (5th Cir. 2008) (Held on rehearing *en banc* federal district court had authority to review his claim even if it was unexhausted; returned to panel for consideration on merits); *Diaz v. Quarterman*, 228 F. App'x 417 (5th Cir. 2007) (granting certificate of appealability; relief subsequently denied in *Diaz v. Quarterman*, 239 Fed. App'x 886 (5th Cir. 2007)); *Hopper v. Dretke*, 106 F. App'x 221 (5th Cir. 2004) (granting certificate of appealability but denying relief); *Guy v. Cockrell*, 343 F.3d 348 (5th Cir. 2003) (reversing grant of summary judgment to State by district court below in light of existence of outstanding fact issues; remanding for hearing); *Patterson v. Cockrell*, 69 F. App'x 658 (5th Cir. 2003) (affirming denial of relief; granting certificate of appealability on claim of incompetence to be executed, but dismissing without prejudice to raising again when execution imminent); *King v. McCotter*, 795 F.2d 517 (5th Cir. 1986) (remanding to district court with instructions to court to provide statement of reasons for the denial of King's claims); *Wilson v. Butler*, 813 F.2d 664 (remanded for evidentiary hearing; Jones, J., concurring); *on reh'g*, 825 F.2d 879 (5th Cir. 1987) (Jones, J., dissenting to remand for evidentiary hearing).

## AFFIDAVIT OF LILLIAN B. HARDWICK
## IN SUPPORT OF COMPLAINT REGARDING JUDGE EDITH JONES

Before me, the undersigned notary, personally appeared Lillian B. Hardwick, who, after being by me duly sworn, stated as follows:

1.      "I am over the age of eighteen years. I have been asked to render an expert opinion in this matter. I am not being compensated for doing so. I have no personal knowledge of any facts in this matter. I honestly hold all of the opinions I am expressing here.

2.      "I understand that, as a federal judge, Judge Edith Jones is not subject to the Texas Code of Judicial Conduct ('Texas Code'). Instead, she is subject to the Code of Conduct for United States Judges ('US Code'). However, the canons of the US Code cited in the Complaint are strikingly similar in substance to those in the Texas Code. Therefore, I am providing the analysis below as if the alleged facts (1) were proven and (2) were considered in light of the Texas Code. Below I have set out a summary of my qualifications, which are fully detailed in the attached resume (Exhibit A).

### Qualifications

3.      "I am co-author with Robert P. Schuwerk, of the University of Houston Law Center of *Handbook of Texas Lawyer & Judicial Ethics* (Thomson-West) ('the treatise').

4.      "I am solely responsible for the research and writing of Parts III, IV, V, and VI. Part IV covers the Texas Code of Judicial Conduct, Part V covers Proceedings before the Commission on Judicial Conduct, and Part VI covers Removal of Judges from Particular Cases in Texas State Court. Parts III, IV, and V have been in the treatise since the initial edition. I added Part VI for the 2003 edition, and it has appeared ever since. In the continuing course of my research for the treatise, I have reviewed all of the public sanctions since the inception of the Texas Commission on Judicial Conduct ('the Commission') and collected relevant underlying documents.

5.      "I have attended the most significant formal proceedings (a 'formal proceeding' is a trial-like fact-finding process conducted when serious or complicated complaints have been made against judge) that have been conducted since my research began. These include the formal proceeding regarding former District Judge Terry Canales, conducted in Austin in August 2002[1] and the formal proceeding regarding the complaint against Presiding Judge of the Court of Criminal Appeals Sharon Keller, which consumed nearly a week in San Antonio in summer 2009.[2]

---

[1]See Lillian B. Hardwick, *Proceedings before the Commission on Judicial Conduct*, 66 Tex. B.J. 107, 115 (2003).

[2]See, e.g., Mary Alice Robbins, *Impact Player of the Year: State Commission on Judicial Conduct Rules and Reliance: Post-Execution Fight Reveals Conflict Among*

EXHIBIT "L"

6.      "As part of my research on the Texas Code of Judicial Conduct, I attended the American Judicature Society's National College on Judicial Conduct and Ethics in Chicago in October 2004. Although the concern of the AJS is the Model Code of Judicial Conduct, the Texas Code reflects many of the provisions and the format of the prior Model Code, which was revised in 2007.

7.      "I provide expert reports, trial testimony, and/or consulting services relating to the subjects in the treatise. For example, when a judge has had a complaint filed against him or her with the Commission, my report or testimony typically explains that the judge has not violated the Texas Code and may explain some contravention of the guidelines governing proceedings before the Commission in the process.

### Appropriateness of expert opinion

8.      "The ethical guidelines for Texas judges in the Texas Code are comparable to the Texas Disciplinary Rules of Professional Conduct for lawyers. In general, authorities have recognized that violation of a rule of conduct is relevant to civil complaints against lawyers.[3] Certainly a judge is not held to a lawyer's 'standard of care' and is not in the position of a fiduciary while on the bench. However, the Texas Code, like the judicial codes of other states still do,[4] formerly provided for recusal and disqualification of judges, based on the goal of an impartial judiciary. Once Texas Rules of Civil Procedure 18a and 18b were promulgated, the Judicial Ethics Committee in Texas (appointed by the Texas Supreme Court), which issues advisory opinions regarding the application of the Texas Code of Judicial Conduct, ceased to consider recusal matters.[5]

---

*Judicial Governing Standards*, Tex. Law., 12/20/10, available at http://www.law.com/jsp/tx/PubArticleTX.jsp?id=1202476363906.

[3]See *Two Thirty Nine Joint Venture v. Joe*, 60 S.W.3d 896, 905 (Tex. App.—Dallas 2001), *rev'd on other grounds*, 145 S.W.3d 150 (Tex. 2004) ("the trier of fact may consider the construction of a relevant rule of professional conduct that is designed for the protection of persons in the position of the claimant as evidence of the standard of care and breach of the standard").

[4]*See, e.g.*, Alabama's Canons of Judicial Ethics, Canon 3C.

[5]Ethics Advisory Opinion 127 (1989) ("The judge who submitted this question also inquired whether a judge who makes an Art.5537-36 decision to initiate a protective custody proceeding should recuse himself from making the protective custody determination under the statute. The recusal provisions that were stated in Canon 3C of the Code of Judicial Conduct are now covered by the Texas Rules of Civil Procedure. The Committee concludes that a decision on recusal is an adjudicative responsibility of the judge and that the Committee should no longer undertake to answer questions concerning recusal.").

2

9.      "The language in Texas Rules 18a and 18b having formerly been in the Texas Code makes certain judicial recusal and disqualification decisions relevant to the same extent comparable language still appears in the US Code.

10.     "Rarely have sanctions of the Texas Judicial Conduct Commission referenced recusal or disqualification since the promulgation of Rules 18a and 18b. This may be due largely to the fact that the Commission's position on recusal or disqualification has no effect on a trial or hearing, even assuming that the Commission could investigate a matter and issue a decision in time to have such an effect. On the rare occasions when sanctions have mentioned that the judge should have recused or disqualified himself or herself, the factual scenarios are at least illustrative of what the Commission deems problematic *based on language that still appears in the Texas Code.* Consequently, I have summarized below what may be applicable sanctions.

11.     "In addition, appellate panels sometimes reference the Texas Code of Judicial Conduct in assessing appeals based on a denied recusal motion, suggesting the consideration of relevant portions of the Texas Code. Accordingly, I have indicated some of those considerations below.

Opinion

12.     "I have reviewed the facts alleged in the Complaint, along with the affidavits of the attendees to the speech Judge Jones made. For purposes of this opinion, I am assuming the accuracy of the alleged facts. In my opinion, based on the language in the Texas Code, as reflected in sanctions by the Texas Commission on Judicial Conduct and in court opinions, sanction of Judge Jones would be consistent with the Commission's handling of prior complaints. In my opinion, Judge Jones would most likely be sanctioned for violations of Canons 2A, 2B, 3A, 3B(2), 3B(3), 3B(4), 3B(5), 3B(6), 3B(7), and 4A, altogether or in some combination. While (for reasons explained below), the Commission would likely not sanction Judge Jones for violating Canon 1, should she appeal a sanction or request for removal, the Special Court of Review (appointed by the Texas Supreme Court to hear an appeal) or the Review Tribunal (a panel of the Texas Supreme Court for removal proceedings) could well include Canon 1. Based on the violation of multiple provisions, my opinion is that a public sanction of a higher level (such as a reprimand or a censure) would be consistent with the Commission's past sanctions.

Consideration of the Texas Code and the US Code

*"Shall" versus "should"; Canon titles*

13.     "According to Canon 8B of the Texas Code, a judge may be disciplined only for violating mandatory provisions, indicated by 'shall' or 'shall not'; provisions containing 'should' or 'should not' are aspirational only.   In spite of this statement, and in spite of Texas Code Canon 1 having always read 'should,' Canon 1 has sometimes been cited

3

in sanctions, typically in conjunction with the violation of canons containing 'shall.'

14. "Many of the Canons in the Texas Code contain the mandatory language of 'shall.' One of the Canons in the US Code contains 'shall': Canon 3 (C) Disqualification:

(1)     A judge shall disqualify himself or herself in a proceeding in which the judge's impartiality might reasonably be questioned, including but not limited to instances in which . . . .

15. "The Texas Code contains only a single comment, that added by the Texas Supreme Court when it amended two canons in 2002. That comment does not contain 'shall.'

16. "The US Code contains multiple comments. None of the comments contains 'shall.' However, four contain 'must':

a.     Canon 2A. An appearance of impropriety occurs when reasonable minds, with knowledge of all the relevant circumstances disclosed by a reasonable inquiry, would conclude that the judge's honesty, integrity, impartiality, temperament, or fitness to serve as a judge is impaired. Public confidence in the judiciary is eroded by irresponsible or improper conduct by judges. A judge *must* avoid all impropriety and appearance of impropriety. A judge *must* expect to be the subject of constant public scrutiny and accept freely and willingly restrictions that might be viewed as burdensome by the ordinary citizen. . . .

b.     Canon 3A(5). In disposing of matters promptly, efficiently, and fairly, a judge *must* demonstrate due regard for the rights of the parties to be heard and to have issues resolved without unnecessary cost or delay. . . .

c.     Canon 3C(1)(c). In a criminal proceeding, a victim entitled to restitution is not, within the meaning of this Canon, a party to the proceeding or the subject matter in  controversy. A judge who has a financial interest in the victim of a crime is not required by Canon 3C(1)(c) to disqualify from the criminal proceeding, but the judge *must* do so if the judge's impartiality might reasonably be questioned under Canon 3C(1) or if the judge has an interest that could be substantially affected by the outcome of the proceeding under Canon 3C(1)(d)(iii).

17. "The titles of Canons in the Texas Code are topics, not complete sentences; thus, they do not contain words of authority such as 'shall' or 'should.' Accordingly, a Texas judge may not be sanctioned for violating any requirement or admonition stated only in a title and not in the text of a Canon. The titles of Canons in the US Code are complete sentences, all containing 'should,' except for Canon 4, which contains 'may.' Arguably, judges may be sanctioned under the US Code for violation of any duties specified in the Canon titles, even though the duties may be detailed differently in the actual Canons.

4

*Canon 1 in the Texas Code versus the US Code*

18.    "Following is a comparison of Canon 1 in the Texas Code versus the US Code:

| Texas Code | US Code |
|---|---|
| Canon 1 Upholding the Integrity and Independence of the Judiciary | Canon 1: A Judge Should Uphold the Integrity and Independence of the Judiciary |
| An independent and honorable judiciary is indispensable to justice in our society. A judge should participate in establishing, maintaining and enforcing high standards of conduct, and should personally observe those standards so that the integrity and independence of the judiciary is preserved. The provisions of this Code are to be construed and applied to further that objective. | An independent and honorable judiciary is indispensable to justice in our society. A judge should maintain and enforce high standards of conduct and should personally observe those standards, so that the integrity and independence of the judiciary may be preserved. The provisions of this Code should be construed and applied to further that objective. |

*The Role of Canon 1 in Texas Sanctions*

19.    "Frankly, public sanctions in Texas rarely refer to a violation of Canon 1;[6] when Canon 1 has appeared, it has been in connection with other Canons.[7] In my opinion, this is due to the hortatory aspect of the Canon, both with 'should' and the vague guidance provided by its language. Based on my review of public sanctions, I have concluded that the Commission has cited Canon 1 as a basis to enhance the sanction (e.g., public versus private, or a higher level of public sanction). The Texas Supreme Court has agreed with the hortatory nature of 'should.'[8]

20.    "Nonetheless, Canon 1 has not been without application:

---

[6]This is a citation to my own review of public sanctions in Texas; I summarize the application of Canon 1 in §§ 25:1-25:8 in the 2013 edition of *Handbook of Texas Lawyer & Judicial Ethics.*

[7]*See, e.g.,* Order of Public Censure of Hector Lopez, Justice of the Peace, April 7, 1993 (concerning 4 incidents, Judge Lopez was found to have violated Canons 1 and 2A regarding 1 incident); Public Reprimand of Joseph Devany, Assoc. Justice, 5th Court of Appeals, April 30, 1996 ("conduct constituted willful violation of Canons 1 and 2A").

[8]*Joachim v. Chambers*, 815 S.W.2d 234, 239 n. 9 (Tex. 1991).

5

a.  The Commission has sought removal of judges based, in part, on their violation of Canon 1, in some combination with other Canons. The opinions of the Texas Supreme Court reflect some consideration of an reliance on (albeit unclear) Canon 1.[9]

b.  Courts assess Canon 1 in judicial disciplinary cases, whether or not the Commission has alleged a specific violation.[10]

c.  Courts consider Canon 1 in judicial disqualification matters.[11]

d.  Advisory opinions issued by the Texas Supreme Court's Judicial Ethics

---

[9]*See, e.g., In re Thoma*, 873 S.W.2d 477, 503 (Tex. Review Trib. 1994, no appeal) ("we find sufficient competent evidence of probative force to support the Commission's finding and conclusion that the *ex parte* actions of Respondent were willful violations of Canon 1, 2B, 3A(4), and 3A(5) as alleged."); *In re Lowery*, 999 S.W.2d 639, 658 (Tex. Review Trib. 1998, no appeal) ("Respondent next contends that the majority of his misdeeds were conducted not in his official capacity as a judge, but as a private citizen and should not be sanctionable. The Texas Code of Judicial Conduct does not distinguish between the two. Canon 1 states that a judge should participate in establishing, maintaining, and enforcing high standards of conduct and should personally observe those standards so that the integrity and independence of the judiciary is preserved.").

[10]*In re Hecht*, 213 S.W.3d 547, 574 n.41 (Tex. Spec. Ct. Rev. 2006) ("Our conclusion is reinforced by examining Petitioner's public statements in the context of several relevant provisions of the Canons [listing the Preamble and Canons 1, 2, 4B(1), 5(1), 5(2)] ").

[11]*Ex parte Ellis*, 275 S.W.3d 109, 136 (Tex. App.—Austin 2008, no pet.) ("our rules and judicial canons require that a judge also *appear to be* impartial, so as not to call into question the fairness or integrity of the court. *See* Tex.R. Civ. P. 18b(2)(a); Texas Code of Judicial Conduct, Canons 1 & 2."); *In re Ryan*, 2012 WL 6755005, at *1 (Tex. App.—Houston [1st Dist.] 2012, orig. proceeding) (mem.) ("The court continued that it found that 'the Associate Judge must be disqualified from this matter and should be disqualified from representing family law clients in this County.' As authority for the disqualification order, the trial court cited the 'Code of Judicial Conduct, Canons 1–4.' ") (writ conditionally granted on trial court's *sua sponte* disqualification). *See also Public Utility Com'n of Texas v. Cities of Harlingen*, 2010 WL 1173070, at *641 ("At a minimum, due process requires a fair and neutral decisionmaker—both at trial and on appeal. 'An independent and honorable judiciary is indispensable to justice in our society.' Tex. Code of Jud. Conduct, Canon 1. By deciding the merits without disclosing the participation of a now-recused justice and without affording the parties an opportunity to waive or object to any conflict on the part of that judge or the remaining panel members as contemplated in the rules of civil and appellate procedure, the majority undermines the integrity and impartiality of the judiciary.") (footnote omitted) (Patterson, J., dissenting).

6

113 of 158

Committee have warned against violation of Canon 1, in spite of the
Commission's lack of specific enforcement of it.[12]

21.    "Based on the Texas advisory opinions and consideration of Canon 1 by Texas
courts in connection with review of judicial sanctions, removal requests by the
Commission, and assessment of a judge's impartiality, my opinion is a reviewing court
could rely upon Canon 1 in considering an appeal by Judge Jones of a sanction based
on other Texas Canons.  My opinion, however, is that the Commission would not provide
Canon 1 as a standard for any sanction.

### Canon 2A in the Texas Code versus the US Code

22.    "Following is a comparison of Canon 2A in the Texas Code versus the US Code:

| Texas Code | US Code |
|---|---|
| Canon 2 Avoiding Impropriety and the Appearance of Impropriety in All of the Judge's Activities<br><br>A. A judge shall comply with the law and should act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary. | Canon 2: A Judge Should Avoid Impropriety and The Appearance of Impropriety in All Activities<br><br>(A) Respect for Law. A judge should respect and comply with the law and should act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary.<br><br>**Comment**<br>Canon 2A. An appearance of impropriety occurs when reasonable minds, with knowledge of all the relevant circumstances disclosed by a reasonable inquiry, would conclude that the judge's |

---

[12]*See,* e.g., Op. No. 238 (1999) (adopting earlier opinion that judge assisting in
fund-raising must comply with Canon 1); Op. No. 198 (1996) (sitting state district judge
may not be the subject of a local League of Women Voters annual fund raising "roast"
of an elected official); Op. No. 204 (1997) (active, sitting judge may not preside over
simulated court proceedings in a television program, due to Canons 1 and 4); Op. No.
173 (1994) (municipal court judge also serving as city attorney violates several Canons,
including Canon 1); Op. No. 225 (1998) ("If the inquiring justice of the peace, or any
judge, is prosecuting cases within its jurisdiction, especially contacting the accused for
guilty plea arrangements, then the judge is absolutely, unequivocally, and indefensibly
violating both the Code of Judicial Conduct [specifically including Canon 1] and the
Texas Constitution.").

7

| | honesty, integrity, impartiality, temperament, or fitness to serve as a judge is impaired. Public confidence in the judiciary is eroded by irresponsible or improper conduct by judges. A judge *must* avoid all impropriety and appearance of impropriety.  A judge *must* expect to be the subject of constant public scrutiny and accept freely and willingly restrictions that might be viewed as burdensome by the ordinary citizen. . . . |
|---|---|

### The Role of Canon 2A in Texas Sanctions

23. "Violation of Canon 2A is probably cited more often–in isolation or in combination with a violation of other canons–by the Texas Commission than the violation of any other canon.[13]  In my opinion, this is because the failure of a judge to 'comply with the law' does not require a consideration of the judge's motives, predispositions, bias/prejudice, or competence.  Canon 2A often appears as a basis for sanction in connection with the first sentence in Canon 3B2: 'A judge should be faithful to the law and shall maintain professional competence in it.  A judge shall not be swayed by partisan interests, public clamor, or fear of criticism.'  Although the first part of the first sentence ('A judge should be faithful to the law') appears to have the same meaning as Canon 2A, the former contains 'should' instead of 'shall.'  The Commission, by citing Canon 3B2 along with Canon 2A, may imply that it has inferred the judge does not know the law (and has not maintained professional competence in it), but that distinction is not made.  The fact that the judge has violated two 'shall' provisions in the Canons probably supports a harsher sanction (this is a conclusion based on an historical review of the Commission's sanctions, as the Commission has not published any sanction guidelines).  The following compares the wording of Canon 3B2 in the Texas Code and Canon 3A1 in the US Code:

---

[13]See §§ 26:1-26:7 in the 2013 edition of *Handbook of Texas Lawyer & Judicial Ethics.*

8

| Texas Code | US Code |
|---|---|
| Canon 3. B. Adjudicative Responsibilities. (2) A judge should be faithful to the law and shall maintain professional competence in it. A judge shall not be swayed by partisan interests, public clamor, or fear of criticism | Canon 3. (A) Adjudicative Responsibilities. (1) A judge should be faithful to, and maintain professional competence in, the law and should not be swayed by partisan interests, public clamor, or fear of criticism. |

24.     "The Commission has also been generous with the application of the second prong of Canon 2A, although it lacks a 'shall' provision. It has done this by combining a violation of Canon 2A with another Canon having a 'shall' provision, as in Canon 2B (with the first three 'shall' provisions most often being applied). Following is a comparison of Canon 2B in the Texas Code with that in the US Code:

| Texas Code | US Code |
|---|---|
| Canon 2. B. Adjudicative Responsibilities. (2) A judge shall not allow any relationship to influence judicial conduct or judgment. A judge shall not lend the prestige of judicial office to advance the private interests of the judge or others; nor shall a judge convey or permit others to convey the impression that they are in a special position to influence the judge. A judge shall not testify voluntarily as a character witness. | Canon 2. (B) Outside Influence. A judge should not allow family, social, political, financial, or other relationships to influence judicial conduct or judgment. A judge should neither lend the prestige of the judicial office to advance the private interests of the judge or others nor convey or permit others to convey the impression that they are in a special position to influence the judge. A judge should not testify voluntarily as a character witness. |

9

Also, once recusal and disqualification were removed from the Texas Code and placed in Rules 18a and 18b, they became 'law' with which a judge could fail to comply by not recusing or disqualifying himself or herself when required to do so.[14]

25.    "Sanctions by the Commission on Judicial Conduct when a judge presides over a case from which the judge should have been recused or disqualified reflect the same grounds as in Rule 18b. Canon 2A provides that a judge 'shall comply with the law.' In 2007, the Commission sanctioned a justice of the peace for dismissing cases in which a particular police officer in the judge's precinct would testify on the basis that the judge doubted the police officer's credibility. The Commission concluded that, instead of dismissing the cases, the judge should have recused himself from such cases, as the dismissals 'raised legitimate questions as to the judge's impartiality' in those cases.[15] In another sanction of the same judge, although the Commission made no mention of recusal, it did provide a basis for such a motion: 'based on the history of resentment that had built up within Judge Wall toward the attorney representing Burnett, Judge Wall's decision to go forward with the criminal trial and find Burnett guilty in absentia when the judge knew her attorney and the prosecutor were in trial in a courtroom across the hall was a manifestation of the judge's bias or prejudice against Burnett's attorney, who he felt had routinely treated him without proper respect.'[16]

26.    "In the facts leading to another sanction involving Canon 2B, a district court judge had a long-time relationship with the lawyer of a step-father in a child custody matter. The Commission concluded that the judge's relationship 'influenced his conduct and judgment . . . causing litigants and their counsel to form legitimate concerns that the judge would not be fair, neutral, and impartial' in the proceedings, in contravention of Canon 2B.'[17]

27.    "A number of private sanctions, which do not name the judge, reflect similar concerns. In one, the judge failed to comply with procedures requiring full disclosure of a relationship that might warrant his recusal, which 'effectively prevented the litigants from making an informed decision about whether the judge was capable of fairly and impartially deciding a custody case,' in violation of Canons 2A, 2B, and 3B(1).[18]

28. "Somewhat ironically, in spite of its lack of a 'shall' provision, the Judicial Ethics

---

[14]See §§ 26:3-26:4 in the 2013 edition of *Handbook of Texas Lawyer & Judicial Ethics.*

---

[15]CJC No. 07-0251-JP, Public Admonition of Bob Wall (12/13/07).

[16]CJC No.06-045-JP, Public Admonition of Bob Wall (07/13/07).

[17]CJC Nos. 03-1016-DI and 04-1119-DI, Public Warning of Britt Plunk (05/30/06).

[18]Private Warning of a County Court at Law Judge (08/15/08).

10

Committee has issued more advisory opinions on the second prong of Canon 2A than the first. My historical analysis revealed that these opinions 'address, with variations on specific factual situations, the impartiality of the judge [based on the situations being inconsistent with what a judge would do]. To a large extent, this is explained by the Code having formerly been a basis for recusal.'[19]

29.    "The Texas Commission applies Canon 2A both to a judge failing to 'comply' with the law in its application and failing to abide by it in personal behavior. The Texas Supreme Court has rejected the limitation of Canon 2A to the behavior of a judge in his or her professional capacity.[20]

30.    "Based on the behavior of judges leading to public sanctions, as well as private sanctions, in Texas, my opinion is that the Commission's sanction of Judge Jones for the nature of her speech would be consistent with the Commission's interpretation and application of Texas Code Canons 2A, 2B, and 3B(2).

### Canons 3B(3)-(7) in the Texas Code versus Canons 3A(2)-(3) in the US Code

31.    "Following is a comparison of Canons 3B(3)-(7) in the Texas Code with Canons 3A(2)-(3) in the US Code:

| Texas Code | US Code |
|---|---|
| Canon 3: Performing the Duties of Judicial Office Impartially and Diligently<br><br>A. Judicial Duties in General.<br><br>The judicial duties of a judge take precedence over all the judge's other activities. Judicial duties include all the duties of the judge's office prescribed by law. In the performance of these duties, the following standards apply.<br><br>B. Adjudicative Responsibilities.<br><br>(3) A judge shall require order and | CANON 3: A JUDGE SHOULD PERFORM THE DUTIES OF THE OFFICE FAIRLY, IMPARTIALLY AND DILIGENTLY<br><br>The duties of judicial office take precedence over all other activities. In performing the duties prescribed by law, the judge should adhere to the following standards:<br><br>(A) Adjudicative Responsibilities.<br><br>(2) A judge should hear and decide matters assigned, unless disqualified, and should maintain order and decorum in all |

---

[19] Robert P. Schuwerk & Lillian B. Hardwick, *Handbook of Texas Lawyer & Judicial Ethics* § 26:4, p. 119 (Thomson-West 2013).

[20] *In re Lowery*, 999 S.W.2d 639, 657 (Tex. Review Trib. 1998, no appeal).

11

| decorum in proceedings before the judge. | judicial proceedings. |
|---|---|
| (4) A judge shall be patient, dignified and courteous to litigants, jurors, witnesses, lawyers and others with whom the judge deals in an official capacity, and should require similar conduct of lawyers, and of staff, court officials and others subject to the judge's direction and control.<br><br>(5) A judge shall perform judicial duties without bias or prejudice.<br><br>(6) A judge shall not, in the performance of judicial duties, by words or conduct manifest bias or prejudice, including but not limited to bias or prejudice based upon race, sex, religion, national origin, disability, age, sexual orientation or socioeconomic status, and shall not knowingly permit staff, court officials and others subject to the judge's direction and control to do so.<br><br>(7) A judge shall require lawyers in proceedings before the court to refrain from manifesting, by words or conduct, bias or prejudice based on race, sex, religion, national origin, disability, age, sexual orientation or socioeconomic status against parties, witnesses, counsel or others. This requirement does not preclude legitimate advocacy when any of these factors is an issue in the proceeding. | (3) A judge should be patient, dignified, respectful, and courteous to litigants, jurors, witnesses, lawyers, and others with whom the judge deals in an official capacity. A judge should require similar conduct of those subject to the judge's control, including lawyers to the extent consistent with their role in the adversary process.<br><br>**COMMENTARY**<br>Canon 3A(3).The duty to hear all proceedings fairly and with patience is not inconsistent with the duty to dispose promptly of the business of the court. Courts can be efficient and businesslike while being patient and deliberate.<br><br>The duty under Canon 2 to act in a manner that promotes public confidence in the integrity and impartiality of the judiciary applies to all the judge's activities, including the discharge of the judge's adjudicative and administrative responsibilities. The duty to be respectful includes the responsibility to avoid comment or behavior that could reasonably be interpreted as harassment, prejudice or bias. |

## The Role of Canons 3B(3)-(4) in Texas Sanctions

32.    "Canons 3B(3) and (4) in the Texas Code are directly parallel to Canons 3A(2) and (3) in the US Code. The comment to Canon 3A(3) reflects the harassment, prejudice, or bias covered by Texas Code Canon 3B(5)-(7). While sanctions under

12

Texas Code Canon 3B(4) are easily segregated,[21] sanctions under Canon 3B(5)-(7) are more easily discussed together, due to the similarity in sanctions behavior.[22] Thus, the judge's temperament will be discussed in connection with Texas Code Canons 3B(3) and (4) and US Code Canons 3A(2) and (3), with bias and prejudice discussed later. The following summarizes my understanding of how the Texas Commission has come to apply Canons 3B(3) and (4):

> The similarity, if not in language but in imaginable examples, of infractions of Canons 3B(3) and 3B(4) suggests that both Canons may be cited in condemnation of certain conduct. In referring to "proceedings before the judge," Canon 3B(3) seems to target activities in the courtroom. In referring to people "with whom the judge deals in an official capacity," Canon 3B(4) could refer to behavior occurring in the courtroom and elsewhere. However, behavior falling under Canon 3B(4) may not contravene Canon 3B(3) if the behavior does not occur "in proceedings before the judge," presumably a reference to the courtroom. As to the problematic behavior described in *Barr*, most citations to Canon 3B(3) are paired with citations to Canon 3B(4). However, with respect to the three specific acts of Judge Barr ordering that a writ of attachment be issued to bring a deputy to his court, setting a $50,000 witness bail in connection with the attachment, and excluding the deputy's attorney when the judge addressed the deputy from the bench, the result was different. These acts, the Commission charged, violated Canon 3B(4), without a mention of Canon 3B(3). Presumably the record revealed that the judge failed to behave in these instances *in the courtroom* in a patient, dignified, and courteous manner. Alternatively, the Commission may have concluded · that, instead of indicating a lack of "order and decorum" (as required by Canon 3B(3)), they more clearly showed that the judge failed to be "patient, dignified and courteous" to those who came before him "in an official capacity" (as required by Canon 3B(4)).[23]

33.     "Public and private sanctions against Texas judges for berating and speaking inappropriately with criminal defendants, civil litigants, attorneys, courthouse staff, jurors,

---

[21]Robert P. Schuwerk & Lillian B. Hardwick, *Handbook of Texas Lawyer & Judicial Ethics* § 26:4, pp. 189-204 (Thomson-West 2013).

[22]Robert P. Schuwerk & Lillian B. Hardwick, *Handbook of Texas Lawyer & Judicial Ethics* § 26:4, pp. 204-13 (Thomson-West 2013).

[23]Robert P. Schuwerk & Lillian B. Hardwick, *Handbook of Texas Lawyer & Judicial Ethics* § 27:5, pp. 189-90 (Thomson-West 2013).

13

potential jurors, and witnesses are numerous.[24]

34. "Violation of Canons 3B(3) and (4) have been the primary basis for removal of at least judges from office (the process requires the Commission to seek removal by the Texas Supreme Court, which empanels a Review Tribunal):

    a.    "The actions of Judge Barr, taken together, were violative of Canons 3B(3),(4), and (6) of the Texas Code of Judicial Conduct, were clearly inconsistent with the proper performance of his duties, cast public discredit upon the judiciary of the State of Texas as well as on the administration of justice and thus are likewise violative of Article V, Section 1-a(6)A of the Texas Constitution. . . . Judge Barr's flaw intensifies when coupled with the fact that on September 15, 1994, he openly admitted to the State Commission on Judicial Conduct to his use of profane, vulgar, and demeaning language as a means of getting or keeping the attention of certain individuals." *In re Barr*, 13 S.W.3d 525, 538, 540 (Tex. Rev. Trib.1998, no appeal).

    b.    "In light of our determination that the obscene language charges are alone sufficient to justify the removal and permanent bar from judicial office, we do not address the sufficiency challenges as they relate to the allegations of legal incompetence, interference with an arrest, and use of corporal punishment." *In re Bartie*, 138 S.W.3d 81, 85 n.6 (Tex. Rev. Trib. 2004, no appeal).

35. "One sanction in particular cites factual findings that parallel the interaction between Judge Jones and Judge Dennis that is described in the Complaint. Chief Justice of the Tenth Court of Appeals in Texas, Tom Gray, received a public admonition in December 2008 for violating Canons 2B and 3B(4). In its description of background, the Commission noted that, in the prior year, it had 'received and investigated numerous complaints relating to the vitriolic language contained in several dissenting opinions written by Justice Gray, which opinions contained unprofessional personal attacks against the judge's colleagues on the bench, Justices Bill Vance and Felipe Reyna, and against certain litigants . . . involved in cases before the Court. The increasingly acerbic opinions of Justice Gray became media fodder and were the subject of growing criticism and ridicule in editorials, on internet blogs, and at judicial conferences.'[25] The Commission's findings of fact included the following:

---

[24]Robert P. Schuwerk & Lillian B. Hardwick, *Handbook of Texas Lawyer & Judicial Ethics* § 26:5, pp. 192-202 (Thomson-West 2013).

[25]CJC No. 08-0687-AP, Public Admonition of Tom Gray (12/18/08), available on th Commission's website at http://www.scjc.state.tx.us/pdf/actions/FY09-PUBSANC.pdf.

14

1. At all times relevant hereto, the Honorable Tom Gray was Chief Justice, 10th Court of Appeals, Waco, McLennan County, Texas.

2. In March 2007, Justice Felipe Reyna introduced Justice Gray as the keynote speaker at a fundraiser for the Republican Club of Somervel County in Glen Rose, Texas.

3. At the conclusion of his introduction to the approximately sixty (60) Republicans attending the fundraiser, Justice Reyna told the group, "Please join me in welcoming my good friend, Chief Justice Tom Gray," or words to that effect.

4. Justice Gray began his remarks to the audience by thanking Justice Reyna for the introduction, but went on to state, "Really, we are not friends. He's never been in my home. I've never been in his home. And furthermore, every time there's a close vote on the Court, he always votes with Bill Vance," or words to that effect.

5. Later that evening, several attendees spoke to Justice Reyna, expressing displeasure with and apologizing for Justice Gray's comments.

. . . .

7. Both Justice Reyna and Justice Gray are Republicans; Justice Bill Vance is a Democrat.

8. Thereafter, Justice Gray initiated a "whisper campaign" against Justice Reyna by criticizing him to Republican Party leaders in the counties located within the Court's jurisdiction.

9. Justice Gray attended Republican lunches and dinners and told party leaders "somebody needs to talk to Felipe. He's not being a good Republican," and that Justice Reyna "always votes with a liberal Democrat, [Justice] Bill Vance," or words to that effect.

. . . .

17. Justice Vance and Justice Reyna also testified about instances when Justice Gray has treated court staff in a sarcastic, intimidating and demeaning manner, which conduct also included angry outbursts and personal attacks. Statements implying that the chief clerk would be out of a job after January 1, 2009, and efforts at other times to convince the other justices to vote in favor of firing the chief clerk and the accountant were also common. Such mistreatment was sufficient to reduce some staff members to tears and has contributed to extremely low employee morale at the Court.[26]

36. "Based on the behavior underling public sanctions in Texas, along with the reliance of Review Tribunals on behavior similar to that of Judge Jones in her reported interaction with Judge Dennis, my opinion is that the Commission's sanction of Judge Jones would be consistent with the Commission's interpretation and application of Texas Code Canons 3B(3) and 3B(4).

---

[26] Id.

*The Role of Canons 3B(5)-(7) In Texas Sanctions*

37.    "The theme of Texas Code Canons 3B(5)-(7) is the avoidance of bias or prejudice.  Current Canons 3B(5)-(7) were formerly in a single provision, Canon 3A(9), which read as follows:

> A judge shall perform judicial duties without bias or prejudice.  A judge shall not, in the performance of judicial duties, manifest bias or prejudice by words or conduct and shall not knowingly permit staff, court officials and others subject to the judge's direction and control to do so.  A judge shall require lawyers in proceedings before the court to refrain from manifesting, by words or conduct, bias or prejudice based on race, sex, religion, or national origin against parties, counsel or others

Language was added when the single Canon was broken into three.  Texas Supreme Court Justice Lloyd Doggett, who led the court's revisions of the Texas Code in 1990, explained the source of Canon 3A(9):

> Doggett said the canon was prompted by a model anti-discrimination code recommended by the American Bar  Association and by public uproar over Dallas Judge Jack Hampton's comment that he gave a 30-year sentence to a convicted killer in part because the victims were homosexual.

> Hampton, of the 283rd District, was publicly censured by the State Commission on Judicial Conduct for commenting on a pending case.[27]

38.    "Perhaps because behavior that violates the bias and prejudice aspects of Canons 3B(5)-(7) can also be addressed under other Canons, or perhaps because racial and ethnic slurs are so easily identifiable that judges tend to avoid them, a great number of sanctions for violations of these Canons have not issued.[28]  Also, the Commission has often grouped these Canons and not clarified which acts violated which particular Canon.[29]  Sanctions notable for their facts include the following:

      a.    A Pearland justice of the peace disregarded the video camera in a

---

[27]Darla Morgan, *High Court Loosens Rules on Judge's Campaign Roles; Code Also Includes Anti–Bias Provision*, Tex. Law., Jan. 8, 1990, at 3.  *See also* CJC Order of Public Censure of Moris Jackson Hampton (11/27/89).

[28]Robert P. Schuwerk & Lillian B. Hardwick, *Handbook of Texas Lawyer & Judicial Ethics* § 27:5, pp. 210-213  (Thomson-West  2013).

[29]*Id.*

16

jailhouse bond hearing and was taped using racial slurs with at least two inmates. He explained to a police office that he had done that to one of the inmates thinking he was black, which was not the case. Local media obtained a copy of the tape,[30] and the Commission opened an investigation. The judge resigned after the Commission initiated formal proceedings against him.[31]

b.  The Commission instituted formal proceedings against H.N. McElroy, a Houston Justice of the Peace, charging that he had engaged in "inappropriate touching of P.E. and other African-American female employees of his court" and made "racial slurs referring to African-Americans." In his general denial, Judge McElroy noted that newspaper articles and television and radio reports publicized the "alleged misconduct"; however, he was re-elected by 85% of the vote in a recent election, meaning that the Commission lacked authority to remove or sanction him. Nine months later he agreed to resign from judicial office in lieu of discipline.[32]

c.  A justice of the peace was sanctioned twice in six months for behavior that the Commission said violated Canons 3B(4) and 3B(5), although one sanction also included a violation of Canon 3B(6), and the other included a violation of Canons 2A and 3B(2). He would ask members of the public (typically parents of truant children) who appeared in his court and who seemed to be African-American whether they were indigent and would ask apparent Hispanic individuals whether they could speak English. He also made improper remarks to an African-American parent, an Hispanic parent, and a Pakistani parent. The Commission sanctioned him the first time for violating Canons 3B(3)-(6) and the second time for violating Canons 2A, 3B(2), and 3B(4)-(5). The judge appealed to a Special Court of Review; based on timing, this resulted in two appeals. On the first appeal, the court upheld the violations of Canons 3B(3)-(4); he entered into

---

[30]*Exclusive: Judge Accused of Using Racial Slurs*, Click2Houston.Com, Oct. 31, 2002, available at http://www.click2houston.com/hou/news/theinvestigators/stories/theinvestigators-17512 6220021031-101019.html; Yvonne Mintz & Carlos Armintor, *Zepeda Takes Leave of Absence*, Nov. 2, 2002, available at http://www.thefacts.com/story.lasso?wcd=5565.

[31]CJC Inquiry re Matt H. Zepeda, Commission's Rulings on Objections, Findings, Conclusions and Recommendations (02/12/04). The Commission's website notes the resignation on Mar. 1, 2004, available at http://www.scjc.state.tx.us/pdf/actions/resignlist.pdf.

[32]The Notice of Formal Proceedings (01/16/01) in the Public Record of H.N. McElroy (11/05/01); Answer of Judge H.N. McElroy (02/13/01); Voluntary Agreement to Resign in Lieu of Disciplinary Action (11/05/01).

17

an agreed judgment for the second appeal, resulting in a Public Admonition for violating Canons 2A, 3B(2), 3B(4), and 3B(5).[33]

d.    County Court at Law Judge Brent Keis engaged in what he thought to be welcoming small-talk with a new attorney in his court, who was African-American. Determining from the lawyer the African origin of his name, Judg Keis began a discussion of the Middle Passage. Believing himself and his African-American clients to be compromised, the lawyer filed a complaint, which a colleague shared with the Dallas media. (The Commission places great weight on publicity given to problematic judicial behavior, even if the judge had no role in creating the publicity.[34]) The Commission issued a Public Warning and Order of Additional Education, based on violation of Canons 3B(5), (6), and (8).[35]

39.    "Based on the public and private sanctions in Texas clearly signaling the Commission's intolerance of judicial speech and behavior indicative of racial and ethnic bias and prejudice, my opinion is that the Commission's sanction of Judge Jones for the nature of her speech would be consistent with the Commission's interpretation and application of Texas Code Canons 3B(5), 3B(6), and 3B(7).

*"Disqualifying" Bias In Canon 3C/3D*

40.    "The shift in Texas from a reliance on the Texas Code for judicial recusal and disqualification to Rules of Procedure 18a and 18b had two major steps (and several minor ones). In 1980, Canon 3C in the Texas Code read identically to provisions in Canon D(1)-(3) in the U.S. Code, absent gender updates:

---

[33]*In re J. Kent Adams*, Agreed Judgment, Docket No. 12-0002 (Tex. Ct. Spec. Rev. June 11, 2012); *In re J. Kent Adams*, Decision, Docket No. 12-0001 (Tex. Ct. Spec. Rev. July 3, 2012); CJC No. 09-1028-JP, Public Admonition of J. Kent Adams (10/20/11); CJC No. 11-0141-JP & 11-0514-JP, Public Admonition of J. Kent Ad-ams (03/28/12).

[34]"Because the incident did receive widespread media attention, some members of the public reached the conclusion, perhaps mistaken, that the judge harbored a bias or prejudice against Witherspoon on the basis of the attorney's race. Although Judge Keis insists that he did not intend his comments to be racially insensitive or offensive, it is clear that his remarks were inappropriate in the setting in which they occurred, and that they could easily be misinterpreted by anyone unfamiliar with the Judge." CJC No. 07-0668-CC, Public Warning and Order of Additional Education of Brent Keis (05/14/08).

[35]CJC No. 07-0668-CC, Public Warning and Order of Additional Education of Brent Keis (05/14/08).

18

| Texas Code 1980 | U.S. Code |
|---|---|
| **Canon 3: Performing the Duties of Judicial Office Impartially and Diligently**<br><br>(C) Disqualification<br>    A judge should disqualify himself in a proceeding in which his impartiality might reasonably be questioned, including, but not limited to, instances where:<br>    (a) he has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding;<br>    (b) he served as a lawyer in the matter in controversy, or a lawyer with whom he previously practiced law served during such association as a lawyer concerning the matter, or the judge or such lawyer has been a material witness concerning it;<br>    (c) the judge knows that he, individually or as a fiduciary, or his spouse or minor child residing in his household, has a financial interest in the subject matter in controversy or in a party to the proceeding, or any other interest that could be affected  substantially by the outcome of the proceeding. | **Canon 3: A Judge Should Perform the Duties of the Office Fairly, Impartially and Diligently**<br><br>(D) Disqualification.<br>    (1) A judge shall disqualify himself or herself in a proceeding in which the judge's impartiality might reasonably be questioned, including but not limited to instances in which:<br>    (a) the judge has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding;<br>    (b) the judge served as a lawyer in the matter in controversy, or a lawyer with whom the judge previously practiced law served during such association as a lawyer concerning the matter, or the judge or lawyer has been a material witness;<br>    (c) the judge knows that the judge, individually or as a fiduciary, or the judge's spouse or minor child residing in the judge's household, has a financial interest in the subject matter in controversy or in a party to the proceeding, or any other interest that could be affected  substantially by the outcome of the proceeding;<br>    (d) the judge or the judge's spouse, or a person related to either within the third degree of relationship, or the spouse of such a person is:<br>    (i)  a party to the proceeding, or an officer, director, or trustee of a party;<br>    (ii)  acting as a lawyer in the proceeding;<br>    (iii) known by the judge to have an interest that could be |

19

| | substantially affected by the outcome of the proceeding; or |
|---|---|
| | (iv) to the judge's knowledge likely to be a material witness in the proceeding; |
| | (e) the judge has served in governmental employment and in that capacity participated as a judge (in a previous judicial position), counsel, advisor, or material witness concerning the proceeding or has expressed an opinion concerning the merits of the particular case in controversy. |

41.    "In 1980, the Texas Supreme Court adopted Rule 18a, designed to be a procedural aid to applying Canon 3C(1).[36] Texas was always clear that disqualification, being constitutionally based, was finite in scope. However, Texas later distinguished recusal, which was different in virtually every way from disqualification.[37] One critical distinction is that disqualification may be raised for the first time on appeal, while recusal is waived if not raised in the trial court.   Rule 18b, adopted some time after Rule 18a, distinguished the grounds for recusal versus those for disqualification.  In fact, the first ground for 'disqualification' in former Canon 3C(1) was actually clarified to be a ground for recusal:[38]

| Current Tex. R. Civ. P. 18b.  Grounds for Recusal and Disqualification of Judges. |
|---|
| (a)    *Grounds for Disqualification.*  A judge must disqualify in any proceeding in which:<br>    (1)    the judge has served as a lawyer in the |

---

[36]Luther H. Soules, III, *Rule 18a Recusal or Disqualification of Trial Judge*, 43. Tex. B.J. 1005 (1980).

[37]*See, e.g.,* William Kilgarlin and Jennifer Bruch, *Disqualification and Recusal of Judges*, 17 St. Mary's L.J. 599 (1986).

[38]Note that the mandatory word throughout is "must." After over a decade of considering revisions to Rules 18a and 18b, the court made them, effective August 1, 2011.  Consistent with a current drafting guideline for procedural rules, the court selected "must" over "shall." Also, although the court clarified one of the grounds for recusal, it said that the changes to Rule 18b were not intended to be substantive.

20

matter in controversy, or a lawyer with whom the judge previously practiced law served during such association as a lawyer concerning the matter;

    (2)    the judge knows that, individually or as a fiduciary, the judge has an interest in the subject matter in controversy; or

    (3)    either of the parties may be related to the judge by affinity or consanguinity within the third degree.

(b)    *Grounds for Recusal.* A judge must recuse in any proceeding in which:

    (1)    the judge's impartiality might reasonably be questioned;

    (2)    the judge has a personal bias or prejudice concerning the subject matter or a party;

    (3)    the judge has personal knowledge of disputed evidentiary facts concerning the proceeding;

    (4)    the judge or a lawyer with whom the judge previously practiced law has been a material witness concerning the proceeding;

    (5)    the judge participated as counsel, adviser, or material witness in the matter in controversy, or expressed an opinion concerning the merits of it, while acting as an attorney in government service;

    (6)    the judge knows that the judge, individually or as a fiduciary, or the judge's spouse or minor child residing in the judge's household, has a financial interest in the subject matter in controversy or in a party to the proceeding, or any other interest that could be substantially affected by the outcome of the proceeding;

    (7)    the judge or the judge's spouse, or a person within the third degree of relationship to either of them, or the spouse of such a person:

        (A)    is a party to the proceeding or an officer, director, or trustee of a party;

        (B)    is known by the judge to have an interest that could be substantially affected by the outcome of the proceeding; or

        (C)    is to the judge's knowledge likely to be a material witness in the proceeding; or

    (8)    the judge or the judge's spouse, or a person within the first degree of relationship to either of them, or the spouse of such a person, is acting as a lawyer in the proceeding.

21

42.    "In January 1987, Canon 3C references to disqualification were removed. In 1993, Canon 3B(1) appeared and remains today: 'A judge shall hear and decide matters assigned to the judge except those in which disqualification is required or recusal is appropriate.'

43.    "It should go without saying that the Commission cannot take any action that will affect an ongoing proceeding. The best evidence that a judge has presided in spite of a ground for disqualification or recusal may be a new trial granted on the basis of bias or prejudice or a wrongly denied recusal motion. In one instance, a complainant provided the Commission with evidence that a new trial was granted, along with a transcript of the hearing that resulted in the new trial. Publicly sanctioning the district court judge, the Commission concluded that, '[a]s a result of the judge's inappropriate behavior, the public perceived that the judge lacked impartiality and was biased in favor of the prosecution in violation of Canon 3B(5) of the Texas Code of Judicial Conduct.'[39]

44.    "An example earlier cited for another point involved the Commission's 2007 sanction of a justice of the peace for dismissing cases in which a particular police officer in the judge's precinct would testify on the basis that the judge doubted the police officer's credibility. The Commission concluded that, instead of dismissing the cases, the judge should have recused himself from such cases, as the dismissals 'raised legitimate questions as to the judge's impartiality' in those cases.[40]

45.    "Also cited as an example for an earlier point was a sanction involving Canon 2B, in which a district court judge had a long-time relationship with the lawyer of a step-father in a child custody matter. The Commission concluded that the judge's relationship 'influenced his conduct and judgment . . . causing litigants and their counsel to form legitimate concerns that the judge would not be fair, neutral, and impartial' in the proceedings, in contravention of Canon 2B.'[41]

46.    "Finally, as observed earlier, several private sanctions, which do not name the judge, reflect similar concerns. In one, the judge failed to comply with procedures requiring full disclosure of a relationship that might warrant his recusal, which 'effectively prevented the litigants from making an informed decision about whether the judge was capable of fairly and impartially deciding a custody case,' in violation of Canons 2A, 2B, and 3B(1).[42]

---

[39]CJC No.01 –0442 –DI, Public Warning of Raymond Angelini (12/17/01).

[40]CJC No. 07-0251-JP, Public Admonition of Bob Wall (12/13/07).

[41]CJC Nos. 03-1016-DI and 04-1119-DI, Public Warning of Britt Plunk (05/30/06).

[42]Private Warning of a County Court at Law Judge (08/15/08).

47.    "Significantly, in spite of courts having said that a violation of a canon in the Texas Code does not by itself constitute reversible error,[43] and even though specific guidelines for recusal and disqualification have not appeared in the Texas Code for many years, appellate opinions still reflect consideration of judicial canons in review of denied recusal motions.

48.    "My understanding is that Judge Jones made disparaging remarks about defendants in cases she had decided.  Given the existence of US Code Canon 3D and its mandatory requirement that a judge 'shall disqualify' under certain circumstances–the only 'shall' provision in the US Code–whether she presided in contravention of the requirement in those cases should be determined.  The Texas Commission has demonstrated it would explore a complaint with that basis, due to the prohibition on bias and prejudice and the requirement of impartiality in the current Texas Code. On a determination that she should not have presided over those cases, a sanction would be consistent with the Commission's past determinations.

### *Canon 4 in the Texas Code versus the US Code*

49.    "Following is a comparison of relevant portions of Canon 4 in the Texas Code with Canon 4 in the US Code:

| Texas Code | US Code |
|---|---|
| **Canon 4. Conducting the Judge's Extrajudicial Activities to Minimize the Risk of Conflict with Judicial Obligations** | **Canon 4. A Judge May Engage in ·Extrajudicial Activities That Are Consistent with the Obligations of Judicial Office** |
| **A. Extra-judicial duties in general.**  A judge shall conduct all of the judge's extra-judicial activities so that they do not:<br>        (1)  cast reasonable doubt on the judge's capacity to act impartially as a judge; or<br>        (2)  interfere with the proper performance of judicial duties. | A judge may engage in extrajudicial activities, including law-related pursuits and civic, charitable, educational, religious, social, financial, fiduciary, and governmental activities, and may speak, write, lecture, and teach on both law-related and nonlegal subjects. However, a judge should not participate in extrajudicial activities that detract from the |
| **B. Activities to improve the Law.** A judge may: | dignity of the judge's office, interfere with the performance of the judge's official duties, reflect adversely on the judge's |

---

[43]*Brown v, State*, 2007 WL2012902, at *3 (Tex. App.–Corpus Christi 2007, no pet. (mem.) (not designated for publication).

23

| (1)   speak, write, lecture, teach and participate in extra-judicial activities concerning the law, the legal system, the administration of justice and non-legal subjects, subject to the requirements of this Code; and. . . . | impartiality, lead to frequent disqualification, or violate the limitations set forth below. |
|---|---|

### *The Role of Canon 4 in Texas Sanctions*

50.      "In my opinion, Texas Code Canon 4B only *permits* (with 'may') instead of *encourages* (with 'should') a judge to speak, write, lecture, etc., because doing so is fraught with potential violation of Canon 4A, along with other provisions in the Code. This slippery slope is also why, in my opinion, so many advisory opinions have been sought and issued as to exactly what a judge 'shall' not do under Canon 4A.[44]

51.      "Two particular events concerning the Texas Code are relevant to the alleged comments by Judge Jones as they might be viewed under the US Code.  One involves the only amendments made to the Texas Code in the past 10-15 years.  Because Texas elects its judges, Canon 5 restrictions on political activity are relevant.  Judicial candidates in other states have wrestled with comparable restrictions, and a Minnesota candidate succeeded in prompting a U.S. Supreme Court decision calling for modifications of some restrictions on judicial campaign speech.[45]  In spite of their apparent lack of need for change under *White*, the Texas Supreme Court made some modification to the comparable Texas Code Canons in acknowledgment of *White*.  In so doing, the court provided the first comment to the Texas Code, to Canon 5:

> A statement made during a campaign for judicial office, whether or not prohibited by this Canon, may cause a judge's impartiality to be reasonably questioned in the context of a particular case and may result in recusal.[46]

This comment appears consistent with an excerpt from U.S. Code Advisory Opinion No. 66 issued in June 2009:

> a showing of bias warranting recusal generally must be based on extra-judicial

---

[44]Robert P. Schuwerk & Lillian B. Hardwick, *Handbook of Texas Lawyer & Judicial Ethics* §§ 28:4, 28:5, 28:6, pp. 275-79, 286-92, 295-306  (Thomson-West 2013).

[45]*Republican Party of Minnesota v. White*, 536 U.S. 765, 122 S.Ct. 2528, 153 L. Ed.2d 694 (2002).

[46]Approval of Amendments to the Texas Code of Judicial Conduct, Misc. Docket No. 02-9167 (Tex. Aug. 22, 2002).

24

conduct and not conduct that arises in a judicial context unless the conduct displays a deep-seated favoritism or antagonism that would make fair judgment impossible. *See Liteky v. United States*, 510 U.S. 540, 555 (1994). A judge still needs to consider, however, whether the judge does hold a bias or prejudice *Guide to Judiciary Policy*, Vol. 2B, Ch. 2 Page 66-2 that would require recusal and, additionally, whether any circumstances would create a reasonable question of the judge's impartiality.

52.    "While, in my opinion, what the comment suggested had long been the case regarding any extrajudicial words or behavior, the comment clarified (if not suggested to future litigants in the court of the successful candidate) the potential outcome for words spoken in judicial campaigning. Since the emergence of the comment, judges have been recused following the filing of motions superficially based on prior campaign activities or contributions by the judge. In reality, the motions have presumed bias or prejudice based on the judge's current or past association with a particular group, independent of any specific opinion the judge had expressed.[47]

53.    "The second relevant event concerned judicial membership in two nonprofit organizations for the benefit of children, *absent any comments made by the judges*. An advisory opinion directed that judges could not serve on the judicial council for the Children's Assessment Center, the purpose of the council being the opening of a dialogue regarding mutual concerns about the sensitivity of child sex abuse cases. The basis of the opinion was that '[m]embership on this council would require frequent

---

[47]For example, in late 2005, Texas Republican Congressman Tom DeLay was indicted for conspiracy to violate the Texas Election Code, along with two other Republicans involved in Texas politics. Represented by Houston lawyer Dick DeGuerin, DeLay filed a motion to recuse the judge to whose court the matter was assigned, Judge Robert Perkins, based in part on political contributions. Brief in Support of DeLay's Mot. to Recuse at 1–2 (Oct. 24, 2005), State v. DeLay, No. D1–DC–05–900725 (D. Tex. 2005); DeLay's Mot. to Recuse the Honorable Robert Perkins (Oct. 20, 2005). The brief also focused on Judge Perkins having contributed to a particular organization that "takes extreme political positions and has directly targeted and attacked Congressman Delay in both television and print advertisements." Brief in Support of DeLay's Mot. to Recuse at 6. After a four-hour hearing, the judge assigned to hear the recusal motion granted it without explanation. Hearing Tr. at 157 (Nov. 1, 2005). Another recusal involved a judge's contributions to an organization (which was the defendant), which the recusal motion implied indicated his pre-trial support for that organization. After holding onto the motion for three days and explaining that he had previously disclosed all contributions,, the judge self-recused. *Doe v. Catholic Diocese of El Paso*, 362 S.W.3d 707 (Tex. App.--El Paso 2011, rule 53.7(f) motion granted (Dec 16, 2011) ); Plaintiff's Second Motion to Recuse and Motion for Expedited Hearing, No. 2006-2747, County Ct. at Law No. 3, El Paso County, Tex., Apr. 21, 2009, at 2.

25

recusal in cases in which the members of the organization were testifying."[48]  This is the same guidance that appears in US Code Canon 4: 'a judge should not participate in extrajudicial activities that detract from the dignity of the judge's office, interfere with the performance of the judge's official duties, reflect adversely on the judge's impartiality, [or] lead to frequent disqualification . . .' After the advisory opinion appeared, several Houston-area judges stepped down from their position with the CAC.[49]

54.    "A similar issue arose a few years later with the Texas Court Appointed Special Advocates ('CASA').  A parents' rights group had filed a complaint against a judge for membership—'extrajudicial service'—on the CASA board.  In response, the Commission made one of its rare public statements, after those who had filed the complaint had made it public, in part quoted below:

> In general, judges are required to avoid impropriety and the appearance of impropriety in all of the judge's activities. Canon 2. In order to promote public confidence in the judiciary, it is not enough that a judge be fair and impartial when deciding cases, he must also *appear* to be fair and impartial. Canon 4A(1) of the Texas Code of Judicial Conduct addresses the appearance of impropriety and partiality by stating that "a judge shall conduct all of the judge's extra-judicial activities so that they do not cast reasonable doubt on the judge's capacity to act impartially as a judge." While judges are encouraged to engage in civic and charitable activities, their participation is restricted to activities that do not reflect adversely upon the judge's impartiality or interfere with the performance of judicial duties. Canon 4C.  . . .
>
> In order to avoid the appearance of impropriety and partiality, judges should be cautious about serving an organization, even one as noble and praiseworthy as CASA, when such an organization advocates a particular legal philosophy or position.  . . .  While it is true that judges who serve any sort of advocacy group run the risk that the public will perceive that the judge supports the policy positions of that organization, judges who serve an organization like CASA would likewise endanger the public perception of the judge's impartiality for *it would not be unreasonable for the public to believe that a judge who is affiliated with CASA would endorse and be partial to CASA and the CASA volunteer's recommendations.*  . . .
>
> . . . The Commission would note that the appearance of impropriety in some cases could be cured with a full disclosure of the judge's affiliation with

---

[48]Op. No. 270 (2001).

[49]*Opinion Advises Judges to Step Down from Advocacy Committees*, Abilene Reporter–News, Feb. 23, 2001; http://www.reporternews.com/2001/texas/group0223. html.

26

CASA, on the record, followed with the informed consent of the parties and their counsel to allow the judge to continue to hear and decide the case. Naturally, *if a judge were asked to recuse from cases too frequently because of the relationship with CASA, that judge should step down from his or her membership on the board.* Canon 3B(1).[50]

Reportedly, five of seven judges on the CASA board resigned after the Commission made its public statement.[51]

55.    "In my opinion, based on my research of judicial discipline and recusal and disqualification in Texas, extrajudicial comments of a judge--like those made by Judge Jones--are more suggestive of bias or prejudice and more supportive of a reasonable question as to the judge's impartiality than group memberships. Consequently, sanctioning of Judge Jones for violation of Canon 4A would be consistent with the Commission's prior interpretation and application of that provision."

        Further Affiant sayeth not.

Lillian B. Hardwick

SWORN TO AND SUBSCRIBED before me, the undersigned authority, on this 3rd day of ___June___, 2013,

NOTARY PUBLIC in and for the
STATE OF TEXAS

MARY KATHRYN CRUSER
Notary Public
STATE OF TEXAS
My Comm. Exp. April 5, 2017

---

[50]Public Statement No. PS-2006-01, available at http://www.scjc.state.tex.us/PS-2006-1.PDF ) (emphases added).

[51]Mary Alice Robbins, *Five Judges Resign from CASA Board, Two Remain,* Tex. Law., Dec. 5, 2006, available at http://www.law.com/jsp/tx/PubArticleFriendlyTX.jsp?id=1133617909956.

27

LILLIAN B. HARDWICK
4013 DOMINION COVE
AUSTIN, TEXAS 78759
512/372-3600
lbhardwick@sbcglobal.net

## Education

J.D., University of Houston Law School (1989)

33 hours towards M.S. in Accountancy, University of Houston (1981-1983)

Ph. D., English, University of Texas (1978)

B.A., Political Science, University of Houston (1969) (obtained B.A. hours in 27 months of attendance, while a member of the debate team; major was initially speech)

W.H. Adamson High School (1966) (completed a 4-year high school in 3 years while a member of the debate team)

## Memberships

Texas Disciplinary Rules of Professional Conduct drafting committee, 02/01 to present; co-chair, 2006-2007; chair, 2007-2008, 2008-2009, 2009-2010

College of the State Bar of Texas, 01/05 to present

Member of Scribes, The American Society of Writers on Legal Subjects, 04/99 to 12/08

## Awards

State Bar Presidential Certificate of Merit, 2010, based on Committee service regarding the Texas Disciplinary Rules of Professional Conduct in 2009-2010

State Bar Presidential Certificate of Merit, 2007, based on Committee service regarding the Texas Disciplinary Rules of Professional Conduct in 2006-2007

## Publications

"Rationale for Suggested Changes to Texas Rule 1.04 (Fees)," *The Advocate; State Bar Litigation Section Report*, 55 Summer 2011, at 66.

"A Supreme Collaboration,"*Texas Bar Journal*, Dec. 2010 [regarding proposed Texas Disciplinary Rules of Professional Conduct].

---

*Handbook of Texas Lawyer and Judicial Ethics*, book published by West Group yearly, 2002-2013; co-authored with Robert P. Schuwerk; yearly supplementation; parts personally researched and prepared: Texas Rules of Disciplinary Procedure, Texas Code of Judicial Conduct, Proceedings before the Texas Commission on Judicial Conduct, Removal of Judges from Particular Cases in Texas State Court

Exhibit A

"Two Steps Forward: Judicial Recusal after *Kniatt*," *Voice for the Defense*, Sept. 2008,
at 27-31.

"Classical Persuasion through Grammar and Punctuation," *Journal of Ass'n of Legal Writing
Directors*, Fall 2006

"Risk Avoidance & the Disciplinary Rules," co-authored with Bob Bennett, *San Antonio Lawyer*,
Sept.-Oct. 2006

"Proceedings before the Commission on Judicial Conduct," *Texas Bar Journal*, Feb. 2003

"The SEC's Plain English Rule," *Texas Bar Journal*, Dec. 1998

"Juror Misconduct or Juror Accountability?" 22 *Litigation* 1996

"Juror Misconduct," 17 *Litigation* 1991

*Juror Misconduct*, book published by Clark Boardman in late 1988; co-authored with B. Lee
Ware, then partner at Vinson & Elkins; supplementation in 1989 and 1990

Ghost-author of a book on trial psychology, published in early 1988, including chapters on
analysis of argument and speaking styles, which involved practical application of the research
and conclusions reached in my dissertation

"If You're So Smart, Why Aren't You in Law School?" *Legal Assistant Today*, May/June 1987

"A Basic Format for Deposition Summaries," *Legal Assistant Today*, November/December 1986

"Systemizing Cite-Checking," *Legal Assistant Today*, Spring 1986

"Wanted: The Power Paralegal," *Texas Bar Journal*, June 1985

"Identification and Adaptation in Satan's Speeches in *Paradise Regained*' (1979) (Ph. D.
Dissertation, University of Texas (Austin)); committee member: Robert Jeffrey, Chair (later
dean), Dep't of Speech Communication; analysis of persuasive techniques in Satan's speeches
and naming of new form of persuasion when speaker is dealing with hostile, reluctant, or wary
audience

### Professional Experience

Expert consultation and expert witness engagements regarding attorney ethical responsibilities,
Code of Judicial Conduct, proceedings before the Commission on Judicial Conduct, and recusal
and disqualification of judges in Texas state court, spring 2003 to present

Of counsel, 09/96 - summer 2004, with Caddell & Chapman; *Branch Davidians* trial
preparation; Ford/Firestone mass action litigation regarding accidents occurring in Venezuela
and Mexico .

Caddell & Conwell (now Caddell & Chapman) (plaintiff's work), 09/93 - 09/96; product liability
(polybutylene mass action), medical malpractice, business litigation
Outside counsel (primarily defense work), with Ware Snow Fogel & Jackson and Vinson &

Elkins, 11/89 - 09/93; product liability (part of national defense team for Remington Arms Company, firearms manufacturer)

Legal assistant, self-employed, Litigation Support Services, Inc., Houston, 03/83 - 11/89; product liability, toxic tort (Brio litigation)

Instructor, Legal Writing, University of Houston Downtown College, 09/83 - 11/83 (concurrent with legal assistant employment)

Legal assistant, David P. Seikel, P.C., Houston (defense, business litigation), 07/82 - 02/83

Legal assistant, Morris, Campbell & Seikel (p/k/a Morris & Campbell), Houston (defense, business litigation), 05/79 - 06/82

Instructor, English Department, University of Houston Downtown College, 01/81 - 05/81 (concurrent with Morris, Campbell & Seikel employment)

Legal assistant, Vinson & Elkins, Houston, 01/79 - 04/79

Instructor, English Department, University of Texas, Austin, 05/78 - 12/78; Assistant Instructor, English Department, University of Texas, Austin, 1976 - 1978; Teaching Assistant I & II, English Department, University of Texas, Austin, 1974-1976 (these positions carried full teaching duties); taught as many as 5 sections of 25 students each, per semester, in undergraduate expository writing course

### Legal Seminars, Other Instruction

"Research & Writing," Fall Quarter 2012, Strayer University, Austin, Texas

"English Composition," Summer Quarter 2012, Strayer University, Austin, Texas

"Law, Ethics & Corporate Governance" (independent study graduate course) Summer Quarter 2012, Strayer, Austin, Texas

"English Composition," Spring Quarter 2012, Strayer University (online)

"Business Law," Winter Quarter 2012, Strayer University, Austin, Texas

"Texas Court Judicial Recusal and Disqualification: New Texas Rules of Civil Procedure 18a and 18b," CLEonline.com, winter 2011-present

"You've Been Grieved: Why You May Need An Expert," CLEonline.com, spring 2011-present

"Ethical Issues for Immigration Lawyers," American Immigration Lawyers Association--Austin, Austin, 03/24/2011

"Business Law," Spring Quarter 2011, Strayer University, Austin, Texas

"The 2010 Proposed Texas Disciplinary Rules of Professional Conduct: What's New & Why," CLE delivered to Travis County Women's Lawyers Association, Austin, 10/20/10

"The Proposed New Disciplinary Rules," panelist in panel discussion, State Bar Annual Meeting, 06/11/10

Presentation to the State Bar Board of Directors, Process Underlying the Proposed New Disciplinary Rules, State Bar Annual Meeting, 06/09/10

"The 2009 Proposed Texas Disciplinary Rules of Professional Conduct: How They Differ from the Model Rules & Why," Professional Responsibility classes of Dean Emeritus Jim Alfini, South Texas College of Law, 03/31/10

"The 2009 Proposed Texas Disciplinary Rules of Professional Conduct: How We Got There," *St. Mary's Law Journal* Ninth Annual Symposium on Legal Malpractice and Professional Responsibility, 02/19/10

"Opportunities and Pitfalls for Lawyers on the Internet under Pending Disciplinary Rules," CLE delivered to Hays County Bar Association, 12/11/2009

"Texas Court Judicial Recusal and Disqualification," State Bar of Texas webcast, with Hon. Anne Ashby and Bob Bennett, 12/09/2009

"Opportunities and Pitfalls for Lawyers on the Internet," CLE delivered to San Antonio Trial Lawyers Association, 08/20/2009

"Opportunities and Pitfalls for Lawyers on the Internet," CLE delivered to Pasadena-Baytown Bar Association, 06/11/2009

"Opportunities and Pitfalls for Lawyers on the Internet," CLE delivered to Fort Bend County Bar Association, 04/30/2009

"Opportunities and Pitfalls for Lawyers on the Internet," CLE delivered to Harris County Municipal Justice Bar Association, 03/13/2009

"Opportunities and Pitfalls for Lawyers on the Internet," CLE delivered to Houston Trial Lawyers Association, 01/15/2009

"Attorney Breach of Fiduciary Duty: Why You May Need An Expert," CLEonline.com, 10/2008-11/2012

"The Attorney Disciplinary Process & Standards in Texas: Changed & Changing," Parts I, II & III, CLEonline.com, 03/2007-fall 2011

"Judicial Recusal & Disqualification: 8 Simple Rules for Removing Your State Court Judge," CLEonline.com, 02/2007-fall 2011

Seminars delivered to various law firms: "Ethics & Compliance Program for Law Firms"

"8 Simple Rules for Removing Your State Court Judge," given as seminar to Caddell & Chapman, 08/17/2005

"An Analytical Look at the New Rules of Grievance Procedure," *Grievance Procedures in Texas*, Lorman Education, 11/30/04, Houston, Texas

"Judiciary and the Media," West audio CLE, Spring 2003

Professional Responsibility, 01/03, University of Houston Law Center (first month of course regularly taught by Robert Schuwerk)

"Municipal Courts, Ethics & The Media," 08/21/02, Dallas, Texas

"Municipal Courts, Ethics & The Media," 08/27/02, Houston, Texas

# EXHIBIT B

Case 2:14-cv-00315-WTL-WGH   Document 1-7   Filed 10/16/14   Page 141 of 158 PageID #: 671

Hanging Concentrates the Mind Crisis Magazine   Case: 13-70025   Document: 005112543845   Page: 2   Date Filed: 02/25/2014   Page 4 of 3

FEBRUARY 8, 2013

# Hanging Concentrates the Mind

*by Rev. George W. Rutler*



**Capital punishment does not inspire roaring humor** in healthy minds, so wit on the subject tends to be sardonic.  Two of the most famous examples, of course, are: "In this country it is wise to kill an admiral from time to time to encourage the others,"  and "Depend upon it, sir, when a man knows he is to be hanged in a fortnight, it concentrates his mind wonderfully."

The first, "pour encourager les autres,"  is in "Candide" where Voltaire alludes to the death by firing squad of Admiral John Byng in 1757 for having let Mincorca fall to the French.  The second was Samuel Johnson's response to the hanging of an Anglican clergyman and royal chaplain William Dodd for a loan scam.  Byng's death was the last instance of shooting an officer for incompetence, while Dodd's was the last hanging at Tyburn for forgery. Dodd's unsuccessful appeal for clemency was ghostwritten by Dr. Johnson.

It is not my concern here to take a position on capital punishment which the Catechism (# 2266) acknowledges is not an intrinsic evil and is rightly part of the state's authority. This is nuanced by the same Catechism's proposition that its use  today would be "rare, if not practically non-existent. (#2267)"  As a highly unusual insertion of a prudential opinion in a catechetical formula, this would seem to be more mercurial in application than the doctrine of the legitimacy of the death penalty.  What is oddly lacking, however, is reference to capital punishment as medicinal as well as punitive. Tradition has understood that the spiritual aspect of the death penalty is to "concentrate the mind" so that the victim dies in a state of grace.  Simply put, the less I believe heartily in eternal life, the more disheartened I shall be about entering "a far, far better rest that I go to than I have ever known."

That finale to "A Tale of Two Cities" appeared thirteen years after "Pictures from Italy" in which Dickens described an execution he watched in Rome during the pontificate of Gregory XVI with its chaotic judicial system: "It was an ugly, filthy, careless, sickening spectacle, meaning nothing but butchery," But Dickens noted the presence of monks accompanied by trumpets  holding a crucifix draped in black before the twenty-six year old highwayman who had killed a Bavarian countess making a pilgrimage to Rome.   The

execution was delayed until murderer's wife was brought to him and he at last received absolution. Back in London three years after writing that account, he witnessed in Southwark the hanging of Fredrick and Marie Manning, the last husband and wife jointly to be executed in England. His reaction was similar to that in Rome save that he thought the crowd of 30,000 more unruly and there was no mention of a religious tone.

In Rome in 1817, Pius VII reigning, Lord Byron saw three robbers beheaded in the Piazza del Popolo, and he also noted the priests attending those about to die, with banners and prayers in procession. The swift fall of the guillotine was preferable to the "vulgar and ungentlemanly" gallows in England. Although Dr. Joseph Ignace Guillotin had promoted the use of the "Guillotine," first called the "Louisson," for its relative painlessness, a precursor was in use in Edinburgh in the mid sixteenth century. Regarded as a humane improvement, it was common in many European countries and was used in the Papal States for 369 executions from 1814 to 1870. Giovanni Battista Bugatti was the official papal executioner from 1796 to 1865, having used an axe before the French introduced the guillotine during their occupation of Rome. Under papal rule, there were three normal sites for executions: the Piazza di Ponte Angelo, Piazzo del Popolo, and Via del Cerchi. Shooting was a common form of punishment in the brief Austrian receivership of Rome under the Hapsburg Queen Maria Carolina. Thus we have the firing squad scene in the last act of "Tosca." While the harshest punishment, hanging and drawing and quartering, is often thought of as peculiar to England, it was more common in the Papal States. The last to be killed that way in England were some Jacobite officers in 1745. The sentence was imposed on several Chartist rioters in 1839 but they were given the option of transportation to Australia, which they accepted. When the pope regained possession of the Papal States in 1814, hanging, drawing and quartering was imposed eleven times until it ended in 1817. For particularly heinous crimes, crushing the head with a mallet, the "mazzatello" continued until 1870.

The nickname of the papal executioner Bugatti was Mastro Titta, a slang for Master of Justice (Maestro di Giustizia.) He wore a red cloak and showed ceremonial deference to his victims. Pope Pius IX let him retire at the age of 85 with a considerable pension. This pope, beatified by John Paul II in 2000, was unflinching in the importance with which he invested public executions as an "encouragement" to others. On June 12, 1855 a deranged hat maker and political subversive named Anotonio De Felici chased the Cardinal Secretary of State with a large fork. Cardinal Antonelli escaped unscathed and appealed to the Pope to commute the sentence from beheading to life imprisonment on the grounds of the man's mental imbalance but was refused. Mastro Titta had been retired four years and replaced by his apprentice Antonio Balducci when the final executions in Rome took place on November 24, 1868. Giuseppe Monti and Gaetano Tognetti had been convicted to killing twenty-five Zouave soldiers in the Borgo. The executions ceased, not out of any policy of penal reform, but because of the loss of the Papal States. Agatino Bellomo was the last to be executed in the Papal States, in Palestrina, on July 9, 1870. When Blessed Pius IX was asked to grant a stay of execution for those condemned in 1868, the Pope firmly replied, "I cannot, and I do not want to." He certainly could have by law, which he embodied as state sovereign with "plenitudo potestatis," but by enigmatically saying that he could not, he probably was declaring this a high matter of conscience in the interest of Augustinian tranquility of order as explained by such as Bellarmine, Liguori, Thomas More and Suarez.

When a papal butler was recently arrested, many were surprised that the Vatican City even had a jail. The Lateran treaty of 1929 provided for the execution of anyone attempting to assassinate the Pope within the Vatican. In 1969 capital punishment was quietly removed from the "fundamental law" of the Vatican, without comment and only in Latin, and did not come to public attention until 1971.

The grandson of St. Elizabeth Anne Seton, Archbishop Robert Seton, long-lived but less loved, wrote that during the course of a holiday in France as a boy, the ceremonious spectacle of a man being beheaded inspired him greatly to think of the dignity of life. He was especially close to Leo XIII and St. Pius X who in 1905 reiterated the Roman Catechism of St. Pius V with reference to capital punishment: "Far from being guilty of breaking this commandment (to do no murder) such an execution of justice is precisely an

Case 2:14-cv-00315-WTL-WGH   Document 1-7   Filed 10/16/14   Page 143 of 158 PageID #: 673

Case: 13-00215   Document: 005412543845   Page: 4   Date Filed: 02/25/2014

act of obedience to it. For the purpose of the law is to protect and foster human life."

The medicinal reason for inflicting punishment, goes beyond preventing the criminal from repeating his crime and protecting society, to encouraging the guilty to repent and die in a state of grace. The vindictive reasoning also has this interest in mind: for by expiating the disorder caused by the crime, the moral debt of the guilty is lessened. In the early years of the nineteenth century, St. Vincent Pallotti frequently assisted the condemned to the scaffold, as St. Catherine had done in Siena. He was edified by the many holy deaths he saw, while helping the Archfraternity of San Giovanni, under the patronage of his friend the English Cardinal Acton. Headquartered in the Church of San Giovanni Decollato (St. John the Beheaded), their rule was to urge the condemned to a good confession, followed by an exhortation and Holy Communion followed by the grant of a plenary indulgence. The whole population of Rome was instructed to fast and pray for the intention of the criminal's soul.

All other considerations of the machinery of death aside, this paramount regard for the human soul is quaint only if belief in eternal life is vague. Pope Pius XII was so eager for vindictive penalties that he lent the help of a Jesuit archivist to assist the prosecutors at the Nuremberg trials. He personally told the chief United States prosecutor, Robert Jackson: "Not only do we approve of the trial, but we desire that the guilty be punished as quickly as possible." This was not in spite of, but issuing from, his understanding of the dual role of healing and vindication. All this should not be remaindered as historical curiosities, for, as Pope Pius XII said, "the coercive power of legitimate human authority" has its roots in "the sources of revelation and traditional doctrine" and so it must not be said "that these sources only contain ideas which are conditioned by historical circumstances" for they have "a general and abiding validity." (Acta Apostolica Sedis, 1955, pp.81-82).

*Editor's note: The image above is a painting by Richard Bridgens entitled "An Execution in Rome for Murder, 1820."*

The views expressed by the authors and editorial staff are not necessarily the views of Sophia Institute, Holy Spirit College, or the Thomas More College of Liberal Arts.

 **By Rev. George W. Rutler**

*The Rev. George W. Rutler is the new pastor of St. Michael's church in New York City. His latest book is Principalities and Powers: Spiritual Combat 1942-1943 (South Bend, IN: St. Augustine's Press.)*

## Subscribe to *Crisis*

**(It's Free)**

Enter Email Address

- ⊙ Daily Headlines     [ Subscribe ]
- ○ Best of the Week

Go to *Crisis* homepage

http://www.crisismagazine.com/2013/hanging-concentrates-the-mind                2/21/2014

# EXHIBIT C

Supreme Court of the United States
Washington, D. C. 20543

CHAMBERS OF
THE CHIEF JUSTICE

June 12, 2013

The Honorable Merrick B. Garland
Chief Circuit Judge
United States Court of Appeals
 for the District of Columbia Circuit
William B. Bryant U. S. Courthouse Annex
333 Constitution Avenue, N.W., Room 5927
Washington, D. C.  20001

Dear Chief Judge Garland:

On June 7, 2013, I received a request from the Chief Circuit Judge of the Fifth Circuit, under Rule 26 of the Rules for Judicial-Conduct and Judicial-Disability Proceedings, to transfer a judicial conduct proceeding captioned *In Re Complaint of Judicial Misconduct*, No. 05-13-90099, to the judicial council of another federal judicial circuit.  In response, I have selected the Judicial Council of the District of Columbia Circuit to accept the transfer and to exercise the powers of a judicial council with respect to the identified complaint and any pending or new complaints relating to the same subject matter.

Sincerely,

145 of 158

cc:    The Honorable Carl E. Stewart
       Chief Circuit Judge, United States Court of Appeals for the Fifth Circuit
      The Honorable Thomas F. Hogan
       Director, Administrative Office of the United States Courts
      The Honorable Anthony J. Scirica
       Chair, Judicial Conference Committee on Judicial Conduct and Disability

Case: 13-70025     Document: 00512543847     Page: 1     Date Filed: 02/25/2014

# EXHIBIT D

Federal Judge in Texas Is Accused of Racial Bias - NYTimes.com    Page: 2    Date Filed: 02/25/2014    Page 4 of 2

**The New York Times**

June 4, 2013

# Complaint Accuses U.S. Judge in Texas of Racial Bias

**By ETHAN BRONNER**

A group of civil rights organizations and legal ethicists filed a complaint of misconduct against a senior federal judge on Tuesday, alleging that recent remarks of hers showed bias against minority groups and an inappropriate religious belief in the death penalty.

The complaint, against Judge Edith H. Jones of Houston, who sits on the United States Court of Appeals for the Fifth Circuit, asserts that at a speech at the University of Pennsylvania Law School in February she said that blacks and Hispanics were more prone than others to commit violent crimes and that a death sentence was a service to defendants because it allowed them to make peace with God.

The complaint is signed by representatives of, among others, the League of United Latin American Citizens, the Texas Civil Rights Project and the Mexican Capital Legal Assistance Program and cites a number of people who attended the lecture.

A spokesman for the law school, Steven Barnes, said that the Federalist Society, the conservative group that hosted the speech, did not record it and that there appeared to be no transcript.

A request for comment left with Judge Jones's chambers in Houston was not immediately answered.

According to the complaint, Judge Jones, 64, who was nominated to the bench by President Ronald Reagan, and who until recently was the chief judge of the Fifth Circuit and mentioned during Republican administrations as a possible Supreme Court nominee, said that "racial groups like African-Americans and Hispanics are predisposed to crime."

The complaint says such statements violated the judicial code's requirement that a judge be impartial and avoid damaging public confidence in the judiciary.

One of the affidavits accompanying the complaint is from Marc Bookman, a veteran death penalty lawyer in Pennsylvania, who attended the lecture. He quoted Judge Jones as saying, "Sadly, some groups seem to commit more heinous crimes than others." When asked to

http://www.nytimes.com/2013/06/05/us/federal-judge-in-texas-is-accused-of-racial-bias.ht...    2/21/2014

elaborate, Judge Jones "noted there was no arguing that 'blacks' and 'Hispanics' far outnumber 'Anglos' on death row and repeated that 'sadly' people from these racial groups do get involved in more violent crime," the affidavit said.

Mr. Bookman said in a telephone interview that when the judge was questioned by angry students, "She defensively backed off what she had said or, at least, what the audience had interpreted it to mean."

Another affidavit is from James M. McCormack, former chief disciplinary counsel for the Texas bar, who said that based on the complaint, "it is my opinion that Judge Jones violated the ethical standards applicable to federal judges under the Code of Conduct for United States judges."

Judge Jones is alleged to have said that the defenses often offered in capital cases, including mental retardation and systemic racism, were "red herrings." She also said, according to the witnesses, that Mexicans would prefer to be on death row in the United States rather than in prison in Mexico.

Charles W. Wolfram, one of the country's experts in legal ethics who is retired from Cornell Law School, said Judge Jones's alleged statements were a cause of great concern.

"If I were a parent of a black with borderline IQ accused in a capital case, would I be distressed in knowing that Judge Jones was sitting on my case?" he asked in a telephone interview. "Yes, I would. She seems to have made up her mind on these issues. She is slanted. That is the whole point of the impartiality requirement."

Stephen Gillers, a legal ethics scholar at New York University, said that if Judge Jones really did say that death penalties serve the condemned by forcing them to face God, that was troubling.

"If a judge were to say that during sentencing, that sentence would be vacated," he said. "It suggests that she believes she is helping the accused by giving a death sentence. That is totally inappropriate." He said the central question concerning her alleged statements about race and crime depended heavily on tone and context.

The fate of the complaint now lies with the circuit's chief judge, Carl E. Stewart of Louisiana, the first black in the job. He could dismiss it, speak privately with Judge Jones or order an investigation and set up a committee of judges either in his circuit or another one. Most complaints against judges, many of which come from inmates, are dismissed.

# EXHIBIT E

# THE AUSTIN CHRONICLE

http://www.austinchronicle.com/daily/news/2013-06-04/judge-edith-jones-blacks-and-hispanics-more-violent/

# Judge Edith Jones: Blacks and Hispanics More Violent

BY JORDAN SMITH, JUNE 4, 2013, 1:50PM, NEWSDESK

A complaint filed today by several civil rights groups, including one funded entirely by the government of Mexico, alleges that federal Judge **Edith Jones** has violated her duty to be impartial and damaged the public's confidence in the judiciary, in statements she made in a public lecture – including that blacks and Hispanics are more violent.

Indeed, Jones also said that a **death sentence provides a public service** by allowing an inmate to "make peace with God."

Jones, who sits on the 5th U.S. Circuit Court of Appeals – based in New Orleans, its jurisdiction includes Texas – made numerous offensive and biased comments during a February lecture at the University of Pennsylvania School of Law, according to the complaint filed pursuant to the federal **Judicial Conduct and Disability Act**. The complaint, filed by the **Texas Civil Rights Project, Austin NAACP**, the **League of United Latin American Citizens** (LULAC), and the **Mexican Capital Legal Assistance Program** (among others) alleges that during her talk – billed as "Federal Death Penalty Review with Judge Edith Jones (5th Cir.)" – Jones violated a number of canons of the code of conduct for federal judges.

The lecture was not recorded, but witnesses recalled a number of Jones' controversial statements. The views she expressed included not only that minorities are responsible for more violent crime than are whites, but also that claims by death row inmates that racism or arbitrariness infected their prosecutions, or that they are actually innocent or even mentally retarded, are merely "red herrings," according to those who attended the lecture. She told the law students and other attendees that she thought the U.S. Supreme Court's ruling outlawing the death penalty for the mentally retarded did intellectually disabled individuals a disservice, and that to create such an exemption from execution was a "slippery slope," reads the complaint. "In describing … what Judge Jones said about these cases, I am not able to capture the complete outrage she expressed over the crimes or the disgust she evinced over the defense raised, particularly by the defendants who claimed to be mentally retarded," reads the declaration, filed with the complaint, of veteran Pennsylvania-based death penalty attorney **Marc Bookman**, who attended the lecture. "Judge Jones's disgust at how these defendants were 'using mental retardation' was very evident and very disconcerting," reads the complaint.

Further, Jones "denigrated" the system of justice in Mexico and said it was an "insult" when the U.S.

http://www.austinchronicle.com/daily/news/2013-06-04/judge-edith-jones-blacks-and-hisp...   2/21/2014

considered laws in other countries when looking at the death penalty – presumably including in Mexico, where capital punishment was outlawed in 2005. Jones also told the audience that "any Mexican National would rather be on death row in the United States than in a Mexican prison," reads the complaint, and indicated that the U.S. provides Mexican citizens more legal protections than does their own system of justice. Moreover, according to the complaint, Jones referred to her personal religious views as justification for the death penalty. A killer is "only likely to make peace with God and the victim's family in that moment when the killer faces imminent execution," she said – a proposition that she said she found evidence for in an article she and her husband found online called "Hanging Concentrates the Mind." (Apparently by Rev. George W. Rutler, in the Catholic magazine *Crisis*, Feb. 8, 2013.)

Moreover, according to the complaint, Jones asserted as fact the proposition that blacks and Hispanics are more likely to commit violent crimes. When asked to explain her comments, "she stated that there was 'no arguing' that 'Blacks and Hispanics' outnumber 'Anglos' on death row and 'sadly' it was a 'statistical fact' that people 'from these racial groups get involved in more violent crime,'" reads the complaint. As an example, she noted that it is a "fact" that "'a lot of Hispanic people [are] involved in drug trafficking' which itself 'involved a lot of violent crime.'" According to the complaint, when the lecture host abruptly ended the question-and-answer portion of the program Jones 'lost her composure.'"

Jones' comments about race and crime not only demonstrate an "utter disregard for the fundamental judicial standard of impartiality," but her comments also touch directly on an issue pending in the ongoing case of **Duane Buck**, a death row inmate who has been fighting to get a new sentencing hearing based on the fact that racially biased statements were allowed into testimony. In that case, a psychologist, **Walter Quijano**, testified that blacks, such as Buck, are more violent – and thus present an ongoing danger to society, whether inside or outside prison (a question jurors must consider when determining whether to deliver a death sentence). Indeed, Buck's case is one of six in which Quijano testified as such. When the comments in those cases came to light, in 2000, then-Texas Attorney General **John Cornyn** declared that the state would not stand in the way of new sentencing hearings in each of those cases. "The people of Texas want and deserve a system that affords the same fairness to everyone," Cornyn said in a June 2000 press release. "I will continue to do everything I can to assure Texans of our commitment to an equitable criminal justice system."

Buck's case was treated differently at the time because of its posture on appeal. The case is ongoing, and, ultimately, will make its way to the Fifth Circuit for review.

Indeed, according to the complaint, Jones made direct comments on several cases that have not yet made it all the way through the appeals process – cases on which she may judge, or has already sat in judgment, including the Texas death row cases of **Larry Swearingen** and **Elroy Chester**. Jones authored the January 2012 opinion denying relief to Chester, whose lawyers have argued he is too intellectually deficient to be legally executed; Chester is slated for execution June 12. In the case of Swearingen, sentenced to die for a murder that, his lawyers argue, biological evidence in the form of preserved tissue samples demonstrates he could not have committed because he was already in jail at

the time of the victim's death, Jones was part of the three-judge panel that concluded that Swearingen could have discovered this evidence years ago and that, nonetheless, if true it would not have persuaded jurors to acquit him of the crime. That opinion notwithstanding, Swearingen's execution was stayed by Texas' **Court of Criminal Appeals** and sent back to district court for a further vetting of the science; his execution date was again withdrawn, in February, in order to allow time for new DNA testing.

Jones, 64, was appointed to the Fifth Circuit in 1985 by President Ronald Reagan. The UT Law graduate is an opponent of abortion rights and a supporter of efforts to streamline appeals in death penalty cases. She was twice mentioned as a potential nominee to the U.S. Supreme Court – first during the presidency of George H.W. Bush (who chose David Souter to fill the spot in question), and in 2005, Jones' name resurfaced as a possible nominee of President George W. Bush.

Complaints such as the one against Jones, signed also by a selection of **nationally recognized legal ethicists**, are filed with the chief judge of the court of appeals in the circuit where the judge at issue sits – in this case, the complaint goes to **Carl Stewart**, the current chief judge of the Fifth Circuit. Upon review of the complaint, Stewart is tasked with determining whether it should be dismissed, whether to take corrective action, or whether to appoint a special committee to investigate the allegations. In this case, the filers are asking that the complaint be referred to another circuit for consideration – which, if granted, would remove the matter from Stewart and the Fifth Circuit.

More than a 1,000 judicial complaints were filed each year since 2009, with 1,404 filed in 2011 – the most recent year for which complete numbers are available. That same year more than 1,454 complaints were disposed of (including carry-over complaints from previous years), most – 777 – by dismissal. According to federal statistics, the majority of complaints were filed against federal district judges. Most of those were made in response to alleged "erroneous decisions, other misconduct, personal bias against the litigants or attorneys, or violations of other standards," according to a report by the Administrative Office of the United States Courts. Forty-percent of those complaints were filed by prison inmates. In all, just two dozen complaints received by circuit chief judges were resolved – including cases where corrective action was taken. At the end of the year, 912 cases were still pending; none of the 2011 complaints were referred to a special investigating committee for consideration. After a special committee has completed its investigation, the results are filed with the judicial council, a disciplinary arm of the federal courts. Of the complaints considered in 2011 by judicial council, 644 were concluded after the panel agreed with the chief judge's initial decision.

In a detailed affidavit, **James McCormack**, a legal ethicist, former general counsel and chief disciplinary counsel for the State Bar of Texas, writes that the content of Jones' speech violates a number of ethical provisions within the judicial code of conduct – including the duty to be impartial; to avoid comment on pending, or impending cases; to be respectful and "avoid comment or behavior that could be interpreted as harassment, prejudice or bias,"; and to avoid participating in "extrajudicial activities that detract from the dignity" of the judge's office or would "reflect adversely on the judge's impartiality." In sum, McCormack concluded that Jones has engaged in "cognizable misconduct," he wrote. "Her inflammatory remarks evince bias and prejudice and serve to lower public confidence in our

153 of 158

judiciary," reads the affidavit. "I view this episode as a very sad and unfortunate chapter in the history of our federal judiciary. Most federal judges strive mightily to act fairly and impartially and to strengthen, rather than erode, public confidence in our system of justice," he continued. "Judge Jones's conduct militates in the opposite direction. In my opinion, unless an appropriate disciplinary authority strongly disapproves of ... Jones's statements and properly addresses her flagrant misconduct, our judicial system – and our federal appellate courts in particular – will suffer the consequences of diminished public respect and confidence."

Copyright © 2014 Austin Chronicle Corporation. All rights reserved.

# EXHIBIT F

Page 1



3 of 14 DOCUMENTS

Copyright 2013 The Houston Chronicle Publishing Company
All Rights Reserved
The Houston Chronicle

June 6, 2013 Thursday
3 STAR EDITION

**SECTION:** A; Pg. 1

**LENGTH:** 1047 words

**HEADLINE:** COURTS;Federal judge accused of misconduct;

**BYLINE:** By Lise Olsen

**BODY:**

Houston-based 5th U.S. Circuit Court of Appeals Judge Edith Jones has been accused of making public statements that discriminate against Mexicans, blacks, Hispanics and the mentally disabled and other alleged misconduct in a formal judicial complaint filed by 13 attorneys representing a diverse group of civil rights, anti-death penalty and legal ethics groups.

In a Feb. 20 lecture on the death penalty to students at the University of Pennsylvania law school, Jones reportedly said "racial groups like African-Americans and Hispanics are predisposed to crime," and Mexican nationals would prefer U.S. death row to serving time in their homeland, where execution is banned, according to the complaint.

No copy of the full text of that speech has been made available, although the complaint includes sworn statements from people who say they were present.

Jones did not respond Wednesday to a request for a copy of her remarks or for comment. Under federal law, judges normally are barred from commenting publicly on any pending judicial misconduct matter.

Under court rules, all judicial disciplinary complaints in this region would be reviewed by 5th Circuit Chief Judge Carl E. Stewart, a 1994 appointee of President Bill Clinton who became the circuit's first African-American chief judge in October.

Quit as chief judge

Stewart succeeded Jones as the circuit's chief judge after she resigned three months before the end of her seven-year term "for various family reasons."

Jones, who was often mentioned as a possible candidate for the U.S. Supreme Court during her years as chief

Page 2

COURTS;Federal judge accused of misconduct; The Houston Chronicle June 6, 2013 Thursday

judge, was appointed to the federal bench by President Ronald Reagan in 1985 and has broken several glass ceilings in her storied legal and judicial career.

She's often made national news, lauded and awarded honors by ultra-conservatives and vilified by civil rights experts and feminists - in response to some of her particularly polemic and conservative rulings, particularly in death penalty and anti-discrimination cases.

But she has never previously been targeted in a publicly disclosed formal misconduct complaint.

Unless and until federal judicial disciplinary matters are made public by the judges who review them, all federal judicial misconduct complaints are kept secret.

A spokesman for the 5th Circuit Court of Appeals declined to confirm whether the complaint even existed, although details and documents were released by attorneys who filed it.

Austin-based attorney James C. Harrington, who signed the complaint on behalf of the Texas Civil Rights Project, said he's had many cases overseen by Jones over the years and called it "very risky" for him and other lawyers to take the unusual step of filing a formal complaint against such a powerful and iconic jurist.

"But it gets to the point where we have to take that risk because it involves the integrity of the judicial system," Harrington said. "If we really, as lawyers, believe the judiciary should be fair and impartial, then we need to speak out.

"It's one thing (for a judge) to be antagonistic to civil rights for political or judicial reasons, it's another thing to ... say they're going to execute someone to get them closer to God faster."

The faculty sponsor and a law student who serves as president of the University of Pennsylvania's Federalist Society, which hosted Jones, did not respond to phone calls Wednesday for comment about her remarks.

Remarks on execution

According to the complaint, which is based partly on sworn statements from those who heard Jones' remarks, the judge allegedly said the U.S. justice system provided a service to condemned defendants because they were likely to make peace with God only in the moments before execution.

University of Pittsburgh Law School Professor Arthur D. Hellman, a nationally recognized expert in federal judicial disciplinary matters, said the allegations raised in the misconduct complaint against Jones would likely prompt a full-scale review, given federal court rules and his knowledge of the history of the handling of similar judicial misconduct complaints over the last three decades.

"That this complaint will be taken seriously, I have absolutely no doubt," Hellman said.

The pending judicial misconduct complaint alleges that Jones also displayed a "lack of judicial temperament" and demonstrated extreme disrespect to fellow 5th Circuit Judge James L. Dennis during a recent oral argument, by slamming her hand on the bench and then screaming at him to shut up or leave the courtroom.

As chief judge, Jones presided over the handling of hundreds of judicial misconduct complaints against various judges, including a few complaints that involved abuse of power and even criminal behavior.

Jones personally oversaw a formal investigation by two panels that probed misconduct complaints that resulted in the impeachment of U.S. District Judges Samuel B. Kent and G. Thomas Porteous, two of only 14 federal judges ever impeached.

Kent, a former Galveston-based jurist, was recently released after serving a prison term related to perjury for lying

Page 3

COURTS;Federal judge accused of misconduct; The Houston Chronicle June 6, 2013 Thursday

to Jones and other 5th Circuit judges who investigated allegations that he allegedly assaulted at least two different federal court employees.

Porteous was impeached and removed by Congress for lying in his own bankruptcy case and for committing other criminal acts during his years as a New Orleans-based judge.

During the years that the Porteous and Kent cases were reviewed by Jones, Stewart served as a member of the Judicial Council that also reviewed both cases. Public court records show Stewart served on the council from 2005-2007 and again from 2011 to the present.

2nd complaint pending

The current complaint asks that Stewart transfer the proceeding against Jones to another circuit court for review since it involves Jones, who serves with Stewart on the circuit court, as well as her behavior toward another circuit judge.

Earlier this year, Harrington's group filed a separate public complaint that remains pending against another Houston-based federal judge, U.S. District Court Judge Lynn Hughes, focusing on comments Hughes has made about women.

Court officials declined to comment, although Harrington has not received notice of that complaint's dismissal, which would be normal court procedure.

lise.olsen@chron.com

GRAPHIC: Associated Press Judge Edith Jones likely faces a full-scale review, one legal expert said.

LOAD-DATE: June 6, 2013